1                UNITED STATES OF AMERICA
             EASTERN DISTRICT OF MISSOURI
2                  EASTERN DIVISION

3 MUSTAFA ABDULLAH,           )
                         )
4         Plaintiff,        )
                         )
5     vs.                 )   No. 4:14-CV-1436 CDP
                         )
6 COUNTY OF ST. LOUIS, MO,    )
et al.,                    )
7                          )
        Defendants.       )
8

9       TRANSCRIPT OF TEMPORARY RESTRAINING ORDER HEARING

10       BEFORE THE HONORABLE CATHERINE D. PERRY
            UNITED STATES DISTRICT JUDGE
11
                 August 18, 2014
12

13 APPEARANCES:

14 For Plaintiff:       Mr. Anthony E. Rothert
                   Mr. Grant R. Doty
15                    AMERICAN CIVIL LIBERTIES UNION OF
                   MISSOURI FOUNDATION
16                    454 Whittier Street
                   St. Louis, MO   63108
17
For Defendants:      Mr. Chris Koster
18                    MISSOURI ATTORNEY GENERAL'S OFFICE
                   207 W. High Street
19                    P.O. Box 899
                   Jefferson City, MO   65102
20
                   Mr. Robert H. Grant
21                    ST. LOUIS COUNTY COUNSELOR'S OFFICE
                   41 S. Central
22                    St. Louis, MO   63105

23 REPORTED BY:         SUSAN R. MORAN, RMR, FCRR
                   Official Court Reporter
24                    111 South 10th Street
                   St. Louis, MO   63102
25                    (314) 244-7983

1           (The following proceedings were held in open court

2    on August 18, 2014 at 4:54 p.m.:)

3           THE COURT:  All right.  We are here in the case of

4    Abdullah versus St. Louis County, et al., Case No.

5    4:14-CV-1436.  This case was filed this afternoon, and

6    there's a motion for a Temporary Retraining Order.

7           On behalf of the plaintiff?

8           MR. ROTHERT:  Anthony Rothert and Grant Doty on

9    behalf of the plaintiff.

10          THE COURT:  Okay.  Mr. Rothert and Mr. Doty, okay.

11   And on behalf -- who else do I have here in person first?

12          MR. GRANT:  Judge, my name is Bob Grant.  I'm a

13   Deputy County Counselor representing St. Louis County.

14          THE COURT:  Okay.  And with you?

15          MR. ROTHERT:  That's our paralegal, who is going to

16   help us with some things, we hope.

17          THE COURT:  And then on the telephone who do I have?

18          MR. KOSTER:  This is Chris Koster on behalf of the

19   State of Missouri, Your Honor.

20          THE COURT:  Okay.  And one other person on the

21   phone?

22          MS. SPILLARS:  Yes, Your Honor, this is Andrea

23   Spillars with the Department of Public Safety.

24          THE COURT:  Okay.  And I take it neither of you have

25   anyone else on the phone.  And you know this is a court

1    proceeding officially.  Even though I'm allowing you to be on

2    the phone, you can't be recording it.  Right?

3            MR. KOSTER:  Yes, Your Honor.

4            THE COURT:  Okay.  And in the public there is one

5    person.  And is that someone involved with this case?

6            MR. ROTHERT:  That is the plaintiff.

7            THE COURT:  Okay.  And just so I can state so it's

8    clear in case there's -- I don't think the plaintiff is doing

9    anything, but so that lawyers remember and everyone else

10   remembers, we have no recording in the courtroom, no cell

11   phone, video, et cetera.  All cell phones need to be turned

12   off when you are in the courtroom.  Right?

13           MR. ROTHERT:  Yes, Your Honor.

14           THE COURT:  Okay.  So, Mr. Rothert, tell me what you

15   want.

16           MR. ROTHERT:  Okay.  Should I go to the microphone?

17           THE COURT:  Definitely, because the defendants need

18   to be able to hear you, the people on the phone.

19           MR. ROTHERT:  Your Honor, we're here today about a

20   First Amendment issue in the City of Ferguson.

21           THE COURT:  Let me stop you.  I'm sorry to interrupt

22   this way.  So I've read your filings.  You filed a Complaint

23   and you filed a Motion for Temporary Restraining Order.  And

24   the Motion for Temporary Restraining Order, so that's what

25   you're asking me to do here today?

1        MR. ROTHERT:  Yes.  Today a Temporary Restraining

2   Order is what we're asking for.

3        THE COURT:  And so specifically what you want me to

4   order?  What is it you're asking for?

5        MR. ROTHERT:  The relief that we're requesting is to

6   enjoin the practice of ordering individuals who are not

7   violating any law to refrain from peacefully assembling,

8   gathering on public sidewalks, and threatening them with

9   arrest if they refuse or if they do peacefully assemble on a

10  sidewalk without violating any law.  And also enjoin

11  arresting them for peacefully assembling or conversing on the

12  sidewalk if it's not violating any other law.

13       THE COURT:  Right.  So this is limited to public

14  sidewalks?

15       MR. ROTHERT:  Yes.

16       THE COURT:  You're not asking me to say they can't

17  be in the street or they can't keep them from being in the

18  street or on private property?

19       MR. ROTHERT:  That is correct, sidewalks.  And also

20  I'm not asking if they are violating another law like

21  blocking a sidewalk, I'm not seeking to enjoin that either.

22  So, but -- and it is limited to sidewalks.

23       THE COURT:  And how do you want to proceed this

24  afternoon?  You have evidence to present?

25       MR. ROTHERT:  I would like to briefly present a tiny

bit of evidence, tiny bit of testimony.

THE COURT:  Okay.  You may do so.

MR. ROTHERT:  Okay.  I'd call Mustafa Abdullah.

THE COURT:  Sir, would you step over here to be sworn.  Go ahead.

MUSTAFA ABDULLAH,

Having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROTHERT:

Q.    Mr. Abdullah, did you have occasion today to go to the city of Ferguson?

A.    I did.

Q.    Where in the city of Ferguson did you go?

A.    I was near the intersection of Ferguson and Florissant.

Q.    All right.  And what was your purpose for going there today?

A.    My purpose was -- I had heard that there were issues, complaints that people were having with not being able to protest.  So I went to inquire about those and to ask the people that had been there, you know, what their experience was and if they were having problems protesting, and if so what.

Q.    And when you were speaking to people, how many people would you say you spoke to while you were out there?

1    A.    Probably -- probably 15 or 20 people, yeah.

2    Q.    And were those journalists and members of the public

3    both?

4    A.    Yes, both.

5    Q.    Okay.  And did you run into any trouble yourself while

6    you were out there trying to gather these stories?

