IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MUSTAFA ABDULLAH,                          )
                                           )
                Plaintiff,                 )
                                           )  Cause No. 4:14cv-1436 CDP
v.                                         )
                                           )
ST. LOUIS COUNTY, MISSOURI, et al.,        )
                                           )
                Defendants.                )


DEFENDANT ST. LOUIS COUNTY, MISSOURI'S RESPONSE TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

COMES NOW St. Louis County, Missouri ("County") and in response to

Plaintiff's Motion for a Preliminary Injunction (Doc. #15-1), offers the following:

     I.     Preliminary statement.

On August 16, 2014, the Governor of Missouri declared a state of emergency to

exist and ordered the Missouri Highway Patrol to command all operations in Ferguson.

On August 18, 2014 Movant Abdullah (hereinafter, "Plaintiff") filed a request for a

Temporary Restraining Order because on that date, he alleges, he was ordered to refrain

from standing for more than five seconds on a public sidewalk.  Plaintiff named as

defendants the County of St. Louis, Missouri ("County"),  Ronald K. Replogle, in his

official capacity as Superintendent of the Missouri Highway Patrol, and unknown police

officers whom Plaintiff designates as John Does 1-5.  After hearing evidence on August

18, 2014 this Court denied the request for a TRO.  Plaintiff subsequently filed a Motion

for Preliminary Injunction, along with a memorandum in support of his motion.  For all

of the reasons set out herein, the Court should deny the motion.

II.     <u>Statement of Facts</u>.

Plaintiff has alleged that after the August 9th killing of Michael Brown by a Ferguson police officer, many members of the community responded in anger with frequent demonstrations on the public streets and sidewalks of Ferguson.  (Verified Complaint, paragraphs 13 and 14.)  At 11 a.m. on August 18th Plaintiff, a Program Associate for the American Civil Liberties Union of Missouri, received reports that law enforcement officials were ordering people not to gather or stand for more than five seconds on public sidewalks,  so he went to investigate the reports.  (Verified Complaint, paragraphs 19 and 20.)  He further alleges that he stood on public sidewalks for more than five seconds after which he was threatened with arrest for noncompliance.  (Verified Complaint, paragraph 21.)  Plaintiff claims that others were similarly ordered to refrain from gathering or standing for more than five seconds.  (Verified Complaint, paragraph 23.)

At the hearing on the request for a Temporary Restraining Order, evidence was presented by the Missouri Attorney General on behalf of the Superintendent of the Missouri Highway Patrol.  This evidence included the testimony of Andrea Spillars, Missouri's Deputy Director of Public Safety, who talked about public safety concerns which led to the emergency order being issued by the governor pursuant to Missouri state statutes.  There was also testimony that the so-called five-second rule was a nonviolent policy, that the state has had past experience in emergency situations, that the policy was designed to be a failure-to-disperse policy, and that the policy included a reasonable time, place and manner to engage in protests.  There was no evidence that the state prohibited

speech or attempted to control the content of speech.  According to Ms. Spillars an alternate site was available for people to engage in protests.

The governor of Missouri is empowered by Section 44.100.1(1) R.S.Mo. to declare a state of emergency:

44.100. 1. The emergency powers of the governor shall be as follows:

(1) The provisions of this section shall be operative only during the existence of a state of emergency (referred to in this section as "emergency"). The existence of an emergency may be proclaimed by the governor or by resolution of the legislature, if the governor in his proclamation, or the legislature in its resolution, finds that a natural or man-made disaster of major proportions has actually occurred within this state, and that the safety and welfare of the inhabitants of this state require an invocation of the provisions of this section.

Acting pursuant to Sec. 44.100, Governor Nixon issued Executive Order 14-08 on August 16, 2014, declaring a state of emergency to exist in the State of Missouri.  (See copy of the Order, attached, obtained from the official website of the Secretary of State.)

