IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MUSTAFA ABDULLAH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14-cv-1436 |
| | ) | |
| COUNTY OF SAINT LOUIS, | ) | |
| MISSOURI, RONALD K. | ) | |
| REPLOGLE, in his Official Capacity as | ) | |
| Superintendent of | ) | |
| the Missouri Highway Patrol, | ) | |
| and JOHN DOES 1-5, in their individual | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## COLONEL REPLOGLE'S PRE-HEARING
## MEMORANDUM IN OPPOSITION
## TO MOTION FOR PRELIMINARY INJUNCTION

Plaintiff asks for relief with regard to the manner of enforcement of Missouri's "refusal to disperse" law (§ 574.060, Mo. Rev. Stat. (2000))—the validity of which he does not challenge. He claims that absent some undefined form of order against the named defendants, he will suffer irreparable harm. Given the transitory nature of the alleged rule or policy to which he objects, the overbreadth of his request for relief, and the changes that have occurred since the events described in the Complaint and the Motion, the Court should deny the motion for a preliminary injunction against Colonel Replogle, sued here in his official capacity as Superintendent of the Missouri Highway Patrol.

**INTRODUCTION**

We are not aware of any reported preliminary injunction decision that addresses facts similar to those alleged here: tactical, evolving instructions, given to a cooperative group of law enforcement officers, for a particular situation at a very particular time and place, to address constantly changing events. What Plaintiff calls the "five-second rule" is not a policy, regulation, or statute—and he does not claim that it is. Indeed the suggestion that it was a monolith that could be attacked as such is belied by Plaintiff's repeated claims that the alleged "rule" was often ignored by (or not even known to) law enforcement officers on the scene, and otherwise applied erratically, with different definition or substance, during just part of August 18 and 19. *See* Plaintiff's motion at 6-7. Indeed, the declarations supporting Plaintiff's motion show that no such "rule" was being enforced by August 23. *Id*. at 7. We are not aware of any reported preliminary injunction decision that granted relief weeks after the events complained of, absent some statute, ordinance, or policy that continues in effect, and a showing that it is likely to be applied to the plaintiff.

And of course we have found no reported preliminary injunction decision against someone whose role has changed as much as the role of the Missouri Highway Patrol in Ferguson has changed since the events detailed in Plaintiff's affidavits. Most notably, although on any given day the Highway Patrol may have officers on duty in Ferguson, the Patrol is no longer heading law enforcement agencies in any response to events there. At this point, the Patrol's role in Ferguson is the same as it is across the State of Missouri: to enforce state laws, typically traffic laws on state roads and highways, and to provide cooperative support for other law enforcement agencies when there is a particular need.

We turn briefly to pertinent events in Ferguson. We then take up each of the *Dataphase* factors in turn—and apply each of them in light of the current situation, *i.e.*, we consider the alleged threat of irreparable harm to this plaintiff if the Missouri Highway Patrol is not preliminarily enjoined from enforcing the alleged "five-second rule," the potential harm to others (including residents and businesses in the City of Ferguson) if the Highway Patrol is subjected to the injunction that Plaintiff requests, the likelihood that Plaintiff will succeed on his claim that requiring him to move through a small, troubled area violates his constitutional rights, and the public interest in preserving peace in the small area of concern.

**FACTUAL BACKGROUND**

While the vast majority of demonstrators in Ferguson, beginning about August 11, 2014, were peaceful, over the course of the ensuing days a small number of participants engaged in violent and criminal acts—including looting and burning businesses. In performing its task to ensure public safety, the Missouri Highway Patrol deployed officers to Ferguson. Sometime after they first arrived, a Patrol officer took the operational leadership role—initially by cooperative agreement with other agencies, such as the Ferguson and St. Louis County police departments, and later pursuant to an executive order declaring a "state of emergency" in the area.

While engaged in that effort, Patrol officers frequently met with other participating law enforcement agencies to consider how to effectively respond to the evolving events. The course decided upon was then communicated to the officers from the various agencies on the scene at that time.

One step taken by the group was to establish a designated assembly zone, which Plaintiff calls the "PAZ," where protesters could gather and express themselves by voice and visuals. That zone was within the 3-block area that had become the focal point for protests. Demonstrators

3

who remained on the streets or sidewalks were at times directed to continue moving along the sidewalks or were directed to the designated assembly area. Most demonstrators complied and walked up and down the sidewalks within the 3-block area. Some congregated in the designated assembly area.

