UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MUSTAFA ABDULLAH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:14CV1436 CDP |
| | ) | |
| COUNTY OF ST. LOUIS, MISSOURI, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM, ORDER AND PRELIMINARY INJUNCTION

Plaintiff Mustafa Abdullah seeks a preliminary injunction enjoining certain law enforcement agencies from prohibiting him and protesters in Ferguson, Missouri, from standing still when they are not violating any law. Defendants are St. Louis County and Ronald K. Replogle, in his capacity as Superintendent of the Missouri Highway Patrol. The evidence presented at the preliminary injunction hearing shows that plaintiff is likely to succeed on the merits and that he will suffer irreparable harm unless the injunction is granted. As it was applied in this case, the practice of requiring peaceful demonstrators and others to walk, rather than stand still, violates the constitution. Because it is likely that these agencies will again apply this unconstitutional policy to plaintiff and the peaceful protesters he wishes to meet with, I will enter a preliminary injunction.

Nothing in this preliminary injunction prevents defendants or any other law enforcement officers from enforcing the Missouri failure-to-disperse law or any other law.  Law enforcement must be able to use the full range of lawful means to control crowds and to protect people and property from acts of violence and vandalism, including ordering a crowd to move or disperse if law enforcement officers believe the crowd is assembled for the purpose of violence or rioting.  Nor does this order prevent authorities from restricting protesting in certain areas or making other reasonable restrictions on the protests' time, place and manner.  This injunction prevents only the enforcement of an ad hoc rule developed for the Ferguson protests that directed police officers, if they felt like it, to order peaceful, law-abiding protesters to keep moving rather than standing still.

## **Findings of Fact**

After Michael Brown was shot and killed by a Ferguson, Missouri, police officer on August 9, 2014, crowds of citizens gathered near the shooting site and at other locations in Ferguson.  Some people in the crowd had come to protest; others had come for other reasons, such as praying or bearing witness or providing food and water to those who were protesting.  Most people were assembled peacefully and were not there to commit any acts of violence.

During the nights following the shooting, however, and for several weeks afterward, the crowds became unruly and some in the crowds became violent.  On Sunday night, August 10, a Quick Trip gas station and convenience store was looted and then burned to the ground.  On other nights more businesses were looted and suffered extensive property damage.  Some in the crowds threw rocks, bricks, water bottles and other objects at the police.  Some in the crowds fired guns in the air and at the police; some threw Molotov cocktails; some kicked or otherwise damaged police vehicles.  A number of people were injured.  One night police found an unconscious person who had been severely beaten by someone in the crowd.  On many occasions the people in the front of the crowds were not committing acts of violence; objects were thrown from those standing farther back in the crowd, where police could not identify them.

A number of police departments, including the St. Louis County Police Department and the Missouri State Highway Patrol, were called in to assist the Ferguson Police Department.  Law enforcement authorities used many methods to try to control the crowds and prevent further violence, including using tear gas and smoke canisters.  Not surprisingly, the violence generally began after dark, and crowds during the day were mostly peaceful.

- 3 -

On August 14 Missouri Governor Jay Nixon ordered the Missouri State Highway Patrol to take charge of law enforcement in the area.  On August 16 Governor Nixon signed an executive order declaring a state of emergency and officially ordered other law enforcement agencies to assist the Patrol when requested.  Once the Highway Patrol was in control, it formed a unified command structure with other police departments, including the St. Louis County Police Department.  That group established a temporary command center about a mile from the center of the protest activity.

During the night of Sunday, August 17, a large and unruly crowd began marching toward the law enforcement command center, with some in the crowd announcing that they were going to overrun the command center.  Although that crowd was ultimately turned back, the following day the unified command structure decided on the strategy that is at issue in this lawsuit.

The strategy adopted on August 18 called for law enforcement officers to tell protesters that they had to keep moving and that they could not stand still on the sidewalks.  This was communicated to the officers at the regular roll calls, and the officers were told to use discretion, but were not told any particular circumstances or factors that they should consider in using that discretion.

- 4 -

Plaintiff Mustafa Abdullah works as a program associate for the American Civil Liberties Union, and part of his job duties include observing protest sites such as the one in Ferguson and passing out "Know Your Rights" cards.[1]  He also acts as a legal observer for the ACLU and attempts to engage in conversations with people at the demonstrations to listen to their stories and understand their concerns. He sees part of his role as facilitating communications between law enforcement officers and the public, and he encourages people to follow the directions of the police even if he believes the instructions are problematic.  Before the keep-moving strategy began, Abdullah had visited the protest site and been able to talk to groups of people (while standing still) about their rights, and he wants to continue doing that, without being forced to move.  He testified that he has been involved in many community meetings as part of his work but had never before been forced to have a meeting while walking.  He is not a protester himself, has no desire to engage in violence or civil disobedience, and does not want to be arrested.

