UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MUSTAFA ABDULLAH,                    )
                                     )
                  Plaintiff,         )
                                     )
       v.                            ) No. 4:14-CV-1436-CDP
                                     )
COUNTY OF SAINT LOUIS, MISSOURI,     )
et al.,                              )
                                     )
                  Defendants.        )


PRELIMINARY INJUNCTION HEARING


BEFORE THE HONORABLE CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


SEPTEMBER 29, 2014

APPEARANCES:

For Plaintiff          Anthony E. Rothert, Esq.
                       Grant R. Doty, Esq.
                       **AMERICAN CIVIL LIBERTIES UNION
                       OF MISSOURI FOUNDATION**

                       Grant A. Davis-Denny, Esq.
                       Nathan M. Rehn, Esq.
                       Thomas P. Clancy, Esq.
                       Victoria A. Degtyareva, Esq.
                       **MUNGER TOLLES & OLSON LLP**

For Defendant          Michael A. Shuman
County of              Associate County Counselor
Saint Louis, MO        **ST. LOUIS COUNTY COUNSELOR'S OFFICE**

For Defendant          Robert J. Isaacson, AAG
Ronald Replogle        **ATTORNEY GENERAL OF MISSOURI**

*REPORTED BY:*         *Gayle D. Madden, CSR, RDR, CRR*
                       *Official Court Reporter*
                       *United States District Court*
                       *111 South Tenth Street, Third Floor*
                       *St. Louis, MO  63102      (314) 244-7987*
       (Produced by computer-aided mechanical stenography.)

2

## INDEX

*Plaintiff Witnesses:*

**JOHANNA HOLBROOK**
    Direct Examination by Mr. Clancy . . . . . . . . . Page   8
    Cross-examination by Mr. Shuman . . . . . . . . Page  23
    Cross-examination by Mr. Isaacson . . . . . . . . Page  29

**GRANT DOTY**
    Direct Examination by Mr. Rehn . . . . . . . . . Page  32
    Cross-examination by Mr. Shuman . . . . . . . . Page  46
    Cross-examination by Mr. Isaacson . . . . . . . . Page  52

**DERAY MCKESSON**
    Direct Examination by Mr. Davis-Denny . . . . . . Page  58
    Cross-examination by Mr. Shuman . . . . . . . . Page  80
    Cross-examination by Mr. Isaacson . . . . . . . . Page  87
    Redirect Examination by Mr. Davis-Denny . . . . . Page  95

**MUSTAFA ABDULLAH**
    Direct Examination by Mr. Davis-Denny . . . . . . Page  99
    Cross-examination by Mr. Shuman . . . . . . . . Page 113
    Cross-examination by Mr. Isaacson . . . . . . . . Page 118
    Redirect Examination by Mr. Davis-Denny . . . . . Page 123

**JOEL REINSTEIN**
    Direct Examination by Ms. Degtyareva . . . . . . Page 126
    Cross-examination by Mr. Shuman . . . . . . . . Page 135
    Cross-examination by Mr. Isaacson . . . . . . . . Page 136

*Defense Witness out of order:*

**JON BELMAR**
    Direct Examination by Mr. Shuman . . . . . . . . Page 141
    Cross-examination by Ms. Degtyareva . . . . . . . Page 159
    Cross-examination by Mr. Isaacson . . . . . . . . Page 174
    Redirect Examination by Mr. Shuman . . . . . . . Page 176

*Plaintiff Witnesses continued:*

**JOHNETTA ELZIE**
    Direct Examination by Mr. Davis-Denny . . . . . . Page 178
    Cross-examination by Mr. Shuman . . . . . . . . Page 185

**JAMES DONALD GINGER JR., PH.D.**
    Direct Examination by Ms. Degtyareva . . . . . . Page 188
    Cross-examination by Mr. Isaacson . . . . . . . . Page 203

*Defense Witnesses continued:*

**JEFF BADER**
    Direct Examination by Mr. Shuman . . . . . . . . Page 221
    Cross-examination by Mr. Rehn . . . . . . . . . Page 231
    Redirect Examination by Mr. Shuman . . . . . . . Page 237

**DANIEL ERIC CALDWELL**
    Direct Examination by Mr. Isaacson . . . . . . . . Page 238
    Cross-examination by Mr. Clancy . . . . . . . . . Page 262

**J. BRET JOHNSON**
    Direct Examination by Mr. Isaacson . . . . . . . . Page 267
    Cross-examination by Mr. Davis-Denny . . . . . . Page 280
    Cross-examination by Mr. Shuman . . . . . . . . Page 291

Arguments . . . . . . . . . . . . . . . . . . . Page 295

1        (Proceedings began at 9:07 a.m.)

2            THE COURT:  All right.  Good morning.  We're here in

3    the case of Mustafa Abdullah, et al., versus Saint Louis

4    County, Missouri, et al., and actually, is there another

5    Plaintiff?

6            MR. ROTHERT:  No.

7            THE COURT:  So St. Louis County just handed up this

8    expected list, and I assumed.

9            THE CLERK:  No.  I printed it out.

10           THE COURT:  Oh, no.  We -- you printed it out for me.

11    Okay.  Yeah.  No.  I was just reading from the caption.  So

12    there's only one Plaintiff.

13           MR. ROTHERT:  That's correct.

14           THE COURT:  When I started reading this document, I

15    thought, oh, I missed somebody.  This is Case No.

16    4:14-CV-1436, and we are here for a hearing on the motion for

17    preliminary injunction, and so I would ask the attorneys to

18    please state your names for the record and tell me who all is

19    here in terms of lawyers.  And so for the Plaintiff?

20           MR. ROTHERT:  Your Honor, Anthony Rothert for the

21    Plaintiffs.  Doing the talking today will be some attorneys

22    from Munger Tolles & Olson.

23           MR. DAVIS-DENNY:  Good morning, Your Honor.  Grant

24    Davis-Denny from Munger, Tolles & Olson on behalf of the

25    Plaintiff.

4

1          THE COURT:  Okay.  Speak up because it's very hard to

2  hear in this courtroom.  All right.  Thank you.

3          And who else?  Anybody else speaking?

4          MS. DEGTYAREVA:  Good morning.  Victoria Degtyareva

5  from Munger Tolles & Olson on behalf of the Plaintiff.

6          THE COURT:  All right.  Thank you.

7          MR. REHN:  Yes, Your Honor.  Nathan Rehn from Munger

8  Tolles & Olson on behalf of the Plaintiff.

9          THE COURT:  All right.  Mr. Rehn.

10         MR. CLANCY:  Thomas Clancy from Munger Tolles & Olson

11 on behalf of the Plaintiff.  Good morning, Your Honor.

12         THE COURT:  All right.  Good morning.

13         And then for the Defendant St. Louis County.

14         MR. SHUMAN:  Mike Shuman for the County.

15         THE COURT:  All right.  And for the Defendant Ronald

16 Replogle.

17         MR. ISAACSON:  Robert Isaacson, Your Honor.

18         THE COURT:  Am I pronouncing your client's name

19 correctly?

20         MR. ISAACSON:  Replogle.

21         THE COURT:  Replogle.  Okay.  All right.  So before

22 we begin, there are some preliminary matters to take up.  The

23 first one is I want to remind everyone to turn off their cell

24 phones and that any kind of recording or photographing is not

25 allowed in the courtroom.

1          The second one is there has been a motion filed to

2     exclude witnesses, and I don't know technically whether that

3     applies, but if anybody asks for it, I always grant it, so all

4     witnesses other than parties are excluded from the courtroom.

5     Each of the Defendants, of course, is allowed to have one

6     party representative here.  I see Mr. Abdullah sitting at

7     counsel table.  So anyone else who is a witness needs to go

8     out to the witness room.

9          MR. SHUMAN:  Judge, Chief Belmar is going to be a

10    witness, he's going to testify, but will he be included within

11    the exclusion order?

12         THE COURT:  Well, you -- you're entitled to have

13    one -- you know, the County is the Defendant, and so it can

14    have one client representative, whoever.  Whether you want

15    that to be Chief Belmar or someone else, it doesn't matter to

16    me.

17         MR. SHUMAN:  I think I'd like him to sit in.

18         THE COURT:  Yeah, that's fine.  So he can stay, and

19    then the other witnesses need to be excluded, and the witness

20    rooms are outside.

21         THE CLERK:  He's not here.  He's out in the witness

22    room.

23         THE COURT:  Oh, he's out in the witness room.  Well,

24    you can go get him.  We'll -- we won't -- promise not to do

25    anything until you get back.

1          All right.  Then the next issue is there was a motion

2     to amend the witness list that was filed, I guess, yesterday

3     by the Plaintiff.  That's fine.  I'm not going to -- I think

4     you can call that witness.  We'll -- if the other side wishes

5     to object when you call them, you may do so.  So that motion

6     is also granted.

7          And then the Plaintiffs filed a motion for relief

8     asking me to take judicial notice of a bunch of newspaper

9     articles, and I don't -- I'm not going to take judicial notice

10    of everything that was printed in those articles.  There's a

11    lot of stuff in there that may or may not be true.  There may

12    be some facts you want me to take judicial notice of, and if

13    you want to tell me what those are, I'm happy to do that, but

14    I'm going to deny the motion because it asks generally for me

15    to take judicial notice of everything in the newspaper

16    articles.  If you want me to take, you know, judicial notice

17    of the fact that there have been newspaper articles, that's

18    fine, and certainly, you know, the stuff that's been going on

19    is a matter of news, and as I said at the temporary

20    restraining order hearing, I watch the news the same as

21    everyone else, but I'm not -- you know, I can't say that

22    everything in those articles is beyond dispute.

23          So with that, I think we're ready to proceed.  Do you

24    all want to make any opening statements, or do you want to

25    just proceed with your witnesses?

1          MR. DAVIS-DENNY:  We're fine proceeding, Your

2    Honor --

3          THE COURT:  Okay.

4          MR. DAVIS-DENNY:  -- unless you would like to address

5    anything with us before we get started that was covered in our

6    briefs.

7          MR. ISAACSON:  We're ready to proceed.

8          THE COURT:  Yeah.  No.  I'm ready to go ahead, so you

9    can call your first witness.

10         MR. CLANCY:  Your Honor, Plaintiffs would like to

11   call Johanna Holbrook.

12         THE COURT:  All right.  Is she outside?

13         MR. CLANCY:  She is.

14         THE COURT:  Okay.  And can you remind me of what your

15   name is?

16         MR. CLANCY:  Thomas Clancy, Your Honor.

17         THE COURT:  Okay.  All right.  Ma'am, if you would

18   step up here to the clerk to be sworn.  Just come all the way

19   up, and she'll show you where to go.

20       (Witness sworn.)

21         MR. CLANCY:  Your Honor, may I proceed?

22         THE COURT:  You may.

23                    **JOHANNA HOLBROOK,**

24   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

25   FOLLOWS:

8

1                      DIRECT EXAMINATION

2    BY MR. CLANCY:

3    Q    Good morning, Ms. Holbrook.

4    A    Good morning.  How are you?

5    Q    Good.  Ms. Holbrook, where do you live currently?

6    A    I live in Orlando, Florida.

7    Q    And how long have you lived in Florida?

8    A    Eight years.

9    Q    And where did you live before you moved to Florida?

10   A    I lived in the Ferguson-Florissant area, Florissant to be

11   specific.

12   Q    Is it okay if I refer to it as the Ferguson-Florissant

13   area?

14   A    You definitely can.  That's how the school system is

15   called.

16   Q    And how long did you live there?

17   A    I lived there for 33 years.

18   Q    Were you born in the Ferguson-Florissant area?

19   A    Yes.

20   Q    Ms. Holbrook, what's your current occupation?

21   A    I'm a housewife currently.

22   Q    And when you were residing in the Ferguson-Florissant

23   area, what was your occupation?

24   A    I worked in St. Louis City/St. Louis County courts as a

25   crisis intervention specialist.

9

1   Q     And now that you live in Orlando, do you still come back

2   to the Ferguson-Florissant area?

3   A     Oh, yeah.

4   Q     About how often would you say?

5   A     At least maybe, I'd say, four times a year.

6   Q     For about how long?

7   A     Anywhere from maybe five days to two weeks at a time.

8   Q     And why do you come back to the Ferguson-Florissant area?

9   A     It's just my foundation.  It's where all my family is.

10  It's where all my friends are.

11  Q     Which members of your family live here?

12  A     Everybody -- my mother, my father, my children, my

13  daughters who are 21 and 24, all my in-laws, all my friends.

14  Q     Thank you.  Did you attend any of the protests in

15  Ferguson related to the shooting of Michael Brown?

16  A     I did.

17  Q     If you can recall, what is the first time you attended a

18  protest related to the shootings?

19  A     It was Sunday, I think the 17th of August.

20  Q     And where did you go?

21  A     I went out to Ferguson Avenue and West Florissant, by the

22  Ferguson Market.

23  Q     And why did you go there?

24  A     Just to experience the atmosphere.  I kind of just wanted

25  to feel it, see what was going on.

Johanna Holbrook  Direct Examination                    9/29/2014

10

1   Q    Did you go there to protest?

2   A    No.

3   Q    No.  So what was your goal in going there?

4   A    My goal was just to go out there and, I guess, document

5   it for my own personal preference.  I have my own personal

6   experiences, and I just wanted to be a part of the situation.

7   Q    And around what time of day did you go on that Sunday?

8   A    It was early in the evening, maybe 6:00, 5:00 or 6:00.

9   Q    And what did you observe that Sunday when you went to the

10  protest area?

11  A    It was just a lot of people out there, from old people to

12  young kids, just kind of being on the street.

13  Q    Were there police officers?

14  A    Yes.

15  Q    Would you say there was a large number of police

16  officers, a small number?

17  A    It was -- they were just kind of blocking off traffic, so

18  there was, I would probably say, eight to 10.

19  Q    And did you see any police officers or anyone else

20  telling the protesters they had to keep moving?

21  A    No.

22  Q    That Sunday, did you observe any protestors committing

23  any acts of violence?

24  A    No.

25  Q    After that Sunday, did you return to the protest area?

11

1   A    Yes, I did.

2   Q    When's the next time you returned?

3   A    I went the next day, on Monday.

4   Q    About what time did you go?

5   A    It was about 10:30 in the morning.

6   Q    And what happened when you approached the protest area?

7   A    I was asked to keep walking.  I met a few people.  We

8   stopped to kind of communicate about some few things, give our

9   feelings, and we were told to keep walking.

10  Q    And who told you to keep walking?

11  A    The St. Louis County Police officers.

12  Q    And how do you know they were St. Louis County Police

13  officers?

14  A    Their uniforms are brown.

15  Q    And where were you generally in the protest area when

16  this happened?

17  A    I was just getting to where the QuikTrip area was, across

18  the street, almost right by -- there's a car wash right there.

19  Q    And when the officers approached you and told you to keep

20  moving, did it appear to you like the protests were about to

21  turn violent?

22  A    No.

23          MR. ISAACSON:  Objection.  Foundation.

24          THE COURT:  Overruled.

25  Q    (By Mr. Clancy) Did it appear to you that there was some

1    sort of emergency or dangerous situation?

2    A    No.

3    Q    Did these officers explain to you why you had to keep

4    moving?

5    A    No.  They just said, "Keep walking."

6    Q    Did they explain where a rule that you had to keep moving

7    came from?

8    A    No.

9    Q    Were you told that you could stand still for five seconds

10   or less?

11   A    No.

12   Q    Were you told that you had to disperse or leave the

13   protest area?

14   A    No, huh-uh.

15   Q    Did you videotape any of the encounters with the police?

16   A    I did actually.

17        MR. CLANCY:  Mr. Bales, would you please play

18   Exhibit 2.

19        (Video played.)

20   Q    (By Mr. Clancy) Ms. Holbrook, do you recognize this

21   video?

22   A    Yes.

23   Q    How do you recognize it?

24   A    I took it.

25   Q    Do you recognize any of the other people in the video?

Johanna Holbrook Direct Examination                    9/29/2014

13

1   A     Uh-huh.

2   Q     Which ones?

3   A     Mustafa.

4   Q     And which gentleman was he?

5   A     He was the tall gentleman in -- I think it's a white

6   shirt.

7   Q     And before the video began, were Mustafa or any of the

8   other gentlemen there behaving violently that you could see?

9   A     No.

10  Q     Were they making any threats that you could see or hear?

11  A     No.

12  Q     And was there a larger crowd in that video that we can't

13  see?

14  A     No, not particularly where we were.

15  Q     Were -- it's a little hard to tell from the audio, but

16  were Mustafa and the other gentlemen told they had to leave

17  the protest area?

18  A     No.

19  Q     What did the officers tell them?

20  A     Just to move.

21  Q     And what were they trying to do in that video?  I'm

22  sorry.  What were Mustafa -- what was Mustafa trying to do in

23  that video?

24  A     We were going to say a prayer.

25  Q     And when they were told to move, could they continue to

1    pray?

2    A    Not specifically, no.

3    Q    And, Ms. Holbrook, about how long were you in the protest

4    area on Monday, August 18?

5    A    It was roughly about seven hours, I would say.

6    Q    And were you ever threatened with arrest during that time

7    if you didn't keep moving?

8    A    Yes.

9    Q    About how many times were you threatened with arrest?

10   A    Approximately six.

11   Q    And anytime that you were told to keep moving, did you

12   feel you were behaving violently?

13   A    No.

14   Q    Were you breaking any laws that you knew of?

15   A    No.

16   Q    How about others that were near you when law enforcement

17   told you to keep moving?  Were they breaking any laws that you

18   could see?

19   A    No.

20   Q    Do you recall if during that day the officers who

21   threatened to arrest you -- if they were from -- which law

22   enforcement jurisdiction they were from?

23   A    St. Louis County.

24   Q    And how do you know that?

25   A    Their brown uniforms and their white and red police cars.

15

1   Q    Was the rule that you had to keep walking enforced

2   consistently throughout the day?

3   A    No.

4   Q    How so?

5   A    It seemed like the later in the day, the larger the crowd

6   grew, it was just more of a crowd control situation versus a

7   command situation.

8   Q    So did they enforce the rule more or less consistently

9   later in the day when there was a larger crowd?

10  A    Less consistent.

11  Q    And did you feel that earlier in the day when they were

12  enforcing the rule more consistently that the atmosphere was

13  more or less dangerous?

14  A    It wasn't dangerous.

15  Q    Did the requirement that you keep moving affect your

16  ability to express yourself on Monday?

17  A    It did.

18  Q    How so?

19  A    To different people I met while I was out there on the

20  street.  There was a 60-year-old lady who was there, very

21  visibly upset for her own reasons, and I just felt the need to

22  want to comfort her because she was very visibly upset.  There

23  was a 13-year-old kid that was out there by hisself.  Whatever

24  reasons brought him out there, he was by hisself, and there

25  was reporters out there that wanted to hear stories, wanted to

16

1    know why I was there, and it was just hard to assist the

2    crying lady or comfort the young boy that was by hisself, just

3    protect him.  He was a little kid, you know, and it's hard to

4    do when you're being herded around the block.

5    Q    At any point on Monday, did any officer tell you about an

6    alternative protest zone or a protestor assembly zone?

7    A    No.

8    Q    Did you go back to the protest area after Monday?

9    A    I did stop by there on Tuesday.

10   Q    For about how long were you there?  Do you remember?

11   A    Only maybe five to 10 minutes.

12   Q    And what happened when you went to the protest area on

13   Tuesday?

14   A    I actually stopped to talk to somebody I had spent time

15   with the day before.  I saw him on the street, and I wanted to

16   just stop and talk to him, and I was approached by a reporter

17   from Cincinnati, and she was asking me a few questions about,

18   I guess, my experience from being out on the street, and I

19   wasn't able to communicate with either one of them due to the

20   nature of having to continue to move.

21          MR. CLANCY:  Mr. Bales, could you please play

22   Exhibit 1.

23        (Video played.)

24   Q    (By Mr. Clancy) Ms. Holbrook, do you recognize this

25   video?

1    A     Yes.

2    Q     How do you recognize it?

3    A     I took it.

4    Q     And is that your voice in the video?

5    A     It's one of them, yes.

6    Q     Could you describe what's happening in the video?

7    A     This is where I was talking to the reporter from

8    Cincinnati.  She had stopped and asked me a few questions as

9    to what was going on, and I was kind of explaining what I

10   experienced the day before and what was kind of -- what I

11   thought was going on at that moment, and then I left.

12   Q     Did the interview continue after this video?

13   A     No.

14   Q     Why did it not continue?

15   A     Because I just wasn't going through it again the next

16   day.  I wasn't there to protest.  I wasn't there to walk.  I

17   was there to speak with a few people, but due to the nature of

18   having to walk around, that wasn't what I was there for, so I

19   just left.

20   Q     Did you feel that being forced to move affected the

21   interviewee's ability, the interviewer's ability to conduct

22   the interview?

23         MR. ISAACSON:  You know, I would have to object as

24   speculative, Your Honor.

25         THE COURT:  I'll sustain that.

1    Q    (By Mr. Clancy) Did it seem like the reporter was having

2    a hard time interviewing you while you had to keep moving?

3    A    Yes.

4    Q    How so?

5    A    Just because we had to keep moving.  She was actually

6    writing on a piece of paper, trying to document some of the

7    things I was saying to her for, I guess, her report, and she

8    wasn't able to get that down when we were being asked to move.

9    Q    Were any of the -- were either you or the reporter

10   behaving violently prior to the video being shot --

11   A    No.

12   Q    -- that we can see?  And the officers that we see on this

13   video, are you able to tell if they were Missouri State

14   Highway Patrol or County or some other jurisdiction?

15   A    They're St. Louis County.

16   Q    And how can you tell that?

17   A    The uniforms and their cars.

18   Q    And after this video was shot -- after this video was

19   shot, did anyone tell you that you had to leave the protest

20   area?

21   A    No.

22   Q    No.  Ms. Holbrook, have you had a chance to review the

23   declaration you submitted on September 26th?

24   A    Yes.

25   Q    And is everything in your declaration accurate?

Johanna Holbrook Direct Examination                    9/29/2014

19

1    A    It is.  One thing I missed prior to signing it was that

2    the video, this particular video that we're watching now -- it

3    states that it was on Monday; it was actually on Tuesday.

4    Q    Thank you.

5         THE COURT:  Can you all -- those were numbered, I

6    think.  Weren't those 1, 2, 3?

7         MR. CLANCY:  Your Honor, this is Exhibit 1, the video

8    that we're talking about.

9         THE COURT:  Okay.  No.  Yeah.  In the affidavit, were

10   they numbered 1, 2, 3 or were they numbered A, B, C?  I'd like

11   to have some coordination with what was filed in the brief,

12   and I -- let me see.

13        MR. ISAACSON:  Paragraph 12 indicates Exhibit A.

14        MR. CLANCY:  Yeah, it was A, B, C.

15        THE COURT:  Yeah.  So it would be helpful if I knew

16   how the ones we've seen are -- you know, which is A, which is

17   B.  I've got 1 and 2, and so I know I recognize them.  I've

18   looked at them before, but I -- you know, for the record,

19   could you do that?

20        MR. CLANCY:  Yes, Your Honor.  The Exhibit 2 that we

21   played initially --

22        THE COURT:  Yes.

23        MR. CLANCY:  -- is Exhibit C of Ms. Holbrook's

24   declaration.

25        THE COURT:  Okay.

1           MR. CLANCY:  And Exhibit 1 that we just played is

2    Exhibit A of Ms. Holbrook's declaration.

3           THE COURT:  And that's -- and this one is the 19th,

4    not the 18th?

5           MR. CLANCY:  That's correct, Your Honor.

6           THE COURT:  Okay.

7    Q    (By Mr. Clancy) Ms. Holbrook, did the requirement you

8    keep walking influence your decision to leave the protest area

9    on Tuesday?

10   A    It did.

11   Q    How so?

12   A    I just felt a little bullied.  I didn't -- I wasn't there

13   to walk.  I wasn't there to protest.  I didn't come with

14   signs.  I wasn't there to yell all day long.  That wasn't my

15   intention.

16   Q    And did you go back to the protest area after that

17   Tuesday?

18   A    Not until the following Saturday when I was in the area.

19   Q    And what did you see when you went to the protest area on

20   Saturday?

21   A    There was people in prayer circles, holding hands,

22   praying.  They had Bibles open and megaphones.  There was

23   people barbecuing.  There was people selling shirts, you know,

24   small vendors, and it just was like a -- it seemed like a

25   sense of community.

Johanna Holbrook Direct Examination                    9/29/2014

21

1    Q    Was anyone forcing these individuals to keep moving?

2    A    No.

3    Q    Did you hear anyone say that the "keep walking" rule had

4    been repealed?

5    A    No.

6    Q    Did anyone mention the alternative protest area or

7    protestor assembly zone?

8    A    No.

9    Q    What did you think of the activities that you saw on

10   Saturday, August 23rd?

11   A    I think it just showed a sign of community.  People were

12   coming out.  They left all their harsh emotions at home, or

13   the people with the harsh emotions stayed at home that

14   particular day, but it just -- it was peaceful.  It was the

15   Ferguson that I grew up in.  It was just casual.

16   Q    And could these activities have occurred if the "keep

17   walking" rule was enforced at that time?

18   A    Not at all.

19   Q    Did you only experience enforcement of the "keep walking"

20   rule during the daytime?

21   A    Yes.

22   Q    And in your time in the Ferguson protest area, did you

23   see -- ever see any violence by community members during those

24   daylight hours?

25   A    No.

22

1   Q    Overall, did the "keep walking" rule affect your ability

2   to express yourself?

3   A    Yes.

4   Q    How so?

5   A    It didn't give me an opportunity, like with the lady, the

6   older lady.  She had all her emotion for her personal reasons.

7   She needed somebody that particular day.  I wanted to be that

8   person.  For whatever reason, I was drawn to her, and I wasn't

9   able to comfort her and talk to her and calm her down.  And

10  just watching at night, not being there at night because it

11  was a much more violent situation.  When I was there during

12  the day, I just felt compelled to -- to talk to the other

13  people that were there and the little boy that was there.  He

14  had something he wanted to say.  He came there by hisself, and

15  he wanted to communicate and he wanted to --

16       MR. ISAACSON:  Let me object as to what the boy

17  wanted without a better foundation, Your Honor.

18       THE COURT:  Yeah, it's sustained.  It doesn't really

19  make any difference anyway.  You can pull the mike a little

20  closer to you, please.  Thank you.

21       THE WITNESS:  Continue?

22       THE COURT:  Yeah.  Let him ask you a new question.

23       THE WITNESS:  Oh, okay.

24       MR. CLANCY:  Actually, Your Honor, we would move to

25  admit Exhibits 1 and 2 into evidence.

Johanna Holbrook Cross-examination                        9/29/2014

                                                                    23

 1              THE COURT:  1 and 2 are received into evidence.

 2              MR. CLANCY:  I pass the witness.

 3              Thank you, Ms. Holbrook.

 4              THE WITNESS:  Thank you.

 5              THE COURT:  All right.  Cross-examination.  Who

 6    wishes to go first?  Okay.  Go ahead.

 7                        CROSS-EXAMINATION

 8    BY MR. SHUMAN:

 9    Q    Johanna, I'm sorry.  I didn't get your name.  I was

10    having trouble hearing.

11    A    No problems.  Johanna Holbrook.

12    Q    Holbrook?

13    A    Yes.

14    Q    Okay.  Thank you.  And so you were talking about how you

15    were there on Saturday, the 18th, and you arrived in the early

16    evening?

17    A    That was Sunday evening.

18    Q    Sunday evening?

19    A    Yes, sir.

20    Q    So that's the 18th, though, Sunday.  Okay.

21              MR. ISAACSON:  17th.

22    A    17th.  I don't have a calendar in front of me.

23    Q    (By Mr. Shuman) But it was a Sunday?

24    A    A Sunday, yes, sir.

25    Q    I got the days wrong.  Sunday.  And you said that was in

1    the early evening?

2    A    Yes.

3    Q    About what time?

4    A    I would say around 5:00.  It was maybe 6:00.  It was just

5    getting dark.  It was just before dark.

6    Q    Okay.  How long did you stay that day?

7    A    Maybe 30 minutes.

8    Q    Okay.  And I thought you said there were eight to 10

9    police officers.

10   A    That I noticed.

11   Q    That you noticed.  Okay.  Do you recall literally what

12   was said to you that threatened you with arrest?

13   A    It wasn't that particular day.  There was no threats that

14   day.  On Sunday evening?

15   Q    Sunday evening, not threatened with arrest?

16   A    No, sir.  There was a lot of foot traffic, so they

17   were -- the police were only blocking off car traffic for the

18   safety of the people.

19   Q    When were you threatened, threatened with arrest?

20   A    Monday.

21   Q    And what time of day was that?

22   A    It was probably 10:30 or 11:00 in the morning, around

23   that time when I first got down to the West Florissant block.

24   Q    Okay.  I thought you said it was a St. Louis County

25   officer that threatened you.

25

1    A    Yes.

2    Q    Was it one or more than one?

3    A    There was a small group, so I can't say for sure if it

4    was just -- there's being a group of people and a group of

5    police officers.  One spoke to me.  One spoke to another

6    person.  One spoke to another person.  So for myself, I would

7    say only one.

8    Q    Can you recall what they told you?  I mean I know you --

9    generally, they threatened you with arrest, but do you recall

10   the words?

11   A    It was -- when I stopped to speak with people on the

12   street, when I first saw them, we started communicating about

13   our feelings about the whole scenario, and it was just, "You

14   have to keep walking," and then when it didn't happen

15   instantly, it was, "Keep walking or you'll go to jail."  Those

16   were the only words.  It wasn't confrontational by any means.

17   Q    Okay.  I may not have written down all the instances of

18   when you were trying to speak.  You told us about you were

19   trying to assist a crying lady.

20   A    Uh-huh.

21   Q    What were you trying to communicate to that lady?

22   A    I was just trying to tell her she'd be okay.  She was

23   down on the ground.  She was very visibly crying and upset,

24   and I just -- she didn't have anybody with her, and I just

25   felt compelled to say, "You've got to get up."

1   Q    Do you know what she was doing on the ground?

2   A    She was crying.  She was emotionally upset and was just

3   kind of knelt down to herself crying.

4   Q    Was there anything that kept her from getting up?

5   A    Her emotions.

6   Q    And you were also helping a kid, I thought you said.

7   A    There was a 13-year-old boy that was out there.

8   Q    And tell me again those circumstances of helping that

9   kid.

10  A    Well, I guess I wouldn't say -- for him, it wasn't

11  necessarily help.  The lady was clearly upset.  She looked

12  like she needed a hug.  That to me is a little bit of help.

13  The 13-year-old boy, he was out there by hisself, and when we

14  found out he was by hisself, by this time, it was later in the

15  afternoon.  The crowd was growing a little more, and myself

16  and a couple other people on the street just felt like since

17  he was 13 and there was a lot of emotion on the street that we

18  just wanted to keep him close to us because he didn't have an

19  adult with him.

20  Q     Okay.  You weren't really trying to communicate anything

21  to that kid, were you?  More like comfort him, make sure he's

22  okay?

23  A    Yeah, we were just kind of, as adults, wanted to know why

24  he was out there, why he felt compelled to bring hisself out

25  at the age of 13 with nobody with him.

1    Q    Did you get to ask him those things?

2    A    Yes.

3    Q    And you were able to take care of him and prevent him

4    from whatever harm might have happened to him?

5    A    Yeah.  At one point, we walked.  He walked because we had

6    to keep walking, so at one point, he walked with us and then

7    went off somewhere.

8    Q    This second video that was shown --

9    A    Uh-huh.

10   Q    -- I thought you said that you were asked -- you were

11   being asked questions by a lady who was wondering what you

12   were doing there.

13   A    Uh-huh.  A reporter from Cincinnati, she said she was.

14   Q    And she was able to answer your questions -- ask you the

15   questions?

16   A    She asked me a few questions.  For a brief moment, she

17   asked one or two questions that I was able to answer.

18   Q    And you answered the questions?

19   A    Like the first couple questions, yes.

20   Q    Did you have anything else you wanted to say to that

21   reporter?

22   A    Probably because we didn't finish our conversation, if

23   you will.  We never finished it.  We had started a

24   conversation.

25   Q    Did you walk on?

1    A    Yes.  I was asked to move.

2    Q    And what did the reporter do?

3    A    She went a different way.

4    Q    She could have walked on with you?

5    A    She could have, but I was going to my car to leave.

6    Q    And is this the lady who was unable to write something

7    down for you?

8    A    Write something down for me?

9    Q    I apologize because I was having --

10   A    No.  That's okay.

11   Q    -- a little trouble hearing what you were saying.

12   A    Oh, that's okay.  I'm sorry.  No.  She was writing

13   down -- she was asking me questions, and I guess she was

14   writing down my answers.

15   Q    This was the reporter?

16   A    Yes, yes, sir.

17   Q    And you were able to write down the answers for her?

18   A    No.

19   Q    But you were able to answer the questions?

20   A    Yes.  She asked me a question, and then she wrote my

21   answer.  She asked me a secondary question.  She started to

22   write that answer, and then that's when the officers came up

23   and told us all to move.

24   Q    And you went one way, and she decided that she would go

25   the other way?

Case: 4:14-cv-01436-CDP   Doc. #:  63   Filed: 12/02/14   Page: 29 of 316 PageID #: 727
Johanna Holbrook Cross-examination                                      9/29/2014

29

1    A    Uh-huh.

2         THE COURT:  Ma'am, you need to answer yes or no out

3    loud so the court reporter --

4    A    Yes, sir.

5         THE COURT:  -- can take it down?

6         MR. SHUMAN:  Thank you.  That's all I'm going to be

7    asking.

8         THE WITNESS:  Thank you.

9                    CROSS-EXAMINATION

10   BY MR. ISAACSON:

11   Q    Good morning, ma'am.  I just have a few questions.

12   A    Good morning.  How are you?

13   Q    You first showed up on Sunday, the 17th, correct?

14   A    Correct.

15   Q    And you indicated that you saw eight to 10 police

16   officers; is that correct?

17   A    Correct.

18   Q    And there was also a large number of people there; is

19   that fair?

20   A    Yes, sir.

21   Q    Okay.  And that's on that Sunday.  And then you arrived

22   the next day, and you indicated -- you just told us that you

23   perceived a lot of emotion on the street; is that correct?

24   A    Correct.

25   Q    All right.  And what did you mean by that?

1   A     By a lot of emotion?

2   Q     Yeah.

3   A     Just the people that I ran into.  There wasn't a large

4   group of people like there was in the evenings due to, I

5   guess, work and things like that.  It was an early morning on

6   a Monday, and so there was not as many people, but the people

7   that I met seemed very passionate.

8   Q     And there was energy?

9   A     Say again.

10  Q     And there was energy to this group, correct?

11  A     It wasn't really a group.  The lady, the 60-year-old

12  lady, she was by herself, and she had her own emotion to the

13  circumstance and the situation, so she was definitely crying.

14  I wouldn't say she was angry.  She was crying.  She was upset.

15  Q     And did she exhibit any sort of disability with regard to

16  her ability to walk?

17  A     No.

18  Q     Okay.  How about the reporter?  Did she exhibit any

19  disability with regard to her ability to walk?

20  A     No.

21  Q     All right.  You're not telling the courtroom that you

22  can't talk and walk at the same time, correct?

23  A     No.

24  Q     All right.  And same with that reporter?  She appeared to

25  be capable of walking and talking at the same time?

Johanna Holbrook Cross-examination                        9/29/2014

31

1    A    That's correct.

2    Q    And also writing down what you say at the same time?

3    A    As well as walking and writing --

4    Q    Yeah.

5    A    -- and asking the questions?  I feel like that was a

6    little hard.

7    Q    You're not saying she couldn't do it?

8    A    She could do it.

9    Q    Okay.  Did you have any disability at the time with your

10   ability to walk?

11   A    No.

12        MR. ISAACSON:  I don't have anything else, Your

13   Honor.

14        THE COURT:  Any redirect?

15        MR. CLANCY:  No, Your Honor.

16        THE COURT:  All right.  You may step down, ma'am.

17        THE WITNESS:  Thank you.

18        THE COURT:  You may call your next witness.

19        MR. REHN:  Thank you, Your Honor.  We will be calling

20   Grant Doty.

21        THE COURT:  All right.  And would you remind me your

22   name as well?

23        MR. REHN:  I'm Nathan Rehn.

24        THE COURT:  All right.  Thank you.  And I would ask

25   you to pull that mike close to you.  It's not as easy to hear

1    in this courtroom as it may seem.

2           Mr. Doty, would you step up here to the clerk to be

3    sworn?

4                            **GRANT DOTY**,

5    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

6    FOLLOWS:

7                         DIRECT EXAMINATION

8    BY MR. REHN:

9    Q     Good morning, Mr. Doty.

10   A     Good morning.

11   Q     What is your current occupation?

12   A     I'm a staff attorney at the American Civil Liberties

13   Union of Missouri.

14   Q     And have you visited the scene of the protests in

15   Ferguson?

16   A     I have.  I have been to Ferguson 10 times since the

17   shooting of Michael Brown.

18   Q     What was the date of your first visit?

19   A     My first visit was on August 14th.

20   Q     And what was your purpose in going there?

21   A     I went on that first day because of reports that we had

22   heard that individuals were told that they had to stop

23   photographing before the police fired tear gas.

24   Q     Did you actively participate in any protest activities?

25   A     No.  At each of the 10 visits, I've carried a small 8-1/2

1    x 11 sign that said, "American Civil Liberties Union Observer"

2    or "Free Speech Observer."  I wanted to make sure that I was

3    observing and not perceived as a participant.

4    Q    At some point, did you become aware that there was a rule

5    against standing still being enforced in that area?

6    A    Correct.  I learned about that on the morning of the 18th

7    while I was in the office.

8    Q    And then that was the same date as the Court's hearing on

9    Plaintiff's motion for entry of a temporary restraining order;

10   is that right?

11   A    Correct.  That was later that afternoon.

12   Q    And did you attend that hearing?

13   A    I did attend that hearing.

14   Q    At that hearing, did you hear reference to an alternative

15   protest zone being established in Ferguson?

16   A    Yes.  The first I had heard of it was Attorney General

17   Koster represented to our client that an alternative protest

18   zone had been set up sometime after 2:30 that same day, and I

19   later heard Andrea Spillars testify under oath from -- under

20   testimony from General Koster that that zone in fact had been

21   set up, a three- to four-acre zone.

22   Q    Had you heard about the existence of such an alternative

23   zone prior to that hearing?

24   A    No.  That was the first I had heard of it.

25   Q    Now, after that hearing, did you return to Ferguson?

34

1    A    I did.  I returned to my office after the hearing,

2    changed out of my suit, and I immediately went to Ferguson.

3               MR. REHN:  I'd like to display Exhibit 27, which is a

4    map.

5               THE COURT:  And is this the same as the one that was

6    attached to this witness' declaration?

7               MR. REHN:  That's correct, Your Honor.  This was

8    Exhibit 1 to the witness' declaration.

9               THE COURT:  All right.  Thank you.

10   Q    (By Mr. Rehn) Mr. Doty, did you create this map?

11   A    Yes.  This is my exhibit I created wholly myself.

12   Q    And what does this map depict, if you could just give us

13   a general overview?

14   A    It's what I would consider the main protest area in the

15   weeks immediately following the shooting of Michael Brown.

16   The yellow area is where the protesters were mostly, and then

17   that's where the five-second rule was enforced.  The southern

18   end of that yellow zone is Ferguson Road, and then that's West

19   Florissant, and the zone basically was from the QuikTrip in

20   the north to the McDonald's in the south.

21   Q    And you traveled to this area on August 18th after the

22   temporary restraining order hearing?

23   A    I did.

24   Q    Did you see any posting or other notice that there was an

25   alternative protest zone to that yellow area that you've

1    marked here?

2    A    No, I did not.  I drove down that or -- excuse me --

3    north along West Florissant and was stopped by some police

4    officers or Highway Patrol and asked them where the

5    alternative free-speech zone was, and they said, "We don't

6    know what you're talking about.  Park in the press area."  So

7    I went and parked in the press area.

8    Q    And did multiple law enforcement officers communicate

9    with you about the alternative protest zone?

10   A    I did.  And so after I got out of my car, I parked there

11   in the area right behind the purple diamond, which is the

12   press zone, and I asked two additional officers immediately

13   where it was, and they similarly did not know, and then later

14   that evening, I asked more officers, and no one knew of an

15   existence of the zone.

16   Q    Now, at that point in time, did you walk on this stretch

17   of West Florissant Avenue between the McDonald's and the

18   QuikTrip?

19   A    I did.  So I got out of my car and tried to identify this

20   alternative free-speech zone.  I walked north past the

21   QuikTrip, I think about a little over a half of a mile.

22   Q    Were you ever told to keep moving by a law enforcement

23   officer?

24   A    I was twice during that, during that visit.

25   Q    And did you observe any protestors in the area at that

1   time?

2   A    I did.  It was pretty full.

3   Q    Did you see law enforcement officers ordering any of the

4   protestors to keep moving?

5   A    I did.

6   Q    And as you were observing that, would you say that the

7   five-second rule was being consistently applied throughout the

8   protest zone?

9   A    It completely wasn't.  It had to do with the officer who

10  happened to see you.  I stopped a number of times with taking

11  photographs, and many times, I wasn't -- I wasn't told to move

12  on at all, and I was right in front of an officer.  And other

13  times, I was told to move, and I observed others similarly

14  being told to move or not.

15  Q    Did you notice any general differences in the type of

16  persons who were more likely to be told to move?

17  A    Yeah.  I was --

18       MR. ISAACSON:  I don't know that there's an adequate

19  foundation unless we understand the numbers that were there,

20  the percentages of people, and the like.  I mean if we're

21  admitting gut impressions, let's say it that way, but I don't

22  know statistically there's a foundation laid.

23       THE COURT:  Well, I don't think there's a statistical

24  foundation, but I'm going to allow him to testify to this, and

25  you can cross-examine him, so overruled.  Go ahead.

1    A    Yeah.  I mean I'm a 48-year-old white man, and I was not

2    told to move as frequently as I saw African-Americans, and

3    particularly, young African-Americans were told to move more

4    frequently than I was.

5    Q    (By Mr. Rehn) Did you speak to any of the protestors?

6    A    I did.  In fact, some of the times I was stopping, I was

7    talking to them, yes.

8    Q    And some of those times were times where you were told to

9    move?

10   A    Yes.  And sometimes I was not told; I was not told I had

11   to move.

12   Q    Did any protestors tell you they were aware of an

13   alternate protest zone?

14   A    No one knew about it.  In fact, because I had left the

15   TRO hearing and I had heard them testify that there was this

16   alternative zone, I asked anybody who knew about it.  They

17   didn't.  I asked after they were told to move, were they told

18   they could move to another location, and no one was told about

19   an alternative zone.

20   Q    So after that visit on August 19th, did you ever reach

21   out to state officials to find out more information about this

22   alternative protest zone?

23   A    Yeah.  The following morning, I had a hearing in Cole

24   County Court in Jefferson City, so I stopped by the Attorney

25   General's office there at the Supreme Court, and I talked to a

1   senior official and said, "I couldn't find it last night."

2   Q    And what did they tell you?

3   A    They said they would get back with me.

4   Q    And did they ever get back with you?

5   A    Yeah.  As I was driving back to St. Louis, I got an

6   email, and I was told where I could look.

7   Q    And did you then travel back to the site to see the

8   location where you were directed to?

9   A    Yes.  Before I returned to the office, I stopped back at

10  Ferguson.

11  Q    And what location was that?

12  A    So I went -- I went to the -- I parked again in the media

13  zone, and then I walked to what I was told was a used car lot,

14  and it's represented on my map that I created in red.

15  Q    This red rectangle here towards the bottom of the

16  highlighted area?

17  A    Correct.  South of the free-speech -- the walking area.

18  Q    South of the yellow zone there?

19  A    Yeah.

20  Q    Did you see any notice that that was an alternate protest

21  zone?

22  A    No.  It was not marked, and it was not occupied.

23  Q    Was there any other indication that protestors were free

24  to use that area?

25  A    There was none.  In fact, I saw the owner who was outside

1   of his property.  It happens to be a used furniture store, and

2   I asked him if this was the free-speech zone, and he said,

3   "No.  It's my private property."  And I asked him if anybody

4   had contacted him to use the property, and he said, "No.  No

5   one can use my property."

6   Q    Was there ever a public announcement made about that

7   area?

8   A    So I went back to the office.  I had visited there.  It

9   was about 2:00, 2:15, or 2:30, and so I returned to the

10  office, and sometime after 5:00, I -- there was a press

11  release.

12  Q    I'd like to put up Exhibit 3, and this is also Exhibit 2

13  of Mr. Doty's declaration, Your Honor.  Is this the press

14  release you were referring to?

15  A    Yes.

16  Q    And you said this came out around sometime after

17  5:00 p.m., on August 19th?

18  A    Yes, and that was consistent with what Captain Johnson

19  told me earlier in the day.

20  Q    And is -- so that was --

21         THE COURT:  Can I see what it says?  You're pulling

22  up pieces that I really don't need to see.  I need to see the

23  document.

24         MR. REHN:  Yeah.  If we could just start with the

25  date and just get the text of the release.

40

1   Q    (By Mr. Rehn) So this was about 30 hours after the TRO

2   hearing?

3   A    Correct.  Well, probably -- probably closer to 24 hours.

4   Q    Okay.  And this media alert refers to an approved

5   assembly zone, a protestor assembly zone, being located at

6   that location you marked, you identified earlier?

7   A    That is correct, yes.

8   Q    And it also says there is a new media staging area being

9   established?

10  A    Yes, it does.

11  Q    Was there already a media staging area?

12  A    There was.  In fact, on the map, I reflected that by the

13  purple diamond.  It was next to the McDonald's, and it's where

14  I had parked the previous two times.

15  Q    So, Mr. Bales, if we could go back to Exhibit 27.  So

16  this purple diamond, you said, was the media staging area that

17  existed prior to this press release being put out?

18  A    That is correct.

19  Q    And then where was the -- where did the press release

20  designate the new media staging area would be?

21  A    That it was going to be down -- excuse me -- north along

22  West Florissant.  It's represented by that blue dot, and that

23  happens to be the storage -- the monthly storage facility

24  that's located on West Florissant.

25  Q    So in the press release that established this protester

1   assembly zone, in that same press release, they moved the

2   media staging area up to this northern location?

3   A    Correct.  I believe .3 miles.

4   Q    All right.  Can I refer to the protestor assembly zone as

5   the PAZ?

6   A    Yes.

7   Q    Do you understand that?  And was the PAZ visible from

8   that new media staging area?

9   A    Absolutely not.

10  Q    Mr. Bales, could we display Exhibit 5, please.

11       If you could, identify this photograph for me.

12  A    Yeah.  This is a picture I took on the evening of the

13  19th, so this would have been my sixth visit to Ferguson and

14  my second visit of that day.

15  Q    So this is sometime after there had been this press

16  release put out?

17  A    Correct.

18  Q    And there's a sign here.  That's -- that was new; that

19  wasn't there previously?

20  A    That was not there earlier in the day, and it was

21  certainly not there the day before.

22  Q    Did you observe any protesters using the PAZ?

23  A    No, never.  I mean not on this day I did not.

24  Q    And would the PAZ have been visible from the old media

25  staging area?

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 42 of 316 PageID #: 740
Grant Doty Direct Examination                                    9/25/2014

42

1    A    You know, it would have been probably one tenth or more

2    of a mile.  You would have been able to see that it had been

3    occupied.  I believe it would not be easy to see any signs or

4    what the words on the sign would have been had there been

5    signs.

6    Q    Aside from the visibility issue, were there any other

7    problems that you observed with the PAZ?

8    A    Yeah.  You can see there's no lighting in the zone.

9    There's a spotlight across the street.  There's no

10   porta-potties, no water facilities, among other things.

11   Q    Now, that same visit when this picture was taken, did you

12   observe any protestors in the main protest area?

13   A    I did.  It was -- it was pretty full.

14   Q    And did you walk in that area again?

15   A    I did walk that whole area from -- from both -- from the

16   south past the QuikTrip, about a half mile north of there.

17   Q    Did you observe law enforcement officers enforcing a "no

18   standing" rule?

19   A    I did.  The same -- same haphazard or arbitrary

20   enforcement as I had seen the night before.

21   Q    And did you see anyone being arrested?

22   A    That day, I did see someone get arrested in front of the

23   McDonald's.

24   Q    Did anyone tell you why that person was being arrested?

25   A    Yeah.  It was an African-American woman --

1          MR. ISAACSON:  I would have to object until a

2    foundation is laid that that person had an adequate

3    understanding of why that arrest occurred.

4          THE COURT:  Yeah, and, again, I'll overrule that, but

5    you could tell me who told you and why they were arrested, how

6    you know.

7    A    I was -- I was at the corner, and I was talking to Jack

8    Dorsey, who's the founder of Twitter, and he had seen it, and

9    I turned to Jack Dorsey and said, "What just happened there?"

10   He said, "She was arrested for not moving."

11         MR. SHUMAN:  I want to object to the hearsay.

12         THE COURT:  Yeah.  Overruled.  I mean you can cross.

13         MR. REHN:  Your Honor, this is a present sense

14   impression.

15         THE COURT:  This is a preliminary injunction hearing.

16   I'm going to hear -- you know, I'll consider it, and I'll hear

17   it not necessarily for the truth, but go ahead.

18         MR. REHN:  And I would just observe this was a

19   present sense impression, so I think hearsay wouldn't bar it.

20   Q    (By Mr. Rehn) Were you personally ordered to move during

21   that visit when you were in the main press?

22   A    I was.  I had a -- I was on the phone at one point, and I

23   was walking in circles but, apparently, not walking

24   sufficiently, and so I was told I needed to keep moving.

25   Q    And when you were told to keep moving, did any law

1   enforcement officers tell you about the PAZ?

2   A    No, no.

3   Q    Did you hear them tell anyone else about the PAZ?

4   A    In none of my 10 visits did I ever hear anybody tell us

5   about the alternative speech zone.

6   Q    Did you return to this area any other times?

7   A    So the 19th, I was there twice, my fifth and sixth visit,

8   and I returned four additional times since then.

9   Q    What was the day of your next visit?

10  A    It was the 21st, I believe.

11  Q    And on that visit, did you observe any protestors in the

12  PAZ?

13  A    I did.  It was the very first time I had seen people in

14  the zone.

15  Q    And roughly how many people were there?

16  A    Between four and 10.

17  Q    What did they tell you about the PAZ?

18  A    They thought it was -- they thought it was a joke.  They

19  were there basically resting their feet because they had been

20  walking back and forth.  Other complaints were there were no

21  porta-potty facilities, no water for them.  They thought no

22  one could see their signs that they were carrying, and the one

23  young woman that I spoke to complained that the light that was

24  on here --

25            MR. ISAACSON:  Your Honor, are we taking hearsay as

1   it comes?

2          THE COURT:  Well, you can object.  You can object to

3   anything.  I'm going to hear it.  I'm going to hear what they

4   say happened out there, and I'll hear any cross-examination,

5   and then I'll determine whether I should give it any weight.

6          MR. ISAACSON:  Very well.  Thank you.  I won't --

7          THE COURT:  Okay.  Go ahead.

8   A    But the young woman -- one of the complaints she had that

9   night was this light that you can see that was shining from

10  across the street wasn't even on, and she told me she felt

11  unsafe.

12  Q    (By Mr. Rehn) And I'd like to just show one more exhibit.

13  If we could put Exhibit 6 up.

14         And could you please describe what this is?

15  A    Yeah.  This is another picture that I took.  I took it on

16  the 25th.  It may have been my ninth visit there, and it is

17  taken from the second press zone, the moved press zone, so I'm

18  standing here, right in front of the storage facility, and I'm

19  taking my picture south towards the McDonald's and where the

20  alternative free-speech zone is.

21  Q    And is there any -- would you be able to see the

22  alternative zone from here?

23  A    Absolutely not.  Can't see it.

24  Q    So based on your observations, Mr. Doty, would you say

25  that the PAZ was an adequate venue for protestors to

1    communicate their message?

2    A    It was absolutely not adequate.

3              MR. REHN:  Thank you.  No further questions.

4              I would move Plaintiff's Exhibit 27, Plaintiff's

5    Exhibit 2, Plaintiff's Exhibit 5, and Plaintiff's Exhibit 6

6    into evidence.

7              THE COURT:  They are received into evidence.

8              So was the media alert Exhibit 2 or Exhibit 3?

9              MR. REHN:  I believe it was Exhibit 2.  Oh, it was 3.

10   My mistake.

11             THE COURT:  Okay.  So Exhibit 3, Exhibit 5, Exhibit

12   6, and Exhibit 27 are received into evidence.

13             You may cross-examine.

14                         CROSS-EXAMINATION

15   BY MR. SHUMAN:

16   Q    Hi, Mr. Doty.

17   A    Hi.

18   Q    Mike Shuman with the County.

19             THE COURT:  Okay.  You need to keep your voice up.  I

20   couldn't hear any of that, so pull the -- you can move the

21   base of that mike closer to you, or you can step closer to it.

22   Q    (By Mr. Shuman) Mr. Doty, you said you became aware of a

23   rule about protesting.  Why do you call it a rule?

24   A    Why did I call it a rule?

25   Q    Yeah.

1    A    It was just a complaint we got at the ACLU office the

2    morning of the 18th.

3    Q    How do you know it was a rule?

4    A    I mean I don't -- I mean you can call it a policy or

5    practice.  I don't know.  "Rule" might not be the right word.

6    It was a custom.  It was a custom, a policy, a practice.

7    Q    Do you know who promulgated this rule?

8    A    I think from the testimony that I heard at the TRO

9    hearing it was the Highway Patrol under Captain Johnson and

10   St. Louis County.

11   Q    Why are you calling it the five-second rule?

12   A    Because we were told that you had to move and if you

13   stopped moving for five seconds you would be arrested.

14   Q    Who told you that?

15   A    I think the complainant, the person who complained to the

16   ACLU, told us that.  My client told us that as well, and then

17   I observed it.

18   Q    Tell me what you observed.

19   A    I was walking in circles and told I needed to keep

20   moving.

21   Q    Did people -- did any officer look at a watch and say,

22   "Okay.  You've got five seconds, and now you've got to move"?

23   A    Not in the two incidents that I happened on, heard on the

24   18th, but I -- you know, I did hear the officers say, "You've

25   got to keep moving.  You've got to move every five seconds."

48

1   Q    Repeat that, please.  I missed that.

2   A    I said I did not -- I was not told that I had to move in

3   five seconds.  I was told to keep moving, but I did hear the

4   word "five seconds" when I heard other people be told about

5   this rule, and that would have been on the 18th and the 19th.

6   Q    Did you hear anything about any five seconds after the

7   19th?

8   A    Yeah.  The 21st, when I went back and I saw the people

9   occupying the alternative free-speech zone, they told me of

10  the five-second rule as well, and I just -- I also walked

11  there.

12  Q    Who is "they"?

13  A    The four to 10 people that I talked to inside the PAZ.

14  Q    And those were all -- none of those people were law

15  enforcement officers, though, right?

16  A    No, no, no, they were not.

17  Q    And you said something about how young African-Americans

18  were told to move more often than you were?

19  A    Absolutely.

20  Q    Now, you had a sign explaining that you were an observer

21  all the time, right?

22  A    Correct.

23  Q    Okay.  Did you look for other white men to see what was

24  told to them so that you could compare what was said to

25  African-Americans?

1   A    I mean I saw a lot of the reporters were white, and I

2   don't think they were told as well.

3   Q    You saw they were reporters?

4   A    Yes.

5   Q    Did you see black reporters being told to move more than

6   white reporters were told to move?

7   A    You know, I mean, I don't know.  I wasn't going there to

8   compare what reporters were told to do or not to do.

9   Q    You don't know?

10  A    I don't know.

11  Q    About this PAZ -- why are no porta-potties being there a

12  problem for communicating?

13  A    Well, it just made it un-user friendly.  I mean why would

14  you go there if you didn't have the facilities that you could

15  have had in the -- the other zone.  I mean in the days that I

16  went before when people were at the QuikTrip or in the

17  McDonald's area, there's porta-potties that were along the

18  street.  People could use them.  And now you're told to go to

19  an area that does not have those facilities.  I think the

20  people that used them that I spoke to were troubled by that.

21  Q    Anything stop anyone at the PAZ from leaving and finding

22  a porta-potty?

23  A    I'm sorry?

24  Q    Was there anything that would prevent a person at the

25  PAZ -- I don't mean to make light of this, but when they need

1    to use the restroom -- to go and find a restroom and then come

2    back and communicate?

3    A    No.  I mean the young lady that I spoke to that was

4    concerned about the safety said she just urinated in the back

5    of the lot.  She just had her boyfriend stand so that no one

6    could see her urinate.

7    Q    But I didn't ask that.  What I asked was, was there

8    anything that prevented somebody from walking out and finding

9    an appropriate restroom and then coming back and

10   communicating?

11   A    They'd have to enter the zone that they had to keep

12   walking.  I don't know if they were handicapped or if they

13   were limited.  I don't know if they had any physical

14   limitations that prevented them from walking.  I didn't ask.

15   Q    Okay.

16   A    But if they did, I assume they couldn't go down there and

17   use those restrooms.

18   Q    You assume that?

19   A    Yes.

20   Q    You don't know that?

21   A    I assume based on the rule they would have been arrested

22   had they not been able to keep walking to the restroom,

23   correct.

24   Q    Why wouldn't they be able to keep walking to the

25   restroom?

51

1   A    I said I don't know.  I didn't ask them if they were

2   handicapped.

3   Q    You don't know?

4   A    Yes, I don't know.

5   Q    But they had porta-potties outside the PAZ?

6   A    In the area that they had to keep walking, yes.

7   Q    What else about the PAZ was not adequate for

8   communicating?

9   A    I mean its distance from where the media's -- the media

10  was.  It was like -- I think it was -- by the time it had

11  moved, it would have been about 4/10 of a mile.

12  Q    Did anything prevent media from going to the PAZ?

13  A    I do not believe anything would have prevented them from

14  going to the PAZ.

15  Q    And had they, I imagine people could have spoken to them?

16  A    No one was -- the only time I ever saw people in the PAZ

17  was on the 21st.

18  Q    My question was:  If the media had gone to the PAZ, would

19  anything have prevented the people who were there to use the

20  PAZ from communicating with the media?

21  A    No.

22         MR. SHUMAN:  Well, I think that's all I want to ask.

23  Thank you.

24         THE COURT:  All right.  Cross-examination,

25  Mr. Isaacson.

1                          CROSS-EXAMINATION

2      BY MR. ISAACSON:

3      Q      Good morning, Mr. Doty.

4      A      Good morning.

5      Q      The area we're talking about -- there was a stretch

6      there.  I don't know if you -- can you pop the map up for me?

7      The yellow shaded area is a walkway, and let's see.  There we

8      go.  And we're talking from Canfield Drive from Ferguson Drive

9      is about what -- three, three and a half blocks?  Is that

10     fair?

11     A      Yeah.  I think it's 3/10 of a mile, yes.

12     Q      Okay.  And based on what you observed, the -- the

13     encouragement to keep moving and all that, was it always

14     within that 3/10 of a mile?

15     A      That was my experience, yes.

16     Q      And you indicated that when you went there that Monday

17     night, the 18th, the area was pretty full of people; is that

18     fair?

19     A      Correct.  It was.

20     Q      And I believe you testified that you thought at least at

21     one isolated point in time that the instruction was being

22     given to young African-American males more than somebody a

23     little less young like yourself?

24     A      Yes.

25     Q      And you're not telling us that that conclusion has a

1   foundation of proper statistical analysis in terms of enough

2   statistical sampling, all that sort of thing, correct?

3   A     Anecdotal from what --

4   Q     Probably neither of which you and I understand.

5   A     No.  Anecdotal is what I observed only.

6   Q     Okay.  But you ultimately concluded that they weren't

7   given these instructions based on race; isn't that fair?

8   A     The point -- I think the point I was trying to make was

9   it was officer-dependent.  I mean there were times that I

10  stopped and I talked to African-Americans to ask them

11  questions and we were both not told to move for a minute or

12  more, and other times, I would stop simply to take a picture

13  and I was told to move, so I just -- I think my point was it

14  was just very arbitrary.

15  Q     Okay.  And it was not race?  I think that we're both

16  thinking about your paragraph 18 of your declaration, correct?

17  Did you look at it?

18  A     I'm not -- I'm not looking at it.  I read it, yes,

19  absolutely.

20  Q     Okay.  And I'll read it to you quickly, sir.  It says,

21  "The enforcement of the five-second rule seemed arbitrary to

22  me.  Based on my initial observations, the rule appeared to be

23  enforced more aggressively against people of color and younger

24  people regardless of color.  (I am 48 years old and white.)

25  However, I also observed the rule occasionally being enforced

1   against older people and whites (including me – see supra

2   paragraph 16).  I ultimately -- I ultimately concluded that

3   the way the rule was enforced was largely dependent on which

4   law enforcement officer was enforcing it."

5       And that last sentence was your conclusion given all the

6   information you had; is that fair?

7   A    Yes.  And I think my point being in some officers it may

8   have been race that was their driving factor that made them

9   arbitrarily enforce it against African-Americans, and others,

10  you know, it didn't and especially when it had to do with me

11  being enforced.

12  Q    And, again, this is based on a gut impression you

13  obtained; it has no statistical underpinning or anything like

14  that?

15  A    My observations only.

16  Q    Okay.  And you testified about that the press zone got

17  moved; is that correct?

18  A    Correct.  That same press release.

19  Q    And the old press area was right in front of the meat

20  market, is that correct, or pretty close to it, or do you

21  know?

22  A    There's a number of meat markets.  It's the one right --

23  it's literally at the corner.  I mean it's at the corner of

24  Ferguson and Florissant.

25  Q    If I represent to you there's a Ferguson Meat Market, I

1   believe, that is immediately to the south of the McDonald's,

2   does that sound right?

3   A     Then that sounds correct.

4   Q     Okay.  And, in fact, at that time, did you notice whether

5   it had been, for lack of a better word, destroyed, ransacked,

6   or it was in some disheveled state?

7   A     No, I did not notice that.

8   Q     Do you ever remember seeing that over the course of time?

9   A     No, none of my visits.

10  Q     All right.  And do you have any idea of whether, perhaps,

11  that business had closed or when it was going to reopen or

12  anything like that?

13  A     I don't -- I don't know that.

14  Q     Certainly, you wouldn't expect a business if it was

15  trying to reopen to have to maintain that press zone if,

16  perhaps, a better area could be found; is that correct?

17  A     I mean I don't know that.

18  Q     When you returned on August 21st and you indicated you

19  spoke to a number -- your declaration indicates, "I spoke to a

20  number of people in the PAZ and asked them why they were

21  there, and they said they were tired of walking."

22  A     They were.

23  Q     Is that correct?

24  A     Correct.

25  Q     All right.  "I asked if any law enforcement officials had

1  directed them to the PAZ, and they responded they had found it

2  on their own."  Correct?

3  A    That is correct.

4  Q    Is that the sum and substance of the communications you

5  remember with those folks at that location on that night?

6  A    Yeah, and then I asked them what they thought of the

7  zone.  That was where the woman told me that they needed a

8  porta-potty, that, you know, she had to urinate in the back of

9  the lot with her boyfriend covering her.  She was the one that

10 complained that there was not the light across the street.

11 And they also complained that no one -- no one would see them

12 because they were so far away from where, you know, the press

13 and everyone else was.

14 Q    Did you see any press there that exhibited any sort of

15 disability with regard to their ability to walk or move?

16 A    No.  They were sitting on the ground, so I really don't

17 know.

18 Q    The press were sitting on the ground?  Let me restate the

19 question.

20 A    I'm sorry.

21 Q    I'm not sure you heard it.

22 A    I know.

23 Q    Did you observe any press that exhibited any sort of

24 disability with regard to their ability to walk or move?

25 A    Oh, no.  Press, no, not that I know of.

1          MR. ISAACSON:  I have nothing else, Your Honor.

2          THE COURT:  Redirect?

3          MR. REHN:  No, no further questions, Your Honor.

4          THE COURT:  You may step down.

5          You may call your --

6          MR. SHUMAN:  Your Honor --

7          THE COURT:  Yes.

8          MR. SHUMAN:  -- may I have a word about a scheduling

9   matter before we --

10          THE COURT:  Sure.  Why don't you step up to the

11   lectern and tell me what it is.

12          MR. SHUMAN:  I don't think this is going to be a

13   problem because I think we'll probably have plenty of time.

14   Chief Belmar told me before we got started that he's got a

15   2:00 appointment with Senator Blunt in Clayton.  That's a long

16   time from now, and I think we should be okay, but I wanted to

17   just advise you if there's a -- if it looks like we're running

18   late, if there'd be a way to accommodate him and get him on so

19   he can keep his appointment.

20          THE COURT:  Okay.  Well, why don't we proceed.  We'll

21   take a break in a little bit, and during the break, you can

22   talk to the Plaintiff's lawyers, and if you all agree, it's no

23   problem with me.

24          MR. SHUMAN:  Okay.  I just wanted to advise the Court

25   of that issue now.

1              THE COURT:  Right.  That's fine.

2         And your next witness?

3              MR. DAVIS-DENNY:  Next witness, Your Honor, is DeRay

4    Mckesson.

5         (Witness sworn.)

6              MR. DAVIS-DENNY:  May I proceed, Your Honor?

7              THE COURT:  You may.

8              MR. DAVIS-DENNY:  Thank you.

9              THE COURT:  And, again, let me make sure.  You're

10   Mr. Davis-Denny?

11             MR. DAVIS-DENNY:  That's correct, Your Honor.

12             THE COURT:  Okay.

13                        **DERAY MCKESSON,**

14   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

15   FOLLOWS:

16                       DIRECT EXAMINATION

17   BY MR. DAVIS-DENNY:

18   Q    Good morning, Mr. Mckesson.  How are you?

19   A    I'm good.  How are you?

20   Q    Very good.  Thank you.  Could you begin by just telling

21   us where do you live and what do you do?

22   A    I live in Minneapolis, the Twin Cities.  I'm the Senior

23   Director of Human Capital for Minneapolis Public Schools.

24   Q    And --

25             THE COURT:  Can you pull yourself a little closer to

1    the mike or pull the mike a little closer to you because we

2    have trouble -- I have trouble hearing in this courtroom.

3    A     Okay.  Done.

4    Q     (By Mr. Davis-Denny) What does it mean to be the Senior

5    Director of Human Capital for the Minneapolis Public Schools?

6    A     So I manage the talent work for the district, so all

7    hiring for all positions.  I manage that process and those

8    teams, and I also manage the first year professional

9    development opportunities for new teachers, so like new

10   teacher professional development on boarding.

11   Q     Okay.  Have you attended the protests in Ferguson?

12   A     Yes.

13   Q     When have you attended the protests in Ferguson?

14   A     The first time I came down was Saturday, the 16th.

15   Q     And --

16   A     Of August.

17   Q     And how long were you here for that first -- first visit?

18   A     I stayed that entire week, and I left that next, like,

19   Monday night, Tuesday morning.

20   Q     That would be approximately the 25th of August?

21   A     Yes.

22   Q     Okay.  And have you returned since then?

23   A     Yep.  So I came back for the first Ferguson City Council

24   meeting and the County Council or the first Ferguson City

25   Council meeting and then the St. Louis City Council meeting,

DeRay Mckesson Direct Examination                    9/29/2014

60

1    and then I went back home, and then I came back most recently

2    this Friday.

3    Q    Okay.  When you attended the Ferguson protests during the

4    August time frame, where were you typically at?

5    A    In August, it was mostly on Florissant, West Florissant.

6    Q    And why did you attend the Ferguson protests?

7    A    Yep.  So I'd heard it -- I saw it on Twitter.  It was

8    trending, and I was like, "Is this real?"  So that morning, I

9    woke up and I was like, "You know, I think I might drive down

10   to Ferguson," and I waited a little bit until some of my

11   friends could wake up, so I could just do like a gut check to

12   just make sure I wasn't, you know, making it up.  So I called

13   one of my friends, and I was like, "You know, I think I'm

14   going to go," and he was like, "I think you should go."  So I

15   rented a car.  I drove the nine hours to Ferguson.  I put on

16   Facebook that I was coming, and some people that I knew like

17   randomly had a place for me to stay, so I stayed, and that's

18   why I came because I wanted to see if it was really happening

19   the way that it was being reported, and I was like shocked

20   that his body lay for four and a half hours.  Like it just

21   seemed incredible to me.

22            MR. ISAACSON:  I object to that.  It's not

23   responsive.  It's kind of a speech.

24            THE COURT:  Overruled.

25   Q    (By Mr. Davis-Denny) What did you view your role as being

1   in Ferguson when you first arrived?

2   A     Yeah.  So I originally came down to bear witness.  Like I

3   just -- I literally wanted to see.  When I got down here and

4   after the first time I got teargassed, I was like, "This is an

5   incredible -- like this is crazy," so I became a protestor.

6   Q     When you were in the Ferguson protest area, did you

7   commit any acts of violence?

8   A     No.

9   Q     Did you break any laws that you're aware of?

10  A     No.

11  Q     Have you heard of a rule that police officers implemented

12  that prohibited people in the protest area from standing still

13  on sidewalks?

14  A     Yes.  So my understanding is that we could not stand

15  still anywhere, like sidewalks, street, anywhere.

16  Q     Okay.  What was your first interaction with this rule?

17  A     It was on the 18th.  I parked on -- I parked like towards

18  Nesbit because that was when they were starting to card people

19  who didn't live in the neighborhood, so I got there really

20  early.  I parked around Nesbit.  I walked towards the QT, and

21  as I was walking, I passed this woman, who was also a

22  protester, and she was like, "You know you can't stand still

23  today," and I was like, "I don't know what you're talking

24  about" because the day before I had actually stood at the

25  corner instead of going to -- and I'm going to the QT.  I

1    stood and I protested with my signage.  I just like stood

2    still, and then the next day, the 18th, she was like, "You

3    know you can't stand still," and I was like, "I don't know

4    what you're talking about," so I kept walking towards the QT

5    to like get on that corner so I could stand, and then four

6    officers came towards me, and they said three things.  One,

7    they said, "You are walking too slow," and then he said, "You

8    can't pace the same spot," and he said, "You need to keep

9    moving."  There were four of them approaching, but only one

10   spoke to me.

11   Q    Okay.  Could we -- Mr. Bales, could you please display

12   Exhibit 10 for us, and if you could, please cull out about the

13   top half of the page for us, please.

14        All right.  Do you recognize Exhibit 10?

15   A    Yes.

16   Q    What is it?

17   A    It's a tweet.

18   Q    What's a tweet?

19   A    A tweet is 140 characters that you -- you put on Twitter,

20   which is a social media platform, and I live-tweeted almost

21   all of my experiences here in Ferguson.

22   Q    Okay.  And who sent this tweet?

23   A    I did.

24   Q    How do you know that?

25   A    That's my Twitter handle.  It's @deray.  I mean that's my

1   full name.

2   Q    Okay.  And when did you send the tweet that is in Exhibit

3   10?

4   A    I'm sorry.  I posted this at 11:52 a.m. on the 18th.

5   Q    Generally, how soon after observing an event would you

6   tweet about it?

7   A    Yep.  So my goal was either to tweet it immediately as it

8   was happening or like immediately after it happened.  So this

9   was -- I remember doing this.  It was like literally after the

10  four officers stopped me because what's interesting about

11  being stopped is he also -- the officer also was like, "Your

12  sign is really nice," and then he patted me on the shoulder,

13  so my tweets after this were like, "I can't believe he touched

14  me," but -- so I remember this because I tweeted a lot about

15  this interaction.

16  Q    What did you -- what did you tweet on 11:52 a.m. on

17  August 18th?

18  A    So I said, "Just stopped by four troopers who told me

19  that I was walking too slowly.  I cannot stop walking and

20  can't pace one spot."

21  Q    Does this accurately reflect what the law enforcement

22  officers told you on the morning of August 18th?

23  A    Yes.

24  Q    Did the officers tell you that you could stop for up to

25  five seconds?

1    A    No.

2    Q    Did they tell you to disperse?

3    A    No.

4    Q    Did they inform you that you were part of an unlawful

5    assembly?

6    A    No.

7    Q    That you were violating an order to disperse?

8    A    No.

9    Q    That you were part of a riot?

10   A    No.

11   Q    Did they instruct you to leave the area?

12   A    No.

13   Q    Did they tell you to go protest in a designated protest

14   zone?

15   A    No.

16   Q    Did they inform you that there was a designated protest

17   zone?

18   A    No.

19   Q    Did the officers tell you how fast you had to keep

20   walking?

21   A    No.  Just that my current pace was too slow.

22   Q    Did you ask the officers what exactly this rule allowed

23   and what it prohibited?

24   A    No.  No.

25   Q    Why not?

1  A    I don't know if you've been out to West Florissant, but

2  it's not necessarily the most -- you don't necessarily feel

3  like you can like challenge the police, ask them questions, so

4  I didn't.  I was like actually like shocked because I

5  literally in the same spot had just stood the day before and

6  nobody said anything, and there were a lot of protestors out

7  there, so like nobody said anything then.  So this was like a

8  really interesting one because it was the first time that I

9  had actually gotten approached by like a group of officers, so

10 that was like intimidating in its own way, but I didn't feel

11 like I like had the space to say like, "Please explain that to

12 me."  Like that wasn't -- I don't know if you've been out

13 there, but that's not the vibe.

14 Q    Did you observe police officers enforce this rule in a

15 consistent manner?

16 A    No.  It really depended on -- so West Florissant is a

17 really long -- the protest area was like pretty long.  So

18 there were a lot of police officers from different places, and

19 you could tell they were from different places because like

20 you could see the different cars, like the cop cars that said

21 the jurisdictions, and it depended on where you were standing.

22 So like I can vividly remember there were some places like by

23 the -- closer to the -- like across from the QT, there's like

24 a car wash that's like sort of sunken.  It's like a special

25 looking car wash, and the police there were like particularly

1    intense.  So they -- like you needed to be like very on your

2    Ps and Qs when you walked by them whereas if you went like

3    further up, by like Sam's or like the Beauty Mart, like those

4    sort of things, like they -- you could stand still and nobody

5    would do anything there.

6    Q    Okay.  Mr. Bales, could you please display Exhibit 12 and

7    cull out the top half of the page, please.

8         Mr. Mckesson, do you recognize Exhibit 12?

9    A    Yes.

10   Q    What is it?

11   A    A tweet.

12   Q    When did you send -- who sent this tweet?

13   A    I did.

14   Q    And when did you send it?

15   A    4:59 on August 19th.

16   Q    And what did you say in this tweet?

17   A    It's a quote.  "You cannot stand still.  You are subject

18   to arrest."  It's attributed to a police officer to media,

19   photographers, and protestors.

20   Q    And is that something that you heard police officers say

21   to media, photographers, and protestors?

22   A    Yes.

23   Q    And how soon after observing this did you send this

24   tweet?

25   A    Immediately.

1   Q    And what exactly did you mean when you wrote this tweet?

2   A    You know, so what was really like interesting about this

3   moment is that I like turned around, so we were -- you know,

4   we had to keep walking.  I turned around and I see like a --

5   there's like the videographer, there's the -- like the

6   reporter guy, and then there's like a guy with his hand on the

7   back of the videographer, so he like doesn't get hurt.  So

8   they're all walking, and they're like trying to do their

9   thing, and I like sort of bumped into the guy who was trying

10  to make sure that the videographer like didn't get -- like

11  that he didn't fall because they had to keep walking, too.  So

12  I was like, "That's crazy," so I tweeted it.

13  Q    When you made this tweet, I take it you were in the

14  Ferguson protest area.  Is that right?

15  A    Yes.

16  Q    And were the media photographers committing any acts of

17  violence?

18  A    No.

19  Q    Were they breaking any laws?

20  A    No.

21  Q    And how about the protestors?

22  A    No.

23  Q    Mr. Bales, could you please pull up Exhibit 16 and please

24  cull out the tweet at the top of the page.

25       And do you recognize Exhibit 16?

1    A    Yes.

2    Q    And just to speed things up a bit, is it a tweet that you

3    sent on August 23rd at 9:39 p.m.?

4    A    Yes.

5    Q    And what was this tweet about?

6    A    "The police make another arrest.  Man was quiet on

7    sidewalk, standing still, arrested."

8    Q    Did you have an understanding for why he was being

9    arrested?

10   A    No.  He was just standing still.

11   Q    Okay.  Did the police order him to disperse?

12   A    No.

13         MR. ISAACSON:  Your Honor, I'm going to have to

14   object to a better foundation laid as to his ability to

15   observe what had happened.

16         THE COURT:  Okay.  I'll sustain that.  Why don't you

17   tell us a little more here.

18   Q    (By Mr. Davis-Denny) Sure.  Were you standing close

19   enough that you could hear the orders that the police were

20   giving to the individual?

21   A    Yes.

22   Q    Okay.  Did you hear the police order him to disperse?

23   A    So the order was that we cannot stand still because we

24   need to keep walking because you cannot stand still on West

25   Florissant.

1          THE COURT:  Did you hear him say that?

2          THE WITNESS:  Yes.

3          THE COURT:  You heard it said to this person?

4          THE WITNESS:  They said it -- he was in the crowd.

5  They said it to all of us.

6          THE COURT:  Okay.

7          MR. DAVIS-DENNY:  Thank you.

8          THE COURT:  And then what did you see?

9          THE WITNESS:  So I saw them walk over to the man and

10 arrest him.  He did not -- he did not walk.

11         THE COURT:  Did everybody else walk?

12         THE WITNESS:  No.  Some people moved.  Some people

13 didn't.

14         THE COURT:  Okay.

15         THE WITNESS:  It was a fairly large crowd.  It was

16 about 50ish people.  He was one of the people not moving.

17         THE COURT:  Okay.  All right.  Go ahead.

18         MR. DAVIS-DENNY:  Thank you.

19 Q    (By Mr. Davis-Denny) Did you observe him violating any

20 other laws -- the man that was arrested?

21 A    No.  He just -- he just did not move when the police said

22 we all needed to keep moving.

23 Q    Okay.  And was he acting violently?

24 A    No.

25 Q    Mr. Bales, could you please display Exhibit 17, and if

70

1   you could, please cull out the top half of the page.

2       And is this a tweet that you sent on August 23rd at

3   10:19 p.m.?

4   A    Yes.

5   Q    And what did you write?

6   A    "So the police don't seem to" -- that's a typo; it should

7   say "seem," but again, I'm writing really quickly.  "Police

8   don't seem to mind that everyone is standing still for now."

9   Q    And did you send this tweet immediately after observing

10  what you are describing here?

11  A    Yes.

12  Q    Did the -- did you ever hear the police announce that the

13  "no standing" rule or the "keep walking" rule had been

14  abolished?

15  A    No.

16  Q    Okay.  Mr. Bales, could you please display Exhibit 11?

17      And is this also a tweet that you sent?

18  A    Yes.

19  Q    And is it a tweet that you sent on -- at 11:03 on

20  August 19th?

21  A    Yes.

22  Q    Okay.  And excuse me one second.

23      And what were you describing in this tweet?

24  A    Yep.  So I actually mixed up the tweets.  The last tweet

25  was the photographer.  This is the tweet that I meant about

1    the guy who was the reporter who was interviewing somebody,

2    holding -- where the guy was like holding the back of the

3    videographer and we were walking.

4    Q    Okay.  Do you think -- so the media here were also being

5    forced to keep walking?

6    A    Yeah.

7    Q    Did it appear to you that the media and protestors not

8    being able to stand still in the protest area hampered their

9    ability to communicate with one another?

10   A    Yeah.  Yes.  When you are walking, you are -- like we're

11   trying not to get, you know, teargassed or anything else, so

12   you are not necessarily focusing on like talking to a reporter

13   when you like are having to keep walking, to keep walking.

14   Q    And when you made this tweet, was the area around you

15   peaceful?

16   A    Yes.

17   Q    Was there any signs of anyone breaking any laws around

18   you?

19   A    No.

20   Q    Did you ever learn about an alternate protest zone that

21   had been set up?

22   A    Yes.  So I know that there's a -- there's -- like behind

23   the McDonald's and behind the Family Dollar and the credit

24   union, there's a furniture store, and in front of the

25   furniture store, there is a -- there's like a sign that says

1    like, "Approved -- Approved Assembly Area," I think is what it

2    says.  So it's my understanding that like we could -- we

3    definitely stood on that sidewalk.  Like I knew that that was

4    like a safe place where we could do, and we also could

5    assemble in the street right there.  Like we never got moved

6    from being in the street right there.

7    Q    What about the parking lot next to the furniture store?

8    Did you understand that you could assemble there?

9    A    No.

10   Q    Did a police officer ever tell you where the alternate

11   protest area was?

12   A    No.

13   Q    Was -- in your experience, was the alternate protest area

14   used by protestors much?

15   A    Not much.  There would be times where we would march all

16   the way up there, and we could -- again, we could congregate

17   in the street like adjacent to the protest area, and the

18   police like legitimately wouldn't say anything, so like by the

19   end we knew that.  We also could be in -- there was like

20   another lot behind the credit union that we had gone to

21   before, and the police didn't say anything then, which is like

22   behind the Family Dollar.

23   Q    Okay.  And was that a designated protest zone?

24   A    Not that I know.  The only thing that I know is like

25   legitimately like there was a sign that said you could stand

1   here was the thing that said, "Approved Assembly Area," and

2   that was like the sidewalk, and nobody moved us when we were

3   in the street.  People just didn't move us when we were in

4   that other parking lot, but it didn't have a sign that said we

5   could stand there.

6   Q    So when was the most recent time you were in Ferguson?

7   A    So I flew back Friday night, this Friday night.

8   Q    And did you visit Ferguson this weekend?

9   A    Yes.

10  Q    Did you see police officers enforce a "no standing" rule

11  this weekend?

12  A    Yes.

13  Q    Please describe what you saw.

14  A    Yep.  So on Saturday -- today is Monday.  On Saturday, we

15  were at the Police Department, and then we were also at

16  Faraci's Pizza.  So at the Police Department, they came over

17  and told us that we needed to keep walking.  He also -- there

18  was a guy in a white shirt, who I assumed to be like a

19  lieutenant or captain.  He wasn't like a -- he definitely

20  wasn't a patrol officer.  He came over and he told us that --

21  that they had been really lenient by not making us march

22  before at the Police Department.  So he came over and told us,

23  and then they left.  The Ferguson PD left.  They went back

24  across the street.  And then we were at Faraci's.  There was

25  a -- so we were like peaceably protesting.  Then a Darren

1    Wilson supporter came.  That changed the mix-up a lot, and

2    they --

3            THE COURT:  I'm sorry.  Could you say that again?

4            THE WITNESS:  A Darren Wilson supporter came.

5            THE COURT:  Okay.

6    A    So he -- there was like a guy in a walker.  He came with

7    like a sign that said like, "I support Darren Wilson."  That

8    changed the whole composition of the night.  They did like an

9    all call for police to come, so more police came from other

10   places, and then they also told us that we like needed to keep

11   marching; we needed to keep moving; we couldn't stand in one

12   spot.

13           MR. DAVIS-DENNY:  Mr. Bales, could you please pull up

14   Exhibit 29, please?

15       (Video played.)

16           MR. ISAACSON:  Your Honor, could we have a better

17   foundation before we play this?

18           THE COURT:  Yeah.  Why don't you tell us what it is

19   beforehand.

20           MR. DAVIS-DENNY:  Sure.

21   Q    (By Mr. Davis-Denny) Mr. Mckesson, if you see the photo

22   that was up there on the screen for a second, do you recognize

23   that photo?

24   A    Yes.  It's a -- it's like a clip of a video I took of one

25   of the Ferguson PD.

1    Q      And when did you take it?

2    A      Saturday afternoon.

3    Q      Which Saturday?

4    A      The past Saturday.  I don't know the date.

5           THE COURT:  And can you tell me what this exhibit is

6    again?  29?

7           MR. DAVIS-DENNY:  This is Exhibit 29, Your Honor.

8           THE COURT:  Okay.  And so it's a video you took this

9    past Saturday?

10          THE WITNESS:  Yes, ma'am.

11          MR. DAVIS-DENNY:  May we play the video, Your Honor?

12          THE COURT:  Is that --

13          MR. ISAACSON:  Yeah, that's fine.

14          THE COURT:  Yeah, you may.

15       (Video played.)

16   Q   (By Mr. Davis-Denny) Mr. Mckesson, there's a voice that

17   we hear on that video asking if there's a designated

18   free-speech zone.  Do you recognize that voice?

19   A      Yes.  It's me.

20   Q      Did you ever get an answer from this officer telling you

21   where a designated free-speech zone was at?

22   A      No.

23   Q      Which police departments did you see this weekend

24   involved in law enforcement efforts with respect to the

25   protest?

1   A     So earlier on Saturday, people went down to the

2   license -- there's like a license building that the Mayor was

3   apparently at, so -- so when I got down there, there was a

4   Trooper.  There was a State Trooper that was -- that was down

5   there alongside a Ferguson Police Department officer, so he

6   was there.  During the afternoon, it was pretty much just the

7   Ferguson PD, and then sort of later, this is like the late

8   afternoon.  The late afternoon into the evening, Normandy.

9   The police officer -- there was a guy from Normandy there.

10  There was a -- and then there were troopers who were there

11  also.

12  Q     When you say troopers, are you referring to the Highway

13  Patrol?

14  A     Whoever has like the car says "Troopers," like I'm pretty

15  sure like something that says "Troopers."

16        MR. DAVIS-DENNY:  Mr. Bales, could you please put up

17  Exhibit 28?

18        THE COURT:  Hold on a second.  This video we just saw

19  with that police officer -- do you know what law enforcement

20  agency he was with?

21        THE WITNESS:  He was a Ferguson Police Department

22  police officer.

23        THE COURT:  Thank you.

24  Q     (By Mr. Davis-Denny) And do you recognize Exhibit 28?

25  A     Yes.  This is a car that I took from my car -- this is a

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 77 of 316 PageID #: 775
DeRay Mckesson Direct Examination                          9/29/2014

77

1   photo I took from my car as I was leaving the license -- the

2   license building.  The license building is behind me.

3   Q    And when did you take this photo?

4   A    Saturday afternoon.  Early morning.  Saturday afternoon,

5   yeah.

6   Q    Okay.  And is one of these vehicles what you've referred

7   to as a State Trooper vehicle?

8   A    Yes.  The car on the left, I believe, is a State Trooper

9   vehicle.  The car on the right, I believe, is -- I think that

10  was the Ferguson PD.

11  Q    Okay.  And is this near where individuals were protesting

12  in Ferguson this weekend?

13  A    Yeah.  So this parking lot where they are is actually in

14  between the Police Department and the license building.  So we

15  were -- protestors were moving from the license building and

16  going back up the street to the Ferguson PD.

17  Q    Just a couple of final questions for you.  How do you --

18  in your experience, how did the "no standing" or "keep

19  walking" rule affect the protestors?

20       MR. ISAACSON:  I would object to this as no

21  foundation, speculative.

22       THE COURT:  Overruled.

23  A    So I think a couple of things.  One is that it definitely

24  made us tired, so we -- you know, we had to keep walking like

25  all day.  It was hot.  It's still hot.  It was hot yesterday.

1   So that was that.  I think it was -- I think it was hard to

2   coordinate our activities because we were -- like we always

3   had to keep moving, so -- and because it was -- depending on

4   where you were whether you had to keep moving, like if you

5   were trying to say like, "Oh, we're going to march down here,

6   or we're going to go to this street," like that was sort of

7   confusing, and that was a little messy sometimes, so that was

8   tough.  And then I think it was like a little -- like

9   especially with the media because they were like trying to

10  talk to you and like you're -- you know, you're trying not to

11  get like hit by something or like anything else, so they were

12  like they would be aggressively trying to talk to you and

13  interview you, which made sense because they're the media, but

14  they also had to keep walking, so like sometimes -- and there

15  were a lot of media at the very -- like, you know, the weekend

16  of the 16th, it was like anybody with a camera was in West

17  Florissant, so you're like tripping over the media and you're

18  trying to like keep moving.

19  Q    (By Mr. Davis-Denny) How did being told to keep moving

20  affect your feelings towards law enforcement in the area?

21  A    It was frustrating because there were -- again, there

22  were some districts that were like really intense about it,

23  right, like there were like people who were like you need

24  to -- you know, yeah, there were people that were really

25  intense about it, and then there were some that like were

1    pretty chill, so it was just weird, like you didn't know if

2    you were -- like there were people who got arrested for just

3    standing still at points, and like you didn't know if that was

4    going to be you, so, you know, you tried to -- you tried to at

5    least keep walking just a little bit, so that you could always

6    say like, "Okay.  I'm like at least moving."

7               MR. DAVIS-DENNY:  That's all I have.  Thank you.

8               THE COURT:  All right.  We're going to take a

9    15-minute recess at this time.  Why don't you all discuss

10   scheduling, and actually, I'll ask everybody when we come back

11   how long you think this is going to take and what our schedule

12   should be, but talk to yourselves if you think there's

13   anything we need to do out of order.  We'll be in recess for

14   15 minutes.

15        (Court recessed from 10:36 a.m. until 10:53 a.m.)

16               THE COURT:  What about the schedule?  Can you all

17   tell me what you expect, how long you expect this to last?

18               MR. DAVIS-DENNY:  Yes, Your Honor.  We expect that

19   the Plaintiff's case would be done by approximately 12:30.

20   If -- and I understand from County counsel that so long as

21   they get Chief Belmar on the stand by 1:30 they think that

22   he'll be able to make his meeting, so it appears that there

23   won't be an issue currently, but if for some reason we run

24   into an issue with that timing, we're happy to let him go out

25   of order in our case.

Case: 4:14-cv-01436-CDP   Doc. #:  63   Filed: 12/02/14   Page: 80 of 316 PageID #: 778
DeRay Mckesson  Cross-examination                      9/29/2014

80

 1          THE COURT:  Okay.  All right.  So cross-examination.

 2                      CROSS-EXAMINATION

 3   BY MR. SHUMAN:

 4   Q    Hi, Mr. Mckesson.  Nice to meet you.

 5   A    Nice to meet you as well.

 6   Q    You said something about there was a time that you

 7   observed the police were very intense.

 8   A    Uh-huh.

 9   Q    Do you recall saying that?

10   A    Yes.

11   Q    At what time were you referring to?

12   A    So there was a -- there was a time, like I said, in front

13   of the -- there was like a run-down car wash across the street

14   from the -- from the QT, and when you walked by those police

15   officers, they were really aggressive, so when I walked --

16   when I walked in front of those officers, I was like on the --

17   on that side, there's like a sidewalk, and then there's like a

18   stone barricade thing that like separates the street from the

19   sidewalk, and I was like in between those, so like not in the

20   street.

21   Q    Forgive me because I didn't phrase the question real

22   well.  What day was this event that the police were intense

23   on?

24   A    There were many days that the police were intense, but

25   the moment I'm talking about would have been -- it was this

 1    same day.  It was the same day that we had to keep -- the

 2    first time that the police had ever told me directly that I

 3    had to keep walking.

 4            THE COURT:  Was that the 18th or the 19th?

 5            THE WITNESS:  It was the 18th.  It was Monday, the

 6    18th.  16th, 17th, 18th, yep.

 7            THE COURT:  Okay.

 8    Q    (By Mr. Shuman) Okay.  What time of day?

 9    A    So it was -- I got there around noon because that tweet

10    that I posted was literally like right after I got out of my

11    car, so it must have been like in between noon and 2:00.

12    Q    What did you mean by they were intense?

13    A    So I was walking.  This was what I was telling you.  So

14    like I was walking.  So there's a sidewalk, and then there's

15    like the streetish area, and then there's like the big stone

16    barricade, and I was walking in between the two.  Like I was

17    not on the sidewalk, and the police officer yelled at me like,

18    "You need to be on the sidewalk.  That's why it's there."  And

19    he was just like really aggressive with it in a way that was

20    not necessarily how most of the police officers were when they

21    talked to you.  The four police officers that came to me when

22    they told me I was walking too slow were relatively nice.  He

23    touched me, which was weird, but they were relatively nice,

24    whereas like the officers who were across the street from the

25    QT were just like aggressive in tone.

82

1    Q    You've described there was a large group and a guy was

2    arrested for standing still.  Everybody else moved, and he

3    was -- but he stood still and was arrested.  Did I say that

4    right?

5    A    No.  So I never said everybody else moved.  I said some

6    people moved; some people stood still.  He was one of the

7    people who stood still, and he was arrested.

8    Q    Okay.  What time of day was that?

9    A    I'd have to look back at the tweet, but I believe it was

10   like midday.  I believe it was midday.  I don't remember.  I

11   tweeted it, so that was like my timestamp.  I don't

12   remember -- I don't recall what time that tweet was.

13   Q    Was it nighttime or daylight?

14   A    It was -- I believe it was daylight.

15   Q    Were you ever there at night in Ferguson?

16   A    Yes.

17   Q    Let me ask you; did you ever see the whole -- how many

18   times were you in Ferguson?

19   A    So I was there every night from the 16th to whatever that

20   Tuesday morning was, the next Tuesday morning, so the 20

21   something, and then I came back for the Tuesday, Wednesday,

22   Thursday of the City Council, the Ferguson City Council

23   meeting, and then the St. Louis City Council meeting, and then

24   most recently, I've been back this Friday through -- through

25   last night, and I was there for those nights.

Case: 4:14-cv-01436-CDP   Doc. #:  63   Filed: 12/02/14   Page: 83 of 316 PageID #: 781
DeRay Mckesson  Cross-examination                              9/29/2014

83

1    Q    So did you ever see any acts of violence in all the times

2    you were there in Ferguson?

3    A    What would be an act of violence?

4    Q    Well, it was a term that you used.  You said you

5    didn't -- you had never saw any act of violence.

6    A    Oh, I was responding to a question, I believe.  So I --

7    I -- what I did see -- an act of violence?  Well, can you give

8    me an example?

9    Q    Did you see anybody throwing bottles?

10   A    No.

11   Q    Did you see anybody throwing anything?

12   A    No, I never saw a person throw something.  Like I saw

13   things in the air.  Like I don't know who threw them, but I

14   did see -- like I saw -- if anything, I saw people throw tear

15   gas back.

16   Q    Did you see any non-police officer do anything that would

17   be a law violation?

18   A    I did see -- so there was one night where they -- we got

19   pushed from Florissant -- from all the way up West Florissant

20   to Chambers, and then we like got pushed down Chambers, and

21   that was the night that there was like a really bad car

22   accident, and like when the car accident happened, someone did

23   throw like a brick at the -- I believe it's like the

24   Dellwood --

25   Q    What car scene?  I don't --

1   A     Huh?

2   Q     You said this car scene.  What did you mean?

3   A     Yeah, so I'm assuming you've been to West Florissant.

4   Q     Yes.

5   A     Okay.

6   Q     No, no.  I take that back.  I have not been.

7   A     Okay.  So West Florissant is like a really long street,

8   so like the part that people call the protest area is

9   pretty -- it's commercial.  Then when you pass that, there's

10  like a sliver of residential, and then when you pass that

11  residential, there's like another huge stretch of commercial.

12  So what's interesting about this night is that they pushed us

13  like from what people call the protest area.  Then we marched

14  like up the -- and by "march," I mean ran from the police as

15  they shot tear gas, and then we marched up by the residential,

16  and then we were in the area that was like the other

17  residential, where like the other car wash and like Taco Bell

18  are, and that night, the squad cars were like going up and

19  down the street, so we ran, so we got to Chambers, which is

20  like the cross-section, so like Florissant intersects with

21  Chambers right here, and we were going down Chambers.  So

22  people were running down Chambers, and this is one of the

23  nights where the street wasn't blocked off, so there were like

24  a lot of cars everywhere.  So there was a car accident because

25  people were speeding from what they understood to be rubber

1    bullets, and I was standing right there.  So what happened --

2    like I saw this really crazy car accident where like a car was

3    speeding down, running from the police, hit another car.  That

4    was really bad, and like literally when that happened, there

5    were people who were really frustrated at that, and they did

6    like throw a brick or something.  Something shattered the

7    glass at the Dellwood -- I believe it's called like the

8    Dellwood Family Market or something on Chambers.

9    Q    That's the only time you ever saw anybody who wasn't a

10   law enforcement officer do anything aggressive or violent?

11   A    Violent and aggressive are two different things, but

12   violent, yeah.  So like I saw -- I definitely saw people --

13   somebody like throw something.  I don't know what they threw,

14   but like there were people.  The glass broke.

15   Q    On that night only?

16   A    Yeah, that I like saw an actual thing that I would like

17   consider to be like violent or like unlawful.

18   Q    And this past Saturday, you were at the Ferguson Police

19   Department?

20   A    Uh-huh.

21   Q    Okay.

22   A    And last night.  I was there last night as well.  I was

23   there last night as well.

24   Q    And I think the Judge asked you a question about the --

25   the video that displayed a police officer.  You said that was

1   a Ferguson police officer?

2   A    Yes.

3   Q    Okay.  Do you know if the City of Ferguson is a defendant

4   in this case?

5   A    I do not know.

6   Q    You don't know.  And you saw a Normandy police officer?

7   A    Yes.

8   Q    Do you know if the Normandy Police is a defendant in the

9   case?

10  A    I do not know.

11  Q    You don't know who any of the -- well, I mean if you

12  don't know -- do you know who any of the Defendants in the

13  case are?

14  A    I -- no.

15  Q    Okay.  I know you didn't file the suit, so that's okay.

16  A    There was a State Trooper there as well.  So it was

17  Normandy I saw.  There were state troopers and Ferguson PD at

18  Faraci's.

19  Q    Okay.  But it was the Ferguson police officer that was

20  telling everybody they got to keep moving, right?

21  A    No.  It was all the police officers.

22       MR. DAVIS-DENNY:  Object, Your Honor.  Asked and

23  answered.

24  A    It was all the police officers.

25       THE COURT:  Overruled.

1    A    I just took a video of the Ferguson police officer.  All

2    the police officers that were there were telling us that we

3    needed to move.  So the state troopers came, and the Normandy

4    police came in response to like somebody clearly called more

5    police to come.  So they were all telling us that we needed to

6    keep moving and keeping marching.  The only video I took of

7    somebody like telling me like when I was standing right there

8    was the Ferguson police officer.

9            MR. SHUMAN:  Okay.  That's all I want to ask.  Thank

10   you.

11           THE WITNESS:  Cool.

12           THE COURT:  Cross-examination, Mr. Isaacson.

13           MR. ISAACSON:  Yes, Your Honor.

14                     CROSS-EXAMINATION

15   BY MR. ISAACSON:

16   Q    You were there every night from the time you arrived,

17   which was -- what -- August 16th through August 25th on your

18   first trip; is that fair?

19   A    Yes.  So the only night that I was not there as late was

20   I flew out, I believe, like very early Tuesday morning, so I

21   didn't stay out like late that night.

22   Q    And you came down here, and you were missing work,

23   correct?

24   A    I took vacation, yes.

25   Q    Okay.  And you were tweeting to how many followers?

1   A     Today, I have about 7,000 followers.  When I came down

2   here, I had -- when I first started tweeting, I think I had

3   like a thousand.  I like tweeted this picture of J. Cole here,

4   and that like turned into a big thing.

5   Q     I'll ask.  Perhaps, this is an old guy question.  Who is

6   J. Cole?

7   A     J. Cole is a rapper.  So there were a lot of people who

8   came down, but J. Cole was like the only rapper who didn't

9   like make a big publicity thing about it.

10  Q     All right.  Do you intend to develop something

11  professionally with your tweeting?  Are you looking to develop

12  opportunities for yourself doing this?

13  A     No.  My career is education.

14  Q     Okay.  All right.  And when you go in the evenings,

15  there's a lot of people there.  Fair statement?

16  A     Sure.  A lot.  I mean "a lot" is relative.  Like a lot at

17  Florissant was like a couple hundred or a thousand.  A lot at

18  like the PD is like 50, 60, which is what it's been most

19  recently.

20  Q     Did you hear any gunfire?

21  A     Gunfire?  No.  I heard -- I mean I heard tear gas

22  canisters being shot, and I heard what I believed to be rubber

23  bullets being shot.

24  Q     But it's your testimony in any of the nights you were

25  there you never heard any gunfire?

1    A    Not that I know of.

2    Q    Were the noise levels high enough so that maybe it would

3    have precluded being able to hear something like that?

4    A    I think I would have -- the only time that my hearing was

5    in question was there was the -- like the noise guns that do

6    like the -- that like the police use to make noise.  So when

7    that started, everything -- like it was -- you know, it was --

8    that would start, and then there'd be like the smoke bomb

9    things, and then there'd be tear gas.  So like when that all

10   happens, you know, questionable, but I like -- I definitely

11   heard and saw tear gas being shot, and I heard what I believed

12   to be rubber bullets being shot.

13   Q    Did you see destroyed businesses?

14   A    Did I see destroyed -- independent of the one that I just

15   saw -- that I just talked about -- do you want me to repeat

16   that?

17        THE COURT:  No.  He's asking not did you see anybody

18   destroying businesses, but did you see businesses that had

19   been destroyed?

20   A    Oh, the QT.

21   Q    (By Mr. Isaacson) And it was in pretty bad shape when you

22   saw it, correct?

23   A    It remains in pretty bad shape, yes.

24   Q    Okay.  Did you see others that were destroyed?

25   A    If the bar for "destroyed" is like actually like unable

1    to be accessed, only the QT.

2    Q    All right.  Let me use a different word.  Did you see any

3    others that were damaged?

4    A    Huh-uh.  By the time I got there, like everything was --

5    you know, all of West Florissant was boarded up, so like I

6    don't know if it was -- there were people who put up boards to

7    prevent what they thought was going to be damage, so I don't

8    know if like it was actually damaged.  Like McDonald's, for

9    example, their whole like one window was boarded up.  I didn't

10   see the window broken, but I definitely saw it boarded up.

11   Does that make sense?

12   Q    So you saw many businesses that were boarded up?

13   A    I saw businesses boarded up, correct.

14   Q    Did you see any activity from the crowd that would have

15   created -- caused the boarding up of any of these businesses?

16   A    On West Florissant, no.  You know, people only -- the

17   intensity of the crowd increased, you know, when everybody is

18   like running from tear gas, and there were a couple nights

19   where the -- where the street wasn't cleared, so there were

20   cars.  So we were running in like all different directions,

21   and also, the tear gas was shot into the crowd.  So like if I

22   was a business owner, I probably wouldn't want my window like

23   smashed out by a tear gas canister.

24   Q    Or a rock or a brick or somebody kicking a window in,

25   too, right?

DeRay Mckesson  Cross-examination                              9/29/2014

1   A     You know, perhaps, yeah.

2   Q     Yeah, yeah.  Really, it doesn't matter how it happens,

3   right?

4   A     Yeah, I mean, you know, I didn't see -- that question, I

5   think, like sort of seems that people were doing those things.

6   I think that like the Ferguson Burger Bar is like a great

7   example of like a business that we all went to a lot down

8   there, and it opened up the day before Mike Brown died, and

9   they've never boarded up anything.  They are like legitimately

10  across the street from McDonald's, and nobody's ever done

11  anything there.  That's always -- and the barber shop right

12  there as well has like always been completely open, never

13  boarded.

14  Q     You indicated you saw how many arrests?  How many arrests

15  did you tell us about on direct?  Was it one or two?

16  A     Today?

17  Q     Yes.

18  A     That I said?  I talked about the one guy who was standing

19  still and got arrested.  I saw many other arrests, but in

20  terms of talking about it today was that one guy.

21  Q     That gentleman -- how -- what period of time expired from

22  the time you first saw him until he was arrested?

23  A     I would say the police said we needed to keep walking.

24  Probably like no more than 10 minutes, like five, 10

25  minutes-ish.

1  Q    You were looking at him for 10 minutes before he got

2  arrested?

3  A    Yeah.  We were all together.  I mean it was like a --

4  sort of like -- have you been to West Florissant?

5  Q    Yes, I have.

6  A    Oh, that wasn't -- I'm not being smart.  So it's a pretty

7  big street, right, so like we could -- you know, you could see

8  the crowd that you're with and the crowd across the street

9  pretty simply without having to like, you know, be right next

10  to them, so -- so yes.

11  Q    And when you're with the crowd, you're engaging them,

12  correct?  You're talking to people?

13  A    Yeah, or I'm tweeting.

14  Q    Yeah.  You seem a communicative guy.  You weren't

15  standing still, not talking.  You were talking to different

16  people presumably, correct?

17  A    Yeah, talking or tweeting.

18  Q    Okay.  And -- oh, all right.  Now let's talk about last

19  Saturday night.  Was it Saturday night -- the events you

20  talked about at the -- I -- it begins with an F.  What's the

21  name of that?

22  A    Faraci, the pizza place.

23  Q    It is a pizza place.  Okay.  And that was near the

24  Ferguson Police Department, correct?

25  A    "Near" is relative, but it's on the same street as the

Case: 4:14-cv-01436-CDP  Doc. #:  63   Filed: 12/02/14  Page: 93 of 316 PageID #: 791
DeRay Mckesson  Cross-examination                                  9/29/2014

93

1    Ferguson Police Department.  It's like at least five blocks

2    away.

3    Q    Okay.

4    A    Yeah, it's not like super close but close.

5    Q    Ferguson Police Department -- how far is it from where

6    the main protest area was?  Let's say from the intersection of

7    Ferguson and West Florissant.

8    A    Pretty far.  I mean far enough.  Like we could march.

9    Like we marched it before, but it's not like, you know, very

10   close.  Faraci Pizza is much closer to the Ferguson PD than

11   West Florissant is.

12   Q    Okay.  So from the original protest area, would a mile be

13   a fair estimate to where the Ferguson Police Department was?

14   A    A fair estimate?  Yes.

15   Q    Okay.  And I think you said something to the effect

16   things changed when an individual walked in with the "I

17   support Darren Wilson" sign; is that correct?

18   A    Yes.

19   Q    You had an expression.  What did -- do you remember what

20   you said?

21   A    No.

22   Q    All right.  Neither do I.  All right.  What did you

23   mean -- what did you mean -- what did you observe change in

24   there once that individual entered that premises?

25   A    Yep.  So the context for Faraci's is that like earlier in

1   the weekend -- I was not here for this -- it was said that an

2   employee from Faraci pointed a gun at protesters.

3   Q    Sir, I want to keep you focused on the question.  I want

4   to know what you observed once that individual with the sign

5   came in.  What did you --

6   A    Yeah.  So he came over.  He was in a walker.  He had a

7   big sign that said like, "I support Darren Wilson," and he --

8   he was like -- he called us chicken shits, and he did some

9   other stuff.

10  Q    I'm sorry, sir.  Could you keep your voice up?  I lost

11  you there.

12  A    Yeah.  So he called us chicken shits, and then he -- he

13  like marched in front of the -- he was like right in front of

14  the protestors, and then he pushed his walker into two -- into

15  two female protestors, and then that created sort of a moment.

16  So there was this call from the protestors to arrest him, and

17  the police eventually did, but while they were -- while he was

18  right there and there was like this sort of standoff where he

19  pushed his walker into two protestors, they said, "Police, you

20  need to arrest him."  The police officers -- and I saw them

21  like make a call for other police officers to come.

22  Q    Okay.  So there was a physical altercation?

23  A    The support -- the Darren Wilson supporter did push his

24  walker into protestors.  I think an altercation applies if

25  like both people did something, and like there was no response

1    from the protestors.  Physical response.

2            MR. ISAACSON:  I don't have anything else, Your

3    Honor.

4            THE COURT:  Any redirect?

5            MR. DAVIS-DENNY:  Just a couple of questions, Your

6    Honor.

7                        REDIRECT EXAMINATION

8    BY MR. DAVIS-DENNY:

9    Q    Mr. Mckesson, you were -- you were asked a number of

10   questions about incidents at night.  Did -- was the rule ever

11   enforced against you -- the "no standing" rule that we've been

12   talking about -- during the daytime?

13   A    Yes.

14   Q    Okay.  And did you ever observe any acts of violence

15   during the daytime?

16   A    No.

17   Q    Okay.  You were also -- I also wanted to just clarify;

18   even at night, were the majority of protestors peaceful,

19   violent, or something else?

20   A    Very peaceful.  Peaceful.

21   Q    Peaceful.  Okay.

22           MR. DAVIS-DENNY:  Your Honor, that's all I have with

23   this witness.  I did neglect to ask Your Honor to admit

24   Exhibits 10, 12, 11, 16, 17, and 29 and would ask that they be

25   so admitted now.

1          THE COURT:  All right.  They are received into

2     evidence.

3          You may step down.

4          You may call your next witness.  Oh, sorry.

5          MR. ISAACSON:  Question.  You're not -- you're not

6     putting in 27?

7          THE COURT:  I believe 27 is already in.  Isn't that

8     the map?

9          MR. ISAACSON:  No.

10         THE COURT:  Oh, okay.

11         MR. ISAACSON:  Then I misunderstood.  There was a

12    video of the individual, a Ferguson police officer.  Which one

13    was that?

14         MR. DAVIS-DENNY:  29.

15         MR. ISAACSON:  Okay.

16         MR. DAVIS-DENNY:  I'm sorry.  If I misspoke, I meant

17    Exhibit 29.

18         MR. ISAACSON:  I had that as 27.  That could have

19    been my error.

20         THE COURT:  Okay.  29.  Now what about 28?  That was

21    the photograph of the cars.

22         MR. DAVIS-DENNY:  Thank you, Your Honor.  Exhibit 28

23    as well.

24         THE COURT:  Okay.

25         MR. ISAACSON:  I would like to make an objection with

Case: 4:14-cv-01436-CDP  Doc. #:  63  Filed: 12/02/14  Page: 97 of 316 PageID #: 795
9/29/2014 Preliminary Injunction Hearing

97

1   regard to 29.

2           THE COURT:  Okay.  Why don't you step up to the

3   lectern, so I can hear it.

4           THE WITNESS:  Am I staying here?

5           THE COURT:  No.  You can step down.  You're done.

6           MR. ISAACSON:  As I don't see how it is relevant.  It

7   depicts a nonparty explaining an incident, a policy that

8   applied to a situation that we've heard is about a mile away

9   from what we're here about today.  We don't know.  There's no

10  foundation that that individual had any authority to speak

11  even on behalf of Ferguson Police Department or his basis for

12  knowledge of what he was saying, much less the parties in the

13  case, so I don't think 29 should be admitted, Your Honor.

14          THE COURT:  Okay.  That objection is overruled, and I

15  will receive all of those into evidence, including 29 and 28.

16  I think those are arguments that are appropriate for you to

17  make at the appropriate time, but I'm going to receive the

18  evidence.

19          All right.  Your next witness.

20          MR. DAVIS-DENNY:  Our next witness, Your Honor, is

21  Plaintiff Mustafa Abdullah.

22          THE COURT:  All right.  Sir, would you step right

23  here to the clerk to be sworn?

24      (Witness sworn.)

25          MR. DAVIS-DENNY:  And, Your Honor, before I begin

1    with Mr. Abdullah, I had an issue I wanted to raise that I

2    think could help with scheduling.

3              THE COURT:  All right.  Speak up.  I have trouble

4    hearing.

5              MR. DAVIS-DENNY:  Oh, sorry.

6              THE COURT:  I'm trying to make that clear.  Can you

7    tell the difference when your voice is picked up on the mike

8    and when it's not?

9              MR. DAVIS-DENNY:  I do now, yes, Your Honor.

10             THE COURT:  Okay.  Thank you.

11             MR. DAVIS-DENNY:  Yes.  It may be a conversation

12   that's more appropriately had at sidebar.  I'm not sure where

13   Your Honor would prefer to have it, but it's a question

14   about --

15             THE COURT:  Why would it be sidebar?

16             MR. DAVIS-DENNY:  Maybe I should just tell Your Honor

17   what the question is --

18             THE COURT:  Yeah.

19             MR. DAVIS-DENNY:  -- and you could let me know what

20   you prefer.  The question is whether, since this is a

21   preliminary injunction hearing, his declaration can suffice

22   such that I don't need to repeat points that are already made

23   in his declaration.  They will, of course, be appropriate

24   topics for cross-examination, but if Your Honor --

25             THE COURT:  It's your hearing.  You can do it however

1    you want.

2          MR. DAVIS-DENNY:  Okay.

3                        **MUSTAFA ABDULLAH**,

4    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

5    FOLLOWS:

6                        DIRECT EXAMINATION

7    BY MR. DAVIS-DENNY:

8    Q     Good morning, Mr. Abdullah.

9    A     Good morning.

10   Q     Could you please just remind us very briefly where it is

11   you work and what it is you do?

12   A     So I work for the ACLU of Missouri.  My title is Program

13   Associate.  Essentially, what I do is I do advocacy and

14   organizing work for the ACLU.  That includes a whole gamut of

15   things, including, you know, our legislative work to

16   organizing local coalitions to doing, you know, like "know

17   your rights" workshops in the community.

18   Q     Okay.  As the Court heard last time that you testified

19   here, I believe your work has taken you to the Ferguson

20   protest area; is that correct?

21   A     Correct.

22   Q     Generally speaking, what have you been doing in Ferguson?

23   A     So my primary role has been to be distributing "know your

24   rights" cards and to be notifying protestors of what their

25   rights are.  Also, I've been serving in a sort of legal

1   observer capacity, and I've been really trying to connect with

2   the people in Ferguson to sort of hear their stories and what

3   are the problems that they're facing, what are the hopes that

4   they have for their community, so that's what I've been doing.

5   Q    Do you have any communications with law enforcement

6   officers in Ferguson?

7   A    Yes.  On -- on the street, I did.

8   Q    Why?  What were you talking with them about?

9   A    Well, initial -- my initial interactions with law

10  enforcement were when I was being informed about the

11  five-second rule.  I was, you know, standing on the sidewalk,

12  and I was told I couldn't be standing for more than five

13  seconds, and that was my initial interaction.

14  Q    You mentioned a legal observer role with respect to your

15  time in Ferguson.  Can you elaborate on that?  What was your

16  role?

17  A    Yeah.  So, you know, I was just trying to, you know,

18  ensure that the rights of people were being protected but also

19  to try to, you know, establish some communication with -- with

20  law enforcement.  I mean I think there's a lot of lack of

21  communication, a lot of lack of clarity about the directive

22  that folks on the ground are being given.  You know, I sort of

23  in some ways see myself as being a bridge builder.  If there's

24  a -- an order that's being given by law enforcement, I'm not

25  encouraging folks to -- to not abide by that order.  I'm

1   trying to be respectful towards the orders even if we may

2   think that they may be problematic.

3   Q    Have you ever engaged in any acts of violence in

4   Ferguson?

5   A    No.

6   Q    Have you ever committed any unlawful acts to the best of

7   your knowledge in Ferguson?

8   A    No.

9   Q    Did you engage -- encourage others to engage in violence

10  or unlawful acts?

11  A    Absolutely not.

12  Q    Last time we heard -- you were here.  The Court heard

13  mainly about your experiences on Monday, August 18th, with the

14  five-second rule.  Was that the first time you went to

15  Ferguson?

16  A    That was not the first time I went to Ferguson.  The

17  first time I went to Ferguson was the evening of Thursday,

18  August 14th.

19  Q    Were protestors being instructed to keep moving or to not

20  stand for longer than five seconds on August 14th based on

21  what you saw?

22  A    No.

23  Q    So what were you doing there in Ferguson that night?

24  A    I was distributing "know your rights" information, again,

25  just trying to build a conversation with -- with -- with

Mustafa Abdullah Direct Examination                    9/29/2014

102

1    protestors.  It was actually quite a beautiful sight that

2    Thursday night.  There were a lot of people out there.  You

3    know, there were people that were playing music, that were,

4    you know, singing.  There were people that were barbecuing.  I

5    mean it was like a real big, big party, and so it was a

6    really -- it was a really wonderful community building

7    opportunity.  Law enforcement appeared to be very, very

8    professional.  It was just everything was wonderful that

9    night.

10   Q    Mr. Bales, could you please display Exhibit 25.

11        Mr. Abdullah, do you recognize Exhibit 25?

12   A    Yes.

13   Q    Could you please describe for us what it is?

14   A    Yeah.  So it's a -- it's our ACLU of Missouri "know your

15   rights" card.  It just, you know, provides guidance to people

16   on how they should be interacting with law enforcement.

17   Q    Does this card have anything to do with your visit to

18   Ferguson on the night of August 14th?

19   A    Yes.  I was --

20   Q    How is that?

21   A    I was distributing these, these cards.  I think -- you

22   know, I think we had distributed probably several hundred,

23   maybe in the ballpark of 400.  We distributed a lot of cards

24   that night.

25   Q    Okay.  Now, the following week, you experienced the

1   five-second rule, correct?

2   A    Correct.

3   Q    Was it easier to share your message, these "know your

4   rights" cards on August 14th or the following week, or were

5   they roughly the same?

6   A    It was much easier on August the 14th.  On -- the reason

7   that I say that is because, you know, I was usually talking to

8   at least multiple people at a time.  Sometimes -- I think

9   maybe my largest group was like eight or 10 folks that I was

10  talking to, and so it was just -- it was very easy to share

11  this material with a larger group of folks, to get that

12  information out more effectively, but it was also, you know, a

13  relationship building opportunity, and -- and I was also just

14  trying to -- trying to give folks directive about, you know,

15  how they can responsibly interact with law enforcement and

16  not -- you know, encouraging them to not violate the law or

17  not violate their orders.

18  Q    I appreciate that you were sharing information with the

19  protestors on that night of August 14th.  Were they sharing

20  any information with you?

21  A    Yes, yes.

22  Q    Describe please.

23  A    Yeah.  So I mean, you know, I was asking them about the

24  problems that they face in their community.  So there were

25  instances, stories that were shared around to what they

Mustafa Abdullah Direct Examination                    9/29/2014

104

1    perceived to be racial profiling, issues of excessive force,

2    but there were also issues that they talked about in terms of

3    like having a lack of quality after-school programs at their

4    public schools, the lack of job training opportunities.  There

5    were a whole slew of issues that they talked about.

6    Q    Okay.  Well, let's -- let's skip then to August 18th, and

7    you've testified about that before, and it's addressed in your

8    declaration, so I don't want to go through each one of the

9    incidents in detail again, but you saw a video earlier this

10   morning that was Exhibit 2.  Do you recall Exhibit 2 --

11   A    Yes.

12   Q    -- which one that is, so we don't have to play it over

13   again?

14   A    Yes.

15   Q    Okay.  What is going on in Exhibit 2, just to remind us?

16   A    Yes.  So there was a -- there's a pastor, and there was

17   an activist who I was congregating with.  The pastor asked for

18   us to pray with him, and, you know, I'm personally a man of

19   faith, and when a pastor asks me to join him in prayer, I'm --

20   I'm not going to refuse that.

21   Q    Okay.  Were you moving when you were praying?

22   A    No, no.

23   Q    What did the officers who we saw on Exhibit 2 say to you

24   when they approached?

25   A    They -- they said, "Oh, we told you already you can't be

1  standing for more than five seconds," and immediately when --

2  and I was threatened with arrest, and immediately when they --

3  when they came up, as is shown in the video, I was sort of

4  walking backwards away from them towards -- towards the

5  McDonald's.

6  Q    Looking at that video this morning, do you recall how you

7  felt after the officers approached you and told you to keep

8  moving?

9  A    Yeah.  I was -- I was very timid, and I was nervous.

10  I -- I don't want to -- to get arrested, so I was trying to --

11  to not do that.

12  Q    Of course, none of us are probably interested in getting

13  arrested, but is there any particular reason why that's

14  important to you?

15  A    Well, again, I sort of -- in the ongoing events in

16  Ferguson, I see my role as -- as being one of trying to be a

17  bridge builder.  You know, I think it's -- there's a lot of

18  high tension that's going on in Ferguson, a lot of high

19  feelings, a lot of high emotions from multiple parties, but

20  also, you know, particularly between the law enforcement

21  and -- and the people who are protesting.  I'm very concerned

22  about the safety of -- of all people, and so, you know, I --

23  again, like I said, I've been encouraging people to -- to do

24  their best to not violate any orders.  I've been encouraging

25  people to try to be acting responsibly and to -- to not be

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 106 of 316 PageID #: 804
Mustafa Abdullah Direct Examination                    9/29/2014

106

1    doing anything that could up the ante.  I think the -- I know

2    the reason that there's tension is that there's a lack of

3    clear communication that I've witnessed -- clear and

4    consistent, I should say --

5    Q    Okay.

6    A    -- from law enforcement, so that's, you know, a lot of

7    communication -- or confusion.

8    Q    Just for the avoidance of doubt, when you were praying,

9    were you engaged in any acts of violence or other unlawful

10   activity?

11   A    No.

12   Q    Okay.  That order that we saw in Exhibit 2 to keep

13   moving, how did that compare to other orders that you received

14   that day?

15   A    Well, so there was one order that I had received where I

16   was walking with a reporter from the St. Louis Post-Dispatch

17   near the -- in front of the Public Storage business area,

18   going towards the broken-down car -- car wash facility, and

19   there was -- I believe it was a group of three officers,

20   and --

21   Q    And what did they tell you?

22   A    They told me, you know, "Where are you -- where are you

23   going?  You know, we told you" -- you know, it was like,

24   "Where are you going?"  And I said, "Well, I thought I

25   could -- I thought I just shouldn't be standing for more than

1   five seconds," and, you know, they -- they -- they said that I

2   needed to keep on -- to keep on moving, and it was unclear to

3   me because I was walking, but I was walking back and forth on

4   the -- on that strip.

5   Q    Did you understand after your interactions with the

6   officers on -- on August 18th what the rule prohibited you

7   from doing and what it allowed you to do?

8   A    There was a lot of lack of clarity.  I did, you know,

9   understand that I was not supposed to be standing for more

10  than five seconds.  It was unclear about where I would be

11  allowed to walk, though, or where I should be walking to.

12  Q    Did the different ways in which the rule was described to

13  you have any ability on your -- have any impact on your

14  ability to communicate with others?

15  A    Oh, yes, absolutely.

16  Q    How so?

17  A    Well, as I mentioned, on August 14th, you know, I was

18  talking to larger groups of folks at the same time.  You know,

19  this -- I mean I -- I have a lot of meetings, and I've never

20  had a walking meeting.  All right.  Like when I'm trying to

21  build relationships with people and build a sense of trust,

22  it's sitting down at a table or it's at least, you know,

23  looking at each other and directly communicating.  I also

24  just -- I was having in the back of my mind a concern about

25  getting arrested.  I was -- you know, I had a number of

1   concerns going on in the back of my head because of the orders

2   that were being given, so . . .

3   Q    Okay.  On any of the occasions on August 18th where you

4   were instructed to keep moving or not to stand still for more

5   than five seconds or to, you know, get along to where you were

6   going, were you engaged in any violent or unlawful activities?

7   A    No.

8   Q    Were others that you were with engaged in any other --

9   any unlawful or violent activities?

10  A    No.

11  Q    Were you planning any unlawful or violent activities?

12  A    Absolutely not.

13  Q    Did you ever witness violent activity in Ferguson during

14  daylight hours?

15  A    No.

16  Q    And was the rule applied to you during daylight hours?

17  A    The rule was -- was applied to me during daylight hours

18  on August the 18th.

19  Q    Did this rule appear to you to have any impact on

20  tensions between law enforcement officers and protestors?

21       MR. ISAACSON:  Let me just object as I believe it

22  calls for complete speculation.

23       THE COURT:  Overruled.

24  A    Yes, it did.

25  Q    (By Mr. Davis-Denny) In what way?

1    A    Well, I talked with -- I was out there for about an hour

2    on that -- on that morning, and I did talk with a number of

3    media persons and protestors, all of whom were -- had shared

4    stories around their experience that morning with the

5    enforcement of these orders.  They were -- they were confused.

6    It seemed to them to be arbitrary, and -- and so I -- you

7    know, again, I was encouraging them to follow the orders but

8    if they feel like their rights may have been violated, that --

9    you know, that that's something that we can address later but

10   to be respectful and to honor the orders.

11   Q    When was the last time you were in Ferguson?

12   A    The last time I was in Ferguson was Saturday.

13   Q    Okay.  Did you see protestors that night in Ferguson?

14   A    Yes.

15             MR. ISAACSON:  Could I just have -- Saturday the --

16             MR. DAVIS-DENNY:  Oh, I'm sorry.

17             THE WITNESS:  This past Saturday.

18             MR. ISAACSON:  Okay.

19   Q    (By Mr. Davis-Denny) Did you speak with the protestors on

20   Saturday, this last Saturday in Ferguson?

21   A    Yes.

22   Q    How would you describe the relationship between

23   protestors and law enforcement as of this last Saturday?

24             MR. ISAACSON:  I object.

25             THE COURT:  Well, the ones you talked to, right?

Case: 4:14-cv-01436-CDP  Doc. #: 63  Filed; 12/02/14  Page: 110 of 316 PageID #: 808
Mustafa Abdullah Direct Examination                    9/29/2014

110

1          MR. DAVIS-DENNY:  That's correct, Your Honor.  Thank

2   you.

3          THE COURT:  And I'll overrule the objection.  He can

4   say what he thought it was between the ones he talked to.  Go

5   ahead.

6   A    Yeah.  So, yeah, we -- I would say that, you know, we

7   talked to several dozen protestors.  It was a very -- it was

8   very tense, and I think, you know, it's very tense partly

9   because there's a lack of communication about, you know, where

10  they can be protesting, what -- you know, and so we

11  actually -- I had been called out by my boss, Jeffrey Mittman,

12  to come join him just outside of the Ferguson Police

13  Department Saturday evening.  So I went with a bunch of -- a

14  lot of "know your rights" cards, and, you know, Jeffrey and I

15  were engaging with a large group of folks there, educating

16  them on what their rights are and then, again, same thing,

17  sort of encouraging them to be responsible, to be honoring the

18  orders of law enforcement but to -- to sort of let us know if

19  there were any concerns or problems that they encountered that

20  they, you know, wanted to review.

21  Q    (By Mr. Davis-Denny) Okay.  Have you seen any sign that

22  the Highway Patrol or the County have repudiated this rule

23  that you were subjected to?

24  A    No, I have not seen that.

25  Q    Are there any upcoming events that you're involved with

1   organizing with respect to the Ferguson protests?

2   A     Yes.

3   Q     Could you describe that for us?

4   A     Yes.  So on Saturday, October 11th, the local "Don't

5   Shoot" Coalition and the national "Hands Up" Coalition are

6   organizing a "Justice for All" Rally and March on -- for early

7   in the day on Saturday, October the 11th.  It will be taking

8   place here, downtown, around the corner, hopefully.

9   Q     Okay.  Do you know how many are expected to attend the

10  event?

11  A     In the thousands.

12  Q     And is it expected that there will be events in Ferguson

13  as well?

14  A     Possibly.  This is -- you know, this is the only event

15  that I'm intimately a part of organizing.  You know, we are in

16  the process of getting permits for that and coordinating with

17  the City.  It's a very large coalition, so I -- I'm not privy

18  to the details of other events that may be organized.

19  Q     Okay.  If there are major events in Ferguson that

20  weekend, do you expect that you will attend?

21  A     Yeah.  I mean my major role in -- in -- in helping to

22  organize that march and rally on Saturday is to ensure that

23  we're fully complying with the legal process for applying for

24  permits and to ensure that we have enough legal observers out

25  there for the march to -- you know, to, again, educate people

1    on their rights, to establish relationships with the law

2    enforcement there, to try to negotiate, you know, deal with

3    any problems.  We will also have crowd marshals there as well

4    who will be focused on controlling the crowd.

5    Q    Do you have any concerns about going back to Ferguson?

6    A    Yes.

7    Q    What are they?

8    A    Well, I'm always -- I'm always concerned about -- about

9    the possibility of getting arrested when I don't want to.  You

10   know, I'm -- you know, I'm just -- I'm concerned about --

11   about the tensions and the safety in the community.

12   Q    Okay.  Has -- in your experience, has the five-second

13   rule helped to lessen tensions?

14        MR. ISAACSON:  I'm going to have to object.  This is

15   speculative, Your Honor.

16        THE COURT:  You know, I'm going to overrule it just

17   because I suspect other people may be giving similar opinions.

18   I'll give it what weight I think it's worth once I've heard

19   all the evidence.

20   A    Yeah.  I mean I can't even remember how many people I've

21   talked to or engaged with, but, yes, it has.  I think it's

22   more broadly just what appears to be an arbitrary enforcement

23   of the rule.  People are just like, "I can stand on -- you

24   know, I can stand here, or I can stand there, or it's being

25   enforced at this time and not at this time."  So I think it's

1   led to a lot of confusion.

2           THE COURT:  Well, the question was actually --

3           MR. DAVIS-DENNY:  Yes.

4           THE COURT:  -- do you think it's lessened tensions --

5           MR. DAVIS-DENNY:  Thank you, Your Honor.

6           THE COURT:  -- and you said, yes, you think it

7   lessened tensions.

8   A    Oh, sorry, sorry.  It's increased the tensions.

9           THE COURT:  I probably shouldn't help you out that

10  way, but --

11          MR. DAVIS-DENNY:  I appreciate it, Your Honor.

12  A    My apologies.  It has increased the tensions, yes.

13          MR. DAVIS-DENNY:  Thank you, Mr. Abdullah.  That's

14  all I have.

15          THE COURT:  Cross-examination.

16                      CROSS-EXAMINATION

17  BY MR. SHUMAN:

18  Q    Hi, Mr. Abdullah.

19  A    Hi.

20  Q    I want to understand about this five-second rule.  How --

21  where does that name come from?

22  A    I think it's just been dubbed the five-second rule

23  because, you know, when I was told that I couldn't be

24  standing, I asked for an explanation of it, and they said,

25  "Well, you can't be standing for more than five seconds."

1    Q    Who is "they"?

2    A    It was a St. Louis -- I believe it was a St. Louis County

3    Police officer.  It was a brown uniform.

4    Q    Okay.  Did he say -- did this County police officer

5    explain that this was a general County rule, or was it just

6    something that he was saying?

7    A    He didn't provide much explanation for the rule.

8    Q    So you don't know where it came from?

9    A    Well, in the first incident, I -- that was not made clear

10   to me.  It was in the fourth incident on that day of Tuesday,

11   August 14th, where -- where I was, you know, praying with the

12   pastor as depicted in the evidence, that the -- the officers

13   were asked -- I believe it was by the activist -- "Who has

14   given you this order?"  And the officers then said, "Well, our

15   authorities.  This comes from our authorities."  So that's

16   what I heard.

17   Q    And I thought you said that on the 14th it was easier to

18   share your message of handing out the "know your rights" cards

19   than it was later on.

20   A    My apologies.  The incident I was just speaking of was on

21   Tuesday, August 18th, but Thursday, August 14th, yes, it was

22   much easier to share the message.

23   Q    Did you share the message on the 18th?

24   A    I did share the message with -- you know, with a handful

25   of people.

Mustafa Abdullah Cross-examination                    9/29/2014

115

1   Q    Did you hand out the cards?

2   A    I did hand out cards, yes.

3   Q    Did you come home with any cards?

4   A    I did come home with cards.  We have lots of cards.

5   Q    Okay.  You didn't expect to run out?

6   A    That didn't really -- I don't know what I was thinking

7   about at that time.  Yeah.

8   Q    You handed out as many as you could, though, right?

9   A    On -- on Tuesday, I would have liked to have stuck around

10  longer if I felt like I was in a safe position to do so.

11  Q    Why weren't you safe?

12  A    Well, because I had been threatened with arrest five

13  times within an hour, and I just -- I didn't want to -- to

14  risk getting arrested.  That was not in my interest.

15  Q    And I thought you said that there was a point where you

16  spoke with media and with other protestors who were all

17  confused about what they could do.

18  A    Correct.

19  Q    And how did you know that?

20  A    Well, because I was engaging with them.  I was -- I was

21  talking with them.

22  Q    How many people do you think you engaged with?

23       THE COURT:  Okay.  And which day are we talking

24  about?  Are we still on Tuesday, the 18th?

25  A    I believe that we are talking --

1          MR. ISAACSON:  Just for the record, I think Monday

2   was the 18th, right?

3          MR. DAVIS-DENNY:  That's correct.

4          MR. ISAACSON:  We can all agree?

5          THE WITNESS:  Sorry.  Yes.  This was August 18th.

6   That was the Monday.  Sorry.  The date was Monday,

7   August 18th.

8          THE COURT:  Okay.  So that's the day we're talking

9   about?

10         THE WITNESS:  Correct.

11  Q    (By Mr. Shuman) Was this the day that you said that --

12  Monday the 18th -- was that the day that you were -- you spoke

13  with media and protestors and they told you they were confused

14  about what they could do?

15  A    Correct, yes, sir.

16  Q    Okay.  And about how many individuals did you speak with?

17  A    It may have been maybe 15 people or so, 15 to 20 people.

18  Q    Did you encourage them to do anything?

19  A    No.  Well, I encouraged them to -- to be respectful to

20  the officers, to be, you know, responsive to their orders, but

21  also that, you know, if they were experiencing this

22  five-second rule, that I was very concerned about that, and if

23  they felt like any of their other free-speech rights were

24  being violated, that they should -- that they should contact

25  our organization.

Mustafa Abdullah Cross-examination                          9/29/2014

117

1   Q    And you can't know whether they -- ultimately an

2   individual was respectful, but you know that you gave them

3   that advice to be that way?

4   A    Oh, absolutely.  I'm not -- I'm not -- I can't -- you

5   know, I can't vouch for all of their subsequent actions.

6   Q    So where did you meet with them?  In your office?

7   A    Where did I meet with whom?

8   Q    When you were talking to the media and the protestors and

9   gave them this advice, did they come to your office to talk

10  about it?

11  A    No, none of them came to talk to -- to me.  I'm not sure

12  if -- if anybody else --

13  Q    So where were these conversations taking place?

14  A    They are taking place on the sidewalk on West Florissant,

15  mostly between that car wash and the McDonald's.

16  Q    Okay.  And you and Mr. Mitten went to the Ferguson Police

17  Department this past Saturday night?

18  A    Correct.

19  Q    And handed out "know your rights" cards?

20  A    Correct.

21  Q    And you gave advice to everyone there about how to

22  behave?

23  A    Correct.

24  Q    Did you run out of people to talk to?

25  A    Oh, I -- there were a lot of people to talk to that

1    night.  You know, we -- mostly led by Mr. Mittman.  He gave

2    sort of a brief one-on-one "know your rights" presentation to

3    a lot of the protestors there, and I went around to a lot of

4    the individual protestors and was handing out cards and

5    having, you know, conversations with them about their rights,

6    what was going on, and all sort of related subjects.

7              MR. SHUMAN:  Well, thank you, Mr. Abdullah.  That

8    will be all.

9              THE WITNESS:  Thank you.

10             THE COURT:  Cross-examination, Mr. Isaacson.

11                       CROSS-EXAMINATION

12   BY MR. ISAACSON:

13   Q    Sir, your objective in going to Ferguson was to promote

14   and protect the rights of peaceful demonstrators, correct?

15   A    That was one.

16   Q    Okay.

17   A    That was one objective.

18   Q    All right.  Your job and task was not really to monitor

19   the crowds to prevent violence or destruction of property,

20   correct?

21   A    That's not a primary role, but I was -- I was dis -- I

22   was -- I'm actively discouraging, but, yeah.

23   Q    All right.  Not your primary focus?

24   A    Exactly.

25   Q    All right.  And as part of your duties, you were

1    distributing "know your rights" cards to people?

2    A    Correct.

3    Q    And part of what you're doing is you're engaging them,

4    correct?  You want to talk to them.  You want them to talk to

5    you.  You're trying to get information.  You're trying to give

6    information.  Is that fair?

7    A    Yeah, yeah.

8    Q    Okay.  So your role there is to really get to people and

9    kind of get a dialogue going; is that --

10   A    Yeah.

11   Q    -- fair?  All right.  And I believe, in looking at your

12   declaration, it appears you only observed the implementation

13   of anything approaching a five-second rule or anything like

14   that the night of August 18th, on Monday; is that correct?

15   A    Well, so it was between 11:00 a.m. and 12:00 p.m. on

16   Monday, August 18th.

17   Q    So we might have leaked over into the morning of Tuesday.

18   Is that fair?  Is that what you're saying?

19   A    I don't -- I don't -- I can't say anything personally

20   about Tuesday.

21   Q    Okay.  But that's the only time you saw this policy,

22   strategy, or whatever implemented; is that fair?

23   A    Personally, yes.

24   Q    Okay.  Do you have a disability with regard to being able

25   to walk?

Case: 4:14-cv-01436-CDP  Doc. #: 63  Filed: 12/02/14  Page: 120 of 316 PageID #: 818
Mustafa Abdullah Cross-examination                    9/29/2014

120

1    A    No.

2    Q    All right.  So asking you to walk presumably would not

3    prevent you from communicating with people; is that fair?

4    A    It wouldn't prevent me, but it -- it does limit the kind

5    of fruitful discussion that you can have because the -- as I

6    said, when you're walking on that sidewalk, you're constantly

7    thinking about whether you're going to be harassed by law

8    enforcement.  As I said, in the second incident, I was walking

9    and law enforcement came up to me -- three officers -- and,

10   you know, they said, "Where are you going?"  And it was sort

11   of, you know, intimidating, and so I was think -- I had that

12   in the back of my mind.

13   Q    But that's different than having to walk and talk with

14   somebody.  You can walk and talk with somebody and have a

15   rich, productive conversation.  You're not telling us

16   otherwise, are you?

17   A    I would think it would be difficult in that context.

18   Q    Really?

19   A    Yeah.

20   Q    Did you walk the halls in high school?  Did you talk to

21   your friends?

22   A    Well, the -- so I think the context in high school is

23   very different from a context in which you're being told that

24   you can't -- that you can't stand for more than five seconds

25   and then you can't be walking in a particular -- I don't know.

121

 1   I didn't know where I could walk or where I couldn't.

 2   Q    And maybe I'm not being particular enough with my

 3   question.  Just the mere act of having to walk and talk with

 4   somebody does not make it more difficult; it was more being in

 5   this environment; is that fair?

 6   A    Oh, absolutely, yes.

 7   Q    Okay.  All right.  Did you observe any significant

 8   numbers of press that appeared to have a disability with

 9   regard to walking?

10   A    No.

11   Q    Do you recall any significant numbers of people out there

12   that had a disability with regard to walking?

13   A    Not -- not that -- I mean I don't know.  I mean based

14   on --

15   Q    I'm asking what you observed.

16   A    Sure, but, you know, based on what I could see, there

17   were, you know, maybe a few folks, but --

18   Q    Certainly not numerous enough to merit entry into your

19   declaration; is that correct?

20   A    That's correct.

21   Q    Okay.  Now, you can walk and pray at the same time, can't

22   you?

23   A    You can.  It makes it more difficult; that's for sure.

24   You're not focusing on the prayer.  You're focusing on walking

25   and praying.

Mustafa Abdullah Cross-examination                          9/29/2014

122

1    Q    Okay.

2    A    My caveat to that would be if I'm having to walk I

3    would -- even in a safe scenario -- that I would have to be

4    looking at the steps in front of me whereas if I'm standing

5    stationary then I'm not going to have to be looking where I'm

6    walking.

7    Q    You're capable of doing that, though?

8    A    I'm capable of doing that, yeah.

9    Q    Yeah.  Pretty easy -- a young guy like you?

10   A    Yeah.

11   Q    All right.  Last Saturday night's events occurred at the

12   Ferguson Police Department, correct?

13   A    Right, just outside.  We were standing in the parking lot

14   that's just opposite the Ferguson Police Department.

15          THE COURT:  And what time were you there on Saturday

16   approximately?

17          THE WITNESS:  I think I went out about 7:30, and I

18   think we were there until a little bit after 9:00 maybe.

19   Q    (By Mr. Isaacson) And you saw a significant crowd there

20   that night?

21   A    Yeah, yeah.  I would -- I would estimate probably about

22   60 people or so.

23   Q    Okay.  Now, the numbers -- when you were between, you

24   know, let's say, Ferguson and West Florissant and then the QT

25   as you went north, those numbers were a lot more than that,

Mustafa Abdullah Redirect Examination                    9/29/2014

123

1    correct, on a nightly basis?

2    A    Well, so the -- on the August 18th incident, there were

3    only a handful of people that were out there.  There weren't a

4    whole lot of people.

5    Q    You know, and maybe I probably -- were you even there

6    that night?

7    A    On which night?

8    Q    The night of Monday, August 18th, going into that Tuesday

9    morning.

10   A    I do not believe I was there.  No, I don't think so.  No.

11          MR. ISAACSON:  All right.  Yeah, I -- okay.  I don't

12   have anything else.  Thank you.

13          THE WITNESS:  Okay.

14          THE COURT:  Redirect.

15          MR. DAVIS-DENNY:  Just clarify a couple of things,

16   Your Honor.

17                      REDIRECT EXAMINATION

18   BY MR. DAVIS-DENNY:

19   Q    This last Saturday night, when you were across from the

20   Ferguson Police Department station and you were able to hand

21   out the "know your rights" cards, were they enforcing a "no

22   walking" rule at that time?  Did you observe them enforcing a

23   "no walking" rule?

24   A    They -- they --

25          THE COURT:  No walking or no standing still?

Case: 4:14-cv-01436-CDP  Doc. #:  63  Filed: 12/02/14  Page: 124 of 316 PageID #: 822
Mustafa Abdullah Redirect Examination                    9/29/2014

124

 1              MR. DAVIS-DENNY:  I'm sorry, Your Honor.

 2    Q    (By Mr. Davis-Denny) Were they enforcing a "no standing

 3    still" rule?

 4    A    There were no officers that I saw, you know, coming to

 5    approach us.  Yeah, so that didn't happen.

 6    Q    Okay.  You were asked a number of --

 7              THE COURT:  You didn't see any at all?

 8              THE WITNESS:  Well, there were officers that got into

 9    their vehicles, and they were driving off to emergency

10    situations that I saw, but there were no officers during that

11    time that came over to the parking lot where we were.

12              THE COURT:  Okay.

13    Q    (By Mr. Davis-Denny) You were asked a number of questions

14    about whether you can walk and talk at the same time.

15    A    Yes.

16    Q    And I just wanted to ask; did the rule on August 18th

17    that you experienced -- did it have any impact on the number

18    of people that you were able to communicate with at one time?

19    A    Yes, absolutely.

20    Q    Why?

21    A    Well, I mean, you know, when you're standing stationary,

22    you can sort of build an audience.  When you're walking, that

23    becomes a lot more -- a lot more challenging unless the

24    audience is going to be like marching with you or something.

25    So, yeah, it made it a lot more difficult.

 1              MR. DAVIS-DENNY:  Okay.  That's all I have.  Thank

 2    you.

 3              THE COURT:  Anything further?

 4              All right.  You may step down.

 5              You may call your next witness.

 6              MS. DEGTYAREVA:  Your Honor, the Plaintiff would like

 7    to call Joel Reinstein.

 8              THE COURT:  Counsel, I think we should take -- I

 9    don't know if you want to do this now.  I want to take some

10    kind of a lunch recess.  So what time does the -- what time

11    does your client need to -- your witness need to leave?

12              MR. SHUMAN:  1:30, I think we said.  2:30.  I think

13    it was 2:30.

14              THE COURT:  He needs to leave by then?

15              MR. SHUMAN:  Yes.

16              THE COURT:  Yeah.  So we'll take a lunch break.  I

17    don't know when it will be, but we'll probably end up breaking

18    up this witness.  I don't know because --

19              MS. DEGTYAREVA:  I think I anticipate this should be

20    a relatively short witness.

21              THE COURT:  All right.  Mr. Reinstein, would you step

22    right up here to the clerk to be sworn.

23         (Witness sworn.)

24              MS. DEGTYAREVA:  May I proceed, Your Honor?

25              THE COURT:  You may.

1                          **JOEL REINSTEIN**,

2     HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

3     FOLLOWS:

4                          DIRECT EXAMINATION

5     BY MS. DEGTYAREVA:

6     Q     Good morning, Mr. Reinstein.  How are you?

7     A     All right.  You know.

8     Q     Okay.  Great.

9           THE COURT:  Can you pull your chair up and move that

10    mike so it's sort of toward you?  There you go.  You don't

11    have to be right at it, but just --

12          THE WITNESS:  All right.

13          THE COURT:  Thanks.

14          THE WITNESS:  Oh, good.

15    Q     (By Ms. Degtyareva) Mr. Reinstein, have you attended any

16    of the protests that occurred in Ferguson after the shooting

17    of Mike Brown?

18    A     Yeah.  I was there from Friday -- I believe it was

19    August 15th -- up through the next Saturday.

20    Q     And did you go to the protests during all of those days?

21    A     I went there every day except for Tuesday, the 19th.

22    Q     And when you say you went to --

23          MR. ISAACSON:  If I may ask, you said the next

24    Saturday.  The next day was a Saturday, and then there's eight

25    days later.

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 127 of 316 PageID #: 825
Joel Reinstein Direct Examination                        9/29/2014

127

1   A    Right.  I was there for eight days, yeah.

2   Q    (By Ms. Degtyareva) So when you say you went to the

3   Ferguson protests, can you just briefly describe what area

4   specifically you're referring to?

5   A    Sure.  So there was sort of this area where all the

6   protests were going on or at least the ones that I went to.

7   It was on Florissant Street from -- from like the McDonald's

8   in like the southwest corner and the Family Dollar in the

9   southeast corner to -- you know, up to like the QT that was

10  burned down.

11  Q    Why did you go to the Ferguson protest area?

12  A    So I am a volunteer legal observer with the National

13  Lawyers Guild.  They put out a call a couple of days before I

14  went down for more legal observers.  So our role is to -- we

15  come to protests.  You know, protestors ask for the National

16  Lawyers Guild to come send legal observers.  We're volunteers,

17  and then we just sort of observe the protest.  We observe the

18  police and like take notes on what they're doing.

19       THE COURT:  Hold on.  Hold on.  You've got to slow

20  down.

21       THE WITNESS:  Oh, got you.

22       THE COURT:  The court reporter is taking down

23  everything you say, and you're going really fast.  Also, I've

24  been telling everybody else to speak up, but you're too close

25  to that mike, so I'm sorry.

Case: 4:14-cv-01436-CDP   Doc. #:  63   Filed: 12/02/14   Page: 128 of 316 PageID #: 826
Joel Reinstein Direct Examination                          9/29/2014

128

1            THE WITNESS:  All right.

2            THE COURT:  I apologize.

3            THE WITNESS:  How about this?

4            THE COURT:  Yeah.  So you were stopping at about

5      "were there to observe the police."

6      A    Okay.  So --

7            THE COURT:  I tell you what; why don't you give him

8      another question.  You asked him why he -- well, the question

9      was why you went.

10     A    Yeah.  To do legal observing.

11     Q    (By Ms. Degtyareva) All right.  And could you please

12     describe what legal observing is?

13     A    So, basically, we watch the police.  We take notes on

14     what they're doing to -- and then we give our notes to the

15     National Lawyers Guild, which will then, you know, potentially

16     use them to defend protestors in court, possibly prosecute

17     police if there's any misconduct, and then, of course, they

18     instruct us we don't get involved in the protests, like we

19     don't participate in the protests, we don't give protestors

20     any advice, and if we get any orders from the police, we're

21     supposed to comply.  So, of course, I followed those

22     instructions while I was there.

23     Q    While you were in the protest area, did you ever engage

24     in any kind of violent activity?

25     A    Not at all.

1    Q    Did you violate any laws that you're aware of?

2    A    No.

3    Q    And did you encourage anybody else in the protest area to

4    engage in violent activity?

5    A    Definitely not.

6    Q    Now, while you were in the protest area during that week,

7    did you ever see police officers tell anyone that they

8    couldn't stand still or that they had to keep moving?

9    A    Yeah.  I think the first time I saw that would have been

10   Monday, the 18th.  Then I saw it again Wednesday and Thursday.

11   Q    And when you saw police officers enforcing this -- I'm

12   going to call it the "keep moving" rule, just for ease of

13   reference.

14   A    Uh-huh.

15   Q    When you saw them enforcing the "keep moving" rule, did

16   you see what law enforcement agencies they were with?

17   A    Just judging by the color of their shirts, yeah, they

18   would have been like, you know, County Police, Highway Patrol,

19   yeah.

20   Q    So did you ever see somebody that you thought based on

21   the color of their shirt was from the County Police tell

22   protestors to keep moving?

23   A    Yeah.

24   Q    And, again, based on the color of the officers' shirts,

25   did you see anybody that you thought was from the Highway

1    Patrol --

2    A     Yeah, yeah.

3    Q     -- telling people to keep moving?  Now, based on what you

4    observed while you were in the protest area, did it seem like

5    the police officers were consistently enforcing the "keep

6    moving" rule?

7    A     No.

8    Q     What do you mean by that?

9    A     So, for example, it seemed that like -- so there was one

10   night where an individual was being arrested, and as a legal

11   observer, part of our job is to get information on people

12   getting arrested so that we can like, you know, track them

13   through the court system and provide legal support.  So I

14   asked this guy his name.  He didn't respond, but one of the

15   officers in the vicinity immediately told me to keep moving,

16   and that was after like, you know, I barely had been there for

17   like -- you know, like I'd hardly been standing for like a

18   minute, and then other instances -- for example, I believe it

19   was on Monday when a large group, you know, came south down

20   Florissant, protesting and marching, and I overheard some

21   officers -- I'm pretty sure it was the corner of Florissant

22   and Canfield -- saying something to the effect of "Well, like

23   we'll let them go for now."  Like, you know, it's essentially

24   "We're not going to enforce the rule right now."  And they got

25   to the south end of the protest area.  They had this sort of

1    standoff with the police.  It might have been an hour, an hour

2    and a half, and it was only after that point, you know, that

3    they were told to disperse, so just like -- and then, of

4    course, on Friday, the rule didn't seem to be, you know,

5    enforced on Friday.

6    Q    So when you describe this incident with the large group

7    who was standing still, how long were they standing still

8    before they were told to keep moving?

9    A    I mean like an hour, an hour and a half.

10   Q    And did you see any incidents when smaller groups of

11   people were standing still for a shorter period of time and

12   told to keep moving?

13   A    Yeah, definitely.

14   Q    And you described an incident where you were told to keep

15   moving when you asked somebody's name?

16   A    Uh-huh.

17   Q    Do you remember what day that happened?

18   A    I'm pretty sure that would have been Thursday.

19   Q    So when that happened, before you asked for the

20   gentleman's name who was being arrested --

21   A    Uh-huh.

22   Q    -- had you been standing still for any period of time?

23   A    Yeah, you know, maybe like 30 seconds, a minute.

24   Q    And before you asked for his name, did anybody tell you

25   to keep moving?

1   A    No.

2   Q    So it was only after you asked for the name of the man

3   getting arrested that somebody started to enforce this rule

4   against you?

5   A    Right, yeah.

6   Q    Now, again, based on what you saw while you were in the

7   protest area, did you discern patterns in when the rule was

8   being enforced and when it wasn't?

9   A    I mean I would say that, you know, it seemed like it

10  wasn't being enforced or it seemed like it was being enforced

11  if you were doing something that the police didn't like, and

12  it also seemed to be more likely to be enforced if there was

13  more energy to the protest, if there were more people there,

14  yeah.

15  Q    And so when you say when you were doing something the

16  police didn't like, can you give some examples of what that

17  might be?

18  A    I mean trying to get the information of someone being

19  arrested would be something that I personally think they

20  didn't like just because, you know, you know, they knew we

21  were going to try to provide the person with legal support and

22  try to like prevent them from, you know -- you know, like

23  protect them in the courts.

24  Q    Now, Mr. Reinstein, when you were asking for this

25  gentleman's name, were you engaging in any violence?

Case: 4:14-cv-01436-CDP  Doc. #:  63  Filed: 12/02/14  Page: 133 of 316 PageID #: 831
Joel Reinstein Direct Examination                          9/29/2014

133

1   A    No.

2   Q    And as far as you were aware, were you breaking any laws?

3   A    No.

4   Q    Was there anybody around you in the area who was engaging

5   in any violence or breaking any laws that you were aware of?

6   A    No.  It was pretty calm.

7   Q    Now, did you ever talk to any police officers about the

8   "keep moving" rule?

9   A    Yeah.  I asked an officer on Friday if they were still

10  enforcing the rule, and he said, "Yeah, you know, that's the

11  protocol."  He said something to the effect of "That's the

12  protocol we've been given tonight, but apparently we're not

13  enforcing it."  And then I also asked him, "You know, so like

14  what happens if someone, you know, refuses to keep moving when

15  you've told them to?"  He was like, "Well, they could be

16  subject to arrest, but, you know, that's up to our discretion.

17  So like, for example, right now, you know, you're standing

18  here, but like I'm not about to arrest you" is what he said to

19  me.

20  Q    So just to make clear, when you were talking to this

21  police officer, were you standing still in the protest area?

22  A    Yeah.

23  Q    Now, did the police officer tell you how he would decide

24  whether he was going to arrest somebody for standing still or

25  not?

134

1    A    No.  He just said it was like his discretion.

2    Q    And could you tell which law enforcement agency this

3    police officer worked for?

4    A    So I think he had a tan shirt, so I'm thinking County

5    Police.

6    Q    Now, Mr. Reinstein, overall, do you think that the rule

7    against standing still was ever clearly explained to you?

8    A    Not really, no.  It was just kind of like, "Keep moving."

9    Q    Did you understand what you had to do in order to avoid

10   violating this rule?

11   A    Not really.

12   Q    And were you afraid that you could get arrested for

13   violating this rule that you didn't understand?

14   A    Yeah, absolutely.

15   Q    And did you think that the -- or what effect did you

16   think the "keep moving" rule had on the other protestors in

17   the area based on what you observed?

18            MR. ISAACSON:  Again, for the record, Your Honor,

19   this is speculative.

20            THE COURT:  Overruled.

21   A    So I would say that the protests were smaller.  It seemed

22   like they -- you know, they diminished earlier in the night.

23   There were like fewer people sooner, and there wasn't nearly

24   as much energy.  There wasn't -- you know, so I would say it

25   was pretty demoralizing.

1    Q    (By Ms. Degtyareva) Did you think that the rule had

2    any -- hampered the protestors' ability to continue to

3    demonstrate?

4    A    Yeah, absolutely.

5    Q    And why do you say that?

6    A    Because you couldn't stand in one place, you know, you

7    couldn't -- you couldn't stand in the street.  You couldn't,

8    you know, congregate in large groups, it seemed like, you

9    know, and also, you know, it tired people out.  Like, you

10   know, you're on this like roller rink of protest, and

11   eventually, you're tired of walking, and you want to go home,

12   and you can't -- you can't just like take a break in the

13   protest area, you know.

14   Q    Now, Mr. Reinstein, during all of the time that you saw

15   police officers telling protestors that they had to keep

16   moving, did you ever hear them tell protestors that there was

17   an alternate zone where they could go to and continue

18   protesting while standing still?

19   A    No.

20          MS. DEGTYAREVA:  Thank you.  That's all I have for

21   now.

22          THE COURT:  Cross-examination.

23                      CROSS-EXAMINATION

24   BY MR. SHUMAN:

25   Q    Hi, Mr. Reinstein.  Nice to meet you.

Joel Reinstein Cross-examination                          9/29/2014

136

1   A    Hi.  What's your name?

2   Q    Mike Shuman is my name.  I'm with the St. Louis County

3   Counselor's Office.  I'll be very brief.

4   A    Okay.

5   Q    Your testimony a moment ago was that the five-second rule

6   had a -- I'm putting words in your mouth; I appreciate that --

7   a deleterious effect on the numbers of protestors that were

8   there.

9   A    Uh-huh.

10  Q    How in the world do you know that?

11  A    The protests just got smaller.

12  Q    But how in the world do you know that the enforcement --

13  that there weren't a thousand different reasons that the

14  protestors were not there in as large numbers?

15  A    I don't.  There could have been other reasons.

16       MR. SHUMAN:  But you didn't mind -- no.  Okay.

17  That's all, Judge.

18       THE COURT:  All right.  Mr. Isaacson.

19                    CROSS-EXAMINATION

20  BY MR. ISAACSON:

21  Q    Just a few things.  Part of your job out there was to

22  collect evidence to file lawsuits against police officers,

23  correct?

24  A    Something to that effect, yeah.

25  Q    I mean you wrote that in your declaration, right?

1    A    Yeah.

2    Q    Okay.  And it was your practice to attend the

3    demonstrations during that eight days between about 9:00 p.m.

4    and 2:00 a.m.; is that accurate?

5    A    Yeah, roughly.  I mean it would vary, but yeah.

6    Q    And during that eight days, I take it there were good

7    numbers of people that were out there between 9:00 p.m. and

8    2:00 a.m.; is that fair?

9    A    Yeah, more earlier than later, but yeah.

10   Q    When you say "earlier than later" --

11   A    Oh, sorry.

12   Q    -- you mean earlier in the week or more earlier --

13   A    Earlier in the week, right.

14   Q    Okay.

15   A    Yeah.

16   Q    And so when we say earlier in the week, we're talking the

17   16th, 17th, 18th, in there, correct?

18   A    Yeah, yeah.

19   Q    Okay.  And what sort of numbers would you estimate were

20   out there on those -- on those early nights?

21   A    You know, in the hundreds.  I mean it's pretty hard to

22   say, but --

23   Q    Okay.  That's a lot of people?

24   A    Yeah, yeah.

25   Q    Did you ever observe any violence from any of the

1   protestors?  And by "violence," I mean them throwing any

2   articles of any kind, be they bricks, bottles, any other

3   articles, gunfire, Molotov cocktails, anything like that?

4   A    The only thing I saw was throwing water bottles.

5   Q    You mentioned the QT was burned down, correct?

6   A    That was before I came.

7   Q    Okay.  What is your understanding of what a State Trooper

8   uniform looks like?

9   A    I just understood that they were blue.  You know, State

10  Troopers are blue.  The County is tan.  I guess --

11  Q    Oh, I'm sorry.

12  A    And then I guess the National Guard was there.

13  Q    What was your understanding of the color of a Ferguson

14  police officer's uniform?

15  A    A Ferguson police officer, I would have -- I would have

16  thought would be tan.

17  Q    You have no knowledge?

18  A    No.

19  Q    Okay.  Did somebody tell you a State Trooper's uniform

20  was blue, or is that an assumption?

21  A    Yeah, that's what, you know, people were talking about,

22  yeah, saying State Troopers are blue, County is tan.

23  Q    Okay.  And at night, it's difficult to distinguish shades

24  of blue probably, huh?

25  A    Oh, like from dark blue to light blue?

1    Q    Yeah.

2    A    I mean I would say I just wouldn't be able to tell you

3    like, well, dark blue signifies X and light blue signifies Y,

4    but I think it was well lit enough that I -- you know, if I

5    thought, oh, a different agency is dark and a different agency

6    is light, I would have been able to tell.

7    Q    When was the first time you thought about the issue of

8    what color uniforms were the officers wearing?

9    A    I don't know.  Probably -- probably Saturday.

10   Q    Just two days ago?

11   A    Sorry.  No.  I should be clear.  So the first Saturday

12   that I was there, the second day.  Friday, we were there, you

13   know, really briefly, and we got tired really quickly because

14   we'd just driven in like eight hours or so.

15            THE COURT:  Saturday, the 16th, in other words?

16            THE WITNESS:  Right, right.

17            MR. ISAACSON:  Okay.  I don't have anything else.

18   Thank you.

19            THE COURT:  Redirect?

20            MS. DEGTYAREVA:  No, nothing further, Your Honor.

21            THE COURT:  All right.  Why don't you step down.

22            Okay.  How many -- how many more witnesses does the

23   Plaintiff have?

24            MR. DAVIS-DENNY:  We have two more witnesses, Your

25   Honor.  The next one, I expect the direct will last between

1   five and 10 minutes.  I'm happy to do it after lunch, before

2   lunch, whatever you want.

3          THE COURT:  Well, here's what I'd like to do.  I

4   would like to go ahead and have lunch now from now until 1:00

5   p.m., and then I would like for the County to take its witness

6   out of order because I don't know how long it's going to take

7   and I don't want to get into a situation where there's not

8   enough time to cross-examine, et cetera.  Okay.  With the one

9   witness, right?  That's the only one you have a problem with?

10          MR. SHUMAN:  Well, with the time problem.  We have a

11   second County witness, but we can wait until the Plaintiffs

12   conclude.

13          THE COURT:  Yeah, we're just going to do the witness

14   that you say has to leave.  Right.  So that's -- we'll do that

15   right after lunch, and then we'll pick up with the rest of the

16   Plaintiff's case.

17          Okay.  Court will be in recess until 1:00 p.m.

18      (Court recessed from 12:06 p.m. until 1:01 p.m.)

19          THE COURT:  All right.  So, Mr. Shuman, you're going

20   to present a witness out of order?

21          MR. SHUMAN:  Yes, Your Honor.

22          THE COURT:  You may proceed.

23          MR. SHUMAN:  Call Chief Jon Belmar.

24          THE COURT:  Sir, would you step right here to the

25   clerk to be sworn?

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 141 of 316 PageID #: 839
Jon Belmar Direct Examination                                    9/29/2014

141

1                          **JON BELMAR,**

2    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

3    FOLLOWS:

4                         DIRECT EXAMINATION

5    BY MR. SHUMAN:

6    Q    Hi, Chief.

7    A    Good afternoon.

8    Q    We all know who you are, but could you identify yourself

9    for the record, please?

10   A    My name's Jon Belmar.  I'm a Colonel with the St. Louis

11   County Police Department, and I'm the Chief of the St. Louis

12   County Police Department.

13   Q    Quickly tell me your history with the County Police.

14   A    I've been here 28 years.  I've been the Police Chief

15   since January.  Prior to that, I've been a Commander on the

16   department, which means Lieutenant or above, since April of

17   1998.  Prior to that, I was a Sergeant and a Patrolman.

18   Q    I want you to tell us about the command structure for the

19   way the law enforcement agencies worked together in Ferguson

20   prior to Thursday, August 14th, prior to the 14th.

21   A    So prior to the 14th, it was pretty much a collaboration

22   between St. Louis County, the State Highway Patrol, and

23   St. Louis Metropolitan Police Department.  So really, to be

24   fair, the St. Louis County Police Department had the most

25   officers on the ground there.  So I would say, in all intents

1    and purposes, I probably had as much sway there because of my

2    rank and being the Chief, but I know that, for example, I was

3    with Sam Dotson, visiting with him on Monday morning after

4    Sunday, the 10th, and Captain Ron Johnson from the Highway

5    Patrol, and we seemed to all be there together in the evenings

6    when the protest area became dynamic.

7    Q    How did the collaboration work?

8    A    How did the collaboration work?  Well, it was probably --

9    I think sometimes it's not as autonomous as people might

10   really think.  So we were taking a looking at situations that

11   had occurred to us, the protests and some of the criminal

12   activity that arose thereof, and we would say, "Well, you

13   know, this tactic, for example, doesn't work" or "This didn't

14   work as well as we wish it would have, and what can we do

15   differently?"  So we would discuss those things and then try

16   to develop tactics based on that that we thought would have

17   the ability to preserve life and injuries and property.

18   Q    Prior to the 14th, which department had the final say?

19   A    Well, I would think on a -- on a macro scale, it would be

20   the St. Louis County Police Department would have the final

21   say on strategies and tactics and things such as that.  I

22   would imagine with the number of officers that were there,

23   that on a smaller scale, that on smaller decisions that were

24   made, that would probably be a little different, maybe pointed

25   directly toward a department that that officer worked for, but

1  on a macro scale, it would have been the County Police

2  Department.

3  Q    Give me an idea of any one night -- let's take the

4  14th -- how many officers are on the scene.

5  A    So that would have been Thursday, the 14th.  There would

6  have been after 6:00 about 160 plus, pretty much close to 200

7  St. Louis County Police officers.  That evening, I'm guessing

8  somewhere around 80 members of the Missouri State Highway

9  Patrol, perhaps 50 municipal officers, and I don't recall if

10  St. Louis was there that evening.

11  Q    When did City of St. Louis show up?

12  A    Well, they were there on Sunday evening, the 10th, and

13  the 11th.  They weren't there on Tuesday, the 12th, or

14  Wednesday, the 13th.  And I don't remember if they were there

15  on the 14th, but they were back on the 15th.

16  Q    Did anything happen on Thursday, August 14th, that to

17  your mind changed the command structure?

18  A    So the Governor came into St. Louis, and he had a press

19  conference at UMSL, and he met with me, my senior staff, the

20  Superintendent of the Highway Patrol, his senior staff, Bob

21  McCulloch, et cetera; Mr. Dooley, the St. Louis County

22  Executive.

23  Q    Do you remember where this meeting took place?

24  A    It was at the J.C. Penney Building at UMSL, and it

25  occurred sometime in the early afternoon; I would say 1400

1    maybe.  So I had heard that the Governor was going to place

2    the State Highway Patrol in charge of the West Florissant

3    corridor and the protest and the criminal activity thereof

4    that we had been experiencing.  I didn't know anything about

5    this prior to the morning of the 14th, so I went -- I was

6    invited to go to the J.C. Penney's Building at UMSL.  In fact,

7    I did.  I had an opportunity to meet with the Governor, and he

8    expressed to us that he was going to put the Highway Patrol in

9    charge of policing the West Florissant corridor and that -- I

10   think he stopped short of -- he didn't do a State of Emergency

11   that day.  So we met privately.  I say privately.  There were

12   several of us in the room, but it wasn't in front of the

13   media, and then we went upstairs immediately thereafter, and

14   he did a press conference.  I stood about 15 feet away from

15   the Governor, and he advised everybody that the Highway Patrol

16   was going to be assuming command of the West Florissant

17   corridor.

18   Q    So what was your role in the command structure after

19   that?

20   A    So it was clear to me after that that the Highway Patrol

21   was going to be in charge of it.  I mean I was standing

22   adjacent to the Governor when he said that.  So that part was

23   patently clear to me; however, I did have 160 to 200 police

24   officers down there every evening, and so after that, the way

25   I looked at it was that my role in this was going to be

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 145 of 316 PageID #: 843
Jon Belmar Direct Examination                                    9/29/2014

145

1    extending advice, collaborative.

2    Q    Would you describe the working relationship between the

3    Highway Patrol and the County Police after the Highway Patrol

4    arrived on the scene?  How did they get along?

5    A    The commanders?  Frankly, it was outstanding.  Human

6    nature being what it is, I would imagine it wasn't -- it

7    wasn't perfect, but I -- these -- these commanders from the

8    Patrol from the Superintendent on down, I have a lot of regard

9    for, and I know they of me.  As far as our police officers

10   went, I think they understood that this was one of those

11   things to where we had to make sure that we served the public

12   the best we could there and that they were there for each

13   other.  So I didn't -- I don't think there was any sort of an

14   acute problem.

15   Q    I want to draw a distinction between Saturday, August 16,

16   and the days prior to that time.  Okay.  Prior to Saturday,

17   August 16, how were operational decisions made?

18   A    Prior to Saturday, August 16th?

19   Q    Yes.

20   A    What we would do is we would take a look every evening at

21   what had happened the previous day.  Actually, we would do

22   that right after that day kind of ended with a press

23   conference.  We would talk about failures and successes,

24   things that happened well and things that could have happened

25   better and things that we might want to prevent and different

Case: 4:14-cv-01436-CDP  Doc. #: 63  Filed: 12/02/14  Page: 146 of 316 PageID #: 844
Jon Belmar Direct Examination                                    9/29/2014

146

1   scenarios that were occurring on the West Florissant corridor.

2   So we would all talk about whatever kind of strategies or

3   tactics that we thought might be worth a try.

4   Q    Can you give me an example?

5   A    So one of the things that we did was that Dotson, Chief

6   Sam Dotson out of St. Louis -- every year, he has the Annie

7   Malone Parade, and he said that during that, they form pods,

8   and pods are officers that go out in three to five to six

9   officers, and they kind of stand every 25 meters or so apart

10  from each other and just kind of monitor things that are

11  happening.  So, for example, one of the things that we would

12  come out of with the pod system was that we wanted a relaxed

13  bearing.  This wasn't every night, but, for example, we found

14  that a very relaxed bearing worked a lot better than a very

15  structured bearing.  So we didn't really want, for example,

16  toes on the shoulder or anything like that and these guys

17  broken down to parade rest.  We really wanted them just

18  leaning up against the storefronts.

19           THE COURT:  Okay.  Hold on.  You didn't want toes on

20  the shoulder?

21           THE WITNESS:  Uniform shoes, you know, being right

22  there to where we're right next to the roadway.

23           THE COURT:  On the shoulder?  Okay.  Toes on the

24  shoulder of the highway?

25           THE WITNESS:  Right.

Case: 4:14-cv-01436-CDP  Doc. #: 63  Filed: 12/02/14  Page: 147 of 316 PageID #: 845
Jon Belmar Direct Examination                              9/29/2014

147

1          THE COURT:  Of the road?  Okay.

2          THE WITNESS:  Of West Florissant.

3          THE COURT:  I just didn't understand the phrase.

4          THE WITNESS:  Sorry, Your Honor.

5          THE COURT:  Okay.  Go ahead.

6          THE WITNESS:  Sorry.

7    A    So we would talk about those type of things, and these

8    were discussions, and then we would develop strategies thereof

9    that we thought might be productive the next day.

10   Q    (By Mr. Shuman) So this is, again, prior to August 16.

11   If you came up with that kind of a strategy, who made the

12   final decision as to whether it would be implemented?

13   A    It was collaborative on the decision making, but after

14   the 14th, I think pretty much everybody there, every commander

15   or commanding officer, we made sure that Captain Johnson was

16   aware of what the strategy was going to be going forward since

17   the Governor named him as the commander.

18   Q    Do you personally think you had the option to order

19   anything concerning operational activities that Captain

20   Johnson had not okayed?

21   A    On a macro scale, no.  I mean I wouldn't have done that.

22   I would have made sure that Captain Johnson -- I had his

23   endorsement before we put any plan in place, as would have any

24   other commander there.

25   Q    Okay.  We're talking prior to August 16, right?

1    A    Yeah, once the Governor talked on the 14th.

2    Q    Okay.  I'm going to show you what I have marked as County

3    Exhibit A, and I think I can --

4              THE COURT:  Yeah, hold on.  We'll turn on the --

5              MR. SHUMAN:  I should know how to do this, but I'm

6    sorry I need the help.

7              THE COURT:  Hold on.  We're just trying to change the

8    system, so the input is available.  There you go.

9    Q    (By Mr. Shuman) Chief, do you know what this is?

10   A    It appears to be the written documentation of the State

11   of Emergency that Governor Jay Nixon issued, I believe, on the

12   16th of August 2014.

13   Q    Have you read it prior to -- had you read it prior to

14   today?

15   A    I've seen it prior to today.  I had it described to me

16   prior to today, but I haven't read it word-for-word either

17   then or now.

18   Q    Would you please read the third-to-last paragraph, the

19   one beginning --

20             THE COURT:  Can you make that bigger, make it larger

21   so that it will be bigger on the screen?  The whole page

22   doesn't have to be there, but -- yeah, the other way.  There

23   you go.

24             THE WITNESS:  That's okay.  I can read that.

25             THE COURT:  That's good.

1   Q    (By Mr. Shuman) Can you read that?

2   A    "I further order that such other local law enforcement

3   agencies as deemed necessary by the Superintendent of the

4   Missouri State Highway Patrol to maintain order in the city of

5   Ferguson shall assist the Missouri State Highway Patrol when

6   requested by the Superintendent and such law enforcement

7   agencies when operating in the city of Ferguson shall

8   cooperate with all operational directives of the Missouri

9   State Highway Patrol."

10  Q    What effect did that order have on the way you viewed

11  your ability to give commands?

12  A    Final commands, I made sure that everything was ran past

13  Captain Johnson.

14  Q    Chief, were you given explicit directions or commands

15  concerning enforcement of Missouri's refusal-to-disperse

16  statute?

17  A    I was given direction on that.  We -- Saturday, the 16th,

18  there was a curfew put in place.  It was pending.  It was

19  imminent.  It was going to be put in place.  So one of the

20  questions that I think many of the senior commanders had -- I

21  know I had this question -- was, well, if we have a curfew,

22  then how are we going to enforce this because there's going to

23  be situations to where we may not be able to figure out

24  exactly what we're looking at on the corridor with the curfew

25  because there could be people there for very legitimate

1  reasons.  Anyway, those were some of the things that we were

2  thinking about, I know I was thinking about.  I received

3  direction about sundown, maybe a little afterwards -- it's

4  hard telling -- on a phone call.  I don't recall who the call

5  was from.  I assume -- I would have to tell you my best

6  recollection would be it would have been from a member of the

7  command staff of the Highway Patrol, saying that we were going

8  to use failure to disperse as the charge in case we had to

9  arrest somebody if they didn't comply with the curfew, and I

10  thought okay.  I -- I thought it was a little unusual, not

11  tremendously so.  I just hadn't really considered that one.  I

12  called Mr. McCulloch, Bob McCulloch, the Prosecuting Attorney

13  for St. Louis County, just to kind of run it past him, not

14  really to get his permission, but just to say, "Bob, this is

15  what's going on."  He said, "Yeah.  I'm looking at that.  It's

16  probably something that would certainly apply there."  So at

17  that point, I let my charges know that we were going to use

18  failure to disperse given the fact we were going to -- if in

19  fact we had to make an arrest thereon.

20  Q    Did you believe that you had discretion not to command

21  enforcement of this refusal-to-disperse statute?

22  A    Well, I mean I didn't think I had a tremendous amount of

23  discretion in that given the curfew scenario or the intent of

24  what I thought the Governor was trying to do with the curfew.

25  I felt like that they had told us that that was the most

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 151 of 316 PageID #: 849
Jon Belmar Direct Examination                                    9/29/2014

151

1   appropriate charge, and I was -- I agreed with that.  I

2   understood what he was saying, and that's what I was going

3   to -- that's what we were going to do.

4   Q    And had you not agreed, did you think you had the

5   authority to say, "I don't want to be enforcing this"?

6   A    No.  I mean I wasn't going to get into an issue of

7   saying, well, I would rather charge them with this or this or

8   this at this point.  I'm not an attorney.  I assume that the

9   attorneys in Jefferson City had taken a look at this and they

10  had drilled it down, and based on that, I just assumed that

11  that was the best one to go with based on their advice, their

12  counsel.

13  Q    So after receiving that direction about enforcing the

14  refusal-to-disperse statute, did you personally give any

15  commands to police officers about how we're going to be

16  enforcing it?

17  A    I told my commanders that work under me that in fact that

18  failure to disperse is what we were going to use.  I think

19  they looked it up, and then I told them that I wanted to make

20  sure that we did announcements to people prior to arresting

21  them or at least giving them fair warning for failure to

22  disperse and that when possible, when we thought we were going

23  to be in situations to where we had to do that, that I wanted

24  those things done over the intercom, those "Please disperse or

25  otherwise you're subject to arrest," et cetera.

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 152 of 316 PageID #: 850
Jon Belmar Direct Examination                                    9/29/2014

152

1    Q    Just generally, after -- after the issuance of this

2    Executive Order that's Exhibit B, what was your belief as to

3    your ability as the Chief of the County Police to give

4    operational commands in Ferguson after the Highway Patrol

5    or --

6    A    Well, it was undermined obviously.  I didn't feel like I

7    was left totally out.  Again, it was a collaborative, but as

8    far as the final say, I didn't have that any longer.

9    Q    I wish you'd describe -- and you may have gone into this

10   before, but would you say what your role was personally in the

11   development of operational plans in Ferguson?

12   A    Throughout?  The beginning?  The end?  What?

13   Q    Well, let's say post emergency order, post 16th.

14   A    Well, listen, like I said, I had a -- I had a very good

15   working relationship with the senior staff of the Highway

16   Patrol and my senior staff and other agencies that might be

17   there, which generally would have been St. Louis Metropolitan

18   Police Department, and my role was to ensure the public

19   safety, to put plans in place that, obviously, protected life

20   and property while trying to protect certain freedoms of those

21   that wanted the ability to be able to protest and assemble

22   lawfully down there in the West Florissant corridor, and

23   finally to protect my officers.

24   Q    And how was the final decision made as to any particular

25   operational action after the 16th?

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 153 of 316 PageID #: 851
Jon Belmar Direct Examination                               9/29/2014

153

1  A    Pretty much regardless of what it was, if there would be

2  a room of commanders talking about, perhaps, a strategy that

3  we might -- that might bear fruit or whether it was out

4  actually walking on West Florissant, if there was something

5  that I noticed and I observed this with other commanders that

6  we think we wanted to employ, then I would either call or walk

7  to Captain Johnson and say, "Hey, we're looking at doing this.

8  What do you think?"  And vice versa; he'd come over to us and

9  say, "I don't like the way this looks or whatever.  We need to

10 alter this."

11 Q    I think we all know, but would you say who Captain

12 Johnson is or was?

13 A    Captain Ron Johnson is a captain of the Missouri State

14 Highway Patrol, and he is currently billeted as the commander

15 of Troop C here in St. Louis.

16 Q    So did you have any authority to give operational

17 commands absent Captain Johnson's okay?

18 A    Not on a grand scale, no, I mean, but the bottom line is

19 we were always there together, so it wasn't an issue to where

20 I -- I or anybody else suffered to try to find him because,

21 you know, this was 18 straight days of just pretty much living

22 with each other with the exception of maybe four, four and a

23 half hours from about 4:00 in the morning to 8:00 in the

24 morning.

25 Q    Are you aware that the State of Emergency was lifted?

Case: 4:14-cv-01436-CDP   Doc. #:  63   Filed: 12/02/14   Page: 154 of 316 PageID #: 852
Jon Belmar Direct Examination                                    9/29/2014

154

1    A    I am aware that it was lifted, and I cannot tell you what

2    day that happened.  Sorry.

3    Q    Okay.  Well, today, on September 29, what is the command

4    structure for operational decisions in Ferguson?

5    A    Well, that's -- that would be up to the Ferguson Police

6    Department at this point.  There are certain occasions --

7    several in the past week -- where they have called for

8    additional resources in the city of Ferguson at the request of

9    Chief Tom Jackson, and those are municipal officers and

10   members of the Highway Patrol and in many cases St. Louis

11   County officers that respond up there to assist, but as far

12   as, you know, the Unified Command at this point, based on what

13   is not happening on the ground, there really is -- I mean it

14   would be up to Chief Jackson to make the decisions on those

15   type of things.

16   Q    What's your belief about whether you and the County

17   Police will follow directions about operations if any are

18   given by Captain Johnson?

19   A    In the future?

20   Q    Yes.

21   A    We would -- we would follow them.  You know, the bottom

22   line is I guess we could talk for a long time about whether

23   the Governor is going to do another State of Emergency or

24   decree the same thing, but if in fact he does, if that's your

25   question, we're going to fall in line and do what's best for

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 155 of 316 PageID #: 853
Jon Belmar Direct Examination                                    9/29/2014

155

1    the community, and the bottom line is that egos need to be set

2    aside on this thing.  There were a lot of successes there if

3    you want to talk about a lack of loss of life and injuries,

4    and that may be very difficult to sustain, and we're going to

5    do everything we can to make sure that happens, and if that

6    means 100 percent cooperation, then that's what we're going to

7    do.

8    Q    Chief, do you know if the County Police are actively

9    enforcing the refusal-to-disperse statute in Ferguson today?

10   A    Well, they're not actively doing it today.  I can't speak

11   for what any one of 865 police officers may be doing at any

12   given time, but I was in Ferguson Tuesday evening, I believe,

13   and I know I was there Saturday evening, and I had an

14   opportunity to observe some of the protests, and I know the

15   recent one on Saturday, we didn't do any of that.  They --

16   they were allowed to congeal, to stay in the same area, and

17   then when I went over to the Ferguson Police Department, I

18   noticed there was protestors across the street, and they

19   stayed across the street.  They actually did come across at

20   one point when the media started their press conference, but

21   they weren't made to march that I saw.

22   Q    Let me ask you; are you -- are you aware of a command

23   issued by Captain Johnson for police in Ferguson to keep

24   protestors moving?

25   A    Yeah, command's an interesting word, but, yeah, we had a

Case: 4:14-cv-01436-CDP  Doc. #: 63  Filed: 12/02/14  Page: 156 of 316 PageID #: 854
Jon Belmar Direct Examination                                    9/29/2014

156

1  theory that we thought that -- and Captain Johnson thought it

2  would be a good idea if we kept everybody moving based on what

3  we had observed when the crowds became large, especially, in

4  the evening, late evening.  So we felt like that it was --

5  with the failure-to-disperse guidance that we'd received from

6  the Governor's office and the issues that we'd observed with

7  the large crowds and some of the activity that spun out of

8  that, I think Captain Johnson felt like -- I hate to speak for

9  him; I'll just tell you what I observed -- that what we

10 discussed was that if we keep the crowds moving, then we have

11 less of a chance for any criminal activity to embed themselves

12 into an area that might be static, and it wouldn't be that

13 easy if they were moving, so --

14 Q    Tell us about some of the things that happened.

15 A    That was -- that ended up being a directive, to answer

16 your question.

17 Q    Well, yes.  Thank you.  Tell us about some of the things

18 that happened when the people interspersed with the crowds?

19 A    Well, I mean I personally observed rocks, Molotov

20 cocktails, bottles, frozen bottles, bottles with urine,

21 although I didn't personally test it, but that's what the

22 officer thought when it blew up and hit him, and there were

23 shots, gunfire within the crowd, both in the air and directed.

24 So those are some of the things that I observed.  There

25 were -- I think within the first 11 days, there were five

157

1   shootings within the protest corridor.  I observed those also.

2   Q    Did you personally give any commands or directions to

3   County police officers to keep protestors moving?

4   A    I don't specifically remember a moment, but I'm sure I

5   did.

6   Q    Would you have given that direction had Captain Johnson

7   not okayed it?

8   A    No.  And, again, it was a tactic we were using.

9   Q    Here today, on the 29th of September, do you have any

10  plans to command the County Police to keep protestors moving

11  and not standing still?

12  A    No.  We've talked about operational plans.  The truth of

13  the matter is that it was dynamic and it changed

14  minute-by-minute, sometimes even less than that, and I think

15  that if I were to foresee a future where people would be able

16  to stand and there wouldn't be anything negative that came out

17  of it regarding safety or property, then that would probably

18  be the tactic I'd want to go with.

19  Q    But you don't have any immediate plans, I take it?

20  A    No.  I mean we have some operational plans, and again,

21  what I was trying to express to you is that whatever we felt

22  like that worked that allowed peaceful protests down there, we

23  were all for.  That's what we wanted to make sure that

24  happened, but when we noticed certain things and we observed

25  night after night after night after night certain patterns,

 1   then that's why we developed tactics from that, and what I

 2   said was if I needed -- if I would need to alter those and do

 3   a 180 and I thought it would work, I'd do that.

 4           MR. SHUMAN:  Chief, I think I'm going to wrap it up.

 5           Judge, at this time, I'd like to ask for the

 6   admission of County Exhibit B, and I will ask the Court to

 7   take judicial notice of Missouri statute § 44.100, which I've

 8   marked as County Exhibit A.

 9           THE COURT:  Is that the failure-to-disperse statute?

10           MR. SHUMAN:  No.  This is -- 44.100 describes the

11   emergency powers of the Governor.

12           THE COURT:  Okay.  So A is -- have you shown us that?

13   So the first one you showed -- this thing up on the screen is

14   not A; it's B?

15           MR. SHUMAN:  It's B, yes, Judge.

16           THE COURT:  That's B.  Okay.  So Exhibit B, I'll

17   receive that into evidence, and then tell me the statute you

18   want.

19           MR. SHUMAN:  44.100.

20           THE COURT:  Yeah, I'll consider the statutes.  I

21   don't think I have to take judicial notice of them.  They're

22   the law.  So, but, yeah, I'll take judicial notice if that's

23   what you want.  It's Exhibit B?  No.  That's Exhibit A.

24           MR. SHUMAN:  And I'm asking for the admission --

25           THE COURT:  And you have a copy of that for me?

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 159 of 316 PageID #: 857
Jon Belmar Cross-examination                          9/29/2014

159

1          MR. SHUMAN:  Yes, I do.

2          THE COURT:  I'll receive it into evidence.

3          MR. SHUMAN:  And asking for the admission of Exhibit

4   B, which is this Executive Order.

5          THE COURT:  Right.  I've received that into evidence.

6          MR. SHUMAN:  Pass the witness.

7          THE COURT:  Cross-examination.

8          MS. DEGTYAREVA:  May I proceed?

9          THE COURT:  You may.

10                         CROSS-EXAMINATION

11   BY MS. DEGTYAREVA:

12   Q    Good afternoon, Chief Belmar.

13   A    Good afternoon.

14   Q    So I'd like to just make sure I understand your testimony

15   about the orders that you received from the Highway Patrol and

16   the authority that you had with regard to those orders.

17   A    Yeah.

18   Q    So you talked during your direct examination about macro

19   versus minor -- micro decisions.  Did you have to get

20   permission from Captain Johnson for every macro decision that

21   you would implement in the Ferguson protest area?

22   A    Yes.  I made sure that I had his endorsement.

23   Q    And what about for micro decisions about how to actually

24   implement the order that he gave you?

25   A    No, I mean, we didn't do -- we didn't do it that way.  I

1    mean if I'm told to go do something, then I can go do it.

2    Once I understand what I'm supposed to do, then those can be

3    carried out without having to continue the discussion of the

4    collaboration.

5    Q    So you had the authority to establish the ways in which

6    you carried out the instructions that Captain Johnson gave

7    you?

8    A    No, I wouldn't say it's quite that simple.  I would say

9    that we developed the plan or the plan that he gave us on the

10   failure to disperse or that we ended up with, that it was a --

11   that that's how we did it.  It was going to be failure to

12   disperse, and then I think the issue is the discretion each

13   officer applied to it on how it was actually carried out.

14   Q    So you didn't have to get permission from Captain Johnson

15   to figure out how each individual officer would apply the

16   refusal-to-disperse statute?

17   A    No.

18   Q    Now, you also testified that you received an order from

19   somebody in the Highway Patrol about enforcing the

20   refusal-to-disperse statute in relation to the curfew that was

21   in place in the Ferguson protest area.  Do you remember

22   exactly what that person told you about the

23   refusal-to-disperse statute?

24   A    I believe he told me that -- and I wish I could remember

25   who told me this, but I don't.  I can speculate, but there's

1   no reason to.  The -- that I believe I was told that Ted

2   Ardini, who was the Governor's, I believe, Chief Counsel, had

3   advised that -- had called somebody and said that's what

4   they're going to go with is the refusal to disperse, and I

5   received that on a phone call.

6           THE COURT:  Can you explain what you mean when you

7   say, "That's what they're going to go with"?  I mean give me

8   the steps.  What do you mean "go with"?

9           THE WITNESS:  We had this curfew, Your Honor.

10          THE COURT:  Right.

11          THE WITNESS:  And so with the curfew, there's all

12  sorts of things that come with it because we typically only

13  enforce curfews with minors.  So when we're going to deal with

14  curfews with adults, it's kind of new territory for us.  I

15  mean would it be as simple, I wonder, as just failure to obey

16  a curfew; would you do peace disturbance, trespassing, and we

17  could go on and on, so --

18          THE COURT:  Yeah, so as I understand it, what you're

19  saying is you're talking about what would be used as the

20  charges if you arrested somebody for failing to abide by the

21  curfew?

22          THE WITNESS:  Yes, Your Honor.

23          THE COURT:  That's what you mean?

24          THE WITNESS:  Yes, ma'am.

25          THE COURT:  Okay.

1   Q     (By Ms. Degtyareva) And what time was the curfew in

2   place, or when did the curfew start?

3   A     It started on Saturday, the 16th, I believe, and either

4   10:00 or 11:00 at night.

5   Q     And on what day did the curfew --

6   A     Maybe it was 9:00.  I don't remember the exact time.

7   Q     But the curfew was in the evening?

8   A     Yes, ma'am.

9   Q     And do you remember what day the curfew ended?

10  A     I think it ended Monday morning, the 18th.

11  Q     So were you told anything about enforcing the

12  refusal-to-disperse statute after the curfew ended?

13  A     No.

14  Q     And was it your understanding that the

15  refusal-to-disperse statute would only be used while the

16  curfew was in place in order to enforce the curfew?

17  A     No, it wasn't.

18  Q     Did you believe that you were instructed by the Highway

19  Patrol to continue enforcing the refusal-to-disperse statute

20  after the curfew?

21  A     That was the statute that we continued to use.  There

22  were other reasons to get arrested, but that was the main one

23  that we used.

24  Q     And did you receive any specific instructions from anyone

25  in the Highway Patrol that the refusal-to-disperse statute

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 163 of 316 PageID #: 861
Jon Belmar Cross-examination                                   9/29/2014

163

1   would be used for anything other than the curfew?

2   A    I'm not sure it's quite that straightforward.  I think

3   the agreement was, the message that got down to me and the

4   other commanders was that we were going to continue to enforce

5   failure to disperse.

6   Q    So this -- and just to make sure I understand, this

7   command was a separate command from the original command of

8   enforcing the refusal-to-disperse statute --

9   A    It was ongoing.

10  Q    -- during the curfew?  I'm sorry?

11  A    It was ongoing, I think, is the easiest way to explain

12  it.  That's how I understood it in my mind.

13  Q    Now, you also testified that Ron Johnson thought it was a

14  good idea to keep everyone moving, especially in the evenings.

15  When you say that he thought it was a good idea, was he

16  recommending that you keep people moving or did he require you

17  to keep people moving?

18  A    Well, in essence, part of the decision making was a

19  collaboration, but once the decision is made, it's a decision.

20  I mean it's a directive.  So then it doesn't do any good for

21  Ron Johnson or myself to know this stuff.  It's got to be

22  relayed to the police officers.  So because of that, once that

23  decision is made -- and Ron Johnson has final authority on

24  that -- then it's going to have to be given to the officers,

25  saying this is -- failure to disperse is going to be a charge

1    tonight available to you when we get issues of large crowds

2    gathering and not moving, especially if we observe potential

3    activity that comes out of those that, based on our previous

4    observations, would lead a reasonable person to assume we're

5    going to have problems.

6    Q    So did you participate in this collaborative decision

7    making in order to keep people moving in the protest area?

8    A    I did.

9    Q    And did you agree with the strategy, with the rationale

10   behind the strategy?

11   A    I did.

12   Q    Now, was it your understanding that this idea of keeping

13   people moving -- was that also an enforcement of the

14   refusal-to-disperse statute, or was this a different decision?

15   A    No.  I think it was -- I think it all kind of ties

16   together at some point in my mind.  There was a broad area of

17   discretion allowed for that, I mean, frankly, 24 hours a day,

18   not only in the day but in the evening also to where, you

19   know, it kind of depends what you were looking at on whether

20   or not you felt it was going to be an issue or not.  So the

21   number of people, tenor, agitation, different things like

22   that.

23   Q    When you say there was a large amount of discretion, was

24   that discretion that you and your officers had in enforcing

25   the refusal-to-disperse statute?

1    A    I'm talking just discretion I personally had.  I mean I

2    would go down and walk on West Florissant several evenings,

3    and there would be groups that would be standing and not

4    marching or moving, and they were not compelled to nor would I

5    have compelled them to.  So what I'm saying is that, you know,

6    I don't think I'm much different than any other officer who

7    when they see it, that, you know, there may be times where

8    this is going to become necessarily something we have to do

9    but not all the time.

10   Q    Did Ron Johnson or anyone from the Highway Patrol tell

11   you how to -- how to exercise that discretion and when to

12   enforce the refusal-to-disperse statute?

13   A    No.  We discussed that, and we discussed that at roll

14   call briefly with our folks, or I don't mean briefly but

15   generally with our folks on, you know, listen, you know,

16   demeanor, bearing, discretion, different things like that on

17   what we expected from our officers, so that, you know, in many

18   ways, they weren't locked down to just having to do something

19   no matter what by rote.  I mean they had some discretion as

20   they always do.

21        THE COURT:  So I'm -- I'm -- is it your testimony

22   that there was not any practice of telling people they had to

23   keep moving if there wasn't anything -- you know, if it was

24   just a few people on the sidewalks and it was Monday morning

25   and they were praying or doing something else, are you saying

Case: 4:14-cv-01436-CDP  Doc. #: 63  Filed: 12/02/14  Page: 166 of 316 PageID #: 864
Jon Belmar Cross-examination                                9/29/2014

166

1    there was not a requirement that they had to keep moving?

2           THE WITNESS:  Your Honor, the way I would explain

3    that is that there were pass-ons, I think, that confused the

4    officers from the evening, and the evenings would be that, you

5    know, we'd want to try to keep people moving, et cetera, but

6    I, frankly, will tell you that I don't think we were clear

7    enough as commanders after we went home and before we would

8    arrive back in the early afternoon to tell people that, you

9    know, if there's a different dynamic and there's not a

10   problem, then don't worry about it.  Now, I see that as a

11   shortcoming, and we didn't notice that until after this was

12   all over because we didn't know that the pass-ons, the

13   protocols that would guide us for a 24-hour period or so -- I

14   don't think we understood that those probably needed to have a

15   different caveat during the day and they needed to have a

16   different explanation.  We understand that now, but I didn't

17   understand that then.

18   Q    (By Ms. Degtyareva) Chief Belmar, are you familiar with

19   the requirements of Missouri's refusal-to-disperse statute?

20   A    I haven't read it recently.

21          MS. DEGTYAREVA:  Well, Mr. Bales, could you please

22   put up what we've marked for internal purposes as #205?

23   A    I actually did read it on the corridor, but I haven't

24   looked at it lately.

25          MS. DEGTYAREVA:  Could you please just make the text

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 167 of 316 PageID #: 865
Jon Belmar Cross-examination                                    9/29/2014

167

1    of the statute itself bigger?  Thank you.

2    Q    (By Ms. Degtyareva) So is this the refusal-to-disperse

3    statute?

4         THE COURT:  Well, it is.  I can tell you that unless

5    you've changed it somehow.  It's 574.060 of the Missouri

6    statutes.  Unless you've gotten an older version.  No.  This

7    is the one that's effective in '79.  I believe this is the

8    current law.

9    Q    (By Ms. Degtyareva) Okay.  So this statute says that it

10   applies at the scene of an unlawful assembly or riot; is that

11   correct?

12   A    Yes, ma'am.

13   Q    And the statute says that it applies to refusals to obey

14   commands to depart from the scene of an unlawful assembly or

15   riot; is that correct?

16   A    That's what it says.

17   Q    So when you were giving the instructions to your

18   commanding officers and to the County police officers about

19   how to enforce the refusal-to-disperse statute, did you tell

20   them that they should enforce the statute even if there was no

21   unlawful assembly or riot?

22   A    On their pass-ons, yeah, they were told that people

23   needed to keep moving and that that -- that's the instructions

24   that would have been given to an officer at the time.

25        THE COURT:  So I still am -- so they were told,

168

1    "People need to keep moving, and if they don't keep moving,

2    you can arrest them for failure to disperse"?

3         THE WITNESS:  Yes, ma'am, they would be subject to

4    arrest.

5         THE COURT:  And that's what you mean when you say

6    enforcement of the failure-to-disperse rule?

7         THE WITNESS:  Yes, ma'am.

8         THE COURT:  Okay.

9    Q    (By Ms. Degtyareva) All right.  So you didn't tell your

10   officers anything about an unlawful assembly or a riot?

11   A    I didn't think I had to.

12   Q    Did you tell them anything about the criteria that they

13   should use when deciding whether or not to enforce the

14   refusal-to-disperse statute?

15   A    We did and we discussed that at roll calls with our

16   officers that basically said, hey, you know, when you see --

17   we've -- based on what we've experienced over the last few

18   nights, this is what we're trying to prevent.  We're trying to

19   prevent rocks, bottles, different things like that that may be

20   secreted in an area behind several people that will cause

21   problems, and based on that, we don't want to see those kind

22   of groups gather, so we want the groups to keep moving, and in

23   that way, they don't have the ability to do that, like I've

24   already explained.  So we did give that out, but there was --

25   at no time did we tell officers that they absolutely had no

1    discretion.

2    Q     Now, you were in the courtroom when Ms. Holbrook

3    testified and showed the two videos that she took on, I

4    believe, Monday, August 18th, and Tuesday, August 19th.  Do

5    you remember those videos?  If you'd like, I can play them

6    again for you.

7    A     I remember them.

8    Q     So, well, first, are the officers shown in those videos

9    employees of the County Police Department?

10   A     They are.

11   Q     And are the actions that the officers are taking in those

12   videos consistent with the instructions that you received from

13   the Highway Patrol about the refusal-to-disperse statute?

14   A     I believe they were.

15   Q     So are they also consistent with the instructions that

16   you gave to your officers about how they should enforce the

17   refusal-to-disperse statute?

18   A     Yes.

19   Q     Do you see any or did you see any evidence of an unlawful

20   assembly or a riot in those videos?

21   A     No, I did not.

22   Q     And did you see the officers telling people to depart

23   from the scene?

24   A     I did.  Well, they said they had to keep moving.

25   Q     But did you see them tell people they had to actually

1    depart from the area?

2    A    I don't recall that.

3    Q    And were you aware that your officers were implementing

4    your instructions in this manner?

5    A    Not during the day I wasn't.

6    Q    Well, did you ask for reports from your commanding

7    officers about how your instructions were actually implemented

8    in the Ferguson protest area?

9    A    Right.  I talked to the commander during the day, and I

10   wasn't given a specific briefing on such as we witnessed

11   during the video.

12   Q    Did you receive any reports from any of your individual

13   officers about these -- this type of enforcement of the

14   refusal-to-disperse statute?

15   A    No.

16        THE COURT:  Are we talking about a particular point

17   in time?

18   Q    (By Ms. Degtyareva) During the week of Monday -- well,

19   starting on Monday, August 18th, until the present, did you

20   receive any reports from your commanding officers or

21   individual officers that they were enforcing the "keep moving"

22   rule?

23   A    I made -- I made several direct observations when I would

24   get there in the early afternoon, you know, 13, 14, 1500.  I

25   would -- I'd usually go down and drive on the corridor from

171

1  the command post up to Chambers, maybe a little bit further,

2  and come back.  So I would see what was going on just to try

3  to get an idea of, perhaps, what the early evening and late

4  evening might -- might look like, so I did -- I did directly

5  observe what was happening on the corridor, but I certainly

6  wasn't there all the time.

7  Q    So are you saying -- when you were there in the early

8  afternoon, did you see officers telling people to keep moving?

9  A    I didn't.

10 Q    Now, were you aware that a complaint was filed in this

11 court on August 18th, alleging that officers were prohibiting

12 protestors from standing still in broad daylight when there

13 was no unlawful assembly or riot?

14 A    I was aware that there was a matter brought before the

15 Court.

16 Q    Were you also aware that on that same day there was a

17 hearing in this court on a motion for a temporary restraining

18 order?

19 A    I was aware of that.

20 Q    So you were aware of the allegations made by the

21 Plaintiff in this case that the officers were enforcing this

22 rule when there was daylight, no violence?

23 A    I don't think I was aware of the particulars of it, but I

24 was aware of the motion.

25 Q    Now, after you received or after you became aware of

Case: 4:14-cv-01436-CDP  Doc. #:  63  Filed: 12/02/14  Page: 172 of 316 PageID #: 870
Jon Belmar Cross-examination                                    9/29/2014

172

1   these allegations, did you then go and ask your officers

2   whether they were in fact enforcing the rule in this way?

3   A    No.  What we did was I talked with the majors from the

4   Highway Patrol and Captain Johnson and other commanders about

5   this on -- on -- I said, "Hey, you know, there's a challenge

6   to the failure to disperse," and that was really pretty much

7   it.  You know, we -- we -- we had discussions again as a

8   matter of routine operational guidelines on kind of how we

9   were going to -- what our posture was going to be at any given

10  point in time.  So the failure to disperse was certainly

11  something that we had in our quiver, but, you know -- and then

12  we learned that in fact the motion wasn't granted, the

13  temporary --

14  Q    Well, did you take any -- did you take --

15        THE COURT:  Excuse me.  When you keep talking about

16  failure to disperse, are you talking about the same thing that

17  the Plaintiffs in this case have called, whether it's really a

18  rule or not, the "move along" rule or the five-second rule?

19  You're using those two terms interchangeably?

20        THE WITNESS:  Yeah.  We never talked about a

21  five-second rule.  I don't know where that came from.  It

22  didn't come from --

23        THE COURT:  Okay.  But the "move along" rule, is

24  that -- are you using that, the idea that people have to keep

25  walking or moving along -- when you're testifying here about

Case: 4:14-cv-01436-CDP   Doc. #:  63   Filed: 12/02/14   Page: 173 of 316 PageID #: 871
Jon Belmar Cross-examination                                    9/29/2014

173

1   failure to disperse, are you saying they're the same thing?

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  Okay.  Thank you.

4   Q    (By Ms. Degtyareva) So after you learned of these

5   allegations, did you take any additional steps to investigate

6   whether your officers were in fact enforcing the "keep moving"

7   rule in the manner described?

8   A    No, because I wasn't a hundred -- I mean I just wasn't

9   aware of what the allegation was.  I knew that there was an

10  allegation regarding failure to disperse, that there was going

11  to be a motion to see if there would be a temporary

12  restraining order to keep us from using that, and that, again,

13  I was aware that that for the moment wasn't granted, and I

14  learned that -- that there was an officer that did this during

15  the day.  I didn't have the opportunity to view the video, and

16  I don't know if I knew that while I was still before the 26th

17  or if it was after the 26th where I learned it was during the

18  day.

19  Q    Did you take any steps to find out exactly what the

20  allegations against your officers were?

21  A    No, I did not.

22  Q    And did you discipline any officers who had allegedly

23  enforced the "keep moving" rule in this way?

24  A    I did not.

25  Q    Did you discipline any of your commanding officers who

Case: 4:14-cv-01436-CDP   Doc. #:  63   Filed: 12/02/14   Page: 174 of 316 PageID #: 872
Jon Belmar Cross-examination                              9/29/2014

174

1   had been charged with supervising those officers?

2   A    I did not.

3   Q    And did you at any point after learning about these

4   allegations issue orders to your officers that they should not

5   enforce the "keep moving" rule during the day when there was

6   no violence?

7   A    I did not.

8           MS. DEGTYAREVA:  I don't have anything further, Your

9   Honor.

10          THE COURT:  Mr. Isaacson, do you wish to question

11  this witness?

12                      CROSS-EXAMINATION

13  BY MR. ISAACSON:

14  Q    Sir, you talked about some criminal activity that you had

15  observed during those nights.  In terms of -- you recall

16  Friday, August 15th; Saturday, August 16th; Sunday, August

17  17th.  Those were pretty busy and hectic nights, were they

18  not?

19  A    Yes, sir, they were.

20  Q    Okay.  And the things you described were both frequent

21  and ongoing during those nights; is that fair?

22  A    Yes, sir.

23  Q    All right.  You have no problem characterizing those as

24  riots, do you?

25  A    Not at some point.

Jon Belmar Cross-examination                                9/29/2014

175

1    Q    Okay.  And -- and a riot state was frequent -- you would

2    characterize it as a riot frequently during the nights of the

3    15th, 16th, and 17th, correct?

4    A    At one point in the evening, yes, sir, it spun into that.

5    Q    And these were -- would you characterize events during

6    those evenings as -- were they static, moving slowly, or would

7    they tend to change more quickly?

8    A    It's hard to tell.  I mean in the early -- in the early

9    evening, I would typically go out on West Florissant and walk

10   and shake hands and see people and talk, but it could switch

11   pretty quick.  It normally didn't switch until after it got

12   pretty dark, but sometimes, it would be just about darkness

13   when -- when it happened, and I know that Saturday night was a

14   later night.  I think it was okay until about maybe a quarter

15   'til 10:00 at least.  It's hard to say, characterize exactly

16   when it was every night.  I can remember some but not all,

17   but, yes, what would happen was that it would change, and when

18   it did, it changed pretty dramatically.  It went from

19   basically being people that were there to assemble peaceably

20   to something totally different.

21   Q    You indicated -- you gave us numbers of officers, and

22   they were considerable.  You also -- I believe you said there

23   were approximately 50 from municipalities.  How many different

24   municipalities were contributing during that weekend?

25   A    For the purposes of this hearing, I would say it would

1     probably be at least two dozen.

2     Q     Okay.  I'm sorry, sir.  I lost my train of thought here

3     for a minute.  How many businesses did you see that got

4     damaged out there?

5     A     Scores.

6           MR. ISAACSON:  I have nothing further, Your Honor.

7           THE COURT:  All right.  Anything further of this

8     witness?

9           MR. SHUMAN:  Yes, briefly.

10          THE COURT:  Go ahead.

11                        REDIRECT EXAMINATION

12    BY MR. SHUMAN:

13    Q     Chief, when Captain Johnson gave the direction about

14    keeping people moving, did he tell you that in every instance

15    protestors have to keep moving?

16    A     No.

17    Q     Did his directions to you include that officers will have

18    discretion whether you're to keep people moving?

19    A     I don't really recall.  I wish I could think of an exact

20    instance, you know, kind of lock that down a little better.

21    Regardless of whether that was something that he articulated

22    to me, I didn't -- it was not my observations that discretion

23    was not able to be applied.

24    Q     Say that again.

25    A     It was not my observations that discretion by any

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed; 12/02/14   Page: 177 of 316 PageID #: 875
Jon Belmar Redirect Examination                              9/29/2014

177

1   individual officer was unable to be applied.

2   Q    Okay.  What's the value of giving police officers

3   discretion to take a particular enforcement action?

4   A    Well, because there's oftentimes not a lot of absolutes.

5   There can be at times based on certain things that are

6   happening and based on the seriousness of an event.  So -- so

7   things that may be absolute during periods of gunfire at

8   Northwinds Estate and Chambers by the car wash, there would be

9   much less discretion that would be employed during a time like

10  that versus 6:30 in the evening when you're shaking hands with

11  a group of people and they're barbecuing and visiting and

12  protesting.

13          MR. SHUMAN:  Okay.  I think I'm done.  I'd kind of

14  like it if you would stay.  When you need to leave, you're

15  free.  I don't intend to recall.  I don't know if anybody else

16  wants to recall Chief Belmar.

17          THE COURT:  Well, he has to leave, right, is what you

18  said?  Yeah.

19          MR. SHUMAN:  But not probably for about another 40

20  minutes or so.

21          THE COURT:  Okay.  Any further questions of this

22  witness at this time?

23          MS. DEGTYAREVA:  No, Your Honor.

24          THE COURT:  All right.  You may step down.

25          THE WITNESS:  Thank you, Your Honor.

                                                                    178

 1          THE COURT:  And it's between you and your lawyer when

 2   you leave.  It's not -- we're -- as far as I'm concerned, you

 3   can go.

 4          All right.  Plaintiffs may call their next or

 5   Plaintiff may call his next witness.

 6          MR. DAVIS-DENNY:  Plaintiff's next witness is

 7   Johnetta Elzie, Your Honor.

 8          THE COURT:  All right.  Ma'am, if you'll step right

 9   up here to be sworn, to the clerk.

10      (Witness affirmed.)

11          THE COURT:  You may proceed.

12          MR. DAVIS-DENNY:  Thank you, Your Honor.

13                        **JOHNETTA ELZIE**,

14   HAVING FIRST DULY AFFIRMED, WAS EXAMINED AND TESTIFIED AS

15   FOLLOWS:

16                        DIRECT EXAMINATION

17   BY MR. DAVIS-DENNY:

18   Q    Good afternoon, Ms. Elzie.

19   A    Good afternoon.

20   Q    How are you?  Could you start by telling us where you

21   live?

22   A    I live in St. Charles, Missouri.

23   Q    And have you been part of the protests in Ferguson?

24   A    Yes.

25   Q    What role have you played in the Ferguson protests?

Case: 4:14-cv-01436-CDP   Doc. #:  63   Filed: 12/02/14   Page: 179 of 316 PageID #: 877
Johnetta Elzie Direct Examination                          9/29/2014

179

1   A    Overall, I've been an organizer and a documenter of what

2   I see and what's happening.

3   Q    Why did you decide to get involved in Ferguson?

4   A    It wasn't really -- it didn't start off as a want to get

5   involved.  I was on Twitter, and I saw the photo of Mike Brown

6   come down my timeline, and people said that it happened in

7   St. Louis, and I couldn't believe that it had happened at

8   home.  I couldn't believe that an unarmed black boy was

9   murdered in St. Louis, so I just had to go see it for myself,

10  and I went to go see it with my best friend down on Canfield

11  and just stood out there and talked to the neighborhood for

12  about an hour and saw the scene, and I just wanted to see it

13  for myself.

14  Q    You -- you mentioned a moment ago that you -- you were a

15  documenter, I think.

16  A    Uh-huh.

17  Q    How did you do that?  What tools have you used?

18  A    Basically, just using all of the social media that I use

19  normally day-to-day anyway.  So my Twitter, my Instagram, my

20  Facebook, my Tumblr, my YouTube, all of that that I normally

21  just don't really pay attention to, I started using, hoping to

22  catch that people would be interested, so, you know, it could

23  further the interest level in what was happening.

24  Q    Where -- where are the protests centered at today?

25  A    Today, they're usually right in front of the Ferguson

1    Police Department.

2    Q    Is that where they've always been focused at?

3    A    No.

4    Q    Where were they previously centered around?

5    A    Two places.  It would be either on Canfield, like

6    literally in front of the Mike Brown memorial, or it would be

7    at the QuikTrip on West Florissant, on that whole strip.

8    Q    When -- when it was focused on Florissant, did you

9    observe that there was a designated area, a designated protest

10   assembly zone?

11   A    No.

12   Q    I take it you didn't spend much time there?

13   A    No.

14   Q    To the best of your knowledge today, is there a

15   designated protest assembly zone?

16   A    Would that be in front of the Ferguson Police Department?

17   Are you saying is there one over there?

18   Q    Yes.

19   A    Not that I know of, no.

20   Q    Have you attempted to ask officers that question?

21   A    Yes.

22   Q    And have you recorded yourself attempting to ask officers

23   that question?

24   A    Yes.

25        MR. DAVIS-DENNY:  Mr. Bales, would you please put up

1    Exhibit 30?  And before you push "Play," go ahead and give me

2    the first --

3              THE COURT:  Yeah, just show us --

4              MR. ISAACSON:  A little bit better foundation?

5              THE COURT:  Yeah.

6              MR. ISAACSON:  When and where?

7              THE COURT:  Show us the first frame of it.

8              MR. DAVIS-DENNY:  Yeah.

9              THE COURT:  But don't play the video.

10             MR. DAVIS-DENNY:  Okay.

11             THE COURT:  Okay.

12   Q    (By Mr. Davis-Denny) Do you recognize this first frame of

13   the video --

14   A    Uh-huh.

15   Q    -- that is Exhibit 30?  And we'll have to ask you to

16   answer yes or no to my questions.

17   A    Oh, I'm sorry.  Yes.

18   Q    The court reporter can't take down uh-huhs or huh-uhs and

19   things like that.

20   A    I'm sorry.  Yes.

21   Q    How do you -- how do you recognize this?

22   A    I'm the person who's recording this.

23   Q    Okay.  When did you record this?

24   A    Today is Monday.  Sunday.  Saturday night, Saturday

25   evening.

Case: 4:14-cv-01436-CDP  Doc. #: 63  Filed: 12/02/14  Page: 182 of 316 PageID #: 880
Johnetta Elzie Direct Examination                    9/29/2014

182

1   Q    And when you refer to Saturday evening, are you referring

2   to --

3   A    This past Saturday.

4   Q    -- this past Saturday evening?

5   A    Uh-huh, yes.

6        MR. DAVIS-DENNY:  Your Honor, may we play the

7   exhibit?

8        THE COURT:  Any objection?

9        MR. ISAACSON:  I don't know that there's any

10  foundation that's relevant at this point to any of the players

11  here.  I don't know who this gentleman is, and I don't -- so I

12  don't --

13       THE COURT:  Yeah --

14       MR. DAVIS-DENNY:  I can ask --

15       THE COURT:  -- that objection is -- well, I'll

16  overrule it.  You can lay more foundation if you wanted to.

17       MR. DAVIS-DENNY:  Okay.  Thank you, Your Honor.

18  Q   (By Mr. Davis-Denny) Actually, I would like to ask

19  another question, which is:  In the area of the protests over

20  the last weekend, what law enforcement agencies have you

21  observed in the area?

22  A    Altogether?

23  Q    Uh-huh.

24       THE COURT:  Over the last -- but just this past

25  weekend?

1          MR. DAVIS-DENNY:  This past weekend.

2   A    Okay.  Shrewsbury, Hillsdale, Wellston, St. Louis County,

3   Florissant, Hazelwood, Ferguson, Ladue, Normandy, Pine Lawn,

4   State Troopers, Missouri Highway -- Missouri Highway Patrol,

5   and that's all that I can think of right now offhand.

6   Q    (By Mr. Davis-Denny) Okay.  And do you know which law

7   enforcement agency this gentleman is with that's shown in this

8   first frame?

9   A    Yes.

10  Q    And which law enforcement agency is that?

11  A    He's a Ferguson police officer.

12          MR. DAVIS-DENNY:  Okay.  Could we please play Exhibit

13  30, please?

14          THE COURT:  Yeah.  And the objection is overruled.

15      (Video played.)

16  Q    (By Mr. Davis-Denny) Do we hear your voice in Exhibit 30?

17  A    Yes.

18  Q    Are you asking any questions about a designated assembly

19  zone?

20  A    Yes.

21  Q    What are you asking?

22  A    "Where is the free assembly zone that we can stand and

23  protest?"

24  Q    And did you -- how many officers did you ask that

25  question of?

184

1    A    That day?

2    Q    In this particular video.  I'm sorry.

3    A    Oh, in this video, just two.

4    Q    Two?

5    A    Uh-huh.  Yes.

6    Q    And what response did you receive from the two officers?

7    A    The first officer said, "There is no free assembly zone.

8    It's all the free assembly zone.  It's the U.S. Constitution."

9    The second officer, he said, "There is no free assembly zone."

10   Q    Okay.  And the first officer who made the comment about

11   "There is no free assembly zone, but this is all a free

12   assembly zone," was he making you keep walking in this area

13   that he said was all a free assembly zone?

14   A    Yes.

15   Q    How would you describe the level of tension right now in

16   Ferguson between police and protestors based on what you've

17   observed?

18   A    It's very high.  There's a lot of fear from the side of

19   the protestors.  I'm not exactly sure how the police are

20   feeling.  They don't necessarily talk to us, but the --

21   there's a certain level of fear and uncertainty because we

22   just never -- I personally never know what is going to happen.

23   You have to be alert, and it's intense, and it drives -- the

24   anxiety levels are sky-high.

25           MR. DAVIS-DENNY:  Thank you.  That's all I have.

 1              THE COURT:  Cross-examination, Mr. Shuman.

 2              MR. SHUMAN:  Yes, Judge.

 3                          CROSS-EXAMINATION

 4    BY MR. SHUMAN:

 5    Q    Hi.  You're Mrs. Dubales?  I didn't get your name

 6    properly.

 7    A    Johnetta Elzie.

 8    Q    I'm sorry.  Hi, Johnetta.

 9              THE COURT:  Now, sir, we do not address any witnesses

10    by their first names in this courtroom.

11              MR. SHUMAN:  Elzie.  Is it Ms. --

12              THE COURT:  We refer to them by their last names with

13    an appropriate title --

14              MR. SHUMAN:  I'll make sure to keep that in mind.

15              THE COURT:  -- including your friends and people

16    you've never met before.

17              MR. SHUMAN:  I'll make sure to keep that in mind.

18    Q    (By Mr. Shuman) Ms. Elzie, please, this video that you

19    just testified about, do you have any reason to think that the

20    St. Louis County Police Department was behind the events

21    depicted on the video?

22    A    I wouldn't be able to tell you if I necessarily feel that

23    the St. Louis County Police had anything to do with anything.

24    When we asked officers, it just so happened on Saturday these

25    two officers actually stopped to talk.  When I talked -- when

1   I tried to talk to officers, St. Louis County and others, they

2   don't talk.

3   Q    So is the answer, no, that you don't know that St. Louis

4   County --

5   A    Right, so, yes, the answer is no.

6   Q    Do you have any reason to think that the State Patrol is

7   behind any of the events that were depicted on that video?

8   A    No.

9   Q    And what are you in fear of today if you were to go out

10  to Ferguson?

11  A    My safety.  My life.  I've been shot since I've been in

12  the protests.  I've been teargassed four times.  Anything can

13  happen, and I'm just simply passing out water to protestors.

14  So even just standing there, I'm -- I become a target for even

15  just being in the protest.

16  Q    Has anyone threatened you with shooting you in the last

17  couple of days there?

18  A    In the last couple of days, no.

19  Q    Have any -- any police officer done anything that would

20  put you in fear?

21  A    In the last couple of days?

22  Q    Yes, ma'am.

23  A    Yes.

24  Q    What?

25  A    Rushing the crowds, using excessive force, grabbing

Case: 4:14-cv-01436-CDP   Doc. #:  63   Filed: 12/02/14   Page: 187 of 316 PageID #: 885
Johnetta Elzie Cross-examination                    9/29/2014

187

 1    people out of crowds spontaneously.  It could have been

 2    anyone.  I was standing there as a friend.  I could have got

 3    grabbed even just as relevant as last night, but it wasn't me.

 4    It was the people that were next to me that were getting

 5    grabbed.

 6    Q    Who -- who has or has anybody been telling you in the

 7    last couple days that you have to keep moving?

 8    A    Yes.

 9    Q    Who was telling you that?

10    A    The ones that I saw on Saturday were Ferguson police

11    officers, Normandy, and me personally, that was it.

12              MR. SHUMAN:  Okay.  Thank you, Ms. Elzie.

13              THE COURT:  Mr. Isaacson?

14              MR. ISAACSON:  No questions.

15              THE COURT:  All right.  Any redirect?

16              MR. DAVIS-DENNY:  No, Your Honor.

17              THE COURT:  You may step down.

18              THE WITNESS:  Thank you.

19              MS. DEGTYAREVA:  Your Honor, the Plaintiff calls

20    Dr. James Ginger.

21              Your Honor, I'm going to be using some paper

22    exhibits.  Would the Court like copies at this moment?

23              THE COURT:  Yeah.  I mean, if you have copies for me,

24    you could go ahead and hand them up.

25              MS. DEGTYAREVA:  May I approach?

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 188 of 316 PageID #: 886
James Ginger Jr. Direct Examination                    9/29/2014

188

1    THE COURT:  Yeah.  Hand them to the clerk.  Thanks.

2    Sir, would you step on up here to the clerk right

3    here to be sworn?

4    (Witness sworn.)

5    MS. DEGTYAREVA:  May I proceed?

6    THE COURT:  Yes.

7    **JAMES DONALD GINGER JR., PH.D.,**

8    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

9    FOLLOWS:

10    DIRECT EXAMINATION

11   BY MS. DEGTYAREVA:

12   Q    Good afternoon, Dr. Ginger.

13   A    Good afternoon.

14   Q    What do you do for a living?

15   A    I'm a public sector management consultant specializing

16   in -- in public sector agencies, usually law enforcement,

17   sometimes corrections.

18   Q    Could you please describe a little bit of what that

19   involves?

20   A    Everything from routine management studies to events like

21   this, expert -- subject matter expert testimony.

22   Q    And could you please tell us about your educational

23   background?

24   A    I have a Ph.D. in public administration from Virginia

25   Tech, a Master of Science in law enforcement from University

1    of Evansville, and a bachelor's in sociology and law

2    enforcement from the University of Evansville.

3    Q    Have you ever worked as a law enforcement officer?

4    A    I have, yes.

5    Q    Could you please describe in what positions you've

6    worked?

7    A    I was a sworn law enforcement officer in Evansville,

8    Indiana, from 1977 -- I'm sorry -- from 1969 to 1977.  I

9    worked patrol for four years and also worked as a personnel

10   officer and as director of the planning unit.

11   Q    And do you have any other professional experience

12   relating to law enforcement or police practices?

13   A    Yes, ma'am.

14   Q    Could you please describe that, briefly describe that

15   experience?

16   A    I'm the former Director of the Southern Police Institute

17   at the University of Louisville.  That's a nationwide,

18   nationally recognized training organization for police

19   managers.  I also spent several years as Deputy Director of

20   the Police Foundation in Washington, DC.

21   Q    And do you have any experience testifying as an expert in

22   cases relating to police practices?

23   A    Yes, ma'am, I do.

24   Q    Now, turning to this case, who retained you to work on

25   this case?

1    A    Originally, I believe the call came from your office.

2    Q    So you were retained by the Plaintiff Mustafa Abdullah?

3    A    That's correct.

4    Q    What was your assignment in this case?

5    A    I was asked to take a look at the facts and develop an

6    opinion about whether or not the practices that were

7    apparently occurring on the ground in Ferguson conformed to

8    best practices for police handling of civil disturbances.

9    Q    Were you asked to render an opinion about any particular

10   practice that was occurring in Ferguson?

11   A    Yes, ma'am.

12   Q    What was that practice?

13   A    It was referred to as the five-second rule.

14   Q    Now, what material did you review in response to this

15   assignment?

16   A    I reviewed declarations from Mr. Abdullah, from Mr. Doty,

17   from Mr. Reinstein, and from Ms. Holbrook.  I also reviewed

18   the current literature on police handling of civil

19   disturbances.  There may have been some other documents that I

20   looked at that I don't recall at this point.

21   Q    What, if anything else, did you rely on to form your

22   opinions in this case?

23   A    Well, my knowledge, training, and experience of 40 some

24   odd years.

25   Q    And were you able to reach any opinions in the case?

1   A    Yes, ma'am, I did.

2   Q    What opinion did you reach regarding how the -- what

3   we're going to call for ease of reference the five-second

4   rule, how that was implemented in the Ferguson area?

5   A    It appeared to be implemented -- I hate to use the term

6   "arbitrarily," but I don't know a better term to use.  It was

7   implemented and enforced differently by different officers

8   without any form of -- of uniformity, as best I could tell.

9   Q    Now, based on your experience and the materials that you

10  reviewed in this case, were you able to reach any opinions

11  about whether the five-second rule was supported by a written

12  policy?

13  A    There appears to have been none, no.

14  Q    What did you base that opinion on?

15  A    Well, it wasn't available in the record, and it was -- it

16  was enforced so differently between different officers,

17  different agencies that in my experience it indicates

18  something that's not supported by written policy or training

19  or supervision.

20  Q    So were you also able to form opinions about whether this

21  policy had been -- whether the officers enforcing the policy

22  had been properly trained on the policy?

23  A    It appears --

24       MR. ISAACSON:  I don't know that any -- whether

25  they've been properly trained is not pled.  It's not an issue

Case: 4:14-cv-01436-CDP  Doc. #:  63  Filed: 12/02/14  Page: 192 of 316 PageID #: 890
James Ginger Jr. Direct Examination                    9/29/2014

192

1   here.

2         THE COURT:  Yeah.  Actually, I think that may be well

3   taken but overruled.  I'm going to hear whatever the

4   Plaintiffs wish to present from this witness.

5   Q    (By Ms. Degtyareva) Would you like me to repeat the

6   question?

7   A    Yes, ma'am, please.

8   Q    Were you able to form any opinions regarding whether the

9   officers implementing this rule had been properly trained?

10  A    Yes, ma'am.

11  Q    What was that opinion?

12  A    That the training was either nonexistent or it was not

13  effective given the different levels of implementation by

14  officers at different times in different places.

15  Q    And according -- is it in accordance with established law

16  enforcement practices to enforce policies that are not

17  supported by written guidelines or that had not been properly

18  trained?

19  A    Absolutely not.

20  Q    And why not?

21  A    It leads to capricious and arbitrary implementation of

22  what may or may not be an official policy.

23  Q    Now, does the need for consistently enforced policies

24  change when law enforcement agencies are dealing with

25  emergency circumstances or unexpected situations?

1   A    Well, there are always exceptions for exigent

2   circumstances, but generally, the more serious the events are

3   that are being responded to, the more definite is the need for

4   good preplanning, policy, training, and supervision.

5   Q    And are there any guidelines available to law enforcement

6   on how to properly implement consistent policies in exigent

7   circumstances?

8   A    Yes, there are.

9   Q    If you could just briefly describe what some of those

10  guidelines are.

11  A    Well, probably one of the best comes from a fairly

12  reliable source, the FBI Law Enforcement Bulletin, which is a

13  nationwide bulletin from the Federal Bureau of Investigation

14  targeted to police chief executives, such as county sheriffs,

15  chiefs of police, those sorts of folks, and the immediate

16  subordinates of those chief executives, that articulates every

17  month a series of important issues for police to consider as

18  they go about the business of managing the delivery of police

19  service.

20  Q    Now, what, if any, opinion did you reach regarding how

21  effective the five-second rule was in crowd control and

22  enforcing public safety?

23       MR. ISAACSON:  Let me just make a record.  It's

24  completely speculative.

25  Q    (By Ms. Degtyareva) This is just based on your opinions,

Case: 4:14-cv-01436-CDP Doc. #: 63 Filed: 12/02/14 Page: 194 of 316 PageID #: 892
James Ginger Jr. Direct Examination 9/29/2014

194

1  your experience, and the materials you reviewed.

2  A    It was implemented differently by different officers in

3  different situations, apparently, based on the declarations

4  that I've read, and as such, it appears to be not grounded in

5  good policy or training.

6  Q    Were you able to reach an opinion on whether a rule like

7  the five-second rule, even if it were consistently

8  implemented, would be an effective means of crowd control?

9  A    Yes, ma'am.

10  Q    And what was that opinion?

11  A    Well, based on my knowledge and experience in having

12  served in a police department where there were civil

13  disturbances that we needed to respond to, such a rule would

14  not be effective in controlling any -- any of the types of

15  behavior that law enforcement would be interested in

16  controlling.  I can't see a good reason for it.

17  Q    And why do you say that?

18  A    Well, for example, I think one of the defenses of the

19  five-second rule was that it helped -- it helped avoid outside

20  agitators from embedding with the demonstrators.  Logic would

21  dictate that outside agitators can move every five seconds as

22  well as protestors.

23  Q    Now, in your over 40 years of experience and in your

24  review of the relevant literature, have you come across any

25  other examples of law enforcement agencies using a rule such

1   as the five-second rule as a method of crowd control?

2   A    No, ma'am, I haven't.

3   Q    And in your experience, have you come across any research

4   or other evidence that suggests such a policy would be an

5   effective method of crowd control?

6   A    Not available in the public literature that I'm aware of.

7   Q    Can this type of policy if it is arbitrarily enforced

8   have any negative effects on crowd control?

9   A    Certainly.

10  Q    And could you please describe what you mean?

11  A    Well, as people perceive they're being treated unfairly,

12  the level of agitation rises, the level of demonstration

13  rises, and untoward or unwanted events could occur.

14  Q    Now, you mentioned previously an FBI bulletin on crowd

15  management, and I'd like to just show you a copy of that.

16       Mr. Bales, could you please pull up Exhibit 31?

17       Do you recognize this document?

18  A    Yes, ma'am.  Yes, ma'am.

19  Q    What is it?

20  A    It's the August 2012 FBI Law Enforcement Bulletin.

21  Q    And what is an FBI Law Enforcement Bulletin?  What is its

22  purpose?

23  A    Again, it comes -- it comes out monthly.  Its target

24  audience is police chiefs, police executives, county sheriffs,

25  police chiefs, and that immediate tier under the chief

1    level -- deputy chiefs, lieutenant colonels, those sorts of

2    things.

3    Q    Now, in the field of police practices and policy, is this

4    a generally well-accepted source of efficient policies?

5    A    Yes, ma'am.  It's one of the best that I know of.

6    Q    And have you reviewed this document before today's

7    hearing?

8    A    Yes, ma'am.

9    Q    Now, does this document contain any guidance on the

10   potential negative effect of a policy that is enforced against

11   some people but not against others who are similarly situated?

12   A    It does, yes.

13          MS. DEGTYAREVA:  And, Mr. Bales, could you please put

14   up page 5 of this exhibit?  And could you please highlight and

15   bring up the paragraph in the left-hand column that begins

16   with "The ESIM"?

17   Q    (By Ms. Degtyareva) Mr. Ginger, could you please read

18   what this paragraph says?

19   A    "The ESIM maintains that crowd violence escalates if

20   people think police officers treat them unfairly."  That's the

21   first sentence.  If you'd like me to continue?

22   Q    Yes, please.

23   A    "PSJ," which is a procedural criminal justice theory

24   model, "proposes that group members comply with the law when

25   they perceive that officers act with justice and legitimacy.

1  When a crowd becomes unruly and individuals perceive unfair

2  treatment by law enforcement officers, violence can escalate

3  and a riot can erupt.  Recent research finds support for both

4  perspectives and concludes that when police officers act with

5  legitimacy, disorder becomes less likely because citizens will

6  trust and support law enforcement efforts and behave

7  appropriately."

8  Q     Based on your experience, training, and review of the

9  literature, is this an accurate statement?

10  A     Yes, ma'am.

11  Q     Now, you referred earlier to some other crowd control

12  guidelines and model policies that are issued by other law

13  enforcement agencies or police departments, and I'd like to

14  show you a few of those documents as well.  These are lengthy,

15  so I'm going to give you paper exhibits.

16         MS. DEGTYAREVA:  Your Honor, could I approach the

17  witness with these exhibits?

18         THE COURT:  You may.

19         THE WITNESS:  Thank you.

20  Q     (By Ms. Degtyareva) Do you recognize these three

21  documents?

22  A     Yes, ma'am.

23  Q     What are they?

24  A     The first document that you've handed me, which is

25  PLS026011, is a model policy on civil disturbances from the

1    International Association of Chiefs of Police.  The second

2    document, EX022-001, is a operational policy for the Oakland

3    Police Department on crowd control and crowd management.  The

4    third document, Exhibit 008-001, are the POST guidelines --

5    POST being an acronym for the Police Officer Standards and

6    Training -- for the State of California in crowd management,

7    intervention, and control.

8    Q    Did you previously review these materials in forming your

9    opinions in this case?

10   A    Yes, ma'am.

11   Q    And what is the purpose of these types of manuals and

12   guidelines?

13   A    The purpose of these three, obviously, is to -- is to

14   provide guidance for police executives and police command

15   personnel on implementation of crowd control processes.  The

16   model policy program for the International Association of

17   Chiefs of Police, which is one of the major authorities if you

18   will in American policing in terms of policy and policy

19   guidance, is to do the research and promulgate a model policy

20   on high-risk critical tasks in law enforcement, and obviously,

21   since the IACP has a model policy on civil disturbances, they

22   consider that to be a high-risk critical task.

23   Q    And are these sources generally well-accepted as sources

24   of proper police practices and policies?

25   A    Well, the IACP model policies certainly are.  That's sort

1   of the first place one looks when one is working on police

2   policy.  I've written two police operations manuals in my

3   career -- one for Evansville, Indiana; one for the San Antonio

4   PD -- and when they're available, these model policies are

5   invaluable.  It saves a great deal of research and proofing so

6   to speak.

7   Q    Do any of these guidelines or model policies include any

8   reference to using a policy like the five-second rule as a

9   method of crowd control?

10  A    Not that I've seen, no.

11  Q    Do you know -- in your experience, do you know of any

12  other manuals or guidelines that recommend a policy like the

13  five-second rule?

14  A    No, ma'am.  Ferguson is the first place I've heard that

15  uses it.

16  Q    What do you take from that fact?

17  A    Well, it's certainly not in the mainstream of American

18  rubric on responding to civil disturbances and crowd control.

19  Those are outlined in documents such as what we have here, and

20  I didn't mention the Oakland Training Bulletin.  One of the

21  things that police agencies habitually do when confronted with

22  a need for new policy is to consult other agencies that have

23  effective policy to see how theirs read and to see if they're

24  adaptable, so that's why the Oakland piece might be so

25  important.

Case: 4:14-cv-01436-CDP  Doc. #: 63  Filed: 12/02/14  Page: 200 of 316 PageID #: 898
James Ginger Jr. Direct Examination                    9/29/2014

                                                                    200

1   Q    Now, Dr. Ginger, I'd like to ask you a few questions

2   about the refusal-to-disperse statute.  Are you familiar with

3   Missouri's refusal-to-disperse statute?

4   A    Yes, ma'am.

5         MS. DEGTYAREVA:  Mr. Bales, could you please put up

6   what has been marked as number 205, and could you please cull

7   out the text of the statute?

8   Q    (By Ms. Degtyareva) Dr. Ginger, have you previously

9   reviewed Missouri's refusal-to-disperse statute?

10  A    Yes, ma'am, I have.

11  Q    Is this that statute?

12  A    It appears to be, yes.

13  Q    And do you have any experience or knowledge regarding how

14  these types of refusal-to-disperse statutes are properly meant

15  to be used by law enforcement?

16  A    Yes, ma'am.

17  Q    Now, do orders to disperse have to be issued at the scene

18  of an unlawful assembly or riot?

19        MR. ISAACSON:  At this point, I think we're

20  completely vague and --

21        THE COURT:  Actually, at this point, I think

22  you're -- are you having him testify as an expert witness on

23  what is the law because it sounds like it to me, and I don't

24  need an expert on the law.

25        MS. DEGTYAREVA:  I am sorry if my question was

1   unclear.  I intended to ask him whether he -- in his

2   experience of enforcing refusal-to-disperse statutes by law

3   enforcement whether they are generally enforced when there is

4   an unlawful assembly or riot, but --

5            THE COURT:  And why does it matter how they're

6   generally used?  If this is the Missouri law, I mean --

7            MS. DEGTYAREVA:  Your Honor, I can move on.

8            THE COURT:  Yeah.

9            MS. DEGTYAREVA:  If I may ask one question about the

10  statute that --

11           THE COURT:  I mean you can.  I'm just -- you know, if

12  he's going to start lecturing me on what the law allows and

13  doesn't allow, I'm not going to listen to it, but you can ask

14  him whatever you want, and we'll hear if there's an objection.

15           MS. DEGTYAREVA:  Thank you, Your Honor.

16  Q    (By Ms. Degtyareva) Now, when law enforcement declare an

17  unlawful assembly, can that declaration last for an indefinite

18  period of time?

19  A    Well, by definition, in my experience, if an unlawful

20  assembly is declared and dispersed, it is no longer an

21  unlawful assembly, so the answer to that would be no.

22  Q    So if, for example, there was an act of violence and an

23  unlawful assembly were declared on a Sunday night and then

24  that group dispersed by the end of the night, could law

25  enforcement officers still issue orders to disperse the

1   following Monday afternoon?

2          MR. ISAACSON:  At this point, I would object to the

3   complete -- incomplete hypothetical.

4          THE COURT:  I'll overrule it.

5   A    I'm sorry.  Would you repeat the question?

6   Q    (By Ms. Degtyareva) If an unlawful assembly were

7   declared, say on a Sunday night, and the assembly had

8   dispersed, could law enforcement officers continue to issue

9   orders to disperse the following Monday afternoon?

10  A    I believe it would be required, based on my knowledge of

11  police policy and practice, for a second declaration.  If

12  indeed something happened, it would require one, so it

13  couldn't be continued indefinitely.

14  Q    Dr. Ginger, just a few final questions.  I'd like to ask

15  you about the proposed form of a preliminary injunction that

16  the Plaintiff has submitted in this case.

17         Mr. Bales, could you please put up Exhibit #9?

18         And have you seen and reviewed this document before?

19  A    Yes, ma'am, I have.

20  Q    Now, in your opinion, would this -- actually, sorry.

21         Could you remove that?  Okay.

22         So in your opinion, would this proposed form of

23  injunction hamper law enforcement's ability to respond to

24  crowd management or public safety concerns?

25  A    I've read it and reviewed it previously, and from what

1    I've read, no.

2    Q     Why do you say that?

3    A     Well, it still allows effective use of a notice of a

4    declaration of an illegal assembly and a notice to disperse.

5              MS. DEGTYAREVA:  Thank you.  I have nothing further.

6              THE COURT:  Cross-examination --

7              MR. SHUMAN:  No --

8              THE COURT:  -- Mr. Shuman.

9              MR. SHUMAN:  -- for the County.

10             MR. ISAACSON:  I have some, Your Honor.

11             THE COURT:  Mr. Isaacson.

12                        CROSS-EXAMINATION

13   BY MR. ISAACSON:

14   Q     Dr. Ginger, you have not served as a police officer since

15   1977; is that correct?

16   A     That's correct.

17   Q     All right.  The industry has changed a lot in those days

18   since then, correct?

19   A     Absolutely, yes.

20   Q     All right.  And you were a police officer concluding in

21   1977 in Indiana; is that correct?

22   A     That's correct.

23   Q     And where?  Evansville?  Is that what you said?

24   A     Evansville, yes, sir.

25   Q     Okay.  What was the population of Evansville then?

James Ginger Jr. Cross-examination                    9/29/2014

1   A    The population at that time was about 150,000.  It was a

2   300-officer department.

3   Q    Okay.  And surrounding it, was it large enough to have an

4   SMSA?

5   A    Yes, sir.

6   Q    And what was that?

7   A    Probably no more than 200,000.  Maybe a little more than

8   200,000.

9   Q    And you were contacted to do work by the ACLU with regard

10  to this case, correct?

11  A    I believe the original contact came through the Munger

12  law firm.

13  Q    Counsel here?

14  A    Yes.

15  Q    Okay.  And you prepared a declaration for them, correct?

16  A    Yes, sir, that's correct.

17  Q    All right.  You've reviewed it before today?

18  A    Yes, sir.

19       MR. ISAACSON:  Okay.  Your Honor, I have paper

20  copies.  They are things that have been filed electronically.

21  I don't know if you want copies.

22       THE COURT:  What are they?

23       MR. ISAACSON:  Document 15-7, Document 15-5, Document

24  15-6, and Document 15-3.  I don't know if you want your own

25  copies, or we can --

James Ginger Jr. Cross-examination                    9/29/2014

205

1          THE COURT:  I may already have my own copies, but I

2    have no idea what those numbers mean.  So I mean I know what

3    they mean, but I have to look them up.  So why don't you hand

4    them up to me, and I'll take an extra copy if you've got them

5    since -- you know, they may be duplicative, but . . . okay.

6    All right.  Go ahead.

7          MR. ISAACSON:  And, sir, I will -- if I may approach

8    the witness?

9          THE COURT:  You may.

10   Q    (By Mr. Isaacson) All right.  These are Exhibits D, E, F,

11   and G.  I'd ask you to take a look at them.  First of all,

12   with regard to Exhibit D, is that the declaration you

13   prepared?

14   A    Yes, sir.

15   Q    Okay.  And it has a report, or there's the declaration,

16   and then there are exhibits attached, correct?

17   A    That's correct.

18   Q    Page 12 of the report has a signature, does it not?

19   A    Yes, sir.

20   Q    And that was -- you prepared this on August 25th, 2014,

21   correct?

22   A    Correct.

23   Q    And that's your signature there?

24   A    Yes.

25   Q    Do you recall what date you were first contacted to

1   prepare this?

2   A    I'd have to go back and check the record, but from

3   recollection, it was probably 10 days prior.

4   Q    Okay.  And when you -- when you prepared it, how -- what

5   was the mechanism for preparing it?  Did you type it out?  Did

6   you dictate it and give it to somebody to type out, or how did

7   you --

8   A    I do my own typing, so I typed an original draft but not

9   in this format.

10  Q    Okay.  So you submitted it to them, they gave you some

11  comments, and ultimately, you produced a draft; does that

12  fairly summarize what happened?

13  A    I think that's a correct assessment.

14  Q    All right.  Did you proofread it before you signed it?

15  A    Yes, I did.

16  Q    Okay.  Did you want it to be accurate and honest?

17  A    To the best of my ability, yes.

18  Q    And that's with regard to all the opinions in there,

19  correct?

20  A    Yes, sir.

21  Q    And did you take care with regard to developing all the

22  opinions in here?

23  A    Yes, sir, I did.

24  Q    Okay.  Were you charging them for your services here?

25  A    I was.

1    Q    And have they paid you yet?

2    A    I hate to say this, but the check supposedly is in the

3    mail.

4    Q    Okay.  All right.  So this was a serious professional

5    endeavor on your part to prepare this; is that fair?

6    A    Yes, sir.

7    Q    And on page 4 -- strike that.  On the bottom of page 5,

8    you list a series of opinions, correct, and they go (a)

9    through (h), correct?

10   A    That's correct.

11   Q    All right.  And you -- the first one talks about --

12   refers to a -- a rule that they can remain immobile for only

13   five seconds or less; is that correct?

14   A    Yes, sir.

15   Q    All right.  Your understanding of that was derived from

16   written materials that were submitted to you from counsel; is

17   that correct?

18   A    Declarations and other written materials, yes.

19   Q    You didn't interview anybody who was at Ferguson; is that

20   fair?

21   A    That's correct.

22   Q    You were never there, correct?

23   A    Correct.

24   Q    You have never talked to any police officers who were

25   there, have you?

1  A    No, sir.

2  Q    All right.  There's been testimony that these guys were

3  working 20-hour days.  That doesn't surprise you, does it, in

4  a situation like this?

5  A    I've been there and done that myself.

6  Q    Okay.  It's hard work, isn't it?

7  A    It is.

8  Q    All right.  And sometimes you have to make judgment

9  calls, and it's fair to say you can't review every training

10  material, every policy; sometimes you've got to make a call;

11  is that fair?

12  A    That's the nature of police work, yes.

13  Q    Okay.  All right.  And looking at these, (b) through (d),

14  it looks like it's also referring to this five-second rule

15  that you've talked about in paragraph (a); is that correct?

16  A    I'm sorry -- (b) through?

17  Q    You know, sir, I'm sorry.  I'll withdraw that question.

18  Let's go to subparagraph (g), and it says, "Crowd control and

19  incident management techniques employed by the St. Louis

20  County Police and supporting agencies do not comply with the

21  best practices for such activities developed by the Federal

22  Bureau of Investigation, the International Association of

23  Chiefs of Police, and the California Police Officer Standards

24  and Training (POST) organization."  Is that what it says?

25  A    Yes, sir.

1   Q    All right.  You don't mention the State Highway Patrol in

2   there; is that correct?

3   A    No, sir.

4   Q    All right.  Did you have any understanding of their role

5   there?

6   A    Yes.  I had information that they were called in after

7   the initial few days.

8   Q    Okay.  But you made no comment upon what they were doing;

9   is that fair?

10  A    Correct.

11  Q    Okay.  Did you consider any -- obtaining any other data

12  other than what you were given by counsel?

13  A    I considered it, but based on past experience, it's

14  seldom that you get a return phone call from a defendant when

15  you're working for the plaintiff, so I didn't pursue it.

16  Q    Did you review any other information in the media about

17  Ferguson?

18  A    Yes, I did.

19  Q    Okay.  Do you recall what you reviewed?

20  A    At this time, no.  It was not used directly in the

21  report, so I don't recall.

22  Q    Let me point you to page 10 of your declaration there,

23  sir.

24  A    Okay.

25  Q    And it contains -- at the bottom is a paragraph 20; is

1   that correct?

2   A     Yes, sir.

3   Q     Okay.  And the first sentence says, "Ample evidence" --

4   it says "exits"; you probably meant to say "exists," right?

5   A     Yes.

6   Q     All right.  "To indicate that the policy, training, and

7   supervisory failures of the law enforcement agencies involved

8   in response to the demonstrations observed in the wake of the

9   Michael Brown shooting led to capricious and arbitrary

10  application of law enforcement activities."  Is that correct?

11  A     That's correct.

12  Q     All right.  Your next sentence says, "'Move along'

13  responses by law enforcement appeared disproportionately

14  focused on minorities."  Do you see that sentence?

15  A     Yes, sir.

16  Q     That's your writing?

17  A     It is.

18  Q     All right.  And you cited three things there, did you

19  not?

20  A     Yes, sir.

21  Q     Doty declaration, Reinstein declaration, Holbrook

22  declaration, correct?

23  A     Correct.

24  Q     All right.  Let's take them in reverse order.  Holbrook's

25  declaration, I believe, is the next exhibit you have in your

1  pile.  Is that Exhibit E as in Edward?  Yeah, my writing is

2  not the best.

3  A    It looks like an E, yes.

4  Q    All right.  Can you go through that document and tell me

5  where -- anywhere it says, suggests, or infers that "move

6  along" responses by law enforcement appeared

7  disproportionately focused on minorities?

8  A    Are you asking for a conclusion by Ms. Holbrook that

9  that's the case?

10  Q    I want anything in that declaration of Ms. Holbrook that

11  supports the statement that "move along" responses by law

12  enforcement appeared disproportionately focused on minorities.

13  A    At item 16, "The rule to keep moving hurt my ability to

14  express myself."  Item 17, "I couldn't be heard while I was

15  being herded."  Item 18, "I could not stop and comfort my

16  community members, and I could not stay and gather with them

17  as a group."

18  Q    Let me stop you there.  What in there tells you that

19  anything was being done disproportionately with regard to any

20  minority?

21  A    Well, Ms. Holbrook is a minority, so that's part of the

22  calculation.

23  Q    So you took from one instance of one person -- and when

24  did you learn she was a minority?

25  A    I'm sorry?

212

1   Q     When did you learn she was a minority?

2   A     I believe it was in conference with counsel.

3   Q     Was that today?

4   A     No.

5   Q     Before?

6   A     Before, yes.

7   Q     All right.  So you took one person's experience and

8   concluded that it was disproportionately effected on

9   minorities?

10  A     No, sir.  Your question was what in there would indicate

11  if I heard you correctly.

12  Q     That --

13  A     So it's her declaration and the declaration of Reinstein

14  and the declaration of Doty.  It -- as a group.

15  Q     All right.  The word "minorities" is not in there, is it,

16  in her declaration?

17  A     No, sir.

18  Q     There's no word "disproportionately," correct?

19  A     No, sir.

20  Q     There is no words in there that make a comparison about

21  how one group was treated compared to another, is there?

22  A     Not in this deposition or in this declaration, no.

23  Q     Okay.  All right.  Anything else that would support this

24  statement?

25  A     Those are the -- the three or four that I could find

1   immediately.

2   Q    Okay.  All right.  Let's go to Mr. Reinstein's

3   declaration.

4   A    Uh-huh.

5   Q    Same thing.  Find me anything in there that supports the

6   statement that "move along" responses by law enforcement

7   appeared disproportionately focused on minorities.

8   A    Counselor, I'll have to apologize to the Court.

9   Normally, when I write these, I include footnotes, but I was

10  asked to remove those, so this is going to take some time.

11  Q    Fair enough.

12  A    Okay.  I apologize.

13  Q    And for the record, that's Exhibit F.  Is that what

14  you're looking at now?

15  A    Yes, it is.  It looks like it.  It's the Abdullah

16  declaration.

17  Q    I want you -- I'm sorry.  I want you looking at

18  Mr. Reinstein's declaration.  Is that what you have there?

19  A    I have -- well, no.  I have Abdullah.  This is F, or it

20  looks like F.  I'm sorry.

21       MR. ISAACSON:  May I approach, Your Honor?

22       THE COURT:  You may.

23       THE WITNESS:  Reinstein -- let's see if I can find

24  Reinstein.

25       MR. ISAACSON:  Here.

1        THE WITNESS: Oh, I'm sorry.  Yep.  Misread.  My

2   apologies.

3   Q    (By Mr. Isaacson) All right.  If you could identify for

4   us anywhere that would support the inference that the "move

5   along" responses by law enforcement appeared

6   disproportionately focused on minorities.

7   A    I don't find anything here at this point.

8   Q    There's nothing there, is there, sir?

9   A    Not that I can see.

10  Q    Now let's go to the next one.  You also cited Mr. Doty's

11  declaration, and do you have that there, sir?

12  A    Yes.

13  Q    And is that marked G, as in Gus, Defendant's G?

14  A    It must be, yes.

15  Q    Okay.  And I would have you look through that, but in the

16  interest of time, I'm thinking I can direct you.  You can

17  correct me if I'm wrong.  Was it paragraph 18?  Was that the

18  basis for you citing that?

19  A    Again, I apologize for normally those are cited and I

20  think it was a formatting issue that got them removed, but

21  number 18 -- if you'll give me a second to read it.

22  Q    Yeah, you can read the whole thing.  In the interest of

23  time, I believe that's probably what you were referring to.

24  A    I understand that, and I don't want to take the Court's

25  time either.  That's normally why I footnote these things, so

James Ginger Jr. Cross-examination                    9/29/2014

215

1    we can be quick, but I'll just take a second to read 18.

2    Q    Review paragraph 18.

3    A    Yes, that's part of it, part of the issue.

4    Q    Okay.  And to your knowledge, was that the support you

5    had for the position that "move along" responses by law

6    enforcement appeared disproportionately focused on minorities?

7    A    Part of it, yes.

8    Q    Okay.  In fact, by the end of that paragraph, he

9    concludes that it wasn't disproportionately focused on

10   minorities; isn't that right?

11   A    Well, I don't think so.  He said, "However, I also

12   observed the rule occasionally being enforced against older

13   people and whites."

14   Q    Read the next sentence where he says, "Ultimately

15   concluded."

16   A    Again, that doesn't indicate that it was not enforced

17   against minorities.  What it says is, "I ultimately concluded

18   that the way the rule was enforced was largely dependent on

19   which law enforcement officer was enforcing it."

20   Q    Yes.  So, in other words, he disregarded the inference

21   above and ultimately concluded that the way the rule was

22   enforced was largely dependent on which law enforcement

23   officer was enforcing it; that is what he says, correct?

24   A    Yes.  And that raises another issue.

25   Q    And that sentence does not indicate how those officers in

Case: 4:14-cv-01436-CDP  Doc. #: 63  Filed: 12/02/14  Page: 216 of 316 PageID #: 914
James Ginger Jr. Cross-examination                    9/29/2014

216

1    fact treated one group compared to another, does it?

2    A    Well, I would disagree with your logic, Counselor.  I'm

3    sorry.

4    Q    Very well, sir.  What does the word "ultimately

5    concluded" -- what does that phrase mean to you?

6    A    That sentence needs to be read in conjunction with the

7    rest of the paragraph, I would submit.

8    Q    And to you, he's still holding on -- to you, that prose

9    is still holding onto the conclusion where he said based on

10   his initial observations; that's your reading of it?

11   A    My -- my reading is that he's identified his observation

12   of disparate enforcement of the rule, and then to complicate

13   matters, he argues that it depended on the officer, which is

14   exactly the sort of thing that good police policy is designed

15   to affect and control.  So those are two problems, not just

16   one.

17   Q    And that's your reading?

18   A    Based on my knowledge and experience and training, yes.

19   Q    Okay.  You indicate in paragraph 23 -- and I'm on page 11

20   of your declaration, sir.

21   A    Okay.

22   Q    "Based on my knowledge and experience, I know of no

23   American police department that employs a crowd control tactic

24   similar to the five-second rule."  Is that correct?

25   A    Yes, sir.

1  Q    And when you say five-second rule, what -- what did you

2  mean by that?  What was your understanding of the five-second

3  rule?

4  A    It was my understanding that law enforcement agencies in

5  charge of the event in Ferguson were not allowing people or

6  were enforcing a rule that people could not stand stationary

7  for more than five seconds, that it wasn't a uniformly

8  enforced rule but that it was being enforced and people were

9  being required to move along and not stay in one position more

10 than five seconds.

11 Q    So this was essentially a new concept, a new strategy you

12 hadn't seen before; is that fair?

13 A    Yes, sir.

14 Q    All right.  Are you opposed to police departments trying

15 new strategies?

16 A    Not if they're based on good research and good elements

17 from the literature, no.

18 Q    Would you ever -- when you were a police officer some 45

19 years ago or whatever it was -- or was it 35?

20 A    Well, total career was 45, I guess.

21 Q    Okay.  Since 1977 would be --

22 A    Right.

23 Q    Okay.  Thirty odds.

24 A    I started 45 years ago, I guess, is the best way to look

25 at it.

1  Q    All right.  Sometimes would you get ideas from other

2  departments?

3  A    Almost always, yes.

4  Q    Have you conducted any interviews or talked with any

5  police departments about whether they have ever employed a

6  strategy like this or similar to this?

7  A    Recently, no.

8          MR. ISAACSON:  I have nothing else.  Thank you.

9          THE COURT:  Redirect.

10         MS. DEGTYAREVA:  No, Your Honor.  I just ask that

11  Plaintiff's Exhibits 8, 22, 26, and 31 be admitted into

12  evidence.

13         MR. ISAACSON:  We would just object, Your Honor, as

14  best practices are not relevant to whether some behavior

15  comports with the Constitution.

16         THE COURT:  All right.  I'll overrule it and receive

17  the documents in evidence, but that does not -- you know, I'll

18  give them such weight as I deem is appropriate.

19         You may step down.

20         We're going to take a 15-minute recess.  Court will

21  be in recess for 15 minutes.

22         MR. DAVIS-DENNY:  Your Honor --

23         THE COURT:  Oh, yes.

24         MR. DAVIS-DENNY:  -- before we rest, may I just ask

25  to move to admit Exhibit 30 from Ms. Elzie's testimony?  I

1    realized I forgot to do that at the end of her testimony.

2         THE COURT:  Exhibit 30 -- what was that one?

3         MR. DAVIS-DENNY:  That was the video of the officers.

4         THE COURT:  Oh, yeah.  Okay.  Exhibit 30 is received

5    into --

6         MR. ISAACSON:  We'd have the same objection as it's

7    not a party.

8         THE COURT:  Yeah, that objection is noted for the

9    record and overruled.  So Exhibit 30 is received.

10        All right.  We'll take a 15-minute recess.

11      (Court recessed from 2:48 p.m. until 3:06 p.m.)

12        THE COURT:  All right.  Yes.

13        MR. DAVIS-DENNY:  Sorry.  Just two more quick

14   housekeeping matters.  One is I realized that I had forgotten

15   on Mr. Abdullah's testimony to ask to have Exhibit 25, which

16   was the "know your rights" card that he handed out, admitted

17   into evidence, and so I would ask that that be admitted now.

18        THE COURT:  All right.  Exhibit 25 is received into

19   evidence.

20        MR. DAVIS-DENNY:  Thank you.  The second was a

21   question, and that is for the videos that we have that are

22   exhibits, I wanted to see how Your Honor would best -- what

23   the most convenient way is for us to provide those to Your

24   Honor.  We could provide it on a thumb drive if that -- if

25   that would --

Case: 4:14-cv-01436-CDP  Doc. #:  63  Filed: 12/02/14  Page: 220 of 316 PageID #: 918
9/29/2014 Preliminary Injunction Hearing

220

1          THE COURT:  That would be fine.  You've also already

2    given me on a disc, on a CD, I guess, some of them -- a DVD --

3    the ones that were --

4          MR. DAVIS-DENNY:  That's correct.

5          THE COURT:  -- exhibits, two of them, but there's

6    others, so, yeah, a thumb drive is fine.

7          MR. DAVIS-DENNY:  Thank you.

8          THE COURT:  And I don't need another copy of the ones

9    I've already got.

10         MR. DAVIS-DENNY:  Thank you.

11         MR. ISAACSON:  And I say this completely without

12   rancor.  Did you give copies to us or who in our --

13         THE COURT:  Yeah.  Do they have copies?

14         MR. DAVIS-DENNY:  We are happy to give you copies of

15   the videos, yes.  We can make them for you on a thumb drive.

16         MR. ISAACSON:  Okay.  I didn't have them before,

17   correct?

18         MR. DAVIS-DENNY:  Well, you had a couple of them

19   before.  I think the ones that we got this weekend, you would

20   not have had.

21         THE COURT:  Yeah.  So you'll make copies for them,

22   too.

23         MR. DAVIS-DENNY:  That's right.

24         THE COURT:  Whatever you give me, you'll give them.

25   Okay.  And does the Plaintiff have any further evidence?

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 221 of 316 PageID #: 919
Jeff Bader Direct Examination                                    9/29/2014

221

1          MR. DAVIS-DENNY:  I apologize, Your Honor.  I now

2    realize we don't have thumb drives; we have CDs.  Will that be

3    okay?

4          THE COURT:  Yeah, that's fine with me.

5          MR. DAVIS-DENNY:  Okay.  Thank you.  We have nothing

6    further at this time, Your Honor.

7          THE COURT:  Okay.  And so, Mr. Shuman, does St. Louis

8    County wish to present any additional evidence?

9          MR. SHUMAN:  Yes, Judge.  Call Captain Jeff Bader.

10          THE COURT:  All right.  Sir, would you step right

11    over here to the clerk to be sworn.

12                          **JEFF BADER**,

13    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

14    FOLLOWS:

15                       DIRECT EXAMINATION

16    BY MR. SHUMAN:

17    Q    Would you tell us your personal ID, please, name, job

18    duties?

19    A    My name is Jeff Bader.  I hold the rank of Captain with

20    the St. Louis County Police Department.  I am the Precinct

21    Commander for the Fifth Precinct, which serves our citizens or

22    the City of Fenton Precinct.

23    Q    I'll tell you what; you might have to talk up into the --

24          THE COURT:  I'm sorry.  Yeah, pull it a little closer

25    to you.  There you go.

Jeff Bader Direct Examination                                    9/29/2014

222

 1   A    I'm sorry.  Is that a little bit better?  My name is Jeff

 2   Bader.  I'm a Captain with the St. Louis County Police

 3   Department.  I am assigned to our City of Fenton Precinct as

 4   the Precinct Commander.

 5   Q    (By Mr. Shuman) How long have you been with the County

 6   PD?

 7   A    Thirty-one years.

 8   Q    Tell us when you were first assigned to the Ferguson

 9   area.

10   A    I received a call from my Bureau of Communications at

11   approximately 3:11 in the morning on the morning of Saturday,

12   August the 16th.  They advised me that the Chief was

13   requesting I respond to the staging area in Ferguson.

14   Q    Did you have an idea of what you'd be doing in Ferguson?

15   A    No, sir.

16   Q    How did you find out what you'd be doing?

17   A    Upon arrival at about -- well, it was about 4:00 by the

18   time I got there.  I contacted Chief Belmar, at which point he

19   instructed me to help get things organized around the staging

20   area.

21   Q    What did that mean?

22   A    When I arrived, we were still operating with portable

23   generators on the -- the command vehicles for the Highway

24   Patrol, for the St. Louis County Police Department, for the

25   fire departments that had responded, St. Louis City.  They

223

1    weren't operating out of a fixed structure.  I took it to mean

2    at that point that he wanted me to help get the situation

3    organized as part of an Incident Command System, Unified

4    Command type structure.  So throughout the day, we located an

5    office space that was available, made sure the power and water

6    was running to that, located electricians that could provide

7    the power feeds necessary to get the command vehicles that

8    were there on AC current and get the generators turned off,

9    and just basically organized the staging area, command post

10   area.

11   Q    Did you have any role in forwarding -- I don't want to

12   use the incorrect term but like tactical operations of what

13   was -- what the police would do in Ferguson?

14   A    Not on that first day.  The first day was primarily just

15   organizing things.

16        THE COURT:  Organizing things with regard to the

17   police command center?

18        THE WITNESS:  Yes.  Starting to get -- by that time,

19   I think everyone was aware we were going to be there a

20   significant period of time and that we needed to get the

21   resources in place to help stabilize the situation.

22   Q    (By Mr. Shuman) Was the Highway Patrol on-site when you

23   arrived?

24   A    Yes.  When I arrived, obviously, that was on Saturday,

25   and among the instructions Chief Belmar gave me is that my --

224

1   my counterpart with the Highway Patrol would be Lieutenant

2   John Enderle, and he stressed to me that the Highway Patrol

3   was still in charge of the overall scene and that we were

4   there to provide whatever and any assistance that we could.

5   Q     Did you know Captain Ron Johnson?

6   A     I did not.  I knew that he had been appointed in charge

7   of it, and other than working with him on a couple of details

8   throughout the last several years, I did not know him

9   personally.

10  Q     Well, what was your understanding of your obligation, if

11  you had one, to follow the commands of Captain Johnson on the

12  scene at Ferguson?

13  A     As far as my understanding was -- is that Captain Johnson

14  was appointed by the Governor to be in charge of the overall

15  operation and security of this event and that the other

16  agencies, including ours, were there to assist him by

17  providing whatever resources we had available to us.

18  Q     So on the days following the 16th, did you have occasion

19  to take part in making operational decisions?

20  A     Yes.  After the first day, you know, the -- the basic

21  structure of the Unified Command, the Incident Command System,

22  is that the various agencies involved sit down and tabletop

23  and try to come up with operations plans, issues that work,

24  things that don't work, supplies, logistics and things like

25  that.

225

1   Q    Which were the various departments that were actively

2   involved?

3   A    Primarily, the major departments that were involved in

4   those type of discussions would have been the Highway Patrol,

5   St. Louis County, and the City of St. Louis.

6   Q    Would you say they all had equal voices in the

7   development of operational plans?

8   A    I think that when we talk about operational plans

9   everybody's voice was welcome, but, you know, as with all

10  things, there has to be an Incident Commander, there has to be

11  one person in charge or one agency in charge, and they make

12  the final call on the decisions of the things that we're going

13  to do and the things that we're not going to do.

14  Q    And in the situation that you're talking about, who --

15  who was that final decision maker?

16  A    The final -- during my entire time involved with this

17  operation, Captain Johnson was -- was always identified as the

18  overall scene commander.

19  Q    When he'd give a command, did everybody have to follow

20  them?

21  A    When he would give a command, everybody would follow it

22  because that's the way we do combined operations like that.

23  The Incident Commander accepts feedback from everybody, but

24  their rule is -- or their, you know, decision is ultimately

25  the rules we follow.

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 226 of 316 PageID #: 924
Jeff Bader Direct Examination                                 9/29/2014

226

1   Q    So are you familiar with an operational plan in Ferguson

2   involving keeping protestors moving?

3   A    Yes.

4   Q    Describe to me what that meant to you.

5   A    One of the discussions that we had was what were the

6   flash points, what would cause problems to develop, and

7   typically, what we had seen over the several days that this

8   operation had been ongoing is that whenever the protestors

9   became static in one location, crowds would tend to gather

10  around that one location, and inevitably, whenever large

11  crowds would develop, problems would begin to develop, both

12  with pedestrians ending up out in the middle of the street,

13  scuffles breaking out within the crowd, each voice trying to

14  be heard, those types of things.  So we looked at the fact

15  that if we could keep the protestors moving, then maybe we

16  could eliminate some of those problems that developed through

17  stationary protests.

18  Q    Let me stop you for a second, Captain.  You used the word

19  "we"; who are the different people that you're talking about?

20  A    Oh, just the -- you mean personnel or agencies?

21  Q    Well, both personnel and --

22  A    Okay.  The discussions were held between myself,

23  Lieutenant Scott Melies with our department -- I believe she's

24  a Major -- Renee Kriesmann with the City Police Department,

25  some members of the Highway Patrol staff that were there,

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 227 of 316 PageID #: 925
Jeff Bader Direct Examination                                    9/29/2014

227

1  Lieutenant John Enderle.  The plan was basically forwarded up

2  through the chain to Captain Johnson that we begin a process

3  where instead of trying to prevent the protestors we allow

4  them to continue their peaceful protest.  We would encourage

5  them to stay on the move instead of congregating in one

6  location.

7  Q    Do you happen to know which department first came up with

8  the idea of keeping the crowd moving?

9  A    Originally, when we were thinking of trying to develop

10 solutions to this, it was St. Louis City that came up with the

11 original idea based on some success that they've had with

12 those type of operations at their Annie Malone Parade.  At

13 some point, somebody had mentioned that it was possibly a

14 tactic that the New Orleans police used down during Mardi Gras

15 events to help keep the crowds from gathering in one location

16 and becoming unruly.

17 Q    Do you personally know how this was communicated to

18 Captain Johnson, or was it communicated to Captain Johnson?

19 A    I do not know that personally how it was.  You know, I

20 was part of the discussion, you know, where it was brought up

21 to him, and I know that it was discussed during that time and

22 after I left.

23 Q    Did the plan get implemented?

24 A    Yes, the plan was implemented.

25 Q    And who gave the final command to implement the plan?

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 228 of 316 PageID #: 926
Jeff Bader Direct Examination                                    9/29/2014

228

1    A    It would be Captain Johnson's decision.

2    Q    Would it have been implemented by the County Police had

3    Captain Johnson not okayed it?

4    A    I do not know the answer to that one.  That would be -- I

5    was not in charge of the scene, so . . .

6    Q    Were you given any directions about the details of what

7    officers were supposed to do with regard to the plan?

8    A    Just the broad guidelines that we were going to keep the

9    crowds moving and not allow stationary -- not necessarily not

10   allow but keep the crowds moving, encourage them to keep

11   moving, discourage people from gathering in one spot because

12   when we had stationary protests, crowds began to gather and

13   that's when our flash points would erupt.

14   Q    What authority did the County Police have to make

15   operational decisions on its own?

16   A    During this operation, our -- we were in a support role.

17   We can only provide suggestions and offer input, but the final

18   decision would be the Incident Commander.

19   Q    Which was who?

20   A    Captain Johnson.

21   Q    Uh-huh.  Now, how was the plan to keep the crowd moving

22   communicated to the street officers that were working in

23   Ferguson?

24   A    During the roll calls, the officers would be briefed on

25   what the operational plan guidelines were going to be for

Jeff Bader Direct Examination                          9/29/2014

229

1  their shift, and we would explain that -- it was explained to

2  the officers at roll call and the supervisors at roll call

3  that we wanted to keep the crowds moving, that the -- we would

4  discourage them from standing in a single location and that

5  they were to use a lot of discretion as far as being very

6  tolerant because we didn't want to be the flash point.

7  Q    So how was -- I know you used the word "we" again, so I'm

8  going to ask you to be as specific as you can.  What happened

9  at roll call?  And then how commands were handed down.

10 A    Typically, the roll calls that I was involved in, the --

11 each of the three major jurisdictions that were there -- the

12 City Police Department, usually, Chief Sam Dotson, the County

13 Police Department, Jon Belmar, and then either Captain Robbin

14 or -- I'm sorry -- Captain Johnson or any other member of the

15 ranking Highway Patrol there would speak about general tones

16 about what we were going to do.  Then I would be introduced as

17 the person who was going to explain to them the plan for that

18 day's activity.

19 Q    Okay.  Were the officers -- now I'm asking about the plan

20 to keep the crowd moving.  Were the street officers told that

21 they had to enforce this all the time?

22 A    No.  In fact, the instructions that I gave during the

23 roll calls that I attended and that I presented the

24 information is what the officers were told is to use a lot of

25 discretion in their contacts with the crowds.  We stressed to

1    them time and time again don't take an action if that's going

2    to result in being a flash point that's going to cause

3    problems.  We were told that or I instructed them that the

4    orders I was given is that we wanted to keep the crowd moving

5    but not to the point that we caused problems.  They were given

6    a lot of discretion.  You know, if they felt like the person

7    needed several minutes or even longer than that to make up

8    their mind, then to give it to them.  Don't be hasty in their

9    judgment.  In fact, some of the exact words that were used is

10   that these police officers on the scene are street officers

11   every day of the week.  They have discretion thrust upon their

12   shoulders every hour they're at work.  And that we were

13   encouraging them to use that same level of discretion to take

14   action when they felt like it benefited the better good, but

15   that if they felt like a delay of any official action would

16   have that same effect, then not to take official action if

17   they didn't think it was warranted.

18   Q    Did Captain Johnson authorize the use of discretion?

19   A    Yes.

20   Q    How long did this plan remain in effect?

21   A    It was in effect from the time that it was initiated

22   until when operations pretty much ceased.

23   Q    Do you believe that the County Police are under orders

24   today to enforce the plan?

25   A    I have not been told anything different.

Case: 4:14-cv-01436-CDP  Doc. #: 63  Filed: 12/02/14  Page: 231 of 316 PageID #: 929
Jeff Bader Direct Examination                              9/29/2014

231

1    Q    Meaning what?

2    A    That if I were to be sent up there today I would use that

3    same plan as of now, that we would want to keep the protestors

4    moving if possible.

5    Q    Are the officers currently requiring the crowd to move?

6    A    They're not having those issues right now.  From what I

7    can tell, there's a contingent of both the Highway Patrol and

8    the St. Louis County Police that continue to provide services

9    to what we call the West Florissant corridor.  They've had

10   some protests, but they have not had to get involved in any

11   directing of the crowd to move as far as I know.

12   Q    Do you know what Captain Johnson's role is today?  Does

13   he go to the scene?

14   A    I haven't been back up there since operations ceased

15   except for Tuesday of last week when I was the duty officer

16   for the department and I responded up there to an issue then.

17   He wasn't, for all intents and purposes, in charge of that

18   scene.

19        MR. SHUMAN:  That's all the questions I'll have.

20   Thank you, Captain.

21        THE COURT:  Cross-examination.

22                    CROSS-EXAMINATION

23   BY MR. REHN:

24   Q    Good afternoon, Captain Bader.  So if I understand

25   correctly, you arrived on the morning of Saturday,

Case: 4:14-cv-01436-CDP   Doc. #:  63   Filed: 12/02/14   Page: 232 of 316 PageID #: 930
Jeff Bader Cross-examination                                    9/29/2014

232

1   August 16th?

2   A     That is correct.

3   Q     And you were at the command center?

4   A     Yes, sir.

5   Q     Where was that located?

6   A     It was at Northland Shopping Center at Lucas and Hunt and

7   West Florissant.

8   Q     How far was that from the main area where the protestors

9   were walking?

10  A     About less than a quarter of a mile through what we would

11  call the initial boundary of the area.

12  Q     And one thing you mentioned when you were talking about

13  operational decisions was the need to avoid flash points.

14  A     Uh-huh.

15  Q     When during the day had flash points generally been

16  observed?

17  A     Typically, whenever -- our biggest concern for flash

18  points would be -- excuse me -- when groups started to gather.

19  It seemed as long as people were on the move up and down the

20  sidewalks, you know, they were allowed to peaceably protest.

21  Nobody interfered with them.  But what we noticed throughout

22  the history of this event is that whenever groups of people

23  became stationary, the crowd would tend to grow, and as the

24  crowd grew, the problems that came with the crowd also grew.

25  Eventually, the crowds exceeded the ability of the sidewalks

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 233 of 316 PageID #: 931
Jeff Bader Cross-examination                                    9/29/2014

233

1   to hold them, and people would end up in West Florissant

2   street itself.  The vehicular traffic going by had not been

3   rerouted, and the streets hadn't been closed off, so you had a

4   lot of extreme danger with vehicles doing, you know, 25, 30,

5   40 mile an hour through an area where there was a higher than

6   normal amount of pedestrian congestion going on.

7        These -- of course, whenever large groups are allowed to

8   gather, people are entitled to their own opinion, and

9   sometimes within these large groups, we would have people with

10  differing opinions about what they could and could not do,

11  even within the protestors themselves, and these large groups

12  would then sometimes become unruly, and the end result after

13  that is that we would have what we call the flash point on our

14  hand, which was simply a problem would develop that we would

15  be forced to respond to and help to resolve.

16  Q    And what time of day did that happen?

17  A    Typically, those types of events started off very seldom

18  in the morning.  You know, when I talk morning, I'm talking

19  6:00 a.m. to 10:00 a.m.  From 10:00 a.m. on or even -- just a

20  lot of it depended on how many people there were on the

21  street, how many people were protesting, how many people were

22  just going about their daily activities.  Typically, those

23  types of activities would pick up speed, pick up steam, so to

24  speak, frequency, throughout the day and usually by night were

25  everything we could handle and then die off in the early

234

1   morning hours and pick back up.

2   Q    Now, you said that you participated in some operational

3   discussions and then a plan was forwarded.  You said it would

4   be forwarded up the chain.

5   A    Yes, sir.

6   Q    So was the plan to tell protestors to keep moving first

7   formed in those operational discussions that you participated

8   in?

9   A    Yes.

10  Q    And then that plan -- your understanding was that it was

11  forwarded up ultimately to Captain Johnson?

12  A    Yes, sir.

13  Q    Now, how do you know that it was forwarded up to Captain

14  Johnson?  Were you present when the plan was communicated to

15  him?

16  A    Yes, sir.

17  Q    And did you participate in communicating this plan to

18  him?

19  A    Yes, sir.

20  Q    And did you agree with this plan?  And you had

21  participated in formulating it?

22  A    I thought that at that point in time it was a solid plan

23  and that, you know, that's why we forwarded it up.  We don't

24  forward up what we think are bad ideas.

25  Q    But you had participated in and agreed with this plan

1    being proposed?

2    A    I had been advised of the plan and participated in the

3    discussions about it and forwarded on what I thought was -- I

4    forwarded on my ideas on the plan to Captain Johnson.

5    Q    And when Captain Johnson agreed with the plan, do you

6    remember what exactly he said the plan would entail?

7    A    No.  To quote him exactly, I don't know.

8    Q    I believe you described in your direct testimony that at

9    roll call the general plan would be communicated to keep the

10   crowds moving and then you would communicate more specific

11   directions to the officers?

12   A    Yes.  Usually, the senior ranking officials on the roll

13   calls would speak first, and then at some point, you know,

14   Captain Johnson would say that or whoever was running the roll

15   call would say that "Captain Bader is here, and he'll brief

16   you on the details of the activities."

17   Q    And did you say your primary instruction was to enforce

18   this policy to keep the crowds moving at the discretion of the

19   individual officers?

20   A    I wouldn't say that was our primary objective during roll

21   calls.  There was a lot of issues that were normally discussed

22   during roll calls -- everything from trash pickup to relief to

23   equipment, and so that idea -- any ideas that were forwarded

24   out or operational plans were forwarded to the officers during

25   roll call.

1    Q     But with respect to this policy in particular, was it

2    your communications to the officers that the plan was to keep

3    the crowds moving and the officers should exercise discretion

4    in how to do that on an individual basis?

5    A     Yes.  I was directed by Captain Johnson to provide that

6    information to the officers and the supervisors at roll call.

7    Q     Did you discuss with the officers the particular

8    requirements of the Missouri refusal-to-disperse statute?

9    A     I did not, no.

10   Q     Were you aware that the Missouri refusal-to-disperse

11   statute was the legal authority for this operational plan?

12   A     Yes, I was.

13   Q     And did you discuss with the individual officers the need

14   for there to be an unlawful assembly or a riot before they

15   instructed the crowds to keep moving?

16   A     I was not part of that discussion, no.

17   Q     But you were the one communicating directions to the

18   officers at these roll call meetings?

19   A     Not all of the -- not all of the roll calls and not all

20   of the instructions, no.

21   Q     Did you hear anybody communicate to the officers at any

22   roll call meeting that they should not enforce the

23   refusal-to-disperse statute unless there was an unlawful

24   assembly or a riot?

25   A     No.

1            MR. REHN:  No further questions.

2            THE COURT:  Mr. Isaacson, questions?

3            MR. ISAACSON:  No questions, Your Honor.

4            THE COURT:  Any further questions, Mr. Shuman?

5            MR. SHUMAN:  Yes.  I'll be very brief.

6            THE COURT:  Yep.

7                       REDIRECT EXAMINATION

8    BY MR. SHUMAN:

9    Q    Captain, does the County Police still believe that it's

10   under the authority of Highway Patrol?

11   A    Yes.

12   Q    Is there anything about -- anything that the County

13   Police can do in Ferguson operationally without the express

14   okay of the Highway Patrol?

15   A    No.

16   Q    When the plan for keeping the crowd moving was presented

17   to Captain Johnson, had he said he doesn't like it, do you

18   know what the County Police would have done?

19   A    We would not have implemented that plan out without his

20   approval.

21            MR. SHUMAN:  That's all.  Thank you.

22            THE COURT:  All right.  Anything further?

23            You may step down.

24            Mr. Shuman, you may proceed.

25            MR. SHUMAN:  And that's the end of the County's case,

1    Judge.

2          THE COURT:  All right.  Then, Mr. Isaacson, does the

3    State wish to or the State Defendant wish to present evidence?

4          MR. ISAACSON:  Replogle.  Yes, Your Honor.  Let me go

5    get him.

6          THE COURT:  All right.  Sir, would you step right

7    over here to the clerk to be sworn?

8       (Witness sworn.)

9          MR. ISAACSON:  If I may proceed, Your Honor?

10          THE COURT:  Yes, please.

11                    **DANIEL ERIC CALDWELL**,

12    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

13    FOLLOWS:

14                     DIRECT EXAMINATION

15    BY MR. ISAACSON:

16    Q    All right.  Could you state your name for the record,

17    please?

18    A    Daniel Caldwell.

19    Q    And how are you employed, sir?

20    A    With the Missouri State Highway Patrol.

21    Q    How long have you been with the Missouri Highway Patrol?

22    A    Coming up on 25 years.

23    Q    Okay.  What are your current duties, sir?

24    A    I am assigned to Troop C Headquarters, and I am the

25    Troop C St. Louis SWAT Coordinator.

Daniel Caldwell Direct Examination                              9/29/2014

239

1    Q    Okay.

2              THE COURT:  The what?  Troop C what?

3              THE WITNESS:  St. Louis area.

4              THE COURT:  Yeah.  You said, "I'm the" --

5              MR. ISAACSON:  He said SWAT.

6              THE COURT:  Did you say SWAT coordinator?

7              THE WITNESS:  Yes, ma'am.

8              THE COURT:  Okay.  Thank you.

9              MR. ISAACSON:  And try and keep your voice close to

10   the mike there, sir.

11             THE WITNESS:  Oh, okay.

12   Q    (By Mr. Isaacson) Pursuant to your duties with the

13   Patrol, were you assigned to Ferguson, Missouri?

14   A    I was.

15   Q    When did that happen?

16   A    The evening of August 10th.

17   Q    Okay.  And did you proceed there with your team?

18   A    I did.

19   Q    Okay.  And how many people -- and when I say team, that's

20   a SWAT team, correct?

21   A    Correct.

22   Q    All right.  How many individuals were with the SWAT team

23   at that time?

24   A    Twenty members.

25   Q    And when you got there, what shift were you assigned to

240

1    work?

2    A    Late evening through the midnight.

3    Q    Okay.  And it's fair to say the role of the Patrol

4    changed over the course of time while you were there; is that

5    correct?

6    A    That is correct.

7    Q    All right.  We've heard testimony on things in dispute.

8    The Patrol took the lead role on the 14th; is that correct?

9    A    Yes.

10   Q    And that was a Thursday?

11   A    Correct.

12   Q    All right.  You were there from the 10th through the

13   13th, correct?

14   A    Correct.

15   Q    What's -- what were your duties then?

16   A    At that time -- at that time, we were assigned to assist

17   St. Louis County and the patrolling of the crowd and the

18   violence that was taking place.

19   Q    How would you start a night?

20   A    We -- the central area that a lot of the protesting was

21   taking place -- the large crowds would gather at the QuikTrip

22   at West Florissant and Northwoods or Northwinds.  That was the

23   QuikTrip that was burnt down.  So we would assemble there and

24   try to monitor the crowd.

25   Q    Okay.  Sir, we've put up for you Plaintiff's Exhibit 27,

1    which I believe is in evidence, and you talked about a QT, I

2    believe; is that correct?

3    A    Correct.

4    Q    And is that pictured there?

5    A    Yes, it is.

6    Q    All right.  And that's located at the intersection of

7    West Florissant and -- what's the cross street there?

8    A    Northwinds.

9    Q    Okay.  And you can see the "N" or "O" on that street in

10   the upper right-hand corner; is that correct?

11   A    That is correct.

12   Q    All right.  And so, basically, would you -- would the

13   SWAT team patrol, or were you waiting for assignments to

14   situations?

15   A    We were -- when we arrived at the -- we were assigned to

16   the location.  We responded to that area where there was a

17   large crowd, a large crowd.

18   Q    All right.  When you first got there on the 10th, what

19   time about did you start working?

20   A    The 10th was late afternoon.  Our role on the 10th was

21   when the looting was taking place on the evening of that, on

22   the 10th.

23   Q    Describe what you saw that night with regard to the

24   looting you just mentioned.

25   A    When we arrived at that area on West Florissant, calls

1    for service were being given out for particular stores with

2    subjects running into the stores, breaking the windows,

3    entering those stores, and taking property out of them.

4    Q     Would you -- did you respond to some of those locations?

5    A     We did.

6    Q     Where do you remember going that first night?

7    A     We went to the Family Dollar, the Walgreens, the Walmart.

8    Some of those locations, we returned to as well.

9    Q     Okay.  I'm getting fatigued.  What's the first one you

10   mentioned?

11   A     Family Dollar.

12   Q     Okay.  Where is that on 27?

13   A     That is going to be further down at West Florissant and

14   Chambers Road.

15   Q     Okay.  So maybe we can give some background here.  On

16   this diagram, up is north, correct?

17   A     Correct.

18   Q     All right.

19   A     It would be further north.

20   Q     Okay.  And we don't have a legend there, but, okay, so

21   down is south, left is west, right is east, correct?

22   A     Correct.

23   Q     All right.  So the first location you just mentioned was

24   Family Dollar, and so was that south of the QT?

25   A     That would be north of the QuikTrip.  It's off the

1    screen.  For the photo you have up, it's further north of

2    Northwinds at the Chambers intersection.

3    Q    Okay.  And -- all right.  Where -- where were some of the

4    other -- show us on the map, or you can just point.

5    A    On the map picture currently, the -- for the evening of

6    Sunday, the 10th, the looting was taking place further up on

7    West Florissant.

8    Q    So those areas weren't pictured on this map; is that

9    correct?

10   A    Correct.

11   Q    So it's further north?

12   A    Correct.

13   Q    Okay.  All right.  What other locations did you see get

14   looted that night, that first night?

15   A    The Walgreens that's at the intersection of Chambers and

16   West Florissant.  Further north on West Florissant was the

17   Walmart.  Our team responded to those three locations that

18   particular evening.

19   Q    Do you remember any other locations from that first

20   evening?

21   A    We had reports of Foot Locker, I believe it was, that was

22   looted, and some other -- a beauty store was looted, but we --

23   our team specifically did not go to those locations.

24   Q    Did you encounter any violence from any protestors that

25   first evening?

Daniel Caldwell Direct Examination                9/29/2014

244

1    A    No, I did not.

2    Q    All right.  Tell me about the next couple of nights.

3    Let's go the 11th through the 13th.  What sort of activity

4    were you dealing with in those nights?

5    A    The 11th through the 13th is where at the QuikTrip on the

6    map at Northwinds is where the crowds would start to

7    accumulate and grow large.  We were there, responded to those

8    areas to try to keep the roadways open and to monitor their

9    actions.

10   Q    At some point, QT sustained some serious damage, correct?

11   A    Correct.

12   Q    Was that before you got there or after?

13   A    That would have been in the -- I was not there when it

14   was on fire, but it was the -- I believe the evening or early

15   morning hours of the 10th.

16   Q    Okay.  All right.  You saw the before and after picture

17   anyway?

18   A    Yes.

19   Q    Okay.  The damage was significant, was it not?

20   A    I believe it was a total loss.

21   Q    Okay.  All right.  What else do you remember from those

22   first three nights?

23   A    We heard various gunshots throughout the area.  Sometimes

24   they were directed in our -- directed towards us.  Sometimes

25   we were not too sure what direction they came from.  During

245

1   that time, while the crowds were there, we encountered people

2   throwing objects at us.

3   Q    What sort of objects?

4   A    Anywhere from anything they could find on the ground,

5   rocks, bricks, bottles, glass bottles.  Then at times just

6   full water bottles were being thrown at us as well.

7   Q    So that was going on over the course of those three

8   nights?

9   A    Correct.

10  Q    All right.  We get to Thursday, the 14th, and it's your

11  understanding the Patrol became the lead agency; is that fair?

12  A    That is correct.

13  Q    All right.  The 14th went relatively well and was

14  peaceful, was it not?

15  A    It was.

16  Q    All right.  The next night, did it go as well as the

17  14th?

18  A    No, it did not.

19  Q    All right.  What do you remember from the 15th?  What's

20  the first thing you had to deal with as a member of the SWAT

21  team?

22  A    First thing, we had reports of officers at the McDonald's

23  on West Florissant by Ferguson.  Officers at that location

24  were being surrounded by a large crowd of people.  Rocks and

25  debris were being thrown at their vehicles and them while they

1    were standing outside of the car.

2    Q    All right.  And we have the famous golden arches on the

3    map, don't we?

4    A    That is the correct McDonald's.

5    Q    And that's the McDonald's we're talking about?

6    A    Yes.

7    Q    And that's pretty much at the intersection of Ferguson

8    and West Florissant; is that accurate?

9    A    That is accurate.

10   Q    Okay.  So did you respond to that McDonald's?

11   A    Yes.  We responded to the intersection of Ferguson and

12   West Florissant, and we formed a line at that location.

13   Q    And what -- once you got -- what happened next?

14   A    I asked that the radio command post have the officers in

15   the McDonald's area to pull out of that area because they

16   were -- the objects were still being thrown at them.  So we

17   pulled those officers out of that area, and then they

18   responded behind our line of officers.

19   Q    What sort of objects were being thrown at them when you

20   gave that order?

21   A    It was anything on the ground, again, rocks, bricks,

22   glass bottles.  Some of the vehicles sustained damage as well

23   as, as the officers' vehicles were pulling away, subjects were

24   hitting and kicking the vehicles.

25   Q    What were the numbers of the crowd you were dealing with

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 247 of 316 PageID #: 945
Daniel Caldwell Direct Examination                    9/29/2014

247

1    at that point in time?  What's your best estimate?

2    A    Several hundred to a thousand.

3    Q    After you -- what happened next?

4    A    We held the line, and I notified our command post of the

5    situation, and at that time, we were told for all officers to

6    pull out and to return back to the command post.

7    Q    Okay.  And when you say you are holding the line, that

8    means you're essentially standing there?

9    A    Correct.  Officers formed a line the width of West

10   Florissant from curb to curb.  We had a line of officers

11   there.  Once we had all the officers who were in front of us

12   around the McDonald's pull out, all officers were no longer in

13   that area, then we were told to respond back; all officers to

14   respond back to the command post.

15   Q    And when you are holding the line, how far back is the

16   first line of the crowd?

17   A    I would say approximately 20 yards, right about where you

18   are.

19   Q    Very well.  After you pulled back that night, what's the

20   next thing that happened that evening?

21   A    The crowd became or we received information that the

22   crowd was becoming more agitated.  It had not stabilized.  We

23   were then shortly thereafter told to respond back to the area.

24   Q    Okay.  And where did you go?

25   A    We left the command post, proceeded north on West

1   Florissant to just before the intersection of Ferguson; I'd

2   say approximately 30 to 40 yards south of the intersection,

3   and we formed another line of officers there and monitored the

4   situation.

5   Q    And I don't know if we've established this yet.  The

6   command post was in a mall that's not on this diagram, but

7   it's to the south, correct?

8   A    Correct.

9   Q    Does West Florissant sort of curve around at that

10  point --

11  A    It does.

12  Q    -- to go -- would that be east?

13  A    From Lucas and Hunt, it goes north from that location.

14  Q    All right.  And there's a Target there now?

15  A    Yes, sir.

16  Q    I mean a Target store.

17  A    Correct.

18  Q    All right.  So you back to that, and how -- how far away

19  did you -- when you went back, how far away were you from the

20  first encounter that evening?

21  A    Well, I'd say we were approximately 30 yards from the

22  line of where the protestors were.

23  Q    All right.  What happened then?

24  A    We were monitoring the line.  There was verbal commands

25  being given for everybody to disperse from one of our command

1   vehicles.  Nobody was adhering to that direction.

2   Q    Was there any -- were you taking any sort of violent

3   activity from that crowd?

4   A    They were throwing items, but we were far enough back to

5   where they were just hitting the ground in front of us.

6   Q    And what sort of items were they, sir?

7   A    Rocks, bricks, and water bottles again.

8   Q    Okay.  What happened then?

9   A    The crowd then, shortly thereafter, decided to start

10  looting the Ferguson Market, which is essentially right next

11  to the McDonald's on your diagram.  I believe it might --

12  Q    Is it to the south?

13  A    Yes, just a parking lot south of the McDonald's.

14  Q    Okay.  And it's a pretty small little store, isn't it?

15  A    Correct.

16  Q    All right.  So they started looting there.  What happened

17  then?

18  A    We could see subjects were going inside of the store,

19  taking items out.  As that was occurring, another portion of

20  the crowd -- the Ferguson Market is west of West Florissant.

21  Then they started to loot the Family Dollar and, I believe, a

22  beauty store on the east side of the intersection, and they

23  were going essentially across the street.

24  Q    Okay.  All right.

25          THE COURT:  So is it a different Family Dollar?

1          THE WITNESS:  Yes, ma'am.

2   Q    (By Mr. Isaacson) Okay.  That's what threw me, too.  Are

3   there two Family Dollars?

4   A    Correct.  There's two locations on West Florissant.

5   Q    All right.  So what did you see going on once they got to

6   the Family Dollar, the second Family Dollar at Ferguson and

7   West Florissant?

8   A    The crowd was chanting louder, and the crowd

9   essentially -- more members -- it appeared more people from

10  the crowd were taking part and going inside the stores and

11  taking out items.

12  Q    All right.  What did your team do?

13  A    At that time, we were given direction to stand down.  We

14  could not take action on it, and the looting continued.

15  Q    Okay.  Where'd you guys go?

16  A    We just held our line just south of the intersection.

17  Q    Okay.  How long did that looting go on?

18  A    I can't recall directly, but quite awhile.

19  Q    All right.  And you're watching all of this?

20  A    Correct.

21  Q    All right.  Did the fact of the looting kind of divert

22  their attention from throwing things at you guys, or is that

23  still going on, too?

24  A    That was still going on.

25  Q    All right.  Again, was it falling short of you?

Daniel Caldwell Direct Examination                        9/29/2014

251

1    A    Yes.

2    Q    All right.  What's the next incident you recall going to

3    that night?

4    A    That night, we received additional calls of looting going

5    on West Florissant further north, around the Chambers area, at

6    which time we had my team along with a St. Louis County team

7    respond by a roundabout way.  We took New Halls Ferry.  We

8    came down to the opposite side of West Florissant, and we

9    encountered looting going on in an AutoZone, another car

10   place; I think it was like a wheel store.  Looting was going

11   on at those two locations.

12   Q    All right.  Do you remember, as you sit here today, any

13   other events from that Friday night?

14   A    As far as looting goes, that was it.  There was one more

15   incident that occurred shortly later.

16   Q    And what was that, sir?

17   A    When we were responding -- as the evening went on and

18   things calmed down, we were heading back to the command post

19   via West Florissant, and we interrupted a looting in progress

20   where the owners or managers of the store were attempting at

21   gunpoint to stop looting of their liquor store.

22   Q    All right.  What time did your shift end that morning?

23   A    6:00 in the morning.

24   Q    Okay.  All right.  When were you back on the next day?

25   A    We were to be back at the command post at 5:00 p.m. the

1   following day.

2   Q     All right.  And did your team -- they did that?

3   A     Yes, sir.

4   Q     All right.  And so now we're on the Saturday, the 16th.

5   Did you encounter some violence that night?

6   A     We did.

7   Q     Okay.  Tell me the first incident you responded to on the

8   16th.

9   A     Similar as to how it started the night before, we had

10  officers on West Florissant in their vehicles patrolling the

11  area.  They again began to have objects thrown at them --

12  rocks and bottles and so forth -- at their vehicles.  The

13  crowd started to form, and we were asked to respond to that

14  location.

15  Q     Once you got there, what did you see?

16  A     The -- as we approached, some of it had died down.  They

17  saw the police officers or our vehicles responding to the

18  area.  The crowd was still large.

19  Q     Okay.  And I'm sorry, sir.  Where are we right now?

20  A     We are on -- we are on -- still by the McDonald's on West

21  Florissant.

22  Q     Okay.  All right.  How long were you there for that

23  incident?

24  A     Several hours.

25  Q     Okay.  Do you remember any other incidents that evening?

1   A    We just worked towards moving the crowd, dispersing the

2   crowd by moving them north on West Florissant, and as we did

3   that, we continued to encounter items being thrown at us.

4   Q    Okay.  Do you have any other memory of any other

5   incidents on the 16th?

6   A    Essentially, that was -- it was recurring throughout the

7   evening.

8   Q    All right.  And then on -- let's go to the 17th, and

9   that's the Sunday.

10  A    Okay.

11  Q    That evening started off with something fairly

12  significant, did it not?

13  A    It did.

14  Q    All right.  Tell us about that.  What happened when it

15  started?

16  A    We received reports that a large crowd of approximately a

17  thousand protestors were proceeding south on West Florissant,

18  moving towards the Target store, which is the command post.

19  Q    Okay.  Once you received that information, what did your

20  team do?

21  A    We were told to immediately respond to West Florissant

22  from the command post.

23  Q    Okay.  So West Florissant -- again, you're essentially

24  going back to close to the McDonald's and the Ferguson Meat

25  Market; is that correct?

254

1    A    Just prior to that, yes.

2    Q    Yes.  And when you say "prior," you mean south?

3    A    Correct.  By the -- there's an Emerson Electric Company

4    there.  It was in that area.

5    Q    All right.  And Emerson Electric, I guess, just for the

6    record, is sort of in the lower quadrant of the -- what do you

7    call this -- the segment that's there; is that correct?

8    A    Yes, sir.

9    Q    All right.  And there's also kind of a triangular field

10   there, is there not?

11   A    Are you referring to the purple triangle or --

12            THE COURT:  No.  In the -- can you circle?  You can

13   circle it.

14            MR. ISAACSON:  With the ELMO, I know you can hit it.

15            THE COURT:  Yeah.  Just do it with your finger.  Just

16   circle the part you're talking about and ask him about it.

17            MR. ISAACSON:  All right.  We're all right.

18            THE COURT:  I say it should work.  On the screen, it

19   doesn't?  Okay.  This isn't my normal courtroom.

20            MR. ISAACSON:  I shouldn't have washed my hands.

21   We're good.  Thank you.

22   Q    (By Mr. Isaacson) Okay.  So once you got --

23            THE COURT:  So you're talking about the triangle

24   south of McDonald's --

25            MR. ISAACSON:  Yes.

255

1          THE COURT:  -- right?

2   Q    (By Mr. Isaacson) Okay.  And that's just bare, empty

3   grass; is that correct?

4   A    That is, but the Emerson Electric is actually notated at

5   the farther left bottom.  Yes, there it is.

6          THE COURT:  So are you saying you were down there

7   where that lower orange triangle is right now by Emerson?

8          THE WITNESS:  Correct.

9   Q    (By Mr. Isaacson) You're down near Emerson.  Okay.

10  A    Correct.

11  Q    Tell us what happened there.

12  A    As we responded in our vehicles, we drove directly in

13  front of the protestors marching that way.  They were loud, a

14  very, very large crowd, very loud, and we immediately -- our

15  vehicles started to be struck by various objects.

16  Q    What objects do you remember?

17  A    Again, we were getting hit with a lot of rocks for sure,

18  bottles, and chanting with their signs and so forth that they

19  made their intentions known that they were heading towards our

20  location.

21  Q    All right.  And how did that situation resolve itself?

22  A    We had several vehicles there with multiple agencies.  We

23  threw gas grenades out of the vehicles.  Some officers were

24  actually able to get out of the vehicles to do so, and we

25  tried to stop them from proceeding further south on West

Daniel Caldwell Direct Examination                    9/29/2014

256

1    Florissant.  Once they stopped doing that, then we were able

2    to move the crowd back north on West Florissant.

3    Q    And when you say you're moving the crowd, what exactly is

4    going on?

5    A    We -- once we were able to stop them from proceeding

6    south, we had officers exit the vehicles, and we formed a line

7    of officers across the street, along with our vehicles, and we

8    would slowly walk them back.  We probably maintained a

9    distance of 15 yards between ourselves and those people

10   because we had to move slowly because the crowd was so big we

11   had to let people in the farthest back move before we could

12   get the people in the front to move back.

13   Q    All right.  How long did dealing with this whole incident

14   take?

15   A    Oh, an hour or two.

16   Q    Okay.  Do you remember any other incidents the night of

17   that Saturday?

18   A    I remember that as we were moving --

19   Q    Yeah.  Strike that.  I misspoke.  I think we're on

20   Sunday.  Go on.

21   A    I just remember that evening, as we were continuing to

22   move the crowd back, we encountered some things that we had

23   not encountered on the previous nights.

24   Q    What was that, sir?

25   A    They had placed the keystone landscaping rocks that you

1   would make a landscaping wall out of -- they were placing them

2   across the roadway, approximately two to three high, and

3   during this time, we were still throwing gas, trying to get

4   the crowd to disperse.  We had protestors donning or wearing

5   gas masks.  We had not seen that before, and we had times

6   where we saw them picking up or attempting to pick up some of

7   the gas thrown at them and they were trying to throw it back

8   at us.

9   Q    What happened next?

10  A    We were able to disperse the crowd after several hours,

11  and we moved them further north on West Florissant to where

12  the crowds minimized in size.

13  Q    I take it dealing with that situation was most of your

14  night's work on the 17th?

15  A    It was.

16  Q    Okay.  Let's go to the 18th.  We're on Monday now.

17  What -- do you remember the first place your team went that

18  night?

19  A    First place for -- let me recall here.  We responded to

20  the intersection of Ferguson again.

21  Q    Is that where the McDonald's was?

22  A    Correct.

23  Q    Okay.

24  A    And we were there monitoring the crowd.  They were --

25  just a large crowd, again, had formed.  They were blocking the

258

1   road.  We had people of -- of the community -- clergy,

2   citizens, and so forth -- who were there trying to help us

3   open the roadway.  They were able to do that on their own, and

4   the roadway was opened up.

5   Q    Okay.  Was there -- was there any violent activity going

6   on at this sequence?

7   A    Not at that particular -- no.  They were able to -- it

8   started up.  We did have some water bottles thrown at us, but

9   there was people actually in that large crowd who immediately

10  started to try to control the situation.

11  Q    And that was successful?

12  A    That was successful, and then we had a report of a large

13  crowd forming at the QuikTrip there on West Florissant at

14  Northwinds where they needed some teams to respond to.

15  Q    All right.  Did you go there?

16  A    My team went there along with St. Louis County.

17  Q    Okay.  And what happened there?

18  A    We arrived at that location.  On that particular day,

19  there was marching taking place, and at that location, there

20  was a steady flow of people walking up on West Florissant,

21  turning around and coming back, and then when we showed up,

22  they were stopping at that intersection of Northwinds.  They

23  started to congregate and started to come onto the roadway,

24  and then we were giving them -- verbally telling them over the

25  PA system that they needed to get or walk on the shoulder or

Case: 4:14-cv-01436-CDP   Doc. #:  63   Filed: 12/02/14   Page: 259 of 316 PageID #: 957
Daniel Caldwell Direct Examination                        9/29/2014

259

 1   walk on the sidewalks and to continue moving.

 2   Q    All right.  Was there any violence as part of their

 3   response at that point?

 4   A    The only thing we had -- we had some property damage

 5   occurring.  One of the "Yield" signs of the intersection was

 6   pulled up, and one of the protestors was walking around with a

 7   "Yield" sign.

 8   Q    All right.  Do you remember anything else from that

 9   Monday night?

10   A    Yes.

11   Q    What else do you remember?

12   A    As that evening progressed, the numbers grew.  They were

13   not listening to our commands to clear the roadway.  We were

14   stationary in --

15   Q    Where were you exactly when this was going on?

16   A    This is exactly at the intersection of Northwinds and

17   West Florissant.

18   Q    Okay.  So you're close to the QT?

19   A    Yes.  The QT is right in front of us.

20   Q    Okay.

21   A    We were holding that area.  We started to receive rocks

22   specifically thrown at us.  We were telling them over the PA

23   system to stop throwing objects at us and to continue their

24   march.  That was not working.  They congregated further onto

25   the roadway.  There was two Johnny-on-the-Spot portable

Daniel Caldwell - Direct Examination                    9/29/2014

260

1    bathrooms at that location.  They were pushed over onto the

2    roadway, blocking it.  And we even took -- I had our

3    particular vehicle -- we backed it up further, so we were

4    that -- we were trying to back up, so we weren't in arm's

5    reach of those rocks being thrown, and a very short time

6    later, we received multiple gunshots fired at us, probably a

7    dozen from Northwinds west directly at our vehicles.

8    Q    Okay.  Do you remember any other sort of violent activity

9    that night?

10   A    After that subsided, we responded -- shortly thereafter,

11   we responded to a body that was found laying next to the

12   QuikTrip, on the south side of the QuikTrip, and our team went

13   in there, and a subject protestor was beaten up by somebody

14   else -- we don't know who -- significantly beaten up, and he

15   was unconscious, and we put him in our vehicle, and we took

16   him out and had EMS respond to take care of him.

17   Q    Do you remember any other events from the 18th?

18   A    That would have concluded it.

19   Q    Okay.  Your team was off the next two nights; is that

20   correct?

21   A    That is correct.

22   Q    All right.  Your team was never assigned anything with

23   regard to keeping people moving, a five-second rule or

24   anything in that world, correct?

25   A    No, we were not.

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 261 of 316 PageID #: 959
Daniel Caldwell Direct Examination                                    9/29/2014

261

1   Q    You were never even briefed on that; is that fair?

2   A    That's fair.

3   Q    Based on your observations from the 15th through the

4   18th, was there some sort of consistency with regard to the

5   relationship between the size of the crowd and the level of

6   violence that would occur?

7   A    Yes.

8   Q    Would you just tell -- describe that for the Court?

9   A    As the crowd seemed to grow larger, we'd find people

10  infiltrating the back of the crowd, and then they would start

11  to become unruly and either verbally being more abusive, and

12  then we noticed the items that were being thrown at us were

13  from the back of the crowd, not the people in the front of the

14  crowd.

15  Q    Was that a consistent pattern that items were from the

16  back?

17  A    Correct.

18  Q    And your team wasn't making any arrests pursuant to the

19  dispersal statute or moving people along or anything like

20  that, correct?

21  A    No, we were not.

22  Q    And while you were there, did you ever receive any

23  instruction with regard to that aspect of operations?

24  A    We knew what was going to be taking place, but that was

25  not part of our mission.

Daniel Caldwell Cross-examination                          9/29/2014

262

1  Q    All right.  And you heard that thirdhand?

2  A    Correct.

3        MR. ISAACSON:  All right.  I have nothing else from

4  this witness, Your Honor.

5        THE COURT:  Cross-examination.

6                    CROSS-EXAMINATION

7  BY MR. CLANCY:

8  Q    Good afternoon, Sergeant Caldwell.  Can you state again

9  what time your shift generally ran in the SWAT team?

10 A    Yes.  We would be on post by 5:00 p.m., and we worked

11 through until 6:00 a.m.

12 Q    Did you ever work during the daytime hours, or was your

13 shift consistent?

14 A    Our shift was consistent.

15 Q    So you don't have any firsthand knowledge of events that

16 occurred during the day in Ferguson; is that correct?

17 A    Correct.

18 Q    Okay.  And earlier, you were asked whether you were given

19 orders about refusal to disperse and enforcing that statute.

20 As the SWAT team, were you privy to the general roll calls

21 that everyone else was privy to?

22 A    One more time, please.

23 Q    As a member of the SWAT team, would you attend the roll

24 calls that other officers who might be enforcing general crowd

25 control measures would attend?

Daniel Caldwell Cross-examination                    9/29/2014

263

1   A    Typically, we would not.  The road officers would

2   assemble for their assignments for that shift, and then the

3   SWAT officers would be at a different location, and we would

4   be briefed separately.

5   Q    So you wouldn't have any firsthand knowledge about what

6   those officers were told regarding enforcement of the

7   refusal-to-disperse statute --

8   A    Correct.

9   Q    -- is that correct?

10  A    Correct.

11  Q    You've described a series of events that occurred during

12  your shift, including rocks being thrown at you, et cetera.

13  Did all of these events occur during the nighttime?

14  A    During my shift, yes.

15  Q    Uh-huh.  And, specifically, when you're discussing the

16  events that occurred on the evening of the 17th, what --

17  around what time did those events occur?

18  A    Towards midnight hours.

19  Q    And you were asked whether -- about a pattern you saw in

20  terms of more violence occurring -- you said generally was

21  with larger crowds?

22  A    Correct.

23  Q    When you're talking about a larger crowd forming, are you

24  talking about five individuals congregating, 50 individuals

25  congregating?

Daniel Caldwell Cross-examination                        9/29/2014

264

1   A    By the time we were in an area, I would say the crowd was

2   plus or minus from a hundred.

3   Q    So when your -- the pattern that you observed was when

4   crowds reached roughly a hundred officers or a hundred

5   protestors at night, then in those situations the violence

6   might occur; is that correct?

7   A    That's correct.

8   Q    When you were discussing your enforcement on the night of

9   the 18th, you mentioned that when you came across certain

10  large crowds by the QuikTrip and, I believe you said, by the

11  Family Dollar store, you told them to move along?

12  A    Correct.

13  Q    On what basis did you tell them to move along?

14  A    We knew that the assignment of the road officers were not

15  in our area.  At that time, they were dealing with the

16  situation at the McDonald's area, and we knew the direction

17  was to keep the crowd moving.

18  Q    How did you know that the direction was to keep the crowd

19  moving?

20  A    We had heard that the mission for the day shift was to

21  keep the crowd moving.

22  Q    Were you told -- had you heard anything else except, "We

23  have to keep the crowd moving"?  Were there any guidelines or

24  other specifics about when or how to keep the crowd moving?

25  A    We were just told that through the public address system,

1   PA system, that we would be encouraging them to keep moving.

2   Q    Were you told that in order to tell the crowd to keep

3   moving you first had to declare an unlawful assembly?

4   A    Not that I recall.

5   Q    Were you told that in order to keep the crowd moving you

6   had to declare a riot?

7   A    We knew -- we knew that to keep the crowd moving, that we

8   did not want them to stop, we would encourage them, "Don't

9   stop," and I do believe the words -- a phrase came out, "You

10  cannot assemble here, and you need to keep moving" is the

11  direction we were given.

12  Q    I'm sorry.  Maybe my question was unclear.  Were you told

13  that in order to tell the crowd to keep moving you first had

14  to declare a riot?

15  A    No.  We were told that -- for -- to keep the crowd

16  moving.  We did not want them to assemble.  That's when we

17  noticed that the violence would occur.

18  Q    And were you told that when you told the crowd to keep

19  moving you had to tell them to leave or disperse from the area

20  or to just keep them moving?

21  A    Just to keep them moving.

22  Q    Thank you.  And your examination ended and said that you

23  were off the nights of the 19th or 20th; is that correct?

24  A    That is correct.

25  Q    When is the last time that you have been in Ferguson in

266

1   your official capacity?

2   A    We responded there -- I can't remember -- last week when

3   we had more looting occur.  I think that was a Monday evening

4   or a Sunday night, a week or so ago.

5   Q    Is it fair to say that the Missouri State Highway Patrol

6   still responds to events in the Ferguson area?

7   A    Correct.

8   Q    All right.  And as far as you know, have you heard any

9   authority that you are to not tell protestors to keep moving

10  anymore?

11  A    I have not been told that.

12  Q    Is it your understanding that that directive still

13  stands?

14  A    I have no knowledge of that.

15       MR. CLANCY:  No further questions.

16       THE COURT:  Cross-examination.

17       MR. SHUMAN:  No cross from the County, Judge.

18       THE COURT:  All right.  Any redirect?

19       MR. ISAACSON:  No, Your Honor.

20       THE COURT:  You may step down.

21       You may call your --

22       MR. ISAACSON:  May the witness be excused?

23       THE COURT:  Yes.  You may call your next witness.

24       MR. ISAACSON:  Call Major Johnson.

25       THE COURT:  Sir, if you'll step right here to the

1    clerk.

2                        **J. BRET JOHNSON,**

3    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

4    FOLLOWS:

5                        DIRECT EXAMINATION

6    BY MR. ISAACSON:

7    Q    And could you state your name for the record, please?

8    A    J. Bret Johnson.

9    Q    And how are you employed?

10   A    With the Missouri State Highway Patrol.

11   Q    And what is your current rank?

12   A    I'm a Major.  I'm the Field Operations Commander.

13   Q    How many people in the Highway Patrol are ranked above

14   you, sir?

15   A    Two administratively.  One operationally.

16   Q    And how long have you been with the Highway Patrol?

17   A    Over 28 years.

18   Q    What are your duties, generally speaking?

19   A    As the Field Operations Commander, I command the nine

20   geographic troops, one of which is Troop C, 11 counties in

21   Troop C, and Captain Ron Johnson is the Commander, and I'm the

22   supervisor of those nine, nine troops, including Captain

23   Johnson.

24   Q    Generally speaking, what's the Patrol's mission?

25   A    Our mission -- we're a full-service police organization,

J. Bret Johnson Direct Examination                    9/29/2014

268

1    and we provide law enforcement duties throughout the state to

2    include traffic, criminal, gaming.  We're actually a state

3    police, but we're still called the Highway Patrol.

4    Q     Okay.  You enforce state laws?

5    A     We do.

6    Q     Not city ordinances, correct?

7    A     Not city ordinances.

8    Q     All right.  At some point, you became involved in the

9    situation at Ferguson; is that correct?

10   A     I did.

11   Q     All right.  Where were you when you first learned about

12   that?

13   A     I was in Grand Rapids, Michigan, at a conference on the

14   10th and 11th.

15   Q     Okay.  When -- once you got the call, did you come back?

16   A     I eventually did on the 12th.  They flew one of our

17   planes up, and I flew back.

18   Q     Once you got there, once you got back on the 12th, what

19   was your initial involvement with the Ferguson matter?

20   A     On the 12th, I actually came to Troop C and met with

21   Captain Johnson and got a full face-to-face briefing.  I had

22   not -- we had only conversed over the telephone prior to that

23   time.

24   Q     And Captain Johnson -- what is his rank?

25   A     His rank -- he's the Captain.  He's the Commander of

Case: 4:14-cv-01436-CDP  Doc. #: 63  Filed: 12/02/14  Page: 269 of 316 PageID #: 967
J. Bret Johnson Direct Examination                    9/29/2014

269

1   Troop C.

2   Q    Okay.  He's one rank below you?

3   A    He is.

4   Q    Okay.  What -- and you've heard testimony; we agree you

5   became the lead agency on the 14th, correct?

6   A    That is correct.

7   Q    All right.  For the couple days before the 14th, what

8   sort of work were you doing at Ferguson?

9   A    Just mostly observing.  As the Field Operations Major, I

10  make sure that they have the proper assets because we were

11  bringing in uniformed officers and equipment from other troops

12  and my bureau coordinates those to help support Troop C.

13  Q    How would you describe the Patrol's role before the 14th?

14  A    Before the 14th, it was a mutual agreement.  We were

15  supporting in a mutual aid role to St. Louis County and

16  Ferguson PD.

17  Q    All right.  And that role changed on the 14th.  What did

18  that mean in terms of the Patrol's role?  What exactly -- how

19  did your role change?

20  A    Well, with the -- with the Governor's announcement,

21  Captain Ron Johnson was placed in as the Incident Commander

22  of -- of the incident going on here.

23  Q    Okay.  And at that point, what was -- what were the

24  goals; what was the job of the Missouri Highway Patrol in

25  Ferguson?

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 270 of 316 PageID #: 968
J. Bret Johnson Direct Examination                    9/29/2014

270

1    A    Really, we had -- you know, the Governor was very

2    specific; the Colonel was very specific that we would maintain

3    public safety and also protect civil rights and free speech.

4    Q    Okay.  Was one of the goals preventing the destruction of

5    property?

6    A    It was.

7    Q    All right.  What sort of shift were you working from --

8    let's say when you first started 'til the 14th.

9    A    Yeah, when I -- when I got back from Michigan, I was

10   mostly working days.  The Colonel and I both were traveling

11   back and -- back and forth to be here during the day, go back

12   in the evening, and that continued up until the 16th.

13   Q    All right.  And how did your role change on the 16th?

14   A    On the 16th, when the Governor declared a State of

15   Emergency, I prepared myself to come here, and I stayed

16   until -- actually, until the command post was disassembled,

17   and it was moved back operationally to the Troop in the county

18   on the 27th.  So I was here from the 16th to the 27th.

19   Q    And from the 16th to the 27th, what shift were you

20   working?

21   A    I went to nights then because that's when most of the

22   unrest occurred.  I was -- I would come on somewhere around

23   11:00 and work until 4:00, usually 4:00 or 5:00 in the

24   morning.  We were working about 20-hour shifts.

25   Q    And when you say public safety, that also included the

1    safety of the people who were protesting, correct?

2    A    That is correct, and that was a specific direction not

3    only from the Colonel but from the Governor.

4    Q    Once you were there on nights from the 16th -- let's say

5    the 16th and the 17th -- how are you going about your

6    business?  What exactly are you doing?

7    A    Well, in the evening, I would go down.  You know, we were

8    operating at that point as what I would call a Unified Command

9    between Captain Johnson, Chief Belmar, and then also Chief

10   Dotson from the police department since they were all

11   providing a large contingent of manpower, and so we would

12   normally go down in the late evening together to observe the

13   crowds and what was occurring.

14   Q    Okay.  After that happened, what sort of work would you

15   do then?

16   A    Well, it just -- it depended.  We would come up with

17   different strategies.  You know, there were lots of -- as

18   you've heard before, lots of violence going on during those

19   nights, and it was our job as command staff to come up with

20   strategies that would help lessen that.

21   Q    All right.  And you've heard testimony sitting here about

22   how decisions were made and the dialogue that occurred.  You

23   roughly agree with what you heard?

24   A    I do.

25   Q    Okay.  And in terms of -- we've heard a lot about, you

272

1    know, the violence that was occurring and all that sort of

2    thing.  Did you also witness similar events, let's say, on the

3    nights of the 16th and 17th?

4    A    Yes.

5    Q    All right.  Tell the Court what you can recall, some of

6    the things you remember from those nights.

7    A    Well, there were different exchanges, all on -- that I

8    recall all on West Florissant, mostly in the area of -- of the

9    McDonald's -- rocks, bottles, Molotov cocktails, gunfire.

10   It's -- you know, you've heard the testimony.  I witnessed and

11   was involved in -- in observing all of that.

12   Q    Okay.  We use the term a lot.  I don't -- maybe we

13   defined it earlier.  What's a Molotov cocktail?

14   A    It's a bottle with -- with a flammable liquid inside,

15   with a rag that is lit on fire, and then whenever it crashes,

16   it would -- when it impacts, then it would catch on fire then.

17   Q    Okay.  And you've heard the testimony regarding people

18   embedding in -- once the group got large; is that correct?

19   A    That is correct.

20   Q    Now, we've heard it several times.  Do you have any

21   disagreement with that?

22   A    I don't have any disagreement, no.

23   Q    All right.  Let's start with this.  First of all, has

24   there ever existed a five-second rule?

25   A    Never heard of it.

273

1   Q    Okay.

2   A    Until I got here today.

3   Q    Okay.  There was a strategy with regard to keeping the

4   crowd moving?

5   A    Yes.

6   Q    All right.  Now, when info -- information would be given

7   at briefings every night, correct, to start the night?

8   A    Yes.

9   Q    All right.  Who would deliver those briefings?

10  A    Captain Johnson, Chief Belmar, Chief Dotson, and then

11  sometimes myself and the Colonel would -- would have some

12  input into the --

13  Q    Okay.  And did you -- and you were always present for

14  these briefings; is that correct?

15  A    Most of them, yes.

16  Q    Okay.  And --

17  A    On the evening shift, not the day shift.

18  Q    All right.  Now, this idea of keeping people moving --

19  that was -- was that a strategy that was employed?

20  A    It was a strategy.  Actually, the first time that I heard

21  about it, I think some of -- including some of my staff had

22  discussed it, but when it was presented to Captain Johnson,

23  then he presented it to me, and we discussed it at that point.

24  Q    Okay.  And what was the purpose?  How was that going to

25  help with operations?

1   A    Well, we hoped that -- that it was going to minimize the

2   size of the crowds by keeping the protesters and others --

3   this was on public sidewalks.  They were -- you know, when

4   they were allowed to congregate and not continue moving, they

5   were pushing out into the streets.  It would allow us to -- at

6   that point, we were far enough along we had identified

7   different instigators and those that had been previously

8   arrested, and that gave us an opportunity to visualize them.

9   Some had backpacks.  Some had, you know, gas masks.  So those

10  that were going to commit violations of the law, we could more

11  readily identify them if they weren't embedded inside the

12  crowd.

13  Q    So it enhanced your visibility of everybody in that

14  crowd; is that fair?

15  A    That's true.

16  Q    Okay.  Did it have some benefits for keeping the road

17  clear?

18  A    It did.

19  Q    And would you explain that?

20  A    Well, you heard before.  I mean, when you had crowds of

21  200 or more in a lot of these instances, the road was not

22  closed, West Florissant was not closed, and even the nights

23  that it was, it was open to emergency traffic and also local

24  traffic, and they would spill out into the roadways.  Plus,

25  you know, we had complaints from area businesses that the

Case: 4:14-cv-01436-CDP   Doc. #:  63   Filed: 12/02/14   Page: 275 of 316 PageID #: 973
J. Bret Johnson Direct Examination                   9/29/2014

275

1   people that wanted to utilize those businesses or the other

2   public that wanted to utilize those sidewalks could not do so

3   if they were blocked.

4   Q    So a briefing occurred with regard to the "keep them

5   moving"; is that correct?

6   A    That's correct.

7   Q    And how is that strategy explained?

8   A    Captain Johnson explained to them that -- you know,

9   basically, what I -- what I said -- that they would need to

10  keep moving to minimize the crowds and the only way that there

11  would arrests would be if the elements were made of failed to

12  disperse.

13  Q    And that's the statute we've been looking at earlier; is

14  that correct?

15  A    That's correct.

16  Q    Okay.  So it was sort of a two-step analysis, first, keep

17  them moving, and then if not, they had to conduct an analysis

18  with regard to whether they were in violation of that statute;

19  is that correct?

20  A    That's correct.

21  Q    All right.  So the instruction was not "Keep them moving,

22  and if they don't, you're going to lock them up right away"?

23  A    That's correct, no.

24  Q    Would that have been feasible?

25  A    Operationally, it would not.  You know, when you have a

1   coupled hundred people there, I don't know how you could

2   enforce that, so we -- as you've heard before, officers had

3   lots of -- lots of discretion.

4   Q    Do you remember -- did that strategy last very long?

5   A    It didn't really work very long just because of the -- of

6   the size of the crowds.  It would work early afternoon into

7   the evening, but once the crowds got large, that -- it really,

8   really didn't work as well as we would have liked for it to.

9   Q    So was the last briefing that Monday night, the 18th?

10  A    That -- that we discussed it specifically is what I

11  recall.

12  Q    Okay.  And was that -- would you say, based on your

13  presence there, that that strategy was even being used within

14  a couple days of the 18th?

15  A    Not after that, no.

16  Q    Okay.

17  A    Not under our command anyway.

18  Q    At some point, you -- I think you indicated earlier

19  something happened on the 27th.  What was that?

20  A    The 27th, things had -- had calmed down enough.  The

21  National Guard had actually left guarding our command post,

22  and we disassembled our command post, not only our mobile

23  command post but also the offices that we had established

24  within the mall at Lucas and Hunt, and we turned the

25  communications then over to the Troop and to St. Louis County.

1    So our on-site command post ceased to exist on that day.

2    Q    Okay.  Now, I think we had evidence earlier in the day

3    that there was another order on September 3rd.  Is that

4    correct?

5    A    Well, the Executive Order then expired on -- on the 3rd,

6    or the Governor withdrew it.  I'm not sure of the legal term,

7    but, yes, the Executive Order, he pulled it on September the

8    3rd.

9    Q    So at least to your mind the Patrol was not the lead

10   agency after the 3rd; is that correct?

11   A    Legally, we would not have been after the 3rd.

12   Q    And in terms of -- how many people did you still have in

13   Ferguson after the 3rd?

14   A    We kept just a couple small contingent zones there,

15   probably four or five a shift.  They have had a couple

16   incidents since then, the shooting a couple nights ago.  So,

17   naturally, a few more people would come in, but, yeah, going

18   from 150, 200 to four or five a shift.

19   Q    All right.  And what -- those four or five per shift,

20   what are their assignments or what are they -- generally, what

21   are they supposed to be doing?

22   A    They're actually working in the West Florissant area.

23   They're actually practicing community policing and trying to

24   bring Ferguson back into the fold in that area.

25   Q    And operationally, you're not aware of anything the

278

1    Patrol has done to be a lead agent -- to be the lead agency in

2    Ferguson since the 3rd; is that correct?

3    A    Not lately, no.

4    Q    Captain -- Captain Johnson still goes to Ferguson; is

5    that correct?

6    A    He does.  He's still -- he's still helping out.  He's --

7    you know, he's from Ferguson.  He -- you know, he believes in

8    trying to make this a safe -- you know, a safe community, and

9    he's doing all he can from the Patrol's aspect to do that.

10   Q    Okay.  Now, I take it none of us know whether the Patrol

11   might be the lead agency again in Ferguson; is that correct?

12   A    We hope we don't have to be.

13   Q    Okay.  We can't rule it out?

14   A    That's true.

15   Q    Okay.  We don't know what tactics you might want to use

16   or strategies; is that fair?

17   A    Not until those issues are presented.

18   Q    In terms of -- you've heard a little bit about a protest

19   assembly zone.  There's no -- there's been no discussion of

20   that, correct, at this point?

21   A    No.

22   Q    Or has there been any discussion regarding keeping

23   movement since, you know, August 18th, 19th, or 20th in the

24   Patrol as far as you're --

25   A    Not that I'm aware of.

J. Bret Johnson Direct Examination                          9/29/2014

279

1  Q    All right.  Now, you do remember having conversations

2  with Ms. Spillars regarding the protest assembly zone; is that

3  correct?

4  A    I do.

5  Q    Did you -- you discussed various locations?

6  A    We did.

7  Q    All right.  What location did you give her for a PAZ?

8  A    I think what I gave her on the phone was 9026 West

9  Florissant.  It was adjacent to a furniture store.  It was an

10  old Ford parking lot.

11  Q    All right.  I think you heard today that what was

12  communicated was the grass lot across the street.  Is that

13  correct?

14  A    That is correct.

15  Q    All right.  That was just a miscommunication?

16  A    It was a miscommunication.  We were looking at a map at

17  the same time, and she thought I was talking about -- the

18  location we had found was the other side of the street, so

19  that was just a communication part.  She was -- she was in

20  Jefferson City.  I was on scene.

21  Q    And you -- ultimately, that patrol zone was -- that PAZ

22  was established?

23  A    It was.

24  Q    People -- not many people went there, did they?

25  A    They did not.

J. Bret Johnson - Cross-examination                    9/29/2014

280

1   Q    Okay.  And you stopped and you didn't really encourage

2   people to go there after a point in time; is that as far as

3   you knew?

4   A    As far as I know, yes.

5            MR. ISAACSON:  One moment, Your Honor.  I think I'm

6   done.  One moment, Your Honor.

7            I have nothing else, Your Honor.

8            THE COURT:  Cross-examination.

9            MR. DAVIS-DENNY:  May I proceed, Your Honor?

10           THE COURT:  Yes.

11           MR. DAVIS-DENNY:  Thank you.

12                        CROSS-EXAMINATION

13  BY MR. DAVIS-DENNY:

14  Q    By when did you determine that the "keep moving" rule did

15  not work as well as you'd hoped?

16  A    Probably I'd just guess somewhere around the 19th.

17  Q    And why did it not work as well as you'd hoped?

18  A    Probably because the crowds got too large and they --

19  when you'd get into the nightfall, they wouldn't adhere to the

20  verbal commands.

21  Q    Okay.  What strategy did you turn to instead?

22  A    We had started trying to identify the -- those that

23  caused violence, and we inserted arrest teams into the crowd

24  to arrest -- arrest them was the strategy that we started at

25  that time.

1   Q     And was that effective?

2   A     It was.

3   Q     Okay.  If you're called back in to Ferguson, do you

4   expect to use this "keep walking" rule again?

5   A     I don't know.  I'd have to say I would have to see

6   what -- what presents itself.  I can't say what's going to

7   happen next week.

8   Q     Your officers are still involved in Ferguson; is that

9   correct?

10  A     On an assistance basis, yes.

11  Q     Okay.  Have you given them any order not to assist the

12  Ferguson Police Department in enforcing a "keep moving" rule?

13  A     Well, the only thing that they've been told they cannot

14  enforce is city ordinance.

15            THE COURT:  I'm sorry.  Can you --

16            THE WITNESS:  They cannot enforce a city ordinance.

17  Q     (By Mr. Davis-Denny) Okay.  But my question was:  Have

18  you given an order to your officers to not assist the Ferguson

19  Police Department in enforcing a "keep moving" rule?

20  A     I have not.

21  Q     You were asked some questions about the protestor

22  assembly zone.  You had a conversation with Ms. Spillars; is

23  that correct?

24  A     Spillars, yes.

25  Q     Spillars?

1   A    She's the number two person at the Department of Public

2   Safety.

3   Q    Okay.  Did you speak with her the day of the temporary

4   restraining order hearing in this case?

5   A    I'm not -- not sure.

6   Q    Did you speak with her the day of August 18th?

7   A    I believe that was the day I spoke to her, yes.

8   Q    Okay.  Had you or one of your officers received

9   permission from the furniture store owner to -- to use that

10  parking lot when you had that conversation with Ms. Spillars?

11  A    The first conversation, I did not know the answer to

12  that.  I hung up the phone, and then Captain Johnson and I

13  drove down to that location and made contact with the -- with

14  the owner.

15  Q    Your -- your --

16          THE COURT:  So was this the furniture store parking

17  lot, or was it the old Ford dealership parking lot?

18          THE WITNESS:  It's the same place, Your Honor.

19          THE COURT:  It's the same place?

20          THE WITNESS:  Yes.

21          THE COURT:  And so you did go talk to the owner?

22          THE WITNESS:  Captain Johnson -- actually, we both

23  talked to him.  He talked to him personally.  I don't remember

24  if it was the 18th or the 19th, but during -- during that

25  time, I was not aware of the legal procedure that was going

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 283 of 316 PageID #: 981
J. Bret Johnson Cross-examination                            9/29/2014

283

1    on.  The only thing I was aware of is she was asking me to

2    find a location for the approved assembly area.

3    Q    (By Mr. Davis-Denny) Okay.  If another witness testified

4    that he witnessed Captain Ron Johnson having a conversation

5    with the furniture owner on -- the furniture store owner on

6    the 19th, you wouldn't disagree with that?

7    A    And I saw Mr. Doty.  I believe I talked to him actually

8    that day, too, so I -- I don't -- I didn't have a note what

9    day.  It was either the 18th or the 19th.

10        MR. DAVIS-DENNY:  Okay.  And, Mr. Bales, could you

11   please pull up Exhibit 3 real quick, just so we can clarify

12   this?  And if you'll -- first, pull out the title of the press

13   release.

14   Q    (By Mr. Davis-Denny) You may be able to read that without

15   us pulling it out, but do you see it says, "New Ferguson

16   Protestor Assembly Zone and Media Staging Area"?

17   A    Yes.

18   Q    And this is a press release from the Missouri State

19   Highway Patrol; is that correct?

20   A    Yes.

21        MR. DAVIS-DENNY:  Okay.  And if you -- Mr. Bales, if

22   you will please go down to the first paragraph under the one

23   that begins with emphasis, so it's, "An approved assembly

24   zone" --

25        THE COURT:  Why don't you just blow up the whole

284

1    text, and then you can ask him about specific things.

2            MR. DAVIS-DENNY:  Thank you.

3    Q    (By Mr. Davis-Denny) Do you see, sir, where it says, "An

4    approved assembly zone for protestors is being established at

5    the old Ford dealership building located at 9026 West

6    Florissant Avenue"?

7    A    Yes.

8    Q    Okay.  It had not been established the previous day; is

9    that correct?

10   A    No.  I think it was -- I actually think that it was

11   established.  I just don't think we had did a very good job of

12   notifying the protestors where it was.  I think we should have

13   done a better job there.

14   Q    Okay.

15   A    And that's -- I think that's the reason why -- you know,

16   how do you communicate to the masses but a press release, and

17   that's why we decided to do that.

18   Q    Okay.  The officers were not telling people on Florissant

19   Avenue about the protest area zone on the 18th at least; is

20   that correct?

21   A    I don't know what they were advising.

22   Q    Okay.  There was no instruction given by you or Captain

23   Ron Johnson as far as you know to officers that when they told

24   people to keep moving, they were supposed to tell people about

25   the protestor assembly zone; is that correct?

J. Bret Johnson Cross-examination                    9/29/2014

                                                              285

1    A    I was not aware of that.  Yes.

2    Q    I want to make sure I understand the rule that was

3    formulated.  It was an order -- it was an order to keep

4    moving.  People -- people were -- officers were told to order

5    protestors to keep moving on Florissant Avenue; is that

6    correct?

7    A    Well, I really personally wouldn't call it an order.  I

8    think it was a strategy that we implemented operationally, and

9    Captain Johnson explained it at the briefing, that that was a

10   strategy that we were going to -- going to use.

11   Q    Okay.  So there was not an order from the Highway Patrol

12   to the County that they had to implement this strategy; is

13   that correct?

14   A    Not that I recall, no.  That really wasn't the way the

15   Unified Command was operating anyway, so it wouldn't be like

16   we were ordering that.  It was discussed in briefing that that

17   was a strategy we were going to use.  I know there was lots of

18   discussion of -- about discretion.  I know we talked a lot

19   about it at that time because there were some other incidents

20   going on during that time with other police officers'

21   professional actions.  I know I talked a lot about patience

22   and respect.  So we talked about a lot of things when we

23   implemented that.  I know as the temperature got warmer

24   Captain Johnson also talked about we need to use lots of

25   discretion because it's hot.  We even actually provided water

286

1    during -- during those marches, the NAACP march and then the

2    100 Black Men that was on the 26th also.  So we provided a lot

3    of service as we were providing security also.

4    Q     Did you -- you mentioned in there that there were prior

5    incidents with officers.  I just want to understand what

6    you're referring to.  Are these incidents that gave you --

7    A     Unprofessional, yeah.

8    Q     Unprofessional actions by officers?

9    A     Unprofessional acts I'm talking about that were

10   dismissed.  I believe it was a St. Ann officer and then

11   another officer.  So we were constantly reminding our officers

12   about their conduct and discretion.

13   Q     Okay.  And did that cause you concern about granting your

14   officers excessive discretion to enforce or not enforce the

15   "keep moving" rule?

16   A     It did not.  I didn't really think about that

17   specifically because, you know, to do anything about it, you

18   would have to be enforcing the failure-to-disperse statute and

19   make the elements of that.

20   Q     Okay.  You don't believe that the "keep moving" rule was

21   the same thing as the failure-to-disperse statute, right?  In

22   your mind, they are separate things, right?

23   A     Oh, yeah, they're separate, yes.

24   Q     Okay.  Because, for example, with the "keep moving"

25   order, officers weren't required to declare an unlawful

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 287 of 316 PageID #: 985
J. Bret Johnson Cross-examination                    9/29/2014

287

1   assembly, right?

2   A    With the "keep moving" order?

3   Q    Yes.

4   A    No.

5   Q    And with the "keep moving" order, they weren't required

6   to declare a riot; is that right?

7   A    That's correct.

8   Q    And they weren't required to issue a verbal order to

9   disperse from the scene; is that correct?

10  A    Correct.

11  Q    Okay.

12       THE COURT:  What does it mean to declare a riot?

13  Somebody stands up and says, "I declare this is a riot"?  Your

14  questions seem to imply that the failure-to-disperse order

15  requires someone to somehow declare a riot, and I don't know

16  what that means.

17       MR. DAVIS-DENNY:  I think that actually is typical

18  police practice, Your Honor, as I understand it.  That is

19  the -- when there's --

20       THE COURT:  Somebody stands up and says, "I declare

21  this is a riot"?

22       MR. DAVIS-DENNY:  "I declare this crowd a riot," or

23  it can be an unlawful assembly in the case of -- you know, the

24  distinction between --

25       THE COURT:  Okay.  Well, I haven't heard any evidence

1   about that, but go ahead and ask your questions.  I was just

2   confused by the terminology, having not heard any evidence or

3   anything else about that.

4   Q    (By Mr. Davis-Denny) Okay.  Let's talk about the

5   refusal-to-disperse statute for a second.

6   A    Okay.

7   Q    When -- do you have experience with enforcing the

8   refusal-to-disperse statute?

9   A    Not personally but as a commander, yes.

10  Q    Okay.  Have you been trained on how to --

11  A    I've read the statute and discussed it with legal

12  counsel, yes.

13  Q    Okay.  And when you -- what is the typical Missouri State

14  Highway Patrol procedure when it comes to enforcing a

15  refusal-to-disperse statute when you see a crowd has gathered

16  of six or more people and they are acting violently to break

17  the law?  What happens next?

18  A    You would have -- you would have to identify -- because

19  the six or more people would have to gather to commit a crime,

20  you would identify that crime, and that would be an element of

21  that failure to disperse.

22  Q    Okay.  And is it true --

23            THE COURT:  When you say you would have to identify

24  it, what do you mean?

25            THE WITNESS:  Identify another crime that those six

289

1    people unlawfully -- whether they threw rocks, Your Honor, or

2    in this instance --

3             THE COURT:  Yeah, and I think I get that part.  What

4    I'm trying to get was:  What do you mean by -- is "identify"

5    the same thing as "declare"?

6             "I identify" -- you have to say it out loud to the

7    people?

8             THE WITNESS:  No.

9             THE COURT:  "I see that there are six people here.  I

10   declare a riot."  Is that what you have to do?

11            THE WITNESS:  No, Your Honor, not that I'm aware of,

12   and we've had -- you know, this has been going on since, you

13   know, the 9th or 10th, and I haven't heard anyone declare a

14   riot either, but I think we've had one.

15   Q   (By Mr. Davis-Denny) Okay.  Do you -- is the typical

16   practice when you're enforcing the refusal-to-disperse statute

17   to first issue an order to disperse?

18   A    Yes.

19   Q    Okay.  And if someone fails to disperse after an issue

20   has been properly ordered under the -- if you're enforcing the

21   refusal-to-disperse statute, then you can arrest them for

22   refusal to disperse is your understanding of how it works?

23   A    Yes.

24            MR. DAVIS-DENNY:  Okay.  Thank you.  Thanks for

25   clarifying that.  Thank you, Your Honor, for clarifying.

290

1   Q    (By Mr. Davis-Denny) Now, under the "keep moving"

2   statute, if they were told to keep moving --

3            MR. ISAACSON:  Statute?

4            THE COURT:  Not statute but --

5            MR. DAVIS-DENNY:  I'm sorry.

6            THE COURT:  Yeah, we're all getting tired.  Go ahead.

7   Yeah.  The idea of the strategy?

8   Q    (By Mr. Davis-Denny) Yes.  Under the "keep moving"

9   strategy, I just want to make sure I understand how it worked

10  again.  If someone was told to keep moving and they refused to

11  keep moving, then what was supposed to happen?

12  A    To make an arrest, you would have to make the elements of

13  the failure to disperse.

14  Q    Okay.  So they would -- are you saying that they would

15  not have been arrested simply for failing to move?

16  A    Yes.

17  Q    Okay.  And so if -- if any officers told protestors that

18  "If you don't keep moving, you will be arrested," they were

19  not following or they were incorrectly exercising their

20  discretion under the policy; is that correct?

21  A    I don't know of that happening firsthand, but under your

22  example, I would agree with you.

23            MR. DAVIS-DENNY:  Okay.  That's all I have.  Thank

24  you.

25            THE COURT:  Further questions?

Case: 4:14-cv-01436-CDP  Doc. #: 63  Filed: 12/02/14  Page: 291 of 316 PageID #: 989
J. Bret Johnson Cross-examination                    9/29/2014

291

1          MR. SHUMAN:  Yes, Judge.

2          THE COURT:  Go ahead.

3                    CROSS-EXAMINATION

4   BY MR. SHUMAN:

5   Q    Major, a few moments ago, the attorney asked you whether

6   there was an order that the County Police had to obey.  Did

7   you take that to mean a written directive?

8   A    Yes.

9   Q    Okay.  Is there any doubt that once the Highway Patrol

10  and Captain Johnson decided that the strategy of the "keep

11  people moving" was decided that every other law enforcement

12  agency there -- City of St. Louis, St. Louis County, Ladue,

13  Florissant, all the ones that Ms. Elzie described -- had to

14  implement that strategy?

15         MR. DAVIS-DENNY:  Objection.  Leading, Your Honor.

16         THE COURT:  Overruled.

17  A    I would not say that about the other.  I would only say

18  that about the agencies in the Unified Command.  The other

19  agencies are not part of the Unified Command.  There would be

20  no expectations for them to follow that order.

21         MR. SHUMAN:  Okay.  And, Judge, can I --

22  A    And really it was a strategy.  It wasn't an order.  So,

23  yeah, they would -- but they would be expected to do so since

24  he was the Incident Commander.

25         MR. SHUMAN:  Judge, can I approach the witness,

292

1  please?

2          THE COURT:  You may.

3          MR. SHUMAN:  I hand you what was marked County

4  Exhibit C.

5  Q   (By Mr. Shuman) A little bit ago, you said that the

6  Highway Patrol was no longer the lead agency.

7  A   Uh-huh.

8  Q   Now, do you recognize what this County Exhibit C is?

9          MR. ISAACSON:  Can you put it up?  I don't --

10          THE WITNESS:  Yeah.  I was going to say I can't --

11          THE COURT:  Would you put a copy on the screen for

12  us, please?

13          Have you ever seen this before?

14          THE WITNESS:  I have not.

15          THE COURT:  Do you know what it is?

16          MR. SHUMAN:  I was going to ask him to authenticate

17  it.  If the man's never seen it, I can't ask him that.

18          THE WITNESS:  No, I've never seen this.

19          THE COURT:  Okay.

20  Q   (By Mr. Shuman) Do you mind reading the last paragraph?

21          THE COURT:  Is there a dispute about what this is?

22  Can we agree, admit this by stipulation?

23          MR. DAVIS-DENNY:  That's fine, Your Honor.

24          THE COURT:  Exhibit C is received into evidence.

25          MR. ISAACSON:  That's fine.

293

1          THE COURT:  And now you can have him read it.  The

2     "Now, therefore" paragraph?

3          MR. SHUMAN:  Yes, please.

4     A     "Now, therefore, I, Jeremiah W. (Jay) Nixon, Governor of

5     the State of Missouri, by virtue of the authority vested in me

6     by the Constitution and laws of the State of Missouri,

7     including Chapter 44 R.S.Mo., do hereby terminate Executive

8     Order 14-08, including the State of Emergency established

9     therein, and terminate Executive Order 14-09."

10          MR. SHUMAN:  And that will be all the questioning.

11     Thank you.

12          THE COURT:  All right.  Anything further from this

13     witness?

14          MR. ISAACSON:  No, Your Honor.

15          THE COURT:  Okay.  I have a couple of questions.

16          THE WITNESS:  Yes, Your Honor.

17          THE COURT:  So when -- on this "keep moving"

18     strategy, as the shorthand way of saying it, people are going

19     to keep moving.  I believe there's been testimony -- I think

20     you said it -- that there was going to have to be some

21     discretion used.  The officers were going to have to use their

22     discretion.  Now, you just answered some questions about, you

23     know, determining when the failure-to-disperse law has been

24     violated.  What discretion were they supposed to exercise?

25     What were the factors they were supposed to consider in

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 294 of 316 PageID #: 992
J. Brett Johnson     9/29/2014 Preliminary Injunction Hearing

294

1   exercising their discretion in whether to tell people to keep

2   moving?

3          THE WITNESS:  It certainly wasn't the elements of the

4   failure to disperse.  It was only on the size of the crowd.

5   You know, earlier, earlier in the evening, the crowds were not

6   very large, and so it wasn't as important to implement that on

7   every person unless they started grouping up.  So just to use

8   discretion just because if one person happened to stop, there

9   wasn't a need for them to come off their post or their

10  location and tell them to keep moving.  It's only whenever the

11  crowd started being larger.  So use discretion in how you

12  implemented it that way.

13         THE COURT:  Okay.  So the only thing you've told me

14  that would be part of the discretion is the number of people

15  in the crowd?

16         THE WITNESS:  That and when to utilize it, yes.

17         THE COURT:  And what's the "when"?

18         THE WITNESS:  Whenever there would be enough people

19  there that if they started formulating out they would either

20  get into the roadway or block the sidewalk.

21         THE COURT:  And so your testimony is the strategy was

22  to only use it during those kinds of situations?

23         THE WITNESS:  That's -- that was the intent of it.  I

24  don't think that it was communicated as well, but that was

25  certainly the intent.

Case: 4:14-cv-01436-CDP   Doc. #:  63   Filed: 12/02/14   Page: 295 of 316 PageID #: 993
9/29/2014 Preliminary Injunction Hearing

295

1          THE COURT:  Okay.  All right.  Thank you.

2          All right.  Anything further?

3          MR. ISAACSON:  No, not from us, Your Honor.

4          THE COURT:  Okay.  So you can step down.

5          THE WITNESS:  Thank you.

6          THE COURT:  And let's see.  Mr. Shuman, would you

7    take your exhibit back off the witness stand?

8          And then -- all right.  I need to hear argument.

9    It's very late in the day.  How do you all want to proceed?  I

10   mean we'll keep going.  That's, I think, what we need to do,

11   but --

12         MR. DAVIS-DENNY:  Yes, I'm happy to.

13         THE COURT:  -- unless you want to come back in the

14   morning and argue, which I don't think you do.

15         MR. DAVIS-DENNY:  Either way is fine with me.

16         THE COURT:  Well, go ahead.  Tell me what you -- tell

17   me what you think you want me to do.  Go ahead.  You can step

18   to the lectern and make your argument, any argument you want.

19   I have some questions, but --

20         MR. DAVIS-DENNY:  Yes.

21         THE COURT:  -- I'll ask you to say whatever you'd

22   like at this point.  And I have read all the briefs and

23   everything, so I'm not suggesting you need to start at the

24   beginning.

25         MR. DAVIS-DENNY:  Yes.  Well, I would welcome any

 1    questions that Your Honor has.  I don't -- I do not want to

 2    waste Your Honor's time at this point of the day in

 3    particular, and I appreciate Your Honor's patience today.

 4         I think at the TRO hearing Your Honor, although

 5    denying the TRO, was one of the first to, I think, recognize

 6    the serious due process implications that are presented by

 7    this law, in particular, the lack of notice that it gives to

 8    people of what it actually does and does not allow and the

 9    excessive discretion that it gives to officers, and it turns

10    out now with the benefit of more time and being able to talk

11    with more witnesses that those, I think, concerns were

12    well-founded.

13         As we've heard today, discretion was built into the

14    very foundation of this policy.  It was intended to be

15    discretionary.  Captain Bader testified about how it gave --

16    how they gave him, quote, a lot of discretion.  Chief Belmar

17    used the phrase --

18         THE COURT:  Yeah, okay, but police officers always

19    have to exercise discretion.  So discretion by itself is

20    not -- you know, the requirement that you exercise discretion

21    is not by itself a problem.  Every police officer who walks a

22    beat has to exercise discretion every minute he's out there,

23    and there's nothing unconstitutional about that.

24         MR. DAVIS-DENNY:  That's fair, Your Honor, but here,

25    the discretion that was granted, as we've heard, was -- was

1   not acted upon in a way that was at all consistent or that the

2   individuals on the sidewalks could understand what it meant.

3   At times, it meant you couldn't stand still at all.  At times,

4   it meant you couldn't stand still for more than five seconds.

5   At times, it meant you were walking too slowly; you must walk

6   faster.

7           And particularly when this is occurring in the

8   context of core First Amendment dialogue about police

9   practices, about race relations, what is undoubtedly at the

10  essence of the First Amendment, I think that that excessive

11  discretion and the lack of notice are truly problematic.  And,

12  indeed, Your Honor, I think the lack of notice issues and the

13  haphazard nature in which the rule was enforced really go to a

14  number of different issues in this case.

15          One, of course, is the due process concern that we've

16  already talked about, but I think it also goes to the

17  appropriate tests that you would apply if you got past the due

18  process issue and you started looking at this as a pure First

19  Amendment case.  A time, place, and manner test assumes that

20  you are not giving officers excessive discretion to enforce

21  the law.  It assumes a neutral statute that is easily applied.

22          It also, I think, raises content neutrality concerns

23  that would also ratchet up the level of scrutiny that you

24  would apply if this were -- if you reached the First Amendment

25  analysis, but I think it also has important implications for

Case: 4:14-cv-01436-CDP   Doc. #:  63   Filed: 12/02/14   Page: 298 of 316 PageID #: 996
9/29/2014 Preliminary Injunction Hearing

298

1    the public safety interests, and it has implications in a

2    couple of different ways.  One is we've heard testimony from a

3    variety of witnesses today that the -- the rule and, in

4    particular, its haphazard enforcement actually has the

5    perverse effect of increasing tensions in the area.  We heard

6    that from percipient witnesses.  We heard that --

7            THE COURT:  Let me ask you this.  What about in the

8    nighttime hours where violence is happening or beginning to

9    happen as did happen in this case?  Are you saying it could

10   never be used; they could never tell people to move along in

11   that situation or keep moving?

12           MR. DAVIS-DENNY:  No, I'm not telling -- that is not

13   my argument.  If there is a -- an unlawful assembly or a riot,

14   then they certainly have the --

15           THE COURT:  So --

16           MR. DAVIS-DENNY:  Yes.

17           THE COURT:  Right.  So your argument is the only

18   thing police officers can do in this instance where there is a

19   large crowd gathering and violence is either beginning or it

20   appears to be beginning -- the only thing they can do is order

21   the crowd to disperse?

22           MR. DAVIS-DENNY:  Well, no, I wouldn't go that far

23   either, Your Honor.  We heard about options that the Highway

24   Patrol implemented after they determined that this policy

25   actually was not effective.  It involved putting teams of

1 officers in the crowd, stationed throughout the crowd, and

2 that that, apparently, was an effective strategy.  So, no, I'm

3 not saying that that is the only thing that they can do, but

4 to answer your earlier question, it certainly would not -- the

5 injunction that we're seeking certainly would not prohibit

6 them from dispersing an unlawful assembly or a riot.

7         THE COURT:  What about the issue that they say

8 they're not doing it and they're not in control?  You've -- I

9 mean, have you sued the right Defendants?  Ferguson is not a

10 Defendant in this case nor is anybody associated with

11 Ferguson.

12         MR. DAVIS-DENNY:  Right.  I think the evidence shows

13 that both the Highway Patrol and the County are still involved

14 in law enforcement efforts in Ferguson is the first answer.

15 The second answer is that Ferguson clearly is enforcing, as we

16 saw from the video earlier.  Ferguson --

17         THE COURT:  Well, those videos -- the officers in

18 those videos kept referring to the loitering ordinance, which

19 has not been raised in this case until I heard it from those

20 officers, and I assume that that means that Ferguson must have

21 some kind of a loitering ordinance and that's what those

22 Ferguson police officers were relying on, or at least that's

23 what they were saying, right?

24         MR. DAVIS-DENNY:  That's correct.  That's correct.

25         THE COURT:  So that's a little different, isn't it?

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 300 of 316 PageID #: 998
9/29/2014 Preliminary Injunction Hearing

300

1          MR. DAVIS-DENNY:  It is.  It is a different basis

2     than what the Highway Patrol and the County had relied upon.

3     It has its own problems, including that the ordinance requires

4     that you be blocking the sidewalks so that others can't get

5     past, but setting that issue aside, it is.

6          So I think the other answer is that the Highway

7     Patrol and the County remain on -- you know, you can debate

8     what level of likelihood it is that they will get involved,

9     but there is a significant likelihood that they will get

10    reinvolved, and the evidence of that includes the fact that

11    tensions are still high in Ferguson.  That was testimony that

12    you heard from a couple of different fact witnesses.

13         You also heard, I thought, some very illuminating

14    testimony from one of the County's witnesses, Captain Bader,

15    who said on direct examination that if he were sent back in

16    there -- out there again today, he would enforce the same

17    "keep moving" rule.  I think that easily meets the likelihood

18    of irreparable harm test.

19         And I think back to Your Honor's *Iron Hills Schools*

20    case from a few years ago where there certainly was not a

21    certainty after the school district changed its policy that

22    Bibles would again be distributed in fifth grade classrooms,

23    but there was significant evidence based on past practices and

24    statements that --

25         THE COURT:  Didn't the Eighth Circuit reverse me on

1    that case?

2              MR. DAVIS-DENNY:  No.  You were affirmed.

3              THE COURT:  And so I -- yeah, well, but only --

4              MR. DAVIS-DENNY:  You were affirmed, Your Honor.

5              THE COURT:  Okay.  Well, I'm not sure that they

6    agreed with that analysis, so go ahead.

7              MR. DAVIS-DENNY:  There were -- that's fair, Your

8    Honor, but I think that part of your decision was absolutely

9    correct.  I mean there are -- as a --

10             THE COURT:  As I recall it, they affirmed part it of

11   and said I was completely wrong on other parts of it, so I'm

12   not sure which part they thought I was wrong about.

13             MR. DAVIS-DENNY:  Yeah, well, I think -- if you want

14   to get into it, Your Honor, I'm happy to have a longer

15   discussion about it, but given the hour, I don't want to get

16   too far off track here, but I think that portion of your

17   opinion does remain good law.

18             In any event, there is a wealth of law out there that

19   does not require certainty of irreparable harm.  It's a

20   likelihood of irreparable harm, and here, I think we've met

21   that standard based on the fact that it's still being

22   enforced, the testimony of Captain Bader about how he would

23   enforce it again if he goes back in there.  Of course, the

24   Plaintiff's own testimony that this is part of his job to go

25   to that area and that if there -- we heard about the major

Case: 4:14-cv-01436-CDP   Doc. #:  63   Filed: 12/02/14   Page: 302 of 316 PageID #: 1000
9/29/2014 Preliminary Injunction Hearing

302

1   protest rally that's being planned for a couple of weeks from

2   now that will draw several thousand people back to St. Louis.

3   So I think there is a high likelihood that we will see the

4   Highway Patrol or the County get reinvolved.

5            THE COURT:  All right.  Thank you.

6            I'll hear anything from the Defendants.

7            MR. SHUMAN:  Judge, your question that you asked

8   before is what is it that you want -- that we want you to do,

9   and I don't want to repeat much about what has been briefed,

10  but I don't believe you've heard anything today that would

11  lead you to believe that this -- the policy or the strategy,

12  whatever we term it, was anything other than something that

13  was directed by the State.  Now, plainly, the County had a lot

14  to do with the proposal of it, but it's just as plain -- and

15  the County agrees that it was a good idea and to some extent

16  effective.

17           THE COURT:  So your argument is, "The County can't be

18  enjoined because we were just doing what the Highway Patrol

19  told us to do."  I mean that's in your brief, I know, but is

20  that basically what you're saying?

21           MR. SHUMAN:  Well, essentially, that's what it is.  I

22  don't mean to make light of it by saying that was the -- like

23  to do a Nuremberg defense.  I don't mean to put it like that.

24  What I'm saying is in order to have an injunction against

25  St. Louis County, the goverant -- under a 1983 jurisprudence,

Case: 4:14-cv-01436-CDP   Doc. #:  63   Filed: 12/02/14   Page: 303 of 316 PageID #: 1001
9/29/2014 Preliminary Injunction Hearing

303

1    there needs to be evidence that this policy or strategy was a

2    custom, practice, or policy of a final policymaker of

3    St. Louis County.  There's no evidence at all to suggest that

4    this was made by a final policymaker of St. Louis County.

5           Now, there were a few random instances of County

6    police officers telling people what they had to do and to

7    comply with this rule, but that hardly rises to the level of

8    it being a County custom because a few officers were told --

9    made statements about this.  Plus, you have to find --

10          THE COURT:  Well, hold on.  So what you're saying is

11   even though your own captain said he would do it tomorrow if

12   he were out there because this is the policy -- how many

13   people -- that it's not a policy first, right?

14          MR. SHUMAN:  Say --

15          THE COURT:  Your own witness said he would use this

16   again if he went out there tomorrow, right?  He's never been

17   told it's not the rule.

18          MR. SHUMAN:  As I understood it, yes, because he has

19   never been told not to, but that doesn't make it the County's

20   policy.  It means he's under the belief that what the State

21   says still goes today.

22          THE COURT:  Well, there are times when things don't

23   have to be written policies but there's sufficient custom.

24   You said a few random officers.  So are you saying that -- I

25   mean, how many would be enough in evidence?

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 304 of 316 PageID #: 1002
9/29/2014 Preliminary Injunction Hearing

304

1          MR. SHUMAN:  I don't know, but not enough -- not that

2     we saw.  We don't know who they were.  The only -- we saw

3     people testify that those statements were made by people in

4     tan officer -- in tan uniforms.  Only one of them was

5     identified as a County officer.  The others, they said, "Well,

6     I don't even know if they were County officers.  They may have

7     been."  There were so many jurisdictions there; who knows what

8     other uniform colors they are.  I don't know what all the

9     colors they are.  So I only heard one person actually

10    identified positively as a County officer.  So I don't know

11    what the answer to -- to your question is, if there's a

12    minimum threshold, but it's -- it's got to be -- I think the

13    case law uses the term "widespread."  There's nothing at all

14    about a few that would be widespread.

15         THE COURT:  So even if -- even though at the roll

16    call, the officers are being directed to do this, you don't

17    believe that rises to the level because whoever was doing the

18    directing wasn't high enough up in the organization; is that

19    what you're saying?

20         MR. SHUMAN:  No, not at all.  The roll call

21    directions were given because, ultimately, Captain Johnson

22    gave the directive that that was to be followed.  What I'm

23    suggesting is that if we want to say that an individual

24    officer violated the constitutional rights of a protestor,

25    unless there's a number of them -- and I submit that it's more

1    than three -- then the -- the County can't be tagged with

2    respondeat superior liability for an unconstitutional act of a

3    police officer if they were unconstitutional.  I've not

4    conceded that they were, but even if they were, you'd have to

5    have widespread custom of doing this unconstitutional act.

6          I don't want to spend too much time defending the

7    reasonableness of this policy, although every -- all of the

8    County witnesses, if asked, would agree that it was

9    reasonable, but I will suggest that Mr. Rothert was asking you

10   to think that the policy was not a good one not on the basis

11   of it being -- hurting people's free-speech rights but because

12   it was not effective, it would have some negative effects, and

13   I think that's what the expert witness -- that I can't recall

14   his name -- was suggesting, that the policy simply wasn't a

15   good one, it didn't comply with best practices, but he never

16   testified about what effect it would have on constitutional

17   rights of people, and I think that's what the Plaintiffs are

18   suggesting.  They disagree with the utility of the policy, and

19   I don't think -- I hope that you won't pay attention to the

20   utility of the policy.  It's not the Court's role.

21         I think that will conclude my remarks.

22         THE COURT:  Thank you.  Mr. Isaacson.  In your brief,

23   you said that -- that they were -- the Plaintiffs were

24   essentially asking me to order that they not -- that you all

25   not follow the failure-to-disperse law, and the brief seems to

1    equate the failure-to-disperse statute with what was -- what

2    this case is about, whatever you want to call it, the "keep

3    moving" policy or strategy.  "Keep moving" strategy seems to

4    not draw too many objections.  So you're not still saying

5    those are the same things, are you?

6         MR. ISAACSON:  Yeah, they're -- they are two

7    different things.  I mean, what the evidence was is there was

8    a strategy and that, you know, we could apply it, but any

9    arrests that had to be made would be pursuant to that statute.

10        THE COURT:  Okay.  All right.  Go ahead.

11        MR. ISAACSON:  Okay.  And, you know, just being here

12   all day and being brief, I haven't heard one person say a

13   Missouri State Highway Patrol member enforced this or did

14   badly with regard to any of this or told anybody to get moving

15   when there wasn't a riot present or anything.  Haven't heard

16   anything like that.

17        The evidence is also uncontradicted that we weren't

18   doing this after a couple of days.  Okay.

19        THE COURT:  So St. Louis County says, "We're not

20   liable because Captain Johnson made us do it," and you're

21   saying, "We're not liable because -- or because the Highway

22   Patrol didn't go out and do it themselves; they told the

23   County to do it."  That seems a little circular.

24        MR. ISAACSON:  Okay.  The question here is whether

25   we're enjoining.

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 307 of 316 PageID #: 1005
9/29/2014 Preliminary Injunction Hearing

307

1          THE COURT:  Right.

2          MR. ISAACSON:  Okay.  And what the evidence is and

3     they're -- as with any human beings, especially the ones who

4     were working 20 hours a night and everything, they're not

5     going to remember it the same way, okay, but what the evidence

6     is is there's nothing here that says we were applying that in

7     any sort of unconstitutional manner.

8          I would suggest that, you know, they brought in

9     individual instances.  Well, understand with the numbers that

10    we're talking about, those are very isolated instances in

11    terms of the contacts that were going on among hundreds of

12    officers and hundreds and thousands of protesters.  I don't --

13    I'm not here to argue for him, but I mean I don't think that's

14    a sufficient number to even go to the County, okay, but that's

15    an aside.  But what we are saying is, okay, A, you know, we

16    weren't doing it wrong.  Okay.  There was two different

17    things.  B, we weren't even doing it after awhile, and that

18    was before we stopped being lead agency there.  Essentially,

19    things had wound down with our involvement on the 27th.  They

20    officially wound down by the 3rd.  There's nobody here who

21    says -- who would testify that we participated in any manner

22    with regard to enforcing either this strategy or this statute

23    since that time.  So they are asking that you essentially

24    enjoin conduct based on complete speculation, based on what

25    might happen in the future with regard to events in other

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 308 of 316 PageID #: 1006
9/29/2014 Preliminary Injunction Hearing

308

1    locations, based on other things that none of us here can know

2    about, and it is our position that the Court should be

3    reticent to do that because of the interests cited in the

4    cases about courts having to deal with day-to-day police

5    issues, especially in the circumstances we've heard about

6    where there are rapidly changing circumstances, where people

7    are getting injured, people may die, and we think it is very

8    important that these officers, to the extent whatever happens,

9    have as much freedom to deal with that situation as they can

10   within constitutional limits, and as we sit here, nobody has

11   come up here and testified, "That Missouri State Highway

12   Patrol guy told me to move along, and, you know, there was no

13   riot."

14          Okay.  So we really -- based on all that, we believe

15   an injunction, a preliminary injunction, is just -- would not

16   be warranted in this instance.

17          THE COURT:  Mr. Davis-Denny, I'll hear any response.

18   Yeah, unless you want to say anymore.

19          MR. ISAACSON:  No.

20          THE COURT:  No.  I was going to ask him.

21          MR. ISAACSON:  I don't want to leave until you tell

22   me I can.

23          THE COURT:  No.  That's fine.

24          MR. DAVIS-DENNY:  I'll try and keep it brief, Your

25   Honor, on *Monell* liability.

Case: 4:14-cv-01436-CDP  Doc. #:  63  Filed: 12/02/14  Page: 309 of 316 PageID #: 1007
9/29/2014 Preliminary Injunction Hearing

309

1          THE COURT:  Yeah, that's the main point I'd like to

2     hear your response on.  I mean you can say anything else, too,

3     but what about that?

4          MR. DAVIS-DENNY:  Right.  First thought, Your Honor,

5     is that on the -- there's really, I think, two different

6     points related to *Monell* that are being conflated here, and I

7     want to separate them out because I think analytically it will

8     be easier to deal with them separately because they are.  The

9     first is:  Is it a widespread enough custom that it is

10    attributable to the County as a policy or a custom, right?

11    The second issue which needs to be separated out is:  Is this

12    a State order that the County is required to comply with?  And

13    I think those are two separate issues.

14          So let's take the custom or practice.  I mean I think

15    the question it raises in my mind is:  If bringing in five

16    percipient fact witnesses who experienced being subjected to

17    the rule isn't enough, what more must one do at a preliminary

18    injunction hearing to show that this was a widespread custom?

19    Of course, you're not relying just on testimony either, Your

20    Honor.  You've seen videos of County officers enforcing it and

21    not just one video but two different videos of County officers

22    enforcing the rule, and you've seen it in broad daylight when

23    there was no violence or unlawful activity going on, when even

24    the Defendants' witnesses seemed troubled that that was the

25    way that the rule was being enforced, and in several

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 310 of 316 PageID #: 1008
9/29/2014 Preliminary Injunction Hearing

310

1   instances, we know that there weren't large numbers of people

2   being gathered around.  These were -- you know, for example,

3   in Exhibit 2, we have four people stopping to pray.  So that's

4   the answer on custom or practice -- or policy.  And clearly,

5   policy is being formulated here at the highest levels of

6   County government because we know that the Chief was involved

7   in formulating the policy.  So that's one end of the *Monell*

8   liability issue.

9        The other end of the *Monell* liability issue is

10  whether this was an order from the State such that the County

11  simply became an arm of the State and isn't subject to 1983

12  liability, and I think the answer to that is clearly no.  The

13  test, which I think the parties agree on, is that if a county

14  is authorized but not required to enforce a state statute, for

15  example -- that's typically the way this comes up -- then a

16  county can still be subject to *Monell* liability in that case.

17  That's *Vives* case out of the Second Circuit.  The *Snyder* case

18  out of the Seventh Circuit refers to situations where the

19  county has discretion, and here, this is, I think, a very

20  different situation than those, the cases where *Monell*

21  liability has been rejected for counties because here we know

22  that the County was actively involved in formulating and

23  recommending the "keep moving" plan.

24       Chief Belmar testified that this rule was made in

25  collaboration.  Major Johnson refused, even on leading

Case: 4:14-cv-01436-CDP  Doc. #: 63  Filed: 12/02/14  Page: 311 of 316 PageID #: 1009
9/29/2014 Preliminary Injunction Hearing

311

1   questions, to go along with the notion that this was an

2   explicit order that was given.  It was a strategy, as he

3   continually referred to it as, and it was a strategy that was

4   formulated with the active involvement of the County's top

5   officials, so they are liable under *Monell*.

6       I think the other argument, the principal other

7   argument that the Defendants make, that I would just briefly

8   address is the point of whether the injunction would harm

9   public safety or whether the rule was necessary for public

10  safety, and I think, you know, you can look back at the expert

11  testimony, for example, of Dr. Ginger, and the point is not

12  that we're trying to second-guess the policies that are put in

13  place, but the point is if hardly any other city out there or

14  hardly any -- in fact, none of the model policies that we know

15  about refer to a "no standing" rule or a five-second rule.

16  Then it really undercuts the notion that this is in any way a

17  necessary component of -- of police practice and strategy, and

18  of course, that's a relevant consideration if you get to the

19  time, place, and manner test.  I'm not sure it is a relevant

20  consideration, frankly, under due process.  If there is a due

21  process --

22      THE COURT:  Well, hold on.  On the -- on the -- on

23  the standards for a preliminary injunction, the public

24  interest is a relevant consideration, and --

25      MR. DAVIS-DENNY:  That's fair, Your Honor.

1      THE COURT:  -- and one of the questions I have is

2  just, you know, how much should -- are you asking a court to

3  get involved in micromanaging what the police do in an

4  evolving situation and whether that could hurt the public

5  interest.

6      MR. DAVIS-DENNY:  Right.

7      THE COURT:  And, you know, there's been a lot of

8  violence, but as I think the first witness said or one of the

9  witnesses said, you know, nobody has been killed out there,

10  but I'm -- that still could happen.  I mean, should I be the

11  one micromanaging this?  I don't think it's a judge's role.

12      MR. DAVIS-DENNY:  Micromanaging, I wouldn't

13  necessarily endorse, but I don't think this requires you to

14  micromanage.  This is a policy that they've abandoned as

15  ineffective is what they say, and at the same time, they tell

16  us -- you know, another witness tells us that if they go back

17  out there again, they'll start enforcing it again.

18      But two responses to the public interest factor.  One

19  is that the public interest, of course, swings both ways here.

20  The public always has an interest in protecting First

21  Amendment freedoms, but I'll also go back to my earlier point

22  that there is abundant testimony in the record that this

23  actually harms safety because when you apply a policy

24  inconsistently to people in this type of situation, it raises

25  tensions, and I think what we've seen over the weeks of the

1   Ferguson, you know, incidences is that when there's, you know,

2   good communication and police and protestors are working

3   together, these situations can be managed, and I think that's

4   even what their evidence indicates.

5           So I don't think the public interest weighs one way

6   and the likelihood of success on the merits weighs another way

7   here.  I think the public interest here favors enjoining this

8   law because I think it will actually reduce tensions.  It will

9   send a very positive message to the protestors out there that

10  arbitrary laws will not be condoned.

11          THE COURT:  Okay.  I interrupted you where I think

12  you told me -- well, you had just said -- you were getting

13  into due process and whether this was a consideration.  Was

14  there anything else you wanted to add about that since I

15  interrupted you?

16          MR. DAVIS-DENNY:  Oh, Your Honor, I think this is a

17  point that I didn't make earlier, and there is case law, and

18  we've cited it in our brief.  Simply to make the point that

19  the public safety does not justify laws that give citizens

20  undue notice of what's allowed and what isn't allowed or that

21  gives the police excessive discretion, and (a) that's

22  governing precedent, but I think it reflects a very sound

23  thought, which is that laws that are haphazardly applied, per

24  se, can't be effective.  They can't achieve what they are

25  intended to achieve, particularly, when people don't know

1     what -- when they'll run afoul of the law and when they won't.

2           THE COURT:  Anything further from either of the

3     Defendants?

4           MR. ISAACSON:  No, not from us.

5           MR. SHUMAN:  At the risk of being repetitive, we all

6     know there was no written order from the State to the County

7     to do this, but we heard from, well, each of the witnesses

8     that addressed it that the different partners of the Unified

9     Command would propose something; Captain Johnson okayed it; it

10     happened.  If Captain Johnson did not okay it, it didn't

11     happen, and if that doesn't make it a State policy and not a

12     County policy, I just don't know what does.

13           I think Mr. Rothert described the effect of the *Vives*

14     case correctly, but you have to think that this -- in order to

15     think that that would operate against the County, you have to

16     think that it was simply not something that the County had

17     discretion.  I think the *Vives* case uses the word "made a

18     conscious decision to follow this," and I don't see how they

19     could have made a conscious decision when it was Captain

20     Johnson that said, "Yes, let's go with it," and that they --

21     if Johnson had said, "Let's not go with it," when we don't,

22     that's not a conscious decision.  You ought to be guided by

23     *Vives* and not attribute *Monell* liability to the County.

24           THE COURT:  All right.  Thank you.  I'm going to take

25     this all under submission.  I will rule on it as soon as I

1   can.  And I would ask counsel to make sure that I do have a

2   set of each of the exhibits.  Like I say, I've already got --

3   I've got Plaintiff's Exhibit 1 and Plaintiff's Exhibit 2

4   already as part of the pretrial filings, so I will also give

5   you back the ones I already have up here, so you can -- so I

6   can end up with just one copy, and so please leave those with

7   the clerk, and like I say, I'll take it under submission.

8           MR. ISAACSON:  I did not move for D through G because

9   they're already in.

10          THE COURT:  That's fine.  Yeah, that's -- actually,

11  yeah, less paper is good.  Okay.  So court's in recess.

12      (Proceedings concluded at 5:09 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 4:14-cv-01436-CDP   Doc. #: 63   Filed: 12/02/14   Page: 316 of 316 PageID #: 1014
9/29/2014 Preliminary Injunction Hearing

316

<u>CERTIFICATE</u>

        I, Gayle D. Madden, Registered Diplomate Reporter and
Certified Realtime Reporter, hereby certify that I am a duly
appointed Official Court Reporter of the United States
District Court for the Eastern District of Missouri.

        I further certify that the foregoing is a true and
accurate transcript of the proceedings held in the
above-entitled case and that said transcript is a true and
correct transcription of my stenographic notes.

        I further certify that this transcript contains pages
1 through 315 inclusive.

        Dated at St. Louis, Missouri, this 1st day of
December, 2014.


                    _____

                            /s/ Gayle D. Madden

                        GAYLE D. MADDEN, CSR, RDR, CRR

                        Official Court Reporter