7    A.    Yes.  Five times, yeah.

8    Q.    Okay.  And what happened five times?

9    A.    Well --

10    Q.    Let's start the first time.  What happened the first

11    time?

12    A.    So the first time I was told by several officers that I

13    could not be standing on the sidewalk for more than five

14    seconds.

15    Q.    And did they say what would happen if you stood on the

16    sidewalk for more than five seconds?

17    A.    Yeah, that I would be arrested.

18    Q.    And what were you doing on the sidewalk?

19    A.    I think at the time I was talking to somebody.

20    Q.    And did that happen -- what did you do after you were

21    told that you could stand for more than five seconds on the

22    sidewalk?

23    A.    I started walking.

24    Q.    Okay.  Did you continue to talk to people while

25    walking?

1    A.    Yes.

2    Q.    Did you have any more encounters with police officers?

3    A.    Yes, I did.

4    Q.    Okay.  What happened?

5    A.    I was walking back and forth over several blocks sort

6    of between the -- opposite the QT and the McDonald's.  I was,

7    you know, walking and talking with folks.  And I -- basically

8    the same set of officers who came up to me and said, you

9    know, are you lost, where are you going, sort of insinuating

10   that I was again violating their rules.

11   Q.    Did you explain to them what you were doing?

12   A.    I was just walking and conversing.  And I thought the

13   rule was that I shouldn't be standing for more than five

14   seconds on the sidewalk, so I was confused.

15   Q.    Were you threatened with arrest again?

16   A.    Yes.

17   Q.    How many times were you threatened with arrest while

18   you were out there?

19   A.    I was threatened with arrest five times.

20   Q.    All right.  Did you witness other people being

21   likewise -- who were on the sidewalk likewise being

22   threatened with arrest?

23   A.    Yes.

24   Q.    And as far as you could see, were they violating any

25   laws?

1    A.    No.

2    Q.    And this was over a how many block area?

3    A.    Probably about four, five blocks.

4    Q.    And did you ever enter into a street?

5    A.    No.

6         THE COURT:  You must have -- you had to cross a

7    street, didn't you, to go four or five blocks?

8         THE WITNESS:  No, I was staying on the sidewalk on

9    the same -- the sidewalk that's on the side of the

10   McDonald's, I was staying on that sidewalk.  I mean, there's

11   no streets that are cutting off the sidewalk, I mean, I'm

12   just estimating.  It's a far distance that the sidewalk

13   continues from the McDonald's down to the area that's

14   opposite the QT.

15        THE COURT:  Yeah, so there are no cross streets that

16   you were --

17        THE WITNESS:  Correct.  Sorry, yes.

18   BY MR. ROTHERT:

19   Q.    There are cross streets on the other side of West

20   Florissant Road -- Avenue?

21   A.    I think so.  Yeah, I think so.

22        THE COURT:  Okay.  I got it.  When he said he was

23   four or five blocks, that sounded like he must have gone from

24   one block to another block, but he's saying no.  Okay.

25   Q.    At your last -- the last time you encountered the

1  police, where were you?

2  A.    On the McDonald's parking lot.

3  Q.    And were you alone?

4  A.    No, I was with a group of people.  Actually had -- was

5  in the process of taking a picture with Reverend Jessie

6  Jackson.

7  Q.    Okay.  And then what happened?

8  A.    We were approached by a group of officers, I would say

9  a dozen.  I mean, there were a group of people that were

10  standing around us as well.  And they threatened us with

11  arrest if we didn't start moving and going about our way.

12  Q.    And was anyone blocking traffic?

13  A.    No, it was all inside the McDonald's parking lot.

14  Q.    Did you take or do you have any recordings with you

15  here today of encounters --

16  A.    Yes.

17  Q.    -- this morning?

18  A.    Yes.

19  Q.    Okay.  And is this a true and accurate recording of

20  what you saw of another person talking to a police officer

21  about the situation?

22  A.    Yes.

23        MR. GRANT:  Well, I'm going to object at this point.

24  In order to lay the proper foundation he either has to

25  testify that he took these recordings or that he was

1   observing.  I don't know who took the recordings.

2          THE COURT:  Yeah, we need that foundation.  I agree.

3   BY MR. ROTHERT:

4   Q.    Did you observe what is in this recording?

5   A.    Yes.

6   Q.    And did you take it yourself?

7   A.    I did not.

8   Q.    Who took it?

9   A.    Iris, I'm forgetting her last name.  But, yeah, so I

10  was standing next to the person who was taking the video,

11  recording the video.

12  Q.    And after you -- and you have viewed this video?

13  A.    Yes, I have it on my phone.

14  Q.    And does it accurately depict what you saw and heard

15  when you were standing there?

16  A.    Yes.

17         THE COURT:  Okay.  I'm going to allow it.  How long

18  is this?

19         MR. ROTHERT:  Thirty seconds, a minute, or less.

20         THE COURT:  You may play it.  We're going to call

21  this Plaintiff's Exhibit A.

22         MR. ROTHERT:  Yes.

23         THE COURT:  And you'll need to make a record of this

24  and have a record of exactly what you're playing in court.  I

25  don't see a CD or disk or anything around here, but we make

1  records in this court.

2          MR. ROTHERT:  Yes, Your Honor.  Well, we tried to

3  make disks, but they appear not to have worked.  But we will

4  make a disk.

5          THE COURT:  Okay.  So this is Plaintiff's Exhibit A.

6  I'm receiving it for purposes of this hearing only.  Go ahead

7  and play it.

8          MR. ROTHERT:  Yes.

9          (Video played.)

10 BY MR. ROTHERT:

11 Q.    Is that an accurate depiction of what occurred that you

12 saw?

13 A.    Yes.

14 Q.    And were your own interactions with police officers

15 less dramatic than that or --

16 A.    A little bit less dramatic.  I didn't talk with them as

17 much.  The conversation wasn't as long, it was more brief, so

18 a little bit less dramatic.

19 Q.    And were you worried you would be arrested if you

20 continued to talk to people on the sidewalk about what was

21 happening?

22 A.    Yes.  Yes.

23 Q.    And is that the reason you left when you did?

24 A.    Yes.

25 Q.    Okay.  And are you fearful about going back to get

1   stories and information about what's happening?

2   A.    Yeah.  Yes.

3           MR. ROTHERT:  I have no further questions of this

4   witness.

5           THE COURT:  Do you wish to cross-examine?

6           MR. GRANT:  Yes, Your Honor.

7           THE COURT:  Why don't you step up to the lectern

8   too.

9           Now, I think a lot of the arguments here are going

10  to be legal arguments, but I'd like to let the plaintiff make

11  the record, and I'll hear any cross-examination you wish.