Sec. 44.100.1(3)(b) R.S.Mo. empowers the governor to: "Take action and give directions to state and local law enforcement officers and agencies as may be reasonable and necessary for the purpose of securing compliance with the provisions of this law and with the orders, rules and regulations made pursuant thereof."  Executive Order 14-08, in addition to declaring a state of emergency, states that:

 "I do hereby direct the Missouri State Highway Patrol, through its

Superintendent, to command all operations necessary to ensure public safety and

3

protect civil rights in the City of Ferguson and, as necessary, surrounding areas during the period of this emergency."

"I further order that such other local law enforcement agencies, as deemed necessary by the Superintendent of the Missouri State Highway Patrol to maintain order in the City of Ferguson, shall assist the Missouri State Highway Patrol when requested by the Superintendent and *such law enforcement agencies, when operating in the City of Ferguson, shall cooperate with all operational directives of the Missouri State Highway Patrol*" (italics added).  (See copy of the Order, attached, obtained from the official website of the Secretary of State.)

On August 16, 2014 Chief Jon Belmar of the St. Louis County Police Department received a direct command from MHSP and Capt. Ron Johnson of MSHP to begin enforcing the state statute prohibiting "refusal-to-disperse," Sec. 574.060 R.S.Mo. Commanders of other municipal law enforcement agencies operating in Ferguson received the same command.  Chief Belmar and his subordinates in the County Police Department had no discretion whether to follow the commands of Capt. Johnson, and thereafter County police officers began enforcing the statute.

On September 3, 2014, the Governor issued Executive Order 14-10, which terminated Executive Order 14-08.  (See copy of the Order, attached, obtained from the official website of the Secretary of State.  Chief Belmar and his subordinates in the County Police Department are no longer under the direction of MHSP and the direction of Capt. Johnson to enforce the "refusal-to-disperse" statute.  Chief Belmar has given no new command to his subordinates to enforce the statute.

III.    <u>Summary of the law and argument</u>.

A preliminary injunction should issue only if consideration of four particular factors weighs in favor of the movant: the threat of irreparable harm; the balance between the harm to movant and the harm an injunction would inflict; the movant's likelihood of success on the merits of the underlying case; and the public interest.  *Dataphase Sys., Inc. v. C L Sys, Inc.*, 640 F.2d 109,113 (8th Cir. 1981).  The factors surrounding this case do not weigh in favor of Plaintiff.

Plaintiff is unlikely to succeed on the merits of his lawsuit against County.  He can prevail against County only if, first, he is able to prove that enforcement of the so-called five-second rule alluded to in the Verified Complaint is a policy, custom or practice of County.  *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014).  It is neither.  The practices loosely described by Plaintiff as the five-second rule, assuming they occurred at all, were performed at the direction of the Missouri State Highway Patrol ("MSHP") through the command of Capt. Ronald Johnson.  Capt. Johnson was empowered to give directions to local law enforcement agencies operating in Ferguson pursuant to the authority of the Governor to declare an emergency specified in Section 44.100 R.S.Mo.  Executive Order 14-08, issued pursuant to that statute, gave effect to that authority.  Local law enforcement agencies were bound by law to fulfill the directions of Capt. Johnson, and lacked discretion to refuse his commands.  Accordingly, if an alleged five-second rule was enforced against Plaintiff, it was the practice, custom or policy of MSHP, and not of County, to enforce it.

Second, to succeed on the Verified Complaint, Plaintiff must prove that in the absence of injunctive relief he would suffer irreparable harm by reason of County's enforcement of the five-second rule.  However, the Verified Complaint does not allege

that any County police officer enforced the rule against him.  His denomination of John
Does 1-5 as defendants does not even allege that any John Doe was a County police
officer.  Further, on September 3, 2014 the Governor issued Executive Order 14-10,
which terminated Executive Order 14-08, including the state of emergency declared by it.
MSHP no longer has the lawful authority to direct local law enforcement agencies to
comply with its directions, including the authority, if it did so, to require enforcement of
the alleged five-second rule.  Whether the alleged five-second rule will ever be enforced
again is a matter of pure speculation, which is insufficient to support a conclusion that
Plaintiff is under a threat of irreparable harm.