Those who refused to comply with instructions and instead gathered in stationary groups in the protest area were subject to arrest under Missouri's "refusal to disperse" statute:

> A person commits the crime of refusal to disperse if, being present at the scene of an unlawful assembly, or at the scene of a riot, he knowingly fails or refuses to obey the lawful command of a law enforcement officer to depart from the scene of such unlawful assembly or riot.

Mo. Rev. Stat. § 574.060.1.[1]

Plaintiff Abdullah, in his Complaint, testimony, and declaration, and in the declarations of others, does not fully address what was happening in Ferguson on August 18 and 19, the two days as to which they give the most detail. But more important for purposes of the instant motion, he does not address the current situation, nor any future situation that would justify the relief he seeks—the facts on which any preliminary relief must be based.

The effort to keep persons moving in areas where there had been "gatherings disturbing the peace" ended as the number of individuals congregating in the area waned and order was restored. Thus all of Plaintiff's declarants who were "on the ground" in Ferguson after August 19 alleged no instances of enforcement of a "five-second rule" or other means of requiring protestors to keep moving after that date, and confirm that protesters were allowed to remain in

---

[1] The statute does not define "riot." But the statute is a descendant of "the riot act," "an English law of 1715 that provided for the dispersal of gatherings disturbing the peace." Webster's Third New International Dictionary, at p. 1959. There is not room for dispute here that the Patrol and other law enforcement faced "gatherings disturbing the peace."

4

place in groups by August 23, 2014. Doty declaration at 9; Holbrook declaration at 5; Reinstein declaration at 4.

And not only has the situation in Ferguson changed, so has the role of the Missouri Highway Patrol. Governor Nixon ended the state of emergency on September 3. Executive Order 14-10. The Patrol relinquished its role as the lead agency in Ferguson. Although the Patrol may still lend officers to assist in the affected areas of Ferguson, those efforts are part of day-to-day mutual aid provided by law enforcement agencies and the Patrol is not presently leading any response to events in Ferguson.

Certainly since August 23, the Patrol has had no "five-second rule" nor any comparable policy for its officers in Ferguson, nor is the Patrol aware of the lead or other law enforcement agency having, articulating, or applying such a rule.

## REQUESTED RELIEF

The Court must consider Plaintiff's request for a preliminary injunction in terms of the *Dataphase* factors:

> To determine whether preliminary injunctive relief is warranted, the Court must balance the threat of irreparable harm to movant, the potential harm to the nonmoving party should an injunction issue, the likelihood of success on the merits, and the public interest. *Dataphase Sys. v. CL Sys.,* 640 F.2d 109, 113–14 (8th Cir.1981) (en banc).

*Winfield v. Steele*, 4:14CV1022 CDP, 2014 WL 2616904 (E.D. Mo. June 12, 2014), vacated, 755 F.3d 629 (8th Cir. 2014). Plaintiff asks for "a preliminary injunction that prohibits Defendants, their officers, employees, or agents, and those acting on their behalf or in concert with them, from enforcing or threatening to enforce any rule, policy, or practice that grants law enforcement officers the authority or discretion to arrest, threaten to arrest, or order to disperse individuals who are violating no statute or regulation and who are peaceably standing, marching, or

5

assembling on public sidewalks in Ferguson, Missouri." So the questions are whether that broad order is necessary to prevent irreparable harm to Plaintiff, whether restricting law enforcement agencies in advance in that fashion leaves others with sufficient protection, whether Plaintiff is likely to succeed on his claim that he is constitutionally entitled to such an order, and whether such an order serves the public interest.

**IRREPARABLE HARM**

To obtain the relief Plaintiff requests against the Superintendent, Plaintiff Abdullah must first demonstrate to this Court that he will suffer "irreparable harm" absent the proposed preliminary injunction against the Superintendent, as the commander of the Missouri Highway Patrol. In his Motion, however, Abdullah does not make such a demonstration. All he demonstrates is that in the process of enforcing Missouri's "refusal to disperse" law, some (mostly unidentified) officers (and never officers identified as members of the Highway Patrol) instructed protesters on the street and sidewalks in a small area of Ferguson to keep moving. By having his declarants confirm that no such instructions were being given by August 23, Plaintiff undercuts his own claim of irreparable harm. He presents no basis for concluding that any law enforcement agency, much less the Missouri Highway Patrol, currently has or will likely implement, during the period to be covered by a preliminary injunction, a "five-second rule"— much less that the alleged rule will irreparably harm this Plaintiff.

**HARM TO NON-MOVING PARTIES
AND THE PUBLIC INTEREST**

The "non-moving parties" here are law enforcement agencies or their leaders. But they do not act on their own behalf; they act to protect the people they serve—including, but not limited to, residents and those operating businesses in Ferguson. So the "harm to non-moving parties" and the "public interest" steps in the analysis may be conflated.