After the ACLU received reports that police were not allowing people to stand still on August 18, plaintiff went to the area.  As soon as he began talking to people on the sidewalks, he was approached by St. Louis County police officers

---

[1] Some of the advice on the cards tells people who are stopped for questioning to "Stay Calm. Don't Run. Don't argue, resist or obstruct the officer even if you are innocent or your rights are being violated."

and told he must keep moving and could not stand still.  One person asked plaintiff

to join her in prayer, and police said they could pray while they were walking.  The

people plaintiff was talking to were not engaged in any violence.  This happened in

the daytime, and there was not a large crowd present.  Plaintiff testified that after

being told repeatedly to keep moving or be arrested, he left the scene because he

did not want to be arrested.

Plaintiff brought this suit later on August 18, and I held a hearing on his

motion for a temporary restraining order that same day.  At the hearing the

defendants provided evidence that earlier that afternoon they had established an

alternate place where protesters and others could gather and express themselves

without being required to keep moving.  I denied the request for a temporary

restraining order.

After the hearing one of the ACLU lawyers went to Ferguson and tried to

find the alternative protest area.  Highway Patrol officers told him that they did not

know anything about an approved protest zone.  He was twice told to keep moving

while he attempted to ask other people whether they knew of an alternative site.

He returned to the area the next morning, on August 19, again to try to locate the

alternate protest zone.  The place that seemed to correspond to the testimony was

either an open field, or a parking lot by a furniture store.  The owner of the

- 6 -

furniture store told him that the parking lot was his private property and that he had not agreed it could be used as a protest zone. The witness asked several police officers the location of the area designated for protesters to stand still and they either told him there was no such thing or that they had no idea what he was talking about. He also observed police telling people they must keep walking, even though there was no unrest or violent behavior at that time.

Later on August 19 the Highway Patrol issued a press release indicating that a new "Protester Assembly Zone" had been established. The ACLU attorney again went to look for the zone, and this time saw a sign saying "Approved Assembly Area" near the same parking lot he had been to that morning. It was south of the main area of the protests and was not within sight of a new "Media Staging Area" that was established at the same time. Unlike other places where demonstrators had been gathering, the designated area had no access to water or restroom facilities. The testimony established that throughout the August and September periods, very few people used the area, although some used it to rest when their feet became too tired from walking.

Plaintiff presented the testimony of additional witnesses who had been in the area during different times in the days and weeks after the shooting. One of the witnesses testified about his live tweets from the area, documenting times as late as

August 23 when he was being told he would be arrested if he didn't keep moving, and then other times that same day when people were standing still with no interference from police.  Others testified about being told to move, being told they would be arrested if they did not move, and seeing people arrested after they had failed to move.

The evidence from plaintiff's witnesses shows that the police, including those from St. Louis County, told many people who were either peacefully assembling or simply standing on their own that they would be arrested if they did not keep moving.  Some law enforcement officers told people that they could stand still for no more than five seconds.  Others gave instructions that people were walking too slowly, or that they could not walk back and forth in a small area.  Some law enforcement officers did not make people keep moving, others did.  Some officers applied the strategy to reporters, others did not.  Many officers told people who were standing in small groups on the sidewalks during the daytime hours that they would be arrested if they did not keep moving.

At some point the Ferguson Police Department resumed control of the situation.  On August 27 the command center that had been established was disassembled; the governor lifted the state of emergency on September 3, 2014.  Although the Ferguson Police Department resumed its role as the agency

maintaining security within its city limits, it can, and has, sought assistance from St. Louis County, the Missouri Highway Patrol, and other agencies.  Evidence showed that Highway Patrol officers were working in Ferguson as recently as September 27, and that on the same day Ferguson police officers told demonstrators that they must keep moving or they would be arrested.  In the video of that encounter the officers told demonstrators their authority for the instruction was a loitering ordinance, and there was no reference to the failure-to-disperse law.