12  Mr. Grant.

13          MR. GRANT:  And preliminarily, Your Honor, I have

14  had no opportunity to speak with Attorney General Koster, so

15  as to order of questioning --

16          THE COURT:  I'm taking you first because you're

17  present.

18          MR. GRANT:  Because I'm here, okay.

19          THE COURT:  And Attorney General Koster, I assume

20  you're not offended by that?

21          MR. KOSTER:  I'm not offended, Your Honor, that's

22  fine.

23          MR. GRANT:  Thank you.

24                      CROSS-EXAMINATION

25  BY MR. GRANT:

1    Q.    First of all, sir, were you in the video at all?  Did

2    you appear in that video?  Because I thought you said you

3    stood next to the person who took the video.

4    A.    Yes.  So I did not appear in the video, I don't think.

5    But initially I was standing next to her, and then I started

6    to walk away when we were initially being threatened with

7    arrest.  I was not seeking to get arrested.

8    Q.    So if I understand you correctly, how long were you

9    next to her while she was videoing that?

10   A.    Maybe 30 seconds.

11   Q.    All right.  But you think -- and your testimony is that

12   you saw the whole incident?

13   A.    Yes.  Yeah, I was -- yeah.  Yes.

14   Q.    Where were you then while the incident was being

15   filmed?

16   A.    Well, so for the initial 30 seconds or so I was

17   standing with them as the officers had approached us.  And

18   made it very clear that we couldn't be congregating on the

19   sidewalk.  And I had also -- you know, a threat to arrest had

20   been made.  You know, this was the -- I think the third time

21   that the officers, the same officers had seen me and

22   approached me.  So I was walking away after that initial 30

23   seconds.  I stepped back and I continued to walk back towards

24   the McDonald's at that time.

25   Q.    Okay.  Could you go through -- first of all, are you

1  employed by the ACLU?

2  A.    Correct.

3  Q.    And when you say you got complaints, where did you

4  receive these complaints?

5  A.    We saw them on Twitter.  I mean, it was people that

6  were reporting that they were having issues with protesting.

7  Q.    And what is your employment with the ACLU, what are

8  your functions?

9  A.    So my title is program associate.  Essentially I do

10 advocacy work for the ACLU.

11 Q.    And what does that mean?

12 A.    That means doing local organizing in the community.  It

13 also means going and doing lobbying work on the State

14 legislature.  It sort of covers the whole gambit.

15 Q.    Was the person that was filming this, was she part of

16 the ACLU?

17 A.    No, she's not.

18 Q.    And what was her name?

19 A.    Her name was Iris.  I believe it's Iris, yeah.

20 Q.    Do you know her personally?

21 A.    Just met her this morning.

22 Q.    And you met her, I take it, at the scene of the filming

23 or did you meet her before?

24 A.    I met her earlier this morning at our office.

25 Q.    At her office?

A.    At our ACLU office.

Q.    At your offices.  So she came to your office at what time?

A.    It was maybe nine-ish or ten-ish.  It was in the morning, yeah.

Q.    And why did she come to your office?

A.    She was having a meeting at our office.

Q.    What kind of meeting?

A.    I'm not sure what was the subject of the meeting.

Q.    But she doesn't work for the ACLU, but she was coming to your offices to have a meeting?

A.    Yes, sir.

Q.    But you don't know what kind of meeting?

A.    No, sir.  I was not present at the meeting.  I didn't know anything about it.

Q.    All right.  Then when did you meet her, if you weren't in the meeting?

A.    I met her because she had asked for coffee when she came in, and I happily helped get her some coffee.  That was my initial interaction of meeting her.

Q.    And while you're getting coffee or right thereafter she says what in order to get you to -- well, tell me what she said to you.  Why the two --

A.    Basically the conversation was, you know, welcome to the ACLU, can I get you some water, some coffee, and she

1  said, yeah, I would love some coffee.  And I went to get her

2  coffee.  And they were going to start the meeting shortly,

3  and then I left and I went back to my office.

4  Q.    But she didn't come to the ACLU for coffee, she came

5  there for some purpose, right?

6  A.    Yeah, she came to have a meeting.  And I'm not -- and I

7  don't know what the meeting was about.

8  Q.    And then do you accompany her after the meeting to the

9  Ferguson area?

10 A.    No.

11        THE COURT:  So how was it that you came to be

12 standing next to her when she's filming at this event?

13        THE WITNESS:  So she had called me.  Someone from

14 the office I imagine gave her my cell phone number.  And she

15 wanted to come out to the protest.  And she was just

16 connecting with me.  And then that's when the interaction

17 happened on the sidewalk shortly thereafter.

18        THE COURT:  She called you while you were already

19 out there?

20        THE WITNESS:  Uh-huh.

21        THE COURT:  And said what, I'm coming over, let's

22 meet?

23        THE WITNESS:  Yeah, she was just asking how things

24 were going, and she wanted to meet up with me at where I was

25 at.

1          THE COURT:  Sorry.  Go ahead, Mr. Grant.

2          MR. GRANT:  That's fine, Judge.

3    BY MR. GRANT:

4    Q.    Did you discuss with her before you went there that the

5    purpose for which she was going to Ferguson?

6    A.    No.  No.

7    Q.    With respect to the recording that we just witnessed,

8    at some point the police officers are saying, if I understood

9    them, and it was hard to understand them, that in that

10   particular zone they were concerned about the safety of

11   people.  Did you hear that?

12   A.    I did hear that.

13   Q.    And did you hear any details about what their concerns

14   of safety were?

15   A.    No.  At that point -- I mean, I heard that from the

16   video.  But at that point I had walked away and I was not

17   privy to the details of the conversation at the time.  So --

18   but it's not clear from the video what the concerns were.

19   Q.    Well, from your other experiences, because you had five

20   experiences, --

21   A.    Yeah.

22   Q.    -- did officers explain to you why they were concerned

23   about the safety of you and other people in that area or in

24   those five areas?

25   A.    No.

1    Q.    Did you ask them?

2    A.    No.

3    Q.    And I don't want to be general, I want to be as

4    specific as possible, but not take an inordinate amount of

5    time.  In the five instances that you had encounters with the

6    police officers, let's take No. 1, how many people were

7    assembled in addition to yourself?

8    A.    No one.

9    Q.    So the first time you were the only person, you were

10   standing on the sidewalk in a stationary position --

11   A.    Yeah.

12   Q.    -- and the police officer told you to move?

13   A.    Correct.  If my memory is correct, it was three

14   officers who approached me at that time.

15   Q.    You were just standing there?

16   A.    I was just standing there.

17   Q.    And no one else was there?

18   A.    No one else was immediately around me, no.

19   Q.    By the way, did you take any recordings of these

20   incidents?