Third and fourth, the balance between the harm to Plaintiff and the harm to
County, and the public interest in permitting enforcement of the five-second rule by
County, if indeed County were inclined to do so, favors County.  To the extent a five-
second rule actually was developed and enforced, it was done so during the course of a
palpable emergency situation on the streets of Ferguson, and the Court should give a
great deal of deference to law enforcement agencies which are required to maintain order,
and should avoid as much as possible interfering with their reasonable decisions.
Further, the public interest would be greatly harmed if the Court were to enjoin County
from following directions of a higher authority lawfully vested with authority to give
such directions.

IV.    Law and argument.

A.   *Plaintiff is unlikely to succeed on the merits of the Verified Complaint because*
*enforcement of the five-second rule, if it occurred, was not the practice,*
*custom or policy of County.*

6

One of the factors to be considered in deciding whether to issue a preliminary injunction is the *substantial probability* that the movant will succeed on the merits of its case. *Dataphase*, F.2d at 112. *See also Young v. Harris,* 599 F. 2d 870, 875-876 (8th Cir. 1979). In this case, there is not a substantial probability that Plaintiff will succeed on the merits of his case against County.

As indicated in Part III of this Memorandum, liability of a local government for unconstitutional acts of its employees exists only if the acts were the result of a policy, custom or practice of the local government. *Snider*, *id.* The court in <u>Kuha v. City of Minnetonka</u>, 365 F.3d 590, 604 (8th Cir. 2003) opined that there is a plain distinction in this judicial circuit between a governmental policy and a governmental custom, and the two are not interchangeable. A policy is "an official policy, a deliberate choice of a guiding policy or procedure made by the municipal official who has final authority regarding such matters." *Kuha* at F.3d 604, citing *Mettler v. Whitledge*, 165 F.3d 1197 (8th Cir. 1999). *See also Ware v. Jackson County, Mo.,* 150 F.3d 873, 880 (8th Cir. 1998). An unconstitutional custom, on the other hand, can be demonstrated by the following three elements: i.) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; ii.) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and iii.) the plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation. *Kuha*, at F.3d 604.

County does not concede that the crowd control methods employed in Ferguson were anything like what Plaintiff characterizes as the five-second rule. In point of fact,

7

what police officers operating in Ferguson were enforcing was Sec. 574.060 R.S.Mo.,
prohibiting refusal to disperse.  Assuming, *arguendo*, that the various actions comprising
what Plaintiff characterizes as the five-second rule actually occurred, no one from County
established or created the rule, and it was not a County policy.  The evidence will show
that Capt. Johnson of MSHP was the person endowed with authority from the Governor
to give the direction to the County Police to begin enforcing the refusal-to-disperse
statute in Ferguson.  As set out in the Facts section of this memorandum, Sec. 44.100
R.S.Mo. empowers the Governor to declare a state of emergency, and during that
emergency, to authorize MSHP to give operational directives to local law enforcement
agencies.  The Governor gave effect to that authority by his issuance of Executive Order
14-08.  The evidence will prove that the policy to enforce the refusal-to-disperse statute,
mischaracterized by Plaintiff as the five-second rule, was the policy of MSHP and no
final policy maker of County was responsible for it.  Because the alleged five-second rule
was not a policy made by a final policymaker of St. Louis County, no liability can accrue
to County even if the rule alleged by Plaintiff were to be found unconstitutional.

Further, there will be no evidence that enforcing a five-second rule was a custom
of County that can lead to liability under Sec. 1983 jurisprudence.  There will be a
complete lack of evidence of a continuing, widespread and persistent pattern of
unconstitutional conduct by County police officers in the enforcement of the statute.
There will be no evidence of a tacit authorization of unconstitutional conduct known to
County officials with regard to acts of its police officers.  And most certainly there will
be no evidence that Plaintiff suffered any injury because of same.