6

In considering both, it is important to note at the outset that in the cases on which Plaintiff relies in his motion, it was possible to address the harm to non-moving parties with some specificity. In each instance, there was a particular restriction that was defined in advance for a particular period of time, and the Court could consider whether a particular proposed loosening of that restriction—for example, adding or expending a particular protest area to a defined degree—would have on the ability of law enforcement agencies to protect public safety.

Here, the challenge is much more difficult. This is a post-hoc challenge to an alleged policy developed and imposed in the heat of a very difficult situation. And the proposed injunction is not a well-defined, nuanced limitation on the policy, but a replacement for it that could easily require law enforcement officers to either violate the injunction or come to court on very, very short notice to protect people and property in Ferguson.

The proposed injunction asks the Court to, in effect, bar police from ordering any group in Ferguson to disperse if those persons are standing on any "sidewalk" in Ferguson, unless the persons or groups are, at this moment, violating some "statute or regulation." So if police need to clear an area of sidewalk to reach persons on adjacent private property who threaten violence or looting, police may not do so. If police conclude that a person or group on the sidewalk is itself in danger, police cannot insist that they move. In other words, based on Plaintiff's vague claim of some possibility of future harm if he ever returns to Ferguson, Plaintiff asks this Court to do what courts are, consistently and appropriately, so very reluctant to do: "to inject [itself] into the methods of policing." *Menotti v. City of Seattle*, 409 F.3d 1113, 1137 (9th Cir. 2005).

It seems beyond dispute that to simply bar the Highway Patrol and all other law enforcement agencies that have been or could be involved in Ferguson not to ever order anyone to "move along," regardless of the circumstances, would seriously undermine the ability of law

7

enforcement agencies to protect people and property in Ferguson. Whether and how to craft an order so that it has enough flexibility to address not just looting and other violence, but precursors to looting and violence, is a question that merits serious reflection—which Plaintiff's few words on page 21 of his Motion, where he addresses these *Dataphase* factors, does not give.

Though in First Amendment cases the public interest weighs heavily in favor of allowing speech, courts have consistently permitted the States to impose reasonable "time, place, and manner" restrictions. Here, the alleged restriction was part of a concerted—yet very limited, in terms of time and place—effort to protect people and property in Ferguson. The public interest was best served by protecting myriad means of communication about the grievances that prompted the Ferguson protests, while limiting the adverse impact of the violent aspect of those on the residents and businesses in the small area to which the alleged "five-second rule" applied. Injecting the Court into the moment-by-moment task of policing a dangerous, evolving situation cannot reasonably be said to serve the public interest—even in a "free speech" case such as this, where, as discussed further below, there are myriad means of speaking still available.

**LIKELIHOOD OF SUCCESS ON THE MERITS**

**Due process.**

Plaintiff's first claim on the merits is that the alleged "five-second rule" violates his due process rights. In making that claim, he largely ignores the "failure to disperse" statute, of which he had effective notice. His challenge, then, is based on the premise that despite a rapidly evolving situation on the ground, he is entitled to two things: (a) to know, in advance, precisely what steps law enforcement agencies will take to address unforeseen threats; and (2) to have all law enforcement officers at the scene be entirely consistent in when and how they apply the alleged rule—regardless of the officers' affiliation and supervision, the information they have

8

been given, and what they see or perceive around them. But none of Plaintiff's authorities support either requirement.

As the U.S. Supreme Court has observed, "many situations which confront officers in the course of executing their duties are more or less ambiguous." *Terry v. Ohio*, 392 U.S. 1, 36, (1968) (Douglas, J dissenting). Courts must give the Highway Patrol and other "fair leeway for enforcing the law in the community's protection." *Brinegar v. United States*, 338 U.S. 160, 176 (1949), quoted with approval, *Dunaway v. New York*, 442 U.S. 200, 208 (1979). There is no dispute here that some law enforcement action was necessary for "the community's protection."

Nor is there any dispute that the situation was unclear and unstable, which required quickly evolving response. Here, as in "situations involving possible domestic violence," "[p]olice officers … must have sufficient leeway to make snap judgments based upon imperfect information." *Maeberry v. City of St. Paul, Minn.*, CIV 09-1216, 2010 WL 2814285 (D. Minn. July 16, 2010). That at some points during the constantly evolving situation those supervising the various groups of officers agreed to insist that protesters keep moving in part of the area where the threat of violence seemed greatest may not have itself been a "snap judgment." But the need to respond quickly—if not immediately—to changing events did demand quick decisions that often arose out of imperfect information.