Defendants' witnesses testified that the unified command structure, consisting of the top officials of the Highway Patrol, St. Louis County Police, and St. Louis City Police, jointly decided to use this keep-moving strategy.  These witnesses' testimony was inconsistent, however, about what the strategy meant and how it was to be enforced.  The St. Louis County Police Chief testified that the strategy was only intended to be used when crowds became dangerously large and unruly, which had mostly happened in the nighttime.  The Chief testified that he had been instructed to use "failure to disperse" to enforce the strategy.  He also testified that now that the Ferguson Police Department is the law enforcement agency in charge of the area, the St. Louis County police will not be using the keep-moving strategy.  His subordinate, however, who was responsible for communicating the strategy to the officers in the field, testified to no such

- 9 -

limitations.  Instead he said officers were just told to use their discretion.  He

testified that the strategy could be used at any time, and did not require a riot or

unlawful assembly.  He also testified that the strategy was still in effect and that he

would use it again if sent back to Ferguson.  The Highway Patrol Field Operations

Commander (the second highest-ranking officer in the Highway Patrol) testified

that because the legal authority for the keep-moving strategy was the failure-to-

disperse law, people who refused to keep moving could only be arrested if the

elements of that law were met.

## **Conclusions of Law**

Plaintiff brought suit under 42 U.S.C. § 1983, alleging that defendants'

actions and policies infringe upon his First Amendment rights, including the right

to assemble.  In a separate count he alleges that the policy violates the Fourteenth

Amendment's Due Process clause because the policy fails to provide sufficient

notice of what is illegal and because it was enforced arbitrarily.  Only St. Louis

County and Ronald K. Replogle, in his official capacity as Superintendent of the

Missouri Highway Patrol, are defendants.  The Ferguson Police Department is not

a defendant.

In determining whether to issue a preliminary injunction, the Court must

consider the following four factors: (1) the threat of irreparable harm to the movant

if the injunction were not granted; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties to the case; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

### 1. Likelihood of success on merits

#### a. Failure to Disperse

In their briefs, defendants argued that plaintiff is asking me to enjoin enforcement of what the police refer to as the "failure-to-disperse" statute, although they retreated somewhat from that argument at the hearing. In any event, the conduct that plaintiff complains of here is not enforcement of that law.

Mo. Rev. Stat. § 574.060, entitled "Refusal to disperse," states that "[a] person commits the crime of refusal to disperse if, being present at the scene of an unlawful assembly, or at the scene of a riot, he knowingly fails or refuses to obey the lawful command of a law enforcement officer to depart from the scene of such unlawful assembly or riot." Mo. Rev. Stat. § 574.060. An "unlawful assembly" requires that six or more people assemble and agree to violate criminal laws with force or violence. Mo. Rev. Stat. § 574.040. A "riot" requires that the six or more assembled people actually violate criminal laws with force or violence. Mo. Rev.

Stat. § 574.050.   An unlawful assembly requires actions that make it reasonable for rational people in the area "to believe the assembly will cause injury to persons or damage to property and will interfere with the rights of others by committing disorderly acts." *State v. Mast*, 713 S.W.2d 601, 603-04 (Mo. Ct. App. 1986). "[E]very person who is present and cognizant of the unlawful acts being committed by the other members of the assembly can be found guilty of being unlawfully assembled." *Id.* at 604.   Thus, even people who are not themselves committing acts of violence must disperse when ordered to do so. *Id.* at 604-605.

This statute provides no defense to this suit for several reasons.   First, people were not told to "disperse" – in other words, to leave the area.   Instead they were told to keep moving.   Second, the order was given even when there were fewer than six people gathered.   The evidence included examples where the order was given to one person alone, to three people attempting to pray, to a reporter and one other person, as well as to larger groups.   And the order was given to people who were doing nothing to indicate they intended to violate laws of any sort, much less to engage in violence.   In fact, nearly all of plaintiff's fact witnesses testified that despite gatherings that were peaceful and law-abiding at the time, officers told people they must keep moving or they would be arrested.   Unlike the defendant in *Mast*, who was told to disperse and was arrested only after his group wreaked

significant havoc upon people and property, people in Ferguson were subject to the keep moving-rule for no reason other than that they were standing still on the public sidewalks.

There may have been confusion about the legal basis for the keep-moving rule, but there is no doubt that people were ordered to keep moving in situations that could never have been covered by the refusal-to-disperse law.