21   A.    I do have a couple of recordings, but they are not good

22   recordings.  So --

23   Q.    They are on your phone?

24   A.    They are on my phone.  And it wasn't -- yeah, I don't

25   have any recordings of immediate interactions with officers.

1    Q.    What do you have recordings of?

2    A.    I have recordings of the scene and just sort of what

3    was going on and officers interacting with other persons, I

4    was recording it from a distance.  But it's not so audible

5    from the video.

6    Q.    And are those recordings of each of the five encounters

7    you had with the police officers about the same time and the

8    location?

9    A.    I mean, they were all within -- I mean, I was there

10   from about 12 until 1 p.m. or so.

11   Q.    In your Verified Petition you talk about five different

12   instances --

13   A.    Correct.

14   Q.    -- that you had encounters, and I'm trying to determine

15   whether the recordings that you took were taken at the same

16   time and place as those incidents that you allege in your

17   Petition.

18   A.    No.

19   Q.    So when were the recordings --

20   A.    Well, there was one recording.  I think there's one

21   recording that I have for 15 or 16 seconds at the very

22   initial interaction.  But unfortunately my recording was cut

23   off because I got a call.  So, I mean, that was -- that's the

24   one 15-, 16-second recording that I have.  But it's not

25   substantive because it was interfered with because I received

1    a call on my cell phone.

2    Q.    And that was preceding the times that you had

3    encounters with the police officers where your allegations in

4    the Petition --

5    A.    That was immediately preceding I believe -- I can't

6    remember, I think it was either the third or fourth time.  It

7    was -- yeah, it was right at the beginning of the

8    interaction.  And then it was cut off, the recording was cut

9    off, so it's sort of useless.

10   Q.    Let me step back.  When did you arrive in Ferguson

11   today?

12   A.    About noon.

13   Q.    All right.  And when did the encounters with the police

14   officers occur?

15   A.    They occurred between noon and 1 p.m., because I left

16   basically immediately after the last interaction.

17   Q.    Which would have been about 1 p.m.?

18   A.    Correct.

19   Q.    And the recording that we saw, when did that occur,

20   Exhibit A?

21   A.    That may have occurred around 12:35 or 12:40.

22   Q.    We covered encounter one.  Encounter two, were there

23   other people involved when you were being told by the police

24   officers to disperse?

25   A.    There was one other person that I was walking with at

1    the time.

2    Q.    And who was that?

3    A.    It was a reporter from the Post-Dispatch, and I'm

4    blanking out on her name.

5    Q.    It was a female?

6    A.    Yes.

7    Q.    Okay.  What race?

8    A.    She was white.

9    Q.    And did she hear the officer give a direction to

10   disperse?

11   A.    Yes.  Well, the interaction was, I had been walking

12   with her sort of back and forth between the public storage

13   business that's there and then the sidewalk that's just

14   opposite the QT.  I had been walking that with her maybe

15   three or four times backwards and forwards and then the same

16   group of three officers, and there was an additional officer

17   I believe at that time came up to me and said, you can't be

18   walking back and forth, you know, get to where you're going,

19   are you lost?  So that was the --

20   Q.    I'm sorry, I thought in the Petition you were saying

21   that you were not allowed to stay stationary.  But I guess

22   you're expanding that to say that you were told that you

23   couldn't walk in the same place?

24   A.    Yes.  That's what they were telling me the second time,

25   yes.

1   Q.    So even though you were moving, you were ordered to

2   move to a different place, was that it?

3   A.    Yes.  They were telling me -- basically they told me I

4   needed to get to where I was going.  They were insinuating I

5   was to leave.

6   Q.    Did they direct you to a particular place?

7   A.    No.

8   Q.    Okay.  Incident No. 3, were you with anybody else at

9   that time?

10   A.    Yes, I was.

11   Q.    And how many people?

12   A.    It was three of us.  It was the video that's depicted

13   in here.

14   Q.    The video is Incident No. 3?

15   A.    Yes.

16   Q.    All right.  So you have the person who took the video

17   and who else?

18   A.    Her pastor was with us.  That was referenced in the

19   video that the pastor was --

20   Q.    What is his or her name?

21   A.    I'm blanking out on the pastor's name.

22   Q.    Was it a male or female?

23   A.    It's a male.

24   Q.    And what race?

25   A.    African American.

1    Q.    And I would assume that they heard the police officers'

2    directions also?

3    A.    Correct, yes.

4    Q.    And Incident No. 4, was anyone with you there?

5    A.    Yes.  The fourth incident -- so the fourth incident was

6    officers that had approached a group of people, I can't

7    remember how many people it was, and then just ordered them

8    to disperse.  Yeah, so that was in front of -- it's a little

9    like strip mall with a couple of stores.  It's in between the

10   McDonald's and the QT.  So but, yes, I was a part of that

11   group, and we were told to disperse and threatened with

12   arrest if we didn't comply.

13   Q.    Do you know who those people were?

14   A.    No, total strangers.

15   Q.    And how many total?

16   A.    It could have been 10 or 12, yeah.

17   Q.    And were you directed to a particular place by the

18   officers?

19   A.    Not at any time, no.

20   Q.    So the direction was to just disperse?

21   A.    So the direction was that we couldn't be standing for

22   more than five seconds.

23   Q.    But there was no direction to go to a particular place?

24   A.    No, sir.

25   Q.    Okay.  And Incident No. 5, how many people were with

1    you at that time?

2    A.    There may have been 15 or 20 people in the parking lot

3    at McDonald's.  And I was standing with Reverend Jessie

4    Jackson just shaking his hand and getting ready to take a

5    picture with him when a group of officers, maybe it was -- it

6    was at least a dozen officers I think approached us and said,

7    you know, we had to keep on moving, ordered us to disperse,

8    and also threatened with arrest.

9    Q.    And other than Reverend Jessie Jackson, do you know any

10   other people that were in that group?

11   A.    I believe that Iris was outside in the parking lot at

12   that time.  And I had just informally at that time met a

13   couple of people, you know.

14   Q.    Do you remember any names?

15   A.    Not at this time.  Yeah.

16   Q.    At the incident in the parking lot was there any

17   activity that was going on with the crowd?  Were they

18   chanting?  Was there any yelling at the police that you were

19   aware of?

20   A.    No.  I mean, the main attraction was Reverend Jessie

21   Jackson.  He had just gotten out of a car and he was drawing

22   a crowd.  You know, there was people from the sidewalk and

23   people from inside the McDonald's that came out to greet him

24   and to take pictures.

25   Q.    At any time did the police officers in Incidents 1

1   through 5, were there any arrests effected that you know of?

2   A.    No, sir.

3   Q.    Were there any incidents where the officers touched any

4   of the persons who were told to move on?