8

Even assuming that there was a five-second rule and that County police officers
enforced it at the direction of MSHP, County's enforcement of the rule would not convert
the MSHP policy to a County policy.  *Vives v. City of New York*, 524 F.3d. 346 (2nd Cir.
2008) discusses whether a municipal practice of enforcing a state law can lead to liability
for a constitutional deprivation resulting from the enforcement.  The court concentrated
on whether the municipality had freedom to decide whether to enforce the state law; that
is, whether municipal enforcement of state law was a conscious choice of the
municipality.  *Id.* at 351-357.  The court concluded that the decision of a municipality to
honor a non-discretionary obligation to enforce a state law was not a conscious choice.
Accordingly, "the municipality cannot be liable under *Monell* in this circumstance (where
the municipality made no conscious choice to enforce state law)."  *Id.* at 353.  "On the
other hand, if a municipality decides to enforce a statute that it is authorized, but not
required, to enforce, it may have created municipal policy." *Id.  See also Snyder v. King*,
745 F.3d 242, 249 (7th Cir. 2014) ("When state law unequivocally instructs a municipal
entity to produce binary outcome X if conduct Y occurs, we cannot say that the municipal
entity's decision to follow that directive involves the exercise of any meaningful
independent discretion, let alone final policymaking authority.")

Municipal liability for enforcing state law depends, then, on whether the
municipality had free and conscious discretion to enforce the law.  Plainly, under the
command structure authorized by Missouri statute and put into operation by Executive
Order 14-08, County was directed to follow the commands of Capt. Johnson and had no
discretion to decide otherwise.  County's obeying of Capt. Johnson's command was not a

"conscious choice."  Under the *Vives* analysis, no liability should inure to County for a

five-second rule.

The court in *Slaven v. Engstrom*, 848 F.Supp.2d 994, 1004 (D. Minn. 2012),

observed that the Eighth Circuit Court of Appeals has yet to decide the issue.  The district

court noted, though, that "courts generally agree that municipalities and local

governments cannot be liable under Sec. 1983 for enforcing a state statute when it is

required to do so."  *Id.  See also Ashanti v. City of Golden Valley*, 2011 WL 1114320 (D.

Minn. 2011) ("Golden Valley is correct in asserting that a municipality cannot be liable

under *Monell* if it merely implements a state law that it is obligated to enforce");  *See*

*also Smith v. South Dakota*, 2012 WL 1038629 (D.S.D. 2012).

The Second Circuit's holding, and the precedent of other district courts in the

Eighth Circuit, should guide this Court's decision.  That Capt. Johnson had lawful

authority to command the actions of local law enforcement agencies to enforce the

refusal-to-disperse statute is not subject to debate.  Nor is it subject to debate that local

law enforcement agencies, including the County Police Department, had the lawful

obligation to comply with the commands.  Accordingly, County made no conscious

choice to abide by Capt. Johnson's directions.  The plain language of Sec. 44.100

R.S.Mo. and of Executive Order 14-08 make that abundantly clear.  Governor Nixon,

under his statutory authority, lawfully ordered the St. Louis County Police Department to

"cooperate with all operational directives of the Missouri State Highway Patrol."  Neither

the statute nor the executive order admit of any discretion on the part of County to decide

whether to obey the directives.  The only conclusion that can be drawn is that

enforcement of the alleged five-second rule was not the practice of County, and no

10

liability can inure to County.   Plaintiff is therefore unlikely to succeed on the merits of the Verified Complaint.

      B.   *Plaintiff is under no threat of irreparable harm.*

      As the facts of the case will illustrate, with his issuance of Executive Order 14-10 the Governor has terminated the state of emergency that had existed, as well as the authority of MSHP to give operational directions to local law enforcement agencies as was set out with in Executive Order 14-08.  Since the five-second rule, as alleged, was implemented solely at the direction of Capt. Johnson of MSHP, and there will be no evidence suggesting that County would have enforced such a rule absent the direction of Capt. Johnson, it is purely a matter of speculation whether the rule will be enforced against Plaintiff in the future.  Speculation and conjecture about what might happen does not equate to a threat of irreparable harm to Plaintiff.  "Issuing a preliminary injunction based only on the possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may be awarded upon a clear showing that plaintiff is entitled to such relief."  *H&R Block Tax Serv. LLC v. Acevedo-Lopez*, 742 F.3d 1074, 1077 (8th Cir. 2014), citing *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7 (2008).  Thus, the Court should note that this factor favors County when conducting its *Dataphase* analysis.