Ultimately, had the Plaintiff been arrested, presumably for "failure to disperse," he would have been given full, constitutionally required process to challenge that charge. But he was not arrested, nor otherwise subjected to any action that implicates due process concerns. It seems unlikely that he could prevail on due process grounds.

**Freedom of speech.**

Plaintiff's second claim is that the alleged "five-second rule" violates his freedom of speech guaranteed by the First Amendment.

In attacking the ability of law enforcement agencies dealing with groups that have included those looting and burning, as well as using firearms, Plaintiff is attacking what he apparently concedes is a "a content neutral time, place, and manner regulation," to be "'tested under intermediate scrutiny, which questions whether the regulations are narrowly tailored to serve a significant government interest and allow for ample alternative channels for communication.'" *Traditionalist Am. Knights of Ku Klux Klan v. City of Desloge, Mo.*, 983 F. Supp.2d 1137, 1145 (E.D. Mo. 2013), quoting *Phelps-Roper v. Koster*, 713 F.3d 942, 950 (8th Cir. 2013).

Plaintiff states various bases for his claim that the alleged "five-second rule" violates his First Amendment rights: that it gives too much discretion to individual law enforcement officers; that it does not serve a government interest; that it is not narrowly tailored; and that it does not leave ample alternative channels of communication. As discussed below, he is not likely to prevail on any of those bases.

*Discretion of individual officers.*

Plaintiff's argument about discretion is based on the premise that an officer can impose or not impose the alleged "rule" based on whether he or she is "annoyed." Motion at 15. He cites no support for that interpretation of the "rule." But more important, at this stage, his demand is inconsistent with the interests he claims to protect.

All that Plaintiff presents is subjective observations that some peaceful protesters were not asked to "move along." In other words, Plaintiff demonstrates that officers chose to allow

precisely what Plaintiffs says they should have allowed. That the officers did so does nothing more than show that they were appropriately reluctant to unnecessarily interfere with speech. To paraphrase the language of the U.S. Court of Appeals for the Eighth Circuit, this Court should not invalidate the alleged policy or rule because those allegedly administering "show[]too much solicitude for speech." *Thorburn v. Austin*, 231 F.3d 1114, 1120 (8th Cir. 2000).

To argue that the alleged "rule," though allegedly "broadly appli[ed]" (Motion at 18), must be applied universally or not at all is to defeat the ability of police officers to attempt to distinguish between stops and gatherings that threaten to develop into public safety problems, and those that do not—or to demand the impossible: to know in advance what to do in response to unique, unforeseen threats to public safety. None of the cases cited by Plaintiff go that far.

### *Government interest.*

There appears to be no dispute that the interest law enforcement agents were attempting to serve with the alleged "five-second rule" was, of course, protection of the public—in terms of both people and property—and that it is not just a significant, but a compelling one. Nor is there a dispute that the looting and violence demanded some response.

Plaintiff's claim then, is that the response did not serve the interest—*i.e.*, either that attempting to prevent groups from gathering in the very small area where violence had already occurred and the threat of renewed violence was highest could not contribute to public safety. In support of that claim he submits an affidavit from someone who purports to have 20-20 hindsight. But what is missing from Plaintiff's presentation on this point is logic. So long as those in the area moved along the sidewalks, law enforcement officers could observe them and watch for threats. Discouraging crowds from growing at the critical location, the alternative that

11

Plaintiff insists the First Amendment demands, was a logical—but very temporary—step in addressing the threats in Ferguson.

### *Narrow tailoring.*

Plaintiff's principle argument that the alleged "five-second rule" was not "narrowly tailored" is based largely on the application of the rule at times other than in the late evening, when violence was most likely. But here, his claim conflicts with the same facts he cites for his argument that the alleged "rule" was inconsistently applied. Many of the examples that he gives of officers not applying the rule seem to be prior to the problematic hour. There is every reason to believe, based on Plaintiff's statements and those of his declarants, that the alleged "rule" was applied more at night and less during the day—a sliding scale that fits, rather than disproving, the concept of "narrowly tailoring."

Plaintiff's argument also extends to the relative location of the PAZ and the "command center." His argument incorrectly characterizes the spatial relationship. But even more important, Plaintiff ignores the direction of the threat. The alleged "rule" was being applied where violence had occurred and where the available information suggested it was threatened—and only to that small area. It was "narrowly tailored" to address that particular concern.