### b. Municipal Liability

St. Louis County argues that plaintiff is not likely to succeed on the merits against the County because its officers acted on orders from the Highway Patrol and because the orders to keep moving were not part of a policy or custom of the County. The first argument is refuted by the evidence, which showed that the County did not blindly follow orders of the Highway Patrol. Instead, high-ranking County police officers were actively involved in determining the strategies to use. Although the Highway Patrol was the ultimate authority, that did not mean that the County was somehow required to follow orders that violated people's constitutional rights. This is far different from the situation where state law mandates a municipality must act in a certain way with no exercise of any discretion. *See Vives v. City of New York*, 524 F.3d 346, 353 (2nd Cir. 2008); *see also Snyder v. King*, 745 F.3d 242, 249 n.3 (7th Cir. 2014). Here the County police

had a seat at the table in determining the strategy and were part of the final policymaking group.

The second argument – that municipal liability cannot be imposed in this situation because there was no custom or policy – must be analyzed under the authority of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and the cases following it.  In *Monell*, the Supreme Court held that municipalities may be liable for monetary, declaratory or injunctive relief under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the municipality.  *Monell*, 436 U.S. at 690.  To establish liability for a "custom," plaintiff must show that there is: (1) a continuing, widespread, and persistent pattern of unconstitutional misconduct, (2) deliberate indifference or tacit authorization of such conduct by policymaking officials after notice of the conduct, and (3) that the custom caused the violation of plaintiff's constitutional rights.  *See Johnson v. Douglas Cnty Med. Dep't,* 725 F.3d 825, 828 (8th Cir. 2013); *Jane Doe A v. Special Sch. Dist. of St. Louis*, 901 F.2d 642, 646 (8th Cir. 1990).

Plaintiff is likely to succeed on the issue of municipal liability.  In arguing that there is no policy or custom, St. Louis County apparently wishes the court to conclude that all of the different officers who took the same actions over a period

- 14 -

of several days were doing so on their own, without any orders or directions from the County police department policymakers.  This argument is contradicted by the facts of the case.  The evidence presented at the hearing indicates that plaintiff will be able to show either a policy – albeit unwritten and vague – or, at the least, a custom.  Both the St. Louis County Police Chief and the Precinct Captain who testified were directly involved in developing and enforcing the keep-moving strategy, along with the Highway Patrol Captain who had been placed in charge of the situation by the Governor.  This was a deliberate strategy, developed after the unified command structure met and discussed options.  It was communicated to the officers on the street at several different roll call meetings, and continued in use for a period of days (and according to at least one witness, is still in effect).  This is a far different situation from cases like *Bernini v. City of St. Paul,* 665 F.3d 997 (8th Cir. 2012).  In that case municipal liability was rejected where the decision had been made by a police officer who had no ultimate policymaking authority for the police force.  There the decision-maker was the officer in charge on the street when a demonstration became unruly, and he made the decision at that time to encircle the crowd and arrest everyone.  In contrast, the Ferguson decision was made by policymakers gathered to plan an appropriate course of action for future events.  The officers on the street who were telling people they would be arrested if they

- 15 -

stood still were following the policy directives given at several roll calls on several different days.

It is also significant that the policymakers actually *knew* that they could not lawfully arrest people simply for standing peacefully on the sidewalk.  The top members of the unified command decided that they would use the failure-to-disperse law as their legal justification for the orders that all the demonstrators must keep moving, but they also knew that to arrest someone legally they would have to have probable cause to believe that six or more people were gathered for the purpose of violence and had refused an order to disperse.  The policymakers knew the policy was being used against peaceful citizens but did not stop the practice.  This evidence is sufficient at the preliminary injunction stage to show likelihood of success in establishing municipal liability.

*c. Due Process*

Plaintiff argues that the keep-moving rule as it was implemented is unconstitutionally vague in violation of his due process rights.  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Criminal laws must be defined in a way that allows ordinary people to understand what conduct is against the law and does not encourage arbitrary and

- 16 -

discriminatory enforcement.  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  For

example, in *City of Chicago v. Morales*, 527 U.S. 41 (1999), an ordinance that

allowed police to arrest gang members who were "remain[ing] in any one place

with no apparent purpose" was invalid because it gave both "too much discretion

to the police and too little notice to citizens who wish to use the public streets."  *Id.*

at 47, 64 (brackets in original).  Importantly, "[w]here a statute's literal scope,

unaided by a narrowing state court interpretation, is capable of reaching expression

sheltered by the First Amendment, the [void-for-vagueness] doctrine demands a

greater degree of specificity than in other contexts."  *Smith v. Goguen*, 415 U.S.

566, 573 (1974).