5   A.    No, sir.  No.

6   Q.    And obviously there was then no handcuffing or

7   restraining of anyone?

8   A.    No, sir.

9   Q.    Were there any instances that you saw where there

10  were -- we did see the video of No. 3, but were there any

11  instances of people other than that yelling at the officers?

12  A.    Not that -- not that I was privy to or that I remember,

13  no.

14  Q.    And to be specific, that would be Incidents 1, 2 --

15  A.    Correct.

16  Q.    -- 4 and 5?

17  A.    Correct.

18          MR. GRANT:  Your Honor, at this time I have no

19  further questions.

20          THE COURT:  Mr. Koster, do you have any questions?

21          MR. KOSTER:  Very quickly, Your Honor.

22                     CROSS-EXAMINATION

23  BY MR. KOSTER:

24  Q.    Would you repeat your name for me just so that I make

25  sure I have it clearly, sir?

1    A.     Yes, it's Mustafa Abdullah.

2    Q.     And, Mr. Abdullah, what time did this interaction take

3    place that you took the video of?

4    A.     I believe it was about 12:35 or so.

5    Q.     Are you aware, sir, that at some time prior to

6    2:30 p.m. today, St. Louis County Police Department announced

7    the establishment of an alternative protest zone at the

8    corner of West Florissant Avenue and Ferguson Avenue?  Are

9    you aware that that occurred right about that time, sir?

10   A.     No.

11   Q.     Do you know -- it sounds like you know the area pretty

12   well.  The McDonald's that you were referencing earlier in

13   your comment where you had some of this interaction, are you

14   aware that that McDonald's is about 220 feet from the

15   alternate protest zone at West Florissant and Ferguson

16   Avenue, about 220 feet away?

17   A.     I'm not sure what -- how many feet it is.

18   Q.     If I asserted to you that there was set up an alternate

19   protest zone about 220 feet east of the place where you had

20   the interaction this morning, and there was ample space there

21   for protesters to gather even in the thousands, three to

22   four acres of open land there where emergency personnel were

23   placing -- were asking people to protest, any reason that you

24   know of that individuals could not express their First

25   Amendment rights in that area?

A.    I was -- I'm just not privy to that.  I was not aware
of that at all.

Q.    Okay.

        MR. KOSTER:  I have nothing further.  Thank you for
your time.

        THE COURT:  Ms. Spillars, I neglected to make a
note, are you representing the same party that Mr. Koster is
representing?

        MS. SPILLARS:  Yes, Your Honor.  I'm actually the
Deputy Director and General Counsel for the Department of
Public Safety.

        THE COURT:  Okay.  Thank you.  I thought so.  I
assume you don't need to ask any questions?

        MR. KOSTER:  Your Honor, I would ask to put her on
as a witness if you have time.

        THE COURT:  Okay.  Hold on a second and we'll see.
Anything further of this witness, Mr. Rothert?

                    REDIRECT EXAMINATION

BY MR. ROTHERT:

Q.    Two followup questions based on the cross-examination.
Did the other people that you spoke with on the sidewalk have
similar experiences?

A.    Yes.

Q.    And are you aware of after you left of people being
arrested for being on the sidewalk?

1    A.    Yes, I did hear about that.

2         THE COURT:  All right.  You may step down.

3         And, Mr. Rothert, let me remind you of the -- you

4    filed this lawsuit.  I'm not sure what time of day you filed

5    it, but your client has now testified clearly that he has

6    taken videos and has recordings that are relevant.  You

7    understand the duty to preserve.  He understands the duty to

8    preserve.  You've cautioned him to make sure he preserves

9    those.  They are discoverable and everybody is entitled to

10   them.  Right?

11        MR. ROTHERT:  Yes, Your Honor.

12        THE COURT:  And I could have asked him this, but

13   I'll ask you this.  Is Mr. Abdullah the same person that

14   filed the separate lawsuit for a Temporary Restraining Order

15   last Friday?

16        MR. ROTHERT:  That was Mustafa Hussein.

17        THE COURT:  Okay.  I didn't look up the file again.

18   I remember something similar about the names.  He is not the

19   same person?

20        MR. ROTHERT:  No, just a coincidence.

21        THE COURT:  Okay.  All right.  So does the plaintiff

22   have any other evidence?

23        MR. ROTHERT:  Plaintiff has no further evidence.

24        THE COURT:  Okay.  Mr. Koster, I will allow you to

25   present Ms. Spillars briefly as a witness.

1       Ms. Spillars.

2       MS. SPILLARS:  Yes, ma'am.

3       THE COURT:  Over the telephone please raise your

4   right hand and the clerk is going to administer an oath to

5   you.

6       (Witness sworn.)

7       All right.  Mr. Koster, you may proceed.

8       MR. KOSTER:  Thank you, Your Honor.

9                   ANDREA SPILLARS,

10  Having been first duly sworn, was examined and testified as

11  follows:

12                  DIRECT EXAMINATION

13  BY MR. KOSTER:

14  Q.    Ms. Spillars, could you explain to the Court your job

15  title and your role with the Department?

16  A.    I am the Deputy Director and the General Counsel for

17  the Missouri Department of Public Safety.

18  Q.    And it is accurate, I take it, it is accurate that the

19  Ferguson area is under a declared state of emergency under

20  Chapter 44 of the Revised Statutes of the State?

21  A.    That's correct, as of Saturday.

22  Q.    And last -- either late last night after -- early this

23  morning, some time after midnight on the 18th day of August,

24  the governor entered Executive Order 14-809; is that correct?

25  A.    14-09 was issued last night.  14-08 was issued on

1    Saturday, yes.

2    Q.    I misspoke, you're correct, it is Executive Order

3    14-09.  And as part of that executive order, the governor of

4    this state has authorized superintendent of the Missouri

5    Highway Patrol to take such measures including but not

6    limited to restricting and/or closing streets and

7    thoroughfares in the City of Ferguson to maintain peace and

8    order; is that correct?

9    A.    That's correct.

10   Q.    Could you describe for the Court -- I know the Court

11   will take notice of the events of the last seven days, and

12   there's no need to go into that in detail, but with one

13   perhaps exception, could you explain to the Court the event

14   that took place at approximately 8 p.m. last night around the

15   command center, which is just to the east of McDonald's which

16   Mr. Abdullah was speaking of, and the incidents where the

17   command center felt threatened last night.  Could you go

18   through an explanation of that?

19   A.    Yes.  So as you know, the demonstrations that have been

20   happening in the Ferguson area have been by and large

21   peaceful, non-violent.  There is a -- as of last night there

22   has been a growing contingency of individuals that are

23   embedded within that demonstration that are largely from

24   outside the state, outside of the Ferguson area, that have

25   become very coordinated in their -- in some preplanned

1   violent attacks on law enforcement.