      C.   *Both the public interest and the balance between the harm possibly suffered*
               *by Plaintiff and the harm to County militate in favor of denying the motion for*
               *a preliminary injunction.*

      The Court should give a great deal of weight to the public's interest in permitting law enforcement agencies to determine the appropriateness of temporary measures to

maintain order in a limited area.  The evidence will show that the various acts

constituting what Plaintiff refers to as the five-second rule were intended to prevent

violent troublemakers from secreting themselves among peaceful protestors.  As noted by

the Ninth Circuit in a case stemming from the violent protests at the World Trade Center

conferences in Seattle, the court's "role here is not to inject ourselves into the methods of

policing."  *Menotti v. City of Seattle*, 490 F.3d 1113, 1137 (9th Cir. 2005).  The *Menotti*

court further noted that:

> When violent protestors substantially disrupt civic order, there must necessarily be
>
> consequences for all if a city is to satisfy its superordinate duty to provide safety and
>
> security. While respecting the liberty of protestors, a city must be permitted to act
>
> reasonably, within the bounds of the Constitution, to fulfill its responsibilities of
>
> providing physical security and the maintenance of order that is required for all of a
>
> city's residents and visitors.

*Id.* at 1157.

When the ability of law enforcement to promote that very substantial interest is

balanced against the requirement that Plaintiff speak freely so long as he does not run

afoul of the so-called five-second rule, (in fact, the refusal-to-disperse statute), these two

*Dataphase* factors weigh in favor of County and of all defendants in this case.

     V.       <u>Conclusion</u>

Emergency conditions existed in the City of Ferguson after crowds reacted to a

police shooting involving a City of Ferguson police officer.   The governor of Missouri,

by Executive Order, and pursuant to his statutory authority, declared a state of

emergency.  Once the state of emergency was declared, the Missouri State Highway

Patrol through its Superintendent was directed by the governor to command all operations necessary to ensure public safety and protect civil rights in the City of Ferguson and surrounding areas as necessary.  Other local law enforcement agencies, including the St. Louis County Police Department, were ordered by the governor to assist the Missouri State Highway Patrol with maintaining order.  The superintendent of the Highway Patrol, and the governor of the State of Missouri, designated Capt. Johnson of the MSHP to have authority to command all operations and to give final approval of all operational procedures of law enforcement agencies that were ordered to assist MSHP.  This included what Plaintiff refers to as the five-second rule (in reality, enforcement of the refusal-to-disperse statute), which was ordered by Capt. Johnson.  By another Executive Order, the state of emergency has now been declared by the governor to have ended, the State of Missouri is no longer commanding operations in Ferguson, and the so-called five-second rule is no longer in effect.

Plaintiff's request for a preliminary injunction should be denied.  The threat of irreparable harm to Plaintiff is nothing but conjecture.  The request should be denied because Plaintiff is unable to meet his burden of showing substantial probability of success on the merits: the so-called five-second rule was not the official policy, custom or practice of St. Louis County and it was not promulgated by a final policymaker of County.  Any "five-second rule" that existed was the policy of MSHP, by and through its designated commander, during the state of emergency.  During the state of emergency neither St. Louis County nor other police agencies that assisted the MSHP had the discretion to ignore the orders of MSHP.

For all of these reasons, the motion for a preliminary injunction should be denied.

13

Respectfully submitted,

PATRICIA REDINGTON
COUNTY COUNSELOR

By:     _____s/s_____

Michael A. Shuman #MO32418
Associate County Counselor
Lawrence K. Roos Bldg.
41 So. Central Avenue
Clayton, MO. 63105
314-615-7042; Fax 314-615-3732
Mshuman@stlouisco.com

A copy of the foregoing was filed electronically with the CM/ECF e-filing system
operated by the United State District Court for the Eastern District of Missouri, on
September 15, 2014.

_____s/s_____
Michael A. Shuman

14