### *Ample alternative.*

Finally, Plaintiff argues that he lacked an "ample alternative" to speak. He relies on the doctrine that "an alternative mode of communication may be constitutionally inadequate if the speaker's ability to 'communicate effectively is threatened.'" *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1225 (10th Cir. 2007), quoting *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984). But the standard is stricter than Plaintiff's argument suggests: courts "generally will not strike down a governmental

action … unless the government enactment will foreclose an entire medium of public expression across the landscape of a particular community or setting." *Menotti*, 409 F.3d at 1138. And the "ample alternative channels analysis cannot be conducted in an objective vacuum, but instead must give 'practical recognition' to the facts giving rise to the restriction on speech." *Citizens for Peace*, 477 F.3d at 1226, quoting *Menotti*, 409 F.3d at 1140.

Plaintiff's claim is based largely on the location of the public access zone ("PAZ") in relation to the press zone (*e.g.*, Motion at 19). But that argument minimizes or ignores some key points.

First, the PAZ was *not* "far away from [Plaintiff's] intended audience." *Citizens for Peace*, 477 F.3d at 1225. It was within a few dozen yards of the main protest area, well within earshot and sight of much of that area.

Second, though the PAZ was not immediately adjacent to the press area, that did not mean that protestors could not communicate with the press as they walked along the protest route. No law enforcement agency imposed a requirement that the press remain in the so-called "press zone"—and the press did not remain in that area. The press zone was not an area where law enforcement officers were holding press representative in place. They could go everywhere any protester could go. That included walking on the street with Plaintiff or his declarants. It included going to the PAZ. And it included going outside of the small, 3-block area of Ferguson where violence was experienced and threatened—such as to the other locations in the St. Louis area where protests were held.

Third, and perhaps most important, Plaintiff does not and cannot reasonably claim that establishing the PAZ and applying the alleged "five-second rule" "foreclose[d] an entire medium of public expression across the landscape of a particular community or setting." If the "medium"

at issue is protest vocals and signs, the alleged "five-second rule" allowed that throughout the "community or setting." And if the "medium" is contact with representatives of the mass media, well, the idea that requiring that protests using voice or signs move in part of a small area but allowing protesters to gather elsewhere, very nearby, to speak and hold signs does not leave "ample" opportunities to make press contacts makes no sense—particularly in our modern, technologically equipped world. After all, Plaintiff likely had and media representatives certainly had cell phones with which they could communicate at will. Plaintiff and the media could arrange to and then communicate in person, without any restriction less than a block away. And Plaintiff could join protests—again, well-covered by the media—that occurred in other parts of the St. Louis area. The vast array of opportunities for communication was more than "ample" when compared to any prior case we are currently aware of.

## CONCLUSION

Because Plaintiff has not made the requisite demonstration of a need for the broad, inflexible preliminary injunction he seeks, the Motion should be denied.

Respectfully submitted,

**CHRIS KOSTER**
Missouri Attorney General

 /s/ *James R. Layton*
JAMES R. LAYTON
Solicitor General
Mo. Bar #45631
PO Box 899
Jefferson City, Missouri 65102-0899
(573) 751-1800
(573) 751-0774 (facsimile)
James.Layton@ago.mo.gov

ROBERT J. ISAACSON
Assistant Attorney General
Mo. Bar #38361

PO Box 861
St. Louis, Missouri 63188
(314) 340-7861
(314) 340-7029 (facsimile)
Robert.Isaacson@ago.mo.gov

**ATTORNEYS FOR DEFENDANT
RONALD K. REPLOGLE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via the courts CM/ECF system, this 15th day of September, 2014, to:

Anthony E. Rothert
Grant R. Doty
American Civil Liberties Union of
 Missouri Foundation
454 Whittier Street
St. Louis, Missouri 63108
arothert@aclu-mo.org
gdoty@aclu-mo.org

Gillian R. Wilcox
American Civil Liberties Union of
 Missouri Foundation
3601 Main Street
Kansas City, Missouri 64111
gwilcox@aclu-mo.org

Kenneth Michael Trujillo-Jamison
Thomas P. Clancy
Nathan M. Rehn
Grant A. Davis-Denny
Victoria A. Degtyareva
Munger, Tolles & Olson LLP
355 South Grand Avenue
35th Floor
Los Angeles, California 90071
Kenneth.Trujillo-Jamison@mto.com
Thomas.Clancy@mto.com
Nathan.Rehn@mto.com
Grant.Davis-Denny@mto.com
Victoria.Degtyareva@mto.com

*Attorneys for Plaintiff*

Michael A. Shuman
Associate County Counselor
St. Louis County Counselor's Office
Lawrence K. Roos Building
41 So. Central Avenue
Clayton, Missouri 63105
mshuman@stlouisco.com

*Attorney for Defendant St. Louis County, Missouri*

 /s/ *James R. Layton*
Solicitor General