        Plaintiff is likely to succeed on the merits of showing that the keep-moving

policy violates due process in both ways.  Of course, in this situation there is no

statute or ordinance being challenged.  Rather, it is an unwritten policy, given to

officers at their roll calls, instructing them to order people to keep moving

whenever the officers thought it was appropriate to do so.  Some officers told

everyone to keep moving, so if plaintiff was unlucky enough to be standing in the

vicinity of those officers, he would be told to move.  Some officers told people

they would be arrested if they did not move, but at least one officer told people that

they had to keep moving but probably would *not* be arrested if they failed to

comply.  Some officers interpreted the policy to mean that people had to walk at a certain speed, others told people that they could not walk back and forth in a certain-sized area.  Some officers applied it to members of the press, while others did not.  Plaintiff and his other witnesses testified that they could not tell what would or would not be allowed at any given moment.

The rule provided no notice to citizens of what conduct was unlawful, and its enforcement was entirely arbitrary and left to the unfettered discretion of the officers on the street.  This policy "necessarily entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat."  *See Kolender*, 461 U.S. at 360 (brackets and quotation marks omitted).  Like the gang loitering ordinance found unconstitutional in *Chicago v. Morales,* 527 U.S. 41 (1999), the keep-moving policy cannot meet constitutional standards for definiteness and clarity.

### d. First Amendment

Plaintiff's complaint alleges that the keep-moving policy infringed on his First Amendment rights, including the right to peacefully assemble and engage in conversations with others on a public sidewalk.  Defendants concede, as they must, that the public streets or sidewalks where the demonstrations have taken place are considered a traditional public forum.  *See, e.g.*, *Frisby v. Schultz*, 487 U.S. 474, 480 (1988) (discussing forum analysis).  "Consistent with the traditionally open

character of public streets and sidewalks," the Supreme Court has held that the

government's ability to restrict speech in these locations is very limited. *McCullen*

*v. Coakley*, 134 S. Ct. 2518, 2529 (2014).  But the "rights of free speech and

assembly, while fundamental in our democratic society, still do not mean that

everyone with opinions or beliefs to express may address a group at any public

place and at any time." *Cox v. Louisiana,* 379 U.S. 536, 554 (1965).  "Even in a

public forum the government may impose reasonable restrictions on the time,

place, or manner of protected speech, provided the restrictions are justified without

reference to the content of the regulated speech, that they are narrowly tailored to

serve a significant governmental interest, and that they leave open ample

alternative channels for communication of the information." *McCullen,* 134 S.Ct.

at 2529 (brackets and quotation marks omitted).  *See also Phelps-Roper v. Koster,*

713 F.3d 942, 950 (8th Cir. 2013).

I conclude that it is likely plaintiff will prevail on the merits of his First

Amendment claim, and given my conclusions about the Due Process claim, I need

not at this time discuss the First Amendment issues in detail.  The keep-moving

policy – as it was applied to plaintiff and others – prohibited citizens from

peacefully assembling on the public sidewalks.  Although the state has a valid

interest in maintaining order on its streets and sidewalks and in preventing violence

- 19 -

by crowds, this interest is not sufficient to apply such a blanket rule to people

assembling peacefully.  *See Cox,* 379 U.S. at 544-545 (in addition to violating due

process, statute that prohibited people from congregating on sidewalk infringed

upon First Amendment rights to speech and assembly of peaceful protesters).  The

evidence showed that the strategy burdened substantially more speech than was

necessary to achieve its legitimate goals.  In fact, one of the police witnesses

testified that it only worked well during the daytime when there were no large

crowds and no threats of violence – when the crowds grew unruly, telling them to

keep moving was not an effective strategy.  Thus, defendants' own evidence shows

that this strategy fails the requirement that "the means chosen are not substantially

broader than necessary to achieve the government's interest," as described in *Ward*

*v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989).

The parties have not cited any cases where rules similar to the keep-moving

strategy are considered, but in *Foti v. City of Menlo Park,* 146 F.3d 629, 642-43

(9th Cir. 1998), the Ninth Circuit Court of Appeals held that an ordinance requiring

persons carrying signs to be actually moving was unconstitutional because it was

not narrowly tailored to serve the state's interest in the free flow of pedestrian

traffic on sidewalks.  Plaintiff is likely to be able to prove the same failing here.

And even if the restriction could be justified somehow, the alternative protest zone

belatedly established likely did not provide an adequate alternative forum for people to assemble and protest.

### 2. Threat of Irreparable Harm

Defendants argue that plaintiff cannot show that he is threatened with irreparable harm because they are no longer in charge of keeping order in Ferguson.  They also assert that they stopped using the keep-moving strategy.  As discussed above, the evidence was conflicting about whether the policy was still in effect, and there has been no assurance that it would not be implemented again as the protests continue.  Many cases have held that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc*., 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)).