2          So last night that culminated in what law

3   enforcement has described as basically an attempt to overrun

4   the unified command center, which is located in the Target

5   parking lot.  It's a large piece of real estate, and they

6   were trying to maintain their perimeter.  They believed and

7   saw that several individuals were attempting to flight and

8   come upon that area.  And in an attempt to ensure the safety

9   of the officers and the peace and order of the area, they

10  ordered those individuals to stand back, and there was a

11  confrontation.

12         So the law enforcement concern at this point is

13  obviously they want to continue to ensure the peaceful and

14  nonviolent demonstrations and protests within the area, but

15  they are very concerned about this contingency of individuals

16  who are coordinating some planned attacks on law enforcement.

17  Q.    And as a result of last night's activities, the

18  governor summoned approximately how many members of the

19  National Guard to come to the Ferguson area?

20  A.    At this time there's -- the directive has been to

21  supplement and augment as needed.  We've notified the

22  Missouri National Guard that at least 200 individuals are

23  being asked to help secure the unified command center to

24  ensure that that is a safe zone.

25  Q.    In my earlier inquiry of the plaintiff's witness, I

referenced the establishment of an alternative protest site
that is along, as I understand it, along West Florissant in
the protest zone as we have come to understand it over the
last seven days.  Could you explain to the Court your
knowledge of that alternative protest zone?

A.    Yes.  So that area, you are correct, at Florissant and
Ferguson.  It's a parking lot, the Costello Ford parking lot.
And it's actually significantly bigger than the QuikTrip
parking lot that folks have been congregating at.  It's
approximately two or three acres.  Law enforcement intended
to ensure the ability to have some level of control in that
area, and then they intend to block off and have started to
block off the streets to ensure that there is some security
and peace and order in the area.

Q.    And if I represented to you that that alternate protest
zone was actually three to four acres in size, would you have
any reason to think I was incorrect?

A.    I would not.  I have not actually been there.

        MR. KOSTER:  I don't think I have anything further
for this witness, Your Honor.

        THE COURT:  Mr. Rothert, do you wish to
cross-examine?

        MR. ROTHERT:  Yes.

        THE COURT:  And, again, briefly because the time
is --

CROSS-EXAMINATION

BY MR. ROTHERT:

Q.    Ma'am, has there been any violence against police officers in the last nine days since protests have been going on?  Have there been any violence before 8 p.m.?

A.    Has there been any violence against police officers?  I can't hear you.  I'm sorry.

        THE COURT:  He said before 8 p.m.

A.    There have been shots fired at police vehicles.  I can't confirm whether all of those were after 8 p.m.  But there have been multiple occasions of shots fired at police vehicles.  That's one of the reasons they are using the tactical vehicles.

Q.    And are you aware -- can you identify any of those that occurred before 8 p.m.?

A.    I can't confirm whether or not those happened before eight.  They have occurred over the course of several different hours over the last few days.  So some of them may have been before 8 o'clock.  I know that several of them have been after 8 o'clock.

Q.    And is it -- just for clarification, is it the policy of the Highway Patrol to prohibit standing or assembling or conversing on sidewalks?

A.    It is not the policy of the Highway Patrol to do that. We're under an emergency order, however.

1   Q.    And under that emergency order, is that what police

2   officers are being directed to prohibit?

3   A.    I'm sorry, I didn't hear you.

4   Q.    Sorry.  Under the emergency order, are the police

5   officers on the ground being directed to prohibit standing,

6   assembling, or conversing on sidewalks?

7   A.    What law enforcement is trying to do is coordinate the

8   crowd to congregate at this predesignated area, at Ferguson

9   and Florissant.  So the effort to get them into that area is

10  why people are being asked to move.  Because the intent is to

11  then close the roadway where there have been issues, and then

12  that way law enforcement can have better opportunity to

13  maintain peace and order.

14  Q.    Okay.  And also is the intent to close the sidewalks

15  and the roadways?

16  A.    Is the intent to what?  I'm sorry.

17  Q.    Close the sidewalks as well?

18  A.    The intent is to close the thoroughfares, that area,

19  what has been the area where I believe that folks have had

20  some issues, and so now they are going to ensure that there

21  is a large area where everyone can protest and demonstrate,

22  but in safety and security.

23  Q.    Okay.  But my question was whether or not it is -- is

24  it true that you do not allow people to assemble or stand on

25  the sidewalks in Ferguson?

A.     In the particular area that they are closing off,
people are being asked to disperse and go to the other area
to protest.  So, yes, to the extent that they are remaining
in the area which is being closed off, they are not being
allowed to remain in that area.  They are being asked to go
to the other area.

Q.     And you indicated that all of the people who have
caused trouble have been from elsewhere, correct, and not
from --

A.     I don't know that for a fact that every single one of
them.  We do know that based on the information that we have
received, that there are growing numbers of individuals that
are not from the Ferguson area.

Q.     And have you considered or tried checking for ID of
people who you know are assembling along sidewalks as a way
for checking out who people are rather than just prohibiting
them from being there?

A.     No, we have not.

       THE COURT:  This is getting into argument.
Mr. Rothert, how fast will you be in here with a lawsuit if
they start stopping everybody who is there and asking for an
ID?  So, I mean, if you have any facts to ask her, that's
fine.  I think I'm ready to hear argument.

       MR. ROTHERT:  And I just had one other fact.

Q.     And that was, isn't it true that the assaults that law

1  enforcement have experienced have been launched from --

2  launched from the street, isn't that true?

3  A.    Isn't it true that what?  I'm sorry.

4  Q.    The assaults that you referenced on law enforcement,

5  were they launched from streets, from private buildings or

6  from sidewalks, if you know?

7  A.    It's not always easy to tell.

8          MR. ROTHERT:  I have no further questions.

9          THE COURT:  All right.  I think that's sufficient

10  evidence.  I think I know what people's -- what the facts are

11  here.  I probably knew that before or you all probably could

12  have stipulated to it, but that's fine, we've got the facts.

13          I'm going to take a five-minute recess.  When I come

14  back, I'd like to hear any arguments.  Mr. Rothert, from you

15  first as to why --

16          First, before I do, let me clarify.  What I'm

17  hearing from the State is that there is an alternative

18  protest site that has been established.

19          Mr. Grant, are you -- if you don't mind stepping up

20  to the lectern and tell me what you know about this

21  alternative site.

22          MR. GRANT:  Thank you, Your Honor.  I was notified

23  at four o'clock in my office today that this lawsuit was

24  being filed.  I have not had any opportunity other than about

25  a ten-minute quick conversation with several members of the

County Police force who could not really give me much detail. I would like the opportunity to speak with Attorney General Koster because I'm positive that they know more about this alternative site than I do. And, like I said, I haven't been able to contact my clients to know what their knowledge of this is, so I'm at a disadvantage obviously.