Plaintiff testified that he wants to continue his work during the demonstrations without fear that he will be arrested if he stops walking.  Public gatherings and protests related to Michael Brown's death are continuing and will continue into the future.  It is very likely that defendants will continue to be involved.  State troopers and St. Louis County police can be called in to assist at

any time.  Ferguson's relatively small police force is likely to need future

assistance from those agencies.[2]

"The loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373

(1976); *Iowa Right to Life Comm. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999);

*Kirkeby v. Furness*, 52 F.3d 772, 775 (8th Cir. 1995).  Plaintiff has shown that he

will suffer irreparable harm if the injunction is not issued.

### 3.  The Public Interest and Balance of Harms

The public interest favors protecting core First Amendment freedoms.  *See,

e.g., Iowa Right to Life,* 187 F.3d at 970; *Kirkeby*, 52 F.3d at 775; *see also Phelps-

Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds,

Phelps-Roper v. City of Manchester,* 697 F.3d 678 (8th Cir. 2012) (en banc).  Both

the defendants and the public have a legitimate interest in maintaining order and

protecting the public safety.  Both the defendants and the public have a legitimate

interest in assuring that police officers, who have been the target of much of the

violence in Ferguson, are not hurt.  However, there is no evidence that these

interests would be harmed if defendants are prevented from applying the keep-

--------

[2] Plaintiffs have filed a motion to supplement with evidence showing that in the last few days the St. Louis County Police Department has assumed control of security regarding Ferguson protests.

moving rule to people who are peacefully assembled on the sidewalks.   Neither the public interest nor the interests of the defendants favor restricting the core constitutional rights of assembly and speech in the arbitrary and vague manner caused by the keep-moving rule.

### 4.  Bond

Pursuant to Rule 65(c), Fed. R. Civ. P., the Court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Plaintiff has asked that the court waive the bond or require bond in only a nominal amount.  Defendants have not briefed the issue of the amount of a bond.  Given the constitutional issues at stake here and taking into account plaintiff's status as employee of a not-for-profit entity, I will set the bond in the amount of $100.

## <u>Conclusion</u>

Plaintiffs are entitled to the entry of a preliminary injunction enjoining defendants from telling citizens that they must keep moving, or from threatening them with arrest if they stand still, so long as those citizens are not committing a crime, engaging in violent acts, or participating in a crowd that contains other people doing those things.

This injunction does not prevent defendants or other law enforcement agencies from using all lawful means to control crowds and protect against violence.  Missouri's refusal-to-disperse law is not restricted by this injunction. Where there is an unlawful assembly or riot, the police can order persons to disperse and can arrest those who do not.  If a crowd is becoming unruly, the police may find it necessary to order the crowd to disperse – including persons who are not committing crimes or violent acts – and the police may also tell an unruly crowd to move to a different place.  From time to time this may mean that citizens who are themselves peaceful but who are part of a crowd that is becoming violent must obey these orders or face arrest.  This injunction merely prohibits that kind of directive to peaceful citizens who are committing no crimes, whether they are doing so singly or in a law-abiding group.

The rule of law is essential to our constitutional system of government, and it applies equally to law enforcement officers and to other citizens.  Citizens who wish to gather in the wake of Michael Brown's tragic death have a constitutional right to do so, but they do not have the right to endanger lives of police officers or other citizens.  The police must be able to perform their jobs, and nothing in this order restricts their ability to do that.   Accordingly,

- 24 -

**IT IS HEREBY ORDERED** that plaintiff's motion for a preliminary injunction [#14] is granted, and defendants, their officers, employees, or agents, and those acting on their behalf or in concert with them, are enjoined from enforcing or threatening to enforce any rule, policy, or practice that grants law enforcement officers the authority or discretion to arrest, threaten to arrest, or order to move individuals who are violating no statute or regulation and who are peaceably standing, marching, or assembling on public sidewalks in Ferguson, Missouri.

**IT IS FURTHER ORDERED** that this order shall not prevent defendants from enforcing the Missouri refusal-to-disperse statute, Mo. Rev. Stat. §574.060.

**IT IS FURTHER ORDERED** that this injunction becomes effective only upon plaintiff's posting a bond in the amount of $100, and remains in effect until entry of judgment on the merits or further order of the court.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 6th day of October, 2014.

- 25 -