THE COURT: Right. Let's do this. Let me take a ten-minute recess. Now, the problem is if -- you and Mr. Koster need to go have a private conversation. I assume you have a way of doing that. But then --

MR. GRANT: If I can turn on my phone.

THE COURT: -- I need to have him back on the phone here for this record. But obviously you aren't going to do that on the record, you're going to go have a private conversation. So I'm going to be in recess, and the Clerk of Court is going to talk to you all about making sure we get everybody back on the line in ten minutes. And we'll be in recess ten minutes, and obviously give you all a chance to have a private conversation, and then I'll be back out.

MR. GRANT: Thank you, Your Honor.

MR. KOSTER: We are fine, Your Honor, with keeping this line open for convenience.

THE COURT: Okay. That's fine. Just keep it open and then you all can have your private conversation separately.

1          MR. GRANT:  Thank you, Your Honor.

2          THE COURT:  Court is in temporary recess.

3          (Court in recess from 5:43 p.m. until 5:58 p.m.)

4          THE COURT:  Okay.  You all didn't settle this while

5     I was in there?  Okay.

6          Mr. Rothert, I'll hear your arguments as to what you

7     think I'm supposed to be doing here or what you want me to do

8     is really what I mean.

9          MR. ROTHERT:  Your Honor, what we're here about

10    today is there were a very -- the most basic of

11    constitutional rights to assemble, to stand, and to protest

12    on a public sidewalk in the middle of the day in the United

13    States.  Our position is that the government has to prove to

14    take away such a fundamental right, such a basic right, the

15    government needs to prove that it's necessary, that there's

16    no other way to serve whatever interests it has.

17         There are perhaps narrower -- narrower restrictions

18    that could achieve the interests that have been discussed

19    here, and I think especially after the *McCullen v. Coakley*

20    case from June, it's more apparent that it's incumbent upon

21    the government to prove that nothing less restrictive would

22    suffice.

23         There's no evidence of any problems with protesters

24    on public sidewalks at all, but especially during daylight

25    hours.  And so our position is that the government just can't

1  take that right away.

2  So because this is a First Amendment issue, the

3  factors, the *Dataphase* factors usually turn on likelihood of

4  success on the merits.  Here, you know, there is a balance of

5  harms issue, more than in other First Amendment cases

6  perhaps.  But there's been no demonstration that any harm has

7  been caused to anyone by allowing people to assemble on a

8  sidewalk in the middle of the day.

9  And contrary to that, if we take away such a basic

10  fundamental right, that would be a harm to society, it would

11  mean the Constitution lost, and it would -- and it's hard to

12  imagine what other constitutional right could not be

13  restricted.

14  You know, we've learned in this hearing about an

15  alternative location for protests.  I have not done a lot of

16  research on that recently, but the cases that I'm familiar

17  with where an alternative location was found to be a

18  sufficient alternative, you know, weren't about prohibiting

19  assembling on sidewalks across a whole city.  They were about

20  specific events, and there was a protest area very close to

21  that event, whether it was the World Trade Organization

22  meeting or a political convention or a President speaking, it

23  was a small temporary limited area close to the event that

24  was being protested.

25  Here we have really I think it's fair to call it

1    unprecedented effort to prohibit the use of sidewalks by the

2    public in an entire city.  And I don't think that forcing

3    them into an area, even if it's three acres, to exercise

4    their First Amendment rights is a sufficient alternative,

5    especially absent any proof of harm being caused by the thing

6    that's being restricted, which is standing on the sidewalks,

7    during the day especially.

8         So for those reasons, I don't think it's disputed

9    that the practice, whether it's policy or not, the practice

10   right now is in the city of Ferguson to prohibit individuals

11   from standing on a sidewalk, from even talking on a sidewalk,

12   and threatening them with arrest if they persist in doing so.

13        So that is that practice that we are asking the

14   Court to enjoin.  I don't think that there is any evidence in

15   the record to support restricting or such a prohibition at

16   all, but certainly there is not during the daylight hours.

17   And so we'd ask the Court enter a Temporary Restraining Order

18   and then set this for a Preliminary Injunction Hearing where

19   we can have more evidence and detailed discussion.

20        THE COURT:  All right.  Mr. Grant or Mr. Koster,

21   which of you wishes to go first?

22        MR. GRANT:  Mr. Koster.

23        THE COURT:  Okay.  Mr. Koster.

24        MR. KOSTER:  Thank you, Your Honor, for allowing --

25   are you ready for me to proceed?

1          THE COURT:  Yes.

2          MR. KOSTER:  Thank you, Your Honor, for allowing us

3     to come together so late in the afternoon.  I know the Court

4     has taken notice of the violence as well as the state of

5     emergency that has occurred over the last week.

6          Plaintiff is correct that as recently as two months

7     ago the Supreme Court in *McCullen v. Coakley* reassessed or

8     reaffirmed the government's right to regulate time, place,

9     and manner restrictions of protected speech so long as it was

10    content neutral.  This certainly is a content neutral

11    regulation that the Highway Patrol has laid over this

12    situation.  As long as the regulation is narrowly tailored,

13    the establishment of the alternate site and the control of

14    West Florissant Avenue is as narrowly tailored as the seven

15    days of violence and danger would allow.  The alternate site

16    actually abuts West Florissant and is inside the protest zone

17    as it has come to be known over the last seven days.

18         And then the third problem of *McCullen* is the

19    establishment of alternate channels of communication of

20    information which we have discussed.

21         We would ask that the Court deny the Temporary

22    Restraining Order.  We do not believe under *McCullen* that the

23    plaintiffs will prevail on the merits.  The alternate site

24    removes the irreprable harm.

25         Balance of injury or the balancing test certainly

1     weighs in favor of public safety at this juncture.  And this

2     is the path that the government -- that the governor of this

3     state believes is in the public interest.  And so we would

4     ask that you deny the TRO.

5                THE COURT:  All right.  Mr. Grant.

6                MR. GRANT:  Yes, Your Honor, I totally concur with

7     Attorney General Koster's request that you deny this TRO.  I

8     will specifically address the aspects of this TRO request to

9     my clients, which is St. Louis County.

10               Obviously there is no evidence before you other than

11    this Exhibit A of any County police officer involvement or

12    any of the reasons why the County police are involved in

13    asking the plaintiff and these other people to disperse.  We

14    have not had an opportunity at this point to obviously put on

15    evidence.  And I think it would then be totally premature for

16    any kind of an order from this court to in effect enjoin St.

17    Louis County from trying to carry out the emergency order,

18    emergency provisions that the governor has put in place,

19    including the alternative site situation.

20               So I concur with the Attorney General Koster that I

21    just request that you deny this TRO, and specifically, of

22    course, to St. Louis County.  Thank you.

23               THE COURT:  Mr. Rothert, anything further?  Further

24    arguments on your behalf?

25               MR. ROTHERT:  As far as evidence, our evidence is

1    also the Verified Complaint for our TRO hearing.  And I

2    understand, I agree that the test is, you know, whether a

3    regulation is narrowly tailored in part.  But there does need

4    to be evidence that it's not over breached by the government.

5    And I understand this is serious business in Ferguson for

6    safety, but the First Amendment is also serious business as

7    well.  Thank you.

8         THE COURT:  All right.  Well, obviously this case --

9    I think we all heard about this case at about four o'clock

10   this afternoon or a little later, so this is an emergency

11   hearing, as is the plaintiff's right to request.

12        I am going to deny the Motion for Temporary

13   Retraining Order.  When I look at the evidence presented and

14   the factors under *Dataphase* that I am supposed to consider,

15   there is no doubt that restrictions on rights of assembly are

16   very serious and must be carefully constrained.  But

17   reasonable time, place, and manner restrictions have been

18   upheld when it's -- especially whereas here there is an

19   alternate site that has been set up.  And so I think that the

20   likelihood of success on the merits is not clear.

21        I will tell you that the plaintiff's Complaint talks

22   not just about assembly but has a second count over on the

23   due process issue.  And I think that that is a close question

24   because it does seem that under the current practice that

25   there's no way anyone would know what is prohibited and what

1    isn't prohibited, and that I believe does have constitutional

2    problems. However, you've got the issue of the public

3    safety. And the police always have the right to tell people

4    to move out of an area where crimes are, you know, being

5    committed. So there's -- it's not an unlimited right.

6          So I think the likelihood of success on the merits,

7    I can't tell from this, I really can't as to who would

8    prevail.

9          In terms of the danger of irreprable harm, there are

10    cases that say whenever someone's First Amendment rights are

11    being violated, they are showing irreprable harm. But with

12    the establishment of the alternative site, I don't believe

13    the plaintiff has shown the threat of irreprable harm.

14          And then finally when you balance the equities and

15    look at the public interest, I think those factors in this

16    situation weigh in favor of denying the motion.

17          Mr. Rothert again is correct that the public

18    interest is always in favor of the Constitution being upheld.

19    The public interest favors not restricting people's First

20    Amendment rights. However, public safety is a very important

21    public interest, and I think there are, you know -- it's

22    widely recognized that to protect the public safety, some

23    restrictions are allowed.

24          One of the things that I think is a concern is that

25    I don't see how any court can micromanage what the police are

1    doing on the street in an evolving and potentially violent

2    situation.  I have followed the news.  I haven't asked you

3    all to present full evidence on what's been happening.  I

4    don't think -- I think everybody in St. Louis knows what's

5    been happening at least to some extent.

6          I don't know any more than what's been in the public

7    press and what you've told me here today, but I think that

8    there has been violence and threats of violence, and there

9    are certainly some public safety interests here that I

10   believe in this case are paramount.

11         And I don't believe that it's appropriate for the

12   Court or the Court to, you know, be like I say, micromanaging

13   the police.  You can tell them to do this but not that in

14   terms of such an evolving situation or the governor.

15         I also don't think there's any evidence that there's

16   any prohibition going across the entire city as has been

17   argued.  We have some evidence of restrictions in this, I

18   guess the Ground Zero area.  And so the State interest in

19   maintaining the public order I guess is the countervailing

20   interest and also is in the public interest.

21         So I think the *Dataphase* factors when you weigh them

22   out do weigh in favor of denying it.  Another way of saying

23   that would be to say that I don't believe on this record that

24   the plaintiff has met his burden of showing that he's

25   entitled to a Temporary Restraining Order.

1          Last time I checked the docket sheet, there was no

2    Motion for Preliminary Injunction on file, so I'm not going

3    to set a hearing on a motion that hasn't been filed.  If and

4    when one is filed, we can set a hearing.  It's generally my

5    practice -- and, I mean, there needs to be, you know, there's

6    an issue of parties and everything else, because this is an

7    emergency and the people who -- the defendant -- defense

8    lawyers who are here are the people who could be located and

9    are here, and they haven't officially entered appearances.

10   And it might be that someone else would choose to do so.  So

11   I think the parties would need to work that out before we had

12   any further hearing in this case.

13          And normally in a preliminary injunction situation,

14   it is the -- I sort of let the plaintiff control when we have

15   a hearing.  But obviously there would have to be sufficient

16   time for defendants to, you know, see what the case is about

17   and be prepared.  And so my normal practice once we get

18   entries of appearance from everyone is to have a telephone

19   conference to find out when we should set a hearing, and I

20   see no reason to change that process in this case if and when

21   a Motion for Preliminary Hearing is filed.

22          I will enter a written order, and it will be entered

23   momentarily denying the Motion for Temporary Restraining

24   Order.  And I would ask the defense counsel, Mr. Grant and

25   Mr. Koster, to stay on the line with the clerk and ask -- and

1    provide her with some kind of e-mail address and also

2    telephone number but where we could send you -- because

3    I'll -- we'll docket this order right away, but the plaintiff

4    will get that through the docketing system.  But since the

5    defendants haven't entered an appearance, they won't.  So

6    please let the clerk know how to e-mail you a copy of the

7    order when I enter it.  But it's going to be very short.

8    It's just going to say it's denied, okay.

9            All right.  That's my ruling.  And court's in

10   recess.

11           MR. KOSTER:  Thank you, Your Honor.

12           MS. SPILLARS:  Thank you, Your Honor.

13           (Court in recess at 6:15 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2           I, Susan R. Moran, Registered Merit Reporter, in

3    and for the United States District Court for the Eastern

4    District of Missouri, do hereby certify that I was present

5    at and reported in machine shorthand the proceedings in the

6    above-mentioned court; and that the foregoing transcript is

7    a true, correct, and complete transcript of my stenographic

8    notes.

9           I further certify that I am not attorney for, nor

10   employed by, nor related to any of the parties or attorneys

11   in this action, nor financially interested in the action.

12          I further certify that this transcript contains

13   pages 1 - 48 and that this reporter takes no responsibility

14   for missing or damaged pages of this transcript when same

15   transcript is copied by any party other than this reporter.

16          IN WITNESS WHEREOF, I have hereunto set my hand

17   at St. Louis, Missouri, this 22nd day of August, 2014.

18

19          _____

20          /s/ Susan R. Moran
            Registered Merit Reporter

21

22

23